QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Shon Morgan (Bar No. 187736)
  shonmorgan@quinnemanuel.com
  Joseph R. Ashby (Bar No. 248579)
  josephashby@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

  Karin Kramer (Bar No. 87346)
  karinkramer@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:   (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for Defendants Hyundai Motor
America and Hyundai Motor Company

DYKEMA GOSSETT PLLC
  James P. Feeney (219045)
  *jfeeney@dykema.com*
  Benjamin W. Jeffers (P57161)
  *bjeffers@dykema.com*
  Dommond E. Lonnie (142662)
  *dlonnie@dykema.com*
333 S. Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 487-1800
Facsimile: (213) 487-1850

Attorneys for Defendant Kia Motors
America, Inc.

[LIST OF COUNSEL CONTINUED ON NEXT PAGE]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| In Re: | No. MDL 13-2424-GW(FFMx) |
| HYUNDAI AND KIA FUEL ECONOMY LITIGATION | **DEFENDANTS' STATUS CONFERENCE REPORT** |
| THIS DOCUMENT RELATES TO: | Date:        Aug. 15, 2013 |
| ALL ACTIONS | Time:        9:30 a.m. |
| | Courtroom:  10 |
| | Hon. George H. Wu |

HOGAN LOVELLS US LLP
  Dean Hansell (Bar No. 93831)
  dean.hansell@hoganlovells.com
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4665
Facsimile: (310) 785-4601

  Michael L. Kidney (*pro hac vice*)
  michael.kidney@hoganlovells.com
555 Thirteenth St., NW
Washington, DC 20004
Telephone: (202) 637-5883
Facsimile: (202) 637-5910

Attorneys for Defendants Hyundai Motor
America and Hyundai Motor Company

**<u>Confirmatory Discovery Status</u>**

**<u>Defendants have produced sufficient confirmatory discovery for plaintiffs to assess the fairness of the settlement-in-principle.</u>** Defendants have produced more than 18,000 documents totaling more than 157,000 pages. Of that total, more than 62,000 pages were produced specifically in response to plaintiffs' formal requests for production. Defendants' productions are on-going, principally because defendants committed to produce in confirmatory discovery the documents produced in the related government investigations, including investigations by the Environmental Protection Agency ("EPA") and a consortium of state attorneys general. However, defendants have completed the custodial productions for each designated interviewees, providing plaintiffs with ample time to review the materials before the Hyundai Motor America ("HMA") interviews at the end of August and the Hyundai Motor Company ("HKMC")[1] interviews in South Korea in mid-September. There has been no suggestion that those interviews should not proceed as scheduled.

**<u>Settling plaintiffs, defendants, and liaison counsel have resolved most confirmatory discovery disputes.</u>** On May 22, 2013, plaintiffs served document requests on defendants. Defendants promptly proposed a response protocol. (Exh. A). This protocol was addressed at the June 6, 2013 status conference, and on June 14, 2013, defendants provided a detailed letter that set forth what they would and would not produce. (Exh. B). Settling plaintiffs, defendants, and liaison counsel then engaged in substantial meet-and-confer efforts by phone and in writing. (Exhs. C-G). In one of these letters, (Exh. D), defendants stated that they would not

---

[1] The legal name of the entity is Hyundai Motor Company. However, because the document production for Hyundai Motor Company includes some documents that may pertain to the EPA miles-per-gallon testing for both Hyundai and Kia vehicles, this status report and other confirmatory discovery materials refer to the company as HKMC.

1    produce certain categories of documents.  Plaintiffs never responded, but now
2    liaison counsel seeks those documents in its status conference statement without
3    providing a substantive response to defendants' bases for not producing those
4    materials.  In addition to seeking documents without responding to the issues
5    defendants identified during the meet and confer process, liaison counsel also now
6    raises additional issues never discussed at all with defendants.

7

8                                      **Disputed Issues**

9   **I.     DEFENDANTS' INTERNAL ANALYSES OF THE**
10         **REIMBURSEMENT PROGRAM AND SETTLEMENT ARE NOT**
          **DISCOVERABLE**

11         Defendants' internal analyses of the reimbursement program and the
12    settlement-in-principle are irrelevant to assessing the fairness of the settlement-in-
13    principle.  Moreover, this information is attorney work product not subject to
14    discovery.  Liaison counsel argues defendants should be compelled to produce their
15    analyses of the reimbursement program and settlement-in-principle, including any
16    internal analyses of the reversion of funds to defendants, to permit "plaintiffs and
17    the Court to compare the reimbursement program and the settlement and evaluate
18    the extent to which the settlement will maximize the benefits to the class."  (Jt.
19    Status Report at 7).  However, settling plaintiffs do not join in this request.

20       **A.     Defendants' Internal Analyses Are Irrelevant**

21         Defendants have produced information concerning the number of claims
22    made under the reimbursement program, the percentage of owners and lessees
23    participating in the program, the number of debit cards issued, the value of the
24    distributed debit cards, and the amount spent from the distributed debit cards.
25    (Exh. B, D).  The reimbursement program has been in operation for more than nine
26    months.  Therefore, the actual participation of customers in the reimbursement
27    program provides the most appropriate and accurate basis to assess consumer
28

1  response to the program, not defendants' projections before the program was

2  instituted.  Actual participation data, not projections, will also provide the best basis

3  to compare the benefits under the reimbursement program to the settlement benefits.

4  The actual participation data includes the amount spent from the distributed debit

5  cards, which provides the most appropriate and accurate data about funds that

6  remain on the debits cards that could possibly revert to defendants.

7        Liaison counsel and non-settling plaintiffs rely on *In re Dry Max Pampers*

8  *Litigation*, 2013 WL 3957060, at *4-5 (6th Cir. Aug. 2, 2013), in support of their

9  request for internal projections and analyses.  (Jt. Status Report at 6-7).  In *Dry Max*

10  the proposed settlement required the defendant to reinstate a refund program it

11  previously had in place.  *Id.* at *4.  The Sixth Circuit merely found the defendant

12  should have produced data about the *actual* level of consumer participation in the

13  previous program—the precise data defendants have already produced here.

14  Nothing in *Dry Max* supports plaintiffs' demand for defendants' projections and

15  analyses of the reimbursement program and settlement.

16        **B.**    <u>**This Information is Protected Attorney Work Product**</u>

17        Defendants' analyses of the reimbursement program and the settlement-in-

18  principle are attorney work product, which defendants raised with plaintiffs during

19  the meet and confer process.  (Exh. D at 43).  Without addressing this objection,

20  liaison counsel and non-settling plaintiffs nonetheless claim to be entitled to this

21  information.  The information liaison counsel seeks goes to the core of attorney

22  work product:

23          An attorney's evaluation of a proposed settlement is at the
core of the legal services an attorney provides to a client in

24          the course of litigation.  The fact that non-legal
considerations are included within the attorney's legal

25          analysis of the costs and benefits of the settlement does
not alter this fundamental conclusion.

26

27  *Georgine v. Amchem Prods., Inc.*, 1994 WL 502475, at *3 (E.D. Pa. Sept. 2, 1994).

28  Consistent with the work product status of such analyses, courts have rejected

discovery of a party's analysis of a class settlement. *See, e.g.*, *Jaffe v. Morgan Stanley & Co., Inc.*, 2008 WL 346417, at *9 (N.D. Cal. Feb. 7, 2008) (rejecting objectors request for discovery of information used by the settling plaintiffs to evaluate the monetary relief the class would receive in a settlement because the information being sought was "privileged work product"); *Hege v. Aegon USA, LLC*, 2011 WL 1791883, at *8 (D.S.C. May 10, 2011) (granting a protective order barring inquiry into the calculations or analyses a party performed for the purposes of settlement negotiations in relation to a different class settlement). Coupled with plaintiffs' failure to even meet the threshold relevance showing, they cannot approach overcoming the work product protection to obtain such analyses.

## II.   DEFENDANTS ADEQUATELY IDENTIFIED WITHHELD DOCUMENTS

Defendants have agreed to produce in the MDL the documents produced to and substantive communications with the government regarding the adjusted EPA MPG estimates and reimbursement program. However, defendants have identified three limited categories of materials produced to the government that will be withheld in the MDL: (1) confidential business information; (2) confidential financial information; and (3) information defendants indicated in their document responses that they would not be producing. Defendants have identified where documents have been withheld with slip sheets in the document production and explained the basis for excluding these documents in their July 17 letter, (Exh. D). Liaison counsel has not taken issue with defendants' reasons for not producing this information (set forth in defendants' July 17 letter) but contends defendants "should include withheld documents on a privilege log so plaintiffs can evaluate the basis for the withholding." (Jt. Status Report at 9).

This argument is form over substance. The slip sheets permit plaintiffs to assess the extent of the materials withheld, and the substantive explanations permit

1   plaintiffs to assess the basis for doing so.  Plaintiffs have not explained how putting

2   these same documents on a privilege log—and these are not privileged documents—

3   would further assist them.

4

5   **III.    A PRIVILEGE LOG FOR THE DOCUMENT COLLECTIONS OF**

6   **DEFENDANTS' DESIGNATED INTERVIEWEES IS CONSISTENT**
    **WITH THE SCOPE AND PURPOSE OF CONFIRMATORY**

7   **DISCOVERY**

8        Defendants have agreed to compile a privilege log up to November 2, 2012,

9   for responsive documents from the collections of their interviewees withheld on the

10  basis of privilege or work product.  Also, to the extent defendants produce privilege

11  logs to the government, defendants will produce those in the MDL.  But other than

12  for these interviewees, defendants have not agreed to separately provide privilege

13  logs.  However, liaison counsel demands a privilege log for "all documents withheld

14  from the EPA."  (Jt. Status Report at 8).  Settling plaintiffs do not join in this

15  demand.

16       Defendants' agreement to provide a privilege log for their designated

17  interviewees up to November 2, 2012, and to produce any privilege logs produced to

18  the government provides plaintiffs with sufficient information about documents

19  withheld on the basis of privilege.  Liaison counsel's independent demand for a

20  privilege log beyond the scope defendants have agreed to produce imposes a burden

21  that far exceeds the reasonable limits of confirmatory discovery.  It would, for

22  example, include logging the documents for the more than 50 custodians from

23  whom HKMC has collected and expects to produce documents to the EPA.  Liaison

24  counsel have not demonstrated how the benefit of such a privilege log in assisting

25  plaintiffs and the Court to assess the settlement, if any, would outweigh the burden.

26

27

28

## IV.   IT IS PROPER TO LIMIT THE PRIVILEGE LOG TO PRE-LITIGATION DOCUMENTS

Defendants have agreed to provide a privilege log for responsive documents withheld from the document collections of their designated interviewees that were created before November 2, 2012.  November 2, 2012 is the date the EPA, HMA, and KMA announced the adjusted EPA MPG estimates for certain Hyundai and Kia vehicles.  It is also the date HMA and KMA announced the reimbursement program.  Those announcements on November 2, 2012 led to the filing of all but two cases included in the MDL.[2]  Defendants have therefore limited their privilege log to exclude documents created after November 2, 2012.  Non-settling plaintiffs contend the privilege log should continue after November 2, 2012 because certain requests for production seek documents that would have been generated after November 2, 2012.  (Jt. Status Report at 9).  Settling plaintiffs do not join this request.

Using November 2, 2012 as a cut-off date for the privilege log is consistent with the common practice to provide a privilege log only for pre-litigation documents.  *See U.S. v. Bouchard Transp.*, 2010 WL 1529248, at *2 (E.D.N.Y. Apr. 14, 2010) ("[P]rivilege logs are commonly limited to documents created before the date litigation was initiated."); *Glynn v. EDO Corp.*, 2010 WL 3294347, at *7 n.12 (D. Md. Aug. 20, 2010) ("The general practice in this Court is . . . to not require logging post-litigation documents over which the attorney-client privilege or work product doctrine has been asserted.  Accordingly, it was appropriate . . . to omit material created after the litigation was instituted . . . .").  Liaison counsel contends a post-November 2, 2012 privilege log would impose a "minimal" burden because it only involves eight custodians.  (Jt. Status Report at 9).  First, there are eleven custodians collectively for defendants, not eight.  Second, liaison counsel

---

[2]   These two cases are *Espinosa v. Hyundai Motor America* and *Gordon v. Hyundai Motor America*.

1    fails to articulate how a post-November 2, 2012 privilege log might meaningfully

2    assist plaintiffs and the Court in assessing the settlement.  Liaison counsel identifies

3    three categories of post-November 2, 2012 documents plaintiffs have requested, but

4    does not explain why the fact of those requests warrants the burden to compile a

5    post-litigation privilege log.  Defendants have agreed to and have produced

6    responsive, non-privileged post-November 2, 2012 documents, so the privilege log

7    cut-off does not implicate the timeframe for the production of non-privileged

8    documents.  Rather, this seems to be yet another effort to extend limited

9    confirmatory beyond even the requirements of full-scale litigation, without any

10    attempt to articulate good cause.

## V.    CONTRACTS WITH DEBIT CARD PROVIDERS WILL NOT AID ASSESSING THE FAIRNESS OF THE SETTLEMENT

As stated by the settling plaintiffs, the settling parties anticipate the terms of the debit card redemption contemplated in the settlement term sheet will be reflected in the settlement agreement and related exhibits.  (Jt. Status Report at 10).  Liaison counsel nonetheless contends plaintiffs need the underlying contracts with the debit card providers in order to assess the proposed settlement.  No such contracts yet exist, nor is it likely that any party would enter such a contract before a settlement is given preliminary approval.  The information liaison counsel seeks can be provided in the settlement agreement once such arrangements are made.  Liaison counsel does not articulate why this would be insufficient.  In any event, this is at best premature and can be addressed if and when it becomes ripe.

## VI.    DEFENDANTS HAVE PRODUCED SUFFICIENT CUSTOMER COMPLAINT DATA

HMA and KMA produced customer complaints and internal communications about the reimbursement program for each of their designated interviewees.

1    Significantly, both HMA and KMA provided the documents of the persons charged
2    with overall administration of their respective reimbursement programs, and who
3    regularly receive copies of such complaints.  Thus, HMA's and KMA's document
4    productions included a meaningful set of customer feedback documents.  Liaison
5    counsel seeks to require HMA and KMA to produce *all* customer complaints about
6    the reimbursement program.  Settling plaintiffs do not join in this request.

7         HMA's and KMA's agreement to produce customer complaints from the
8    document collections of their designated interviewees represents a reasonable means
9    to provide a meaningful cross-section of the information plaintiffs seek.  As
10   defendants explained in their July 17 letter, providing communications about the
11   reimbursement program from HMA's and KMA's customer communication
12   database would be unreasonably burdensome.  (Exh. D).  Non-settling plaintiffs
13   make the common argument that, because this information is contained in a
14   database, it must be easy to produce.  But defendants' systems make no distinction
15   among different types of communications about the reimbursement program.  There
16   is no simple way to segregate only complaint data.  For instance, a search for
17   communications about the reimbursement program would capture every call
18   requesting details such as when a customer's debit card was mailed or for the
19   reimbursement program website URL.  Thus, HMA and KMA would be required to
20   review every communication about the reimbursement program for responsiveness.
21   Moreover, even were HMA and KMA to forego reviewing the documents for
22   responsiveness, it would be extremely burdensome to redact the personal identifying
23   information from these voluminous customer communications.  And as with most of
24   the issues raised by liaison counsel in the status report, liaison counsel has failed to
25   even try to articulate why the complaint data defendants have produced has in any
26   respect been insufficient for them to assess the proposed settlement terms.

27

28

1

2

**VII.   STATE-BY-STATE SALES DATA IS IRRELEVANT TO THE
         FAIRNESS OF THE SETTLEMENT**

Defendants provided nationwide sales data as part of the term sheet for the settlement-in-principle.  Liaison counsel contends plaintiffs need state-by-state sales data to assess settlement, an issue never raised during the parties' weeks of extensive meet and confer efforts before this conference.  Settling plaintiffs do not join in this request.

State-by-state sales data does not bear on the fairness, reasonableness, or adequacy of the contemplated nationwide settlement.  Liaison counsel contend this data is necessary because the strength of the claims vary by state.  However, the claims vary in strength because of differences in state law, not because of the number of vehicles sold in a given state.  Such information might arguably be relevant to a later fee request, but not to assessing the fairness of the settlement.

Because liaison counsel never raised this issue before filing the conference statement, the extent of the data sought is unclear.  The relevant document requests were very broad, seeking "all documents related to the actual or projected sales of each affected vehicle in each state." (Exh. B at 8).  Plaintiffs note defendants would need to provide certain data to state officials under CAFA but do not reconcile the limited nature of that data with the broad scope of plaintiffs' document requests.  Nor does counsel explain why it would not suffice to receive this data when the CAFA notices are disseminated.

**VIII.  DEFENDANTS AGREED TO PRODUCE RESIDUAL VALUE DATA**

Defendants agreed to provide residual value data for the affected vehicles. Plaintiffs now contend for the first time that defendants' response was "framed in such a way that it appears to exclude documents regarding the decrease in value of the affected vehicles." (Jt. Status Report at 12).  Residual value is a term that in the automotive industry generally refers to the value a vehicle holds or is expected to

1    hold at the end of specified period.[3]  Plaintiffs offer no explanation how defendants'

2    response did not address the information they seek.

3

4    **IX.    NO BASIS EXISTS TO PRODUCE ALL DRAFT SETTLEMENT**
      **AGREEMENTS**

5

6           All plaintiffs' counsel will be provided with the final settlement agreement.

7    Liaison counsel and non-settling plaintiffs nonetheless seek all draft settlement

8    agreements exchanged between the settling parties.  First, no such drafts yet exist.

9    Second, liaison counsel and non-settling plaintiffs have not articulated how

10   reviewing draft settlement agreements will facilitate their assessment of the fairness

11   of a final settlement agreement.

12          Only the final agreement is subject to Court approval, and only those terms (if

13   approved) will bind class members.  Draft agreements have no such effect.

14   Therefore, defendants should not be required to produce draft settlement agreements

15   exchanged between the settling parties.  *Cf. In re Sept. 11 Litig.*, 723 F. Supp. 2d

16   526, 532-33 (S.D.N.Y. 2010) (distinguishing the interests implicated by a final

17   settlement agreement from draft settlement agreements).

18          Requiring production of draft settlement agreements will inject undue

19   complication into the process of reducing the settlement-in-principle to a final

20   _____

21          [3]  *See, e.g.*, Michael Frank, *How They Decide Your Car's Residual Value*,
     POPULAR MECHS. (Feb. 6, 2013), http://www.popularmechanics.com/cars/how-
22   to/repair/how-they-decide-your-cars-residual-value ("Residual value, or resale
     value, is one of the most important factors to consider when buying a car—nearly all
23   of them depreciate, but some much less than others."); *TrueCar and ALG Reveal*
     *New Car Residual Values*, TRUECAR (Dec. 6, 2012),
24   http://blog.truecar.com/2012/12/06/truecar-and-alg-reveal-new-car-residual-values
25   ("Used in calculating lease and loan payments, ALG, A TrueCar Company, has
     been the industry benchmark for providing residual value - how well a vehicle is
26   predicted to hold its value - to automakers and financial institutions in the US and
     Canada for nearly 50 years.").
27

28

1  agreement by essentially inviting dozens of plaintiffs to negotiate, edit, and offer
2  commentary.  All plaintiffs will of course have opportunity to comment on the final
3  agreement, but it will inevitably slow the process and waste resources to have all
4  voices commenting on every iteration.
5
6  **X.   DISTRIBUTION OF HKMC'S EPA SEARCH TERMS SHOULD BE**
7  **LIMITED TO SETTLING PLAINTIFFS' COUNSEL AND LIAISON**
   **COUNSEL**
8        HKMC's production in the MDL is based on HKMC's production to the EPA
9  as part of the EPA's ongoing investigation.  The search terms HKMC is using for its
10  response to the EPA's investigation have been provided to settling plaintiffs'
11  counsel and liaison counsel.  They have determined those terms suffice.  Non-
12  settling plaintiffs contend they also need to review the search terms because liaison
13  counsel "does not bind the remaining" non-settling plaintiffs.  (Jt. Status Report at
14  13).  However, non-settling plaintiffs fail to identify any reason why liaison counsel
15  and settling plaintiffs' counsel have not appropriately assessed the search terms.
16  Non-settling plaintiffs' contention that they need to see the terms to assess the
17  process creates an inefficient duplication of effort and also creates an inefficient
18  process with a multitude of counsel expressing views without a structured decision
19  making process.  Limiting distribution of the HKMC search terms is consistent with
20  the recognition that confirmatory discovery should be focused on the benefit to
21  putative class members.  *Cf. In re HP Inkjet Printer Litig.,* 716 F.3d 1173, 1182 (9th
22  Cir. 2013) (emphasizing the relationship between attorneys' fees for a class
23  settlement and benefit to the class, while distinguishing activity that does not benefit
24  the class).
25
26
27
28

## XI.   ROBERT BABCOCK'S EPA DEPOSITION PROVIDES SUFFICIENT INFORMATION TO ASSESS THE SETTLEMENT

As part of the EPA's on-going investigation, it deposed Robert Babcock, Director of Certification and Compliance Affairs, Regulation and Certification Department at Hyundai-Kia America Technical Center, Inc. ("HATCI"). Mr. Babcock also produced documents to the EPA.  In response to liaison counsel's request to interview Mr. Babcock, defendants offered to produce the EPA's deposition of Mr. Babcock in place of an interview and provided copies of the transcript to settling plaintiffs' counsel and liaison counsel to permit them to evaluate this proposal.  Defendants have also produced Mr. Babcock's EPA document production to all plaintiffs' counsel who undertook the Rule 408 confidentiality agreement.

Defendants' proposal to provide Mr. Babcock's EPA deposition and to provide the transcript to settling plaintiffs and liaison counsel for evaluation recognizes that confirmatory discovery should avoid duplicate effort and waste of resources.  Defendants' proposal is also consistent with the disfavor of duplicative testimonial discovery.  *Graebner v. James River Corp.*, 130 F.R.D. 440, 441 (N.D. Cal. 1989) (denying request for a second deposition and recognizing that "repeat depositions are disfavored, except in certain circumstances").  Moreover, if settling plaintiffs' counsel and liaison counsel agree that the transcript suffices in lieu of an additional interview, the transcript will be provided to non-settling plaintiffs.

## XII.   THE INTERVIEWEES' RESUMES SHOULD BE DISTRIBUTED ONLY TO SETTLING PLAINTIFFS' COUNSEL, LIAISON COUNSEL, AND COUNSEL PARTICIPATING IN THE INTERVIEWS

Defendants provided the resumes for their designated interviewees to setting plaintiffs' counsel and liaison counsel on the understanding that they would only be further distributed to non-settling plaintiffs' counsel to the extent such counsel are

1   directly participating in the interviews.  This process strikes an appropriate balance.

2   Although the interviewees' resumes efficiently convey relevant background

3   information, the resumes also contain personal information irrelevant to this

4   litigation.

5

6   DATED: August 13, 2013          QUINN EMANUEL URQUHART &
                                    SULLIVAN, LLP
7

8

9                                   By _/s/ Shon Morgan_____

10                                       Shon Morgan
                                         Attorneys for Defendants Hyundai Motor
11                                       America and Hyundai Motor Company

12

13  DATED:  August 13, 2013         DYKEMMA GOSSETT PLLC

14

15

16                                  By _/s/ James P. Feeney_____

17                                       James P. Feeney
                                         Attorneys for Defendant Kia Motors
18                                       America, Inc.

19  **C.D. Cal. L. R. 5-4.3.4(a)(2)(i) Attestation**

20  I attest that the e-signature of James P. Feeney was added with authorization

21  conveyed by email from his co-counsel, Benjamin W. Jeffers.

22

23                                       _/s/ Shon Morgan_____

24

25

26

27

28