Elaine T. Byszewski (SBN 222304)
*elaine@hbsslaw.com*
Hagens Berman Sobol Shapiro LLP
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Tel. (213) 330-7150
Fax (213) 330-7152

Robert B. Carey
*rob@hbsslaw.com*
Hagens Berman Sobol Shapiro LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ  85003
Tel. (602) 840-5900
Fax (602) 840-3012

Steve W. Berman
*steve@hbsslaw.com*
Hagens Berman Sobol Shapiro LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel. (206) 623-7292
Fax. (206) 623-0594

*Attorneys for Plaintiff Kaylene P. Brady, et al. and*
*Nicole Marie Hunter, et al.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IN RE:  HYUNDAI AND KIA FUEL ECONOMY LITIGATION<br><br>_____ | MDL Case No. 2:13-ml-2424-GW-FFM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND ORDER DIRECTING NOTICE TO CLASS**<br><br>Date:  January 23, 2014<br>Time:  8:30 a.m.<br>Judge:  Hon. George Wu; Courtroom:  10 |

MDL Case No.: 2:13-ml-2424-GW-FFM

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND ORDER DIRECTING NOTICE TO THE CLASS

# **TABLE OF CONTENTS**

I.     SUMMARY OF FACTS AND THE PROPOSED SETTLEMENT ................. 1

    A.     The Litigation ............................................................................... 1

    B.     The Affected Vehicles ................................................................. 4

    C.     The Defendants ............................................................................ 6

        1.  Kia Motors America, Inc. ................................................... 6

        2.  Hyundai Motor America .................................................... 8

        3.  Hyundai/Kia Motor Corporation ...................................... 10

    B.     Defendants' Reimbursement Program .................................... 13

    E.     The Market Effects Of The Announcement ........................... 14

    F.     The Proposed Settlement ......................................................... 17

II.    ARGUMENT ...................................................................................... 21

    A.     The Court Should Preliminarily Approve The Proposed Settlement. ... 21

        1.     The Proposed Settlement Is Sufficiently Fair, Reasonable, And Adequate For Preliminary Approval. ........................................... 23

            i.     The Strength Of Plaintiffs' Case And The Risk, Expense, Complexity, And Likely Duration Of Further Litigation.. 24

            ii.    The Risk Of Maintaing Class-Action Status Throughout The Trial ......................................................................... 24

            iii.   The Amount or Type of Relief Offered in Settlement ...... 24

            iv.    The Extent of Discovery completed and the stage of the proceedings ...................................................................... 24

            v.     The Experience And Views Of Counsel ........................... 32

            vi.    The Reaction Of The Class Members Ot The Proposed Settlement ......................................................................... 33

        2.     The Proposed Settlement Is The Result Of Extensive, Arm's-Length Negotiations Conducted By Highly Experienced Counsel. 34

        B.      The Proposed Notice Is Adequate And Should Be Approved............... 37

III.    CONCLUSION ................................................................................................ 39

- ii -

# TABLE OF AUTHORITES

**Page(s)**

**CASES**

*Am. Honda Motor Co. v. Superior Court*,
  199 Cal. App. 4th 1367 (Cal. App. 2d Dist. 2011) ............................................. 28

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................... 37

*Anderson v. Hyundai Motor Co.*,
  Case No. 13-CV-1842 (C.D. Cal.) ..................................................................... 36

*Briggs v. United States*,
  No. C 07–05760 WHA, 2010 WL 1759457 (N.D. Cal. Apr. 30, 2010) ........... 21

*Bruno v. Quten Research Inst., LLC*,
  No. SACV 11–00173 DOC (Ex), 2013 WL 990495 (C.D. Cal. Mar. 13, 2013) ................................................................................................................... 22

*Carlough v. Amchem Prods., Inc.*,
  158 F.R.D. 314 (E.D. Pa. 1993) ........................................................................ 37

*Cholakyan v. Mercedes-Benz, USA, LLC*,
  281 F.R.D. 534 (C.D. Cal. 2012) ...................................................................... 27

*Churchill Vill., LLC v. General Elec.*,
  361 F.3d 566 (9th Cir. 2004) ............................................................................. 38

*Cirulli v. Hyundai Motor Co.*,
  Case No. 08-CV-0854 (C.D. Cal.) ..................................................................... 36

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship*,
  100 F.3d 1041 (1st Cir. 1996) ........................................................................... 35

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ...................................................................... 22, 33

*Clesceri v. Beach City Investigations & Protective Servs.*,
  No. CV-10-3873-JST, 2011 WL 320998 (C.D. Cal. Jan. 27, 2011) ........... 30, 32

*Collins v. Cargill Meat Solutions Corp.*,
  274 F.R.D. 294 (E.D. Cal. 2011) ....................................................................... 34

*Corder v. Ford Motor Co.*,
    283 F.R.D. 337 (W.D. Ky. 2012) ....................................................... 27

*Daigle v. Ford Motor Co.*,
    No. 09-3214, 2012 WL 3113854 (D. Minn. July 31, 2012) ............................. 27

*Durrett v. Hous. Auth. of City of Providence*,
    896 F.2d 600 (1st Cir. 1990) ............................................................ 37

*Edwards v. Ford Motor Co.*,
    No. 11-CV-1058-MMA(BLM), 2012 WL 2866424 (S.D. Cal. June 12,
    2012) ...................................................................................... 27

*Finkel v. Am. Oil & Gas, Inc.*,
    10-cv-01808-CMA-MEH, 2012 WL 171038 (D. Colo. Jan. 20, 2012) ............. 29

*Flinn v. FMC Corp.*,
    528 F.2d 1169 (4th Cir. 1975) ..................................................... 29, 35

*Hughes v. Microsoft Corp.*,
    Nos. C98–1646C, 2001 WL 34089697 (W.D. Wash. Mar. 26, 2001) ......... 32, 35

*In re Agent Orange Prod. Liab. Litig.*,
    597 F. Supp. 740 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987) ............ 35

*In re Baldwin-United Corp.*,
    105 F.R.D. 475 (S.D.N.Y. 1984) ...................................................... 34

*In re Bluetooth Headset Products Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ........................................................ 34, 35

*In re Ford Motor Co. E-350 Van Products Liab. Litig.*,
    MDL No. 1687, 2012 WL 379944 (D.N.J. Feb. 6, 2012) ................................ 27

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ................................................... 22, 29, 32

*In re Pac. Enter. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ............................................................ 33

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998) ............................................................ 36

- iii -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995)........................................................................34

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    720 F. Supp. 1379 (D. Ariz. 1989), *aff'd sub nom. Class Plaintiffs v. City of
    Seattle*, 955 F.2d 1268 (9th Cir. 1992)............................................................33

*Irwin v. Hyundai Motor Am., Inc.*,
    Case No. CV2003-020169 (Maricopa County Super. Ct.) ................................36

*Kakani v. Oracle Corp.*,
    No. C 06-06493 WHA, 2007 WL 1793774 (N.D. Cal. June 19, 2007)............23

*Kearney v. Hyundai Motor Co.*,
    Case No. 09-CV-1298 (C.D. Cal.) ....................................................................36

*Lloyd v. Gen. Motors Corp.*,
    275 F.R.D. 224 (D. Md. 2011), 266 F.R.D. 98 (D. Md. 2010) ........................28

*Lundell v. Dell Inc.*,
    No. CIVA C05-3970, 2006 WL 3507938 (N.D. Cal. Dec. 5, 2006) ................17

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012) ..............................................................................27

*Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago*,
    834 F.2d 677 (7th Cir. 1987) .............................................................................35

*Mazza v. Am. Honda Motor Co., Inc.*,
    666 F.3d 581 (9th Cir. 2012) .............................................................................28

*Misra v. Decision One Mortgage Co.*,
    No. SA CV 07-0994 DOC, 2009 WL 4581276 (C.D. Cal. Apr. 13, 2009) ...........
    ................................................................................................................22, 29, 32

*Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004).............................................................27, 32, 33

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*,
    688 F.2d 615 (9th Cir. 1982) .............................................................................29

- iv -

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

*Oscar v. BMW of N. Am., LLC*,
    274 F.R.D. 498 (S.D.N.Y. 2011), No. 09 Civ. 11(PAE), 2012 WL 2359964
    (S.D.N.Y. June 19, 2012) ...................................................................... 28, 29

*Silber v. Mabon*,
    18 F.3d 1449 (9th Cir. 1994) ....................................................................... 37

*Sims v. Kia Motors Am., et al.*,
    Case No. 13-CV-1791 (C.D. Cal.) ............................................................... 36

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................. 22, 23

*Sullivan v. Am. Express Publ'g Corp.*,
    No. SACV 09-142-JST, 2011 WL 2600702 (C.D. Cal. June 30, 2011) ............ 38

*West v. Circle K Stores, Inc.*,
    No. CIV. S-04-0438 WBS GGH, 2006 WL 1652598 (E.D. Cal. June 13,
    2006) ........................................................................................................... 23

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) ...................................................................... 22

**STATUTES**

Cal. Bus. & Prof. Code §§ 17200, *et seq.* ............................................................ 1, 2

Cal. Bus. & Prof. Code §§ 17500, *et seq.* ............................................................ 1, 2

Cal. Civ. Code § 1710 ............................................................................................ 2

Cal. Com. Code § 2313 ........................................................................................... 1

California Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750, *et seq.*) ...... 1, 2

**OTHER AUTHORITIES**

5 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 23.83(1), at 23-336.2 ....... 22

A. CONTE & H.B. NEWBERG, NEWBERG ON CLASS ACTIONS § 11:25 (4th ed.
    2002) ("NEWBERG") .................................................................... 23, 27, 35

FED. R. CIV. P. 23(b)(3) ........................................................................................ 37

- v -

MDL Case No.: 2:13-ml-2424-GW-FFM

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

FED. R. CIV. P 23(c)(2) ................................................................................................ 37

FED. R. CIV. P. 23(c)(2)(b) ........................................................................................... 37

FED. R. CIV. P. 23(e) ...................................................................................... 1, 21, 23, 37

FED. R. CIV. P 23(e)(1) ................................................................................................. 37

MDL Case No.: 2:13-ml-2424-GW-FFM

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

Pursuant to Federal Rule of Civil Procedure 23(e), Plaintiffs respectfully submit this memorandum of points and authorities in support of their Motion for Preliminary Approval of Class Settlement.

## I.   SUMMARY OF FACTS AND THE PROPOSED SETTLEMENT

### A.   The Litigation

This litigation arises out of misstatements by Defendants Hyundai Motor America ("HMA") and Kia Motors America ("KMA") regarding the fuel economy of their vehicles in advertisements and Monroney stickers—the stickers displayed in the window of every new car which list certain official car specifications.  The first class action filed with respect to the misstatements in the fuel-economy numbers stated on the Monroney stickers for Hyundai and Kia automobiles was *Hunter v. Hyundai Motors America*.  Plaintiffs filed that complaint against HMA and KMA on November 2, 2012, in the Central District of California, asserting claims for violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), violation of the California False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et seq.*), violation of the California Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750, *et seq.*), breach of express warranty (Cal. Com. Code § 2313), fraud (California common law), negligent misrepresentation (California common law), and unjust enrichment/common law claim for restitution.  The *Hunter* Plaintiffs alleged that HMA and KMA conducted flawed testing in establishing the EPA MPG estimates for many of their vehicles.

On November 6, 2012, the plaintiffs in *Brady, et al. v. Hyundai Motor America, et al.* filed a class-action complaint against HMA and KMA in the Central District of California on the same basis and alleging the same causes of action as those in the *Hunter* action.  But the *Brady* Plaintiffs included more information regarding the Reimbursement Program, and how a successful class action would seek to pay the Class members damages in a lump-sum payment now to account for

- 1 –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

the time value of money and to alleviate the Class members' burden of proving their losses, driving to the dealership, and having to fill out paperwork every time reimbursement is requested.

In an action filed before the November 2012 announcement—and the first of its type—the plaintiffs in *Espinosa et al. v. Hyundai Motor America* filed a class-action complaint against HMA on January 6, 2012, alleging that HMA disseminated false advertisements regarding the expected gas mileage of its vehicles. This complaint, filed in the Central District of California, asserted claims for violation of the Unfair Business Practices Act (Cal. Bus. & Prof. Code §§ 17200, et seq.), violation of False Advertising Laws (Cal. Bus. & Prof. Code §§ 17500, et seq.), violation of California's Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750, et seq.), fraud, negligent misrepresentation, and deceit (Cal. Civ. Code § 1710). The *Espinosa* Plaintiffs filed their First Amended Complaint on February 23, 2012, asserting the same causes of action and additionally: (1) providing various consumer complaints regarding overstated MPGs; (2) alleging that HMA may have inflated EPA numbers and may not have followed appropriate EPA protocols; (3) providing more details regarding HMA's violations of the Unfair Business Practices Act; and (4) noting that HMA failed to respond to their Notice of Intent to Bring an Action for Damages Under the Consumer Legal Remedies Act.

In total, there were fifty-two putative class-action complaints filed in federal court[1] (and one filed in state court[2]) against HMA, KMA, Hyundai Motors

---

[1] The Federal cases, along with their MDL status are as follows: *Espinosa v. Hyundai Motor Am.* (Lead Case); *Gordon v. Hyundai Motor Am.* (MDL Transfer); *Hunter v. Hyundai Motor Am.* (MDL Transfer); *Sanders v. Hyundai Motor Am.* (MDL Transfer); *Wilton v. Kia Motors Am., Inc.* (MDL Transfer); *Krauth v. Hyundai Motor Am.* (MDL Transfer); *Brady v. Hyundai Motor Am.* (MDL Transfer); *Graewingholt v. Hyundai Motor Am.* (MDL Transfer); *Kievit v. Hyundai Motor Am.* (MDL Transfer); *Maturani v. Hyundai Motor Am.* (MDL Transfer); *Thomson v. Hyundai Motor Am.* (MDL Transfer); *Rottner v. Hyundai Motor Am.* (MDL Transfer); *Thomas v. Hyundai Motor Am.* (Intra-Dist. Transfer); *Olson v. Hyundai*

Corporation ("HMC"), and/or Kia Motors Corporation ("KMC") (HMC and KMC together, "HKMC") regarding the MPG overstatement. Based on the February 5, 2013 Transfer Order from the Judicial Panel on Multidistrict Litigation ("JPML"), many of those cases were transferred and consolidated in this Court as *In re: Hyundai and Kia Fuel Economy Litigation*, MDL No. 2424. During the months after the *Hunter* and *Brady* Plaintiffs filed their complaints, the *Espinosa*, *Hunter*, and *Brady* Plaintiffs (together, the "Settling Plaintiffs" or "Plaintiffs") reached an agreement in principle on settlement terms with HMA, and extended the same terms

---

*Motor Company* (Intra-Dist. Transfer); *Lipman v. Hyundai Motor Am.* (CTO 2/15/13); *Gudgalis v. Hyundai Motor Am.* (CTO 2/15/13); *Bayard v. Hyundai Motor Am.* (Intra-Dist. Transfer); *Quiroz v. Kia Motors Am., Inc.* (Intra-Dist. Transfer); *Naythons v. Hyundai Motor Company* (MDL Transfer); *Simmons v. Kia Motors Corporation* (MDL Transfer); *Woodruff v. Kia Motors Am., Inc.* (MDL Transfer); *Armstrong v. Kia Motors Am.* (MDL Transfer); *Hoessler v. Kia Motors Am.* (MDL Transfer); *Washburn v. Kia Motors Corporation* (MDL Transfer); *Kurash v. Hyundai Motor Am.* (Tag Along); *Leggett v. Kia Motors Corporation* (MDL Transfer); *Carullo v. Kia Motors Am., Inc.* (Intra-Dist. Transfer); *Torres v. Kia Motors Am.* (MDL Transfer); *Hayes v. Kia Motors Am., Inc.* (MDL Transfer); *Weber v. Hyundai Motor Am.* (Tag Along); *Young v. Kia Motors Am., Inc.* (Intra-Dist. Transfer); *Reeves v. Kia Motors Am.* (MDL Transfer); *Maharaj v. Hyundai Motor Am.* (Intra-Dist. Transfer); *Hammond v. Hyundai Motor Am.* (MDL Transfer); *Icovozzi v. Kia Motors Am., Inc.* (Intra-Dist. Transfer); *Dunst v. Hyundai Motor Am.* (CTO 2/13/13); *Rezai v. Hyundai Motor Am.* (MDL Transfer); *Hasper v. Hyundai Motor Am.* (Intra-Dist. Transfer); *Fellers v. Kia Motors Am. Inc.* (Intra-Dist. Transfer); *Elliott v. Hyundai Motor Am.* (Intra-Dist. Transfer); *Bonsignore v. Kia Motors Am.* (Intra-Dist. Transfer); *Sutta v. Hyundai Motors Am.* (Intra-Dist. Transfer); *Myers v. Hyundai Motors Am.* (Intra-Dist. Transfer); *Figueroa v. Hyundai Motors Am.* (Intra-Dist. Transfer); *Terhost v. Kia Motors Am.* (Intra-Dist. Transfer); *Brown v. Kia Motors Am.* (Intra-Dist. Transfer); *Cestaro v. Hyundai Motors Am.* (Intra-Dist. Transfer); *Woodward v. Kia Motors Am. Inc.* (Intra-Dist. Transfer); Martyn v. Hyundai Motors Am. (Intra-Dist. Transfer); *Murphy v. HMA*, Case no. 13-cv-01504 (Intra-District Transfer); *Setser v. Kia Motors America*, Case no. 13-cv-00387 (Intra-District Transfer); *Wilson v. Kia Motors America,* Case no. 13-cv-01069 (March 7, 2013 Transfer). (*See* Dkt. 6 at Exhibit 2 as well as Dkt. 32, 33, 34, 38, 39, 40, 43, and 44 for more detail.)

[2] *Bird v. Hyundai Motor Am..* (*See id.*)

MDL Case No.: 2:13-ml-2424-GW-FFM

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

1   to KMA.  Liaison counsel was designated for the non-settling plaintiffs, and KMA

2   subsequently agreed to the proposed Settlement terms.

3         With the Court's guidance in establishing a settlement discovery schedule, and

4   with ongoing input from liaison counsel, the parties conducted interviews of integral

5   employees of HMA, KMA, and HKMC, and propounded requests for production and

6   interrogatories on Defendants.  The confirmatory process is substantially complete

7   and has resulted in eleven interviews of Defendants' key personnel in the U.S. and

8   Korea, as well as analysis of hundreds of thousands of pages of documents produced.

9   Non-settling plaintiffs' counsel have been regularly updated through liaison counsel.

10         The Settlement requires Defendants to address issues associated with the MPG

11   overstatements on many of their vehicle models, provide lump-sum payments to

12   Class members to compensate them for their extra fuel costs, and pay damages

13   related to Hyundai's advertising of the MPG ratings of four of its vehicles.  The

14   Settlement Agreement is attached hereto as Exhibit 1.  The parties have diligently

15   worked to draft appropriate pleadings, including a stipulated notice regarding a

16   proposed schedule for class-action settlement proceedings, a draft notice to the Class,

17   this motion, and proposed orders granting preliminary and final approval of the

18   class-action Settlement.

19       **B.**    **The Affected Vehicles**

20         As described below, Hyundai and Kia were contacted by the EPA when the

21   EPA's in-use coastdown testing of the 2011 Model Year Elantra showed coastdown

22   test results that materially differed from the certified numbers that HKMC had

23   provided to the EPA and that were used to calculate vehicle EPA estimates.

24   Coastdown tests (which quite literally measure the time for a car to "coastdown"

25   from 45 MPG to 15 MPG with the transmission in neutral) are used to calculate the

26   drag coefficient for a car, which, in turn, is used in conjunction with a dynamometer to

27   estimate fuel efficiency.

28

- 4 –

HKMC researched its coastdown testing procedures and existing regulations in an effort to determine how and why the EPA in-use vehicle results would differ from its own, including issues relating to track smoothness, tire surface, ambient weather, warm-up time, vehicle weight, vehicle selection (pilot or production), data analysis software, and coastdown direction.  (*See* Ex. 2, Dec. 23, 2013 Decl. of Robert Carey ("Carey Decl.") at Ex. J HKMCST0008210-8230).  HKMC eventually discovered a process change to its testing undertaken in May 2010, which was expected to minimize divergence among test results, and that, in actuality, rendered its testing protocol different from the EPA's protocol.  Testing revealed that the process change explained much of the test-result divergence for vehicles tested and certified after May 2010.  (*Id.*)  HKMC also discovered that for some models, there had been a deviation from protocol—that is, a process mistake—in obtaining coastdown testing results which were used to calculate the drag coefficient.

HKMC determined that the following vehicles had coastdown tests affected by the process change, but ***not*** the process mistake:

| Hyundai Vehicles | Kia Vehicles |
| --- | --- |
| 2012 & 2013 Accent | 2011 Optima |
| 2012 & 2013 Azera | 2012 & 2013 Sorento |
| 2011, 2012 & 2013 Elantra | 2012 & 2013 Sportage |
| 2011 & 2012 Sonata | |
| 2012 & 2013 Genesis | |
| 2013 Santa Fe | |
| 2012 & 2013 Tucson | |

HKMC also determined that certain model Veloster, Rio, and Soul vehicles had coastdown tests affected by the process change and the process mistake:

| Hyundai Vehicles | Kia Vehicles |
|---|---|
| 2011 & 2012 Veloster | 2012 & 2013 Rio |
| | 2012 & 2013 Soul |

### C.    The Defendants

Defendants Hyundai Motor America and Kia Motors America, Inc. are the United States distributors for vehicles manufactured by Hyundai Motor Corporation and Kia Motors Corporation, their Korean parent companies.   HMA and KMA consider themselves to be competitors in the marketplace—they do not generally work together, with the reimbursement program at issue in this case being one notable exception.   (Tr. of Apr. 19, 2013 Tape-Recorded Interview of Michael Sprague ("Sprague Tr."), at 84-86, attached to Carey Decl. as Ex. A.)  ; Tr. of Aug. 30, 2013 Tape-Recorded Interview of John Krafcik ("Krafcik Tr.") at 111, attached to Carey Decl. as Ex. F.)   When interviewed, HMA, KMA, and HKMC employees generally claimed that Defendants' U.S.-based marketing and planning departments were not involved with the Korea-based product development and testing mistakes that led to the MPG overstatements.   At the same time, Defendants admit that until the EPA stepped in, they accepted and utilized faulty MPG information received from HKMC's Korean testing facility.

### 1.    Kia Motors America, Inc.

According to KMA Director of Marketing Michael Sprague, KMA's marketing strategy for the past five years focused attributes of design, technology, safety, value, and quality.  (Carey Decl. Ex. A, Sprague Tr. at 17-20, 76.)  Fuel economy was not a major focus of KMA marketing.  (Carey Decl. Ex. A, Sprague Tr. at 17-19, 39-40.)   Marketing references to fuel economy incorporated information from the Product Reference Guide ("PRG"), information which is provided by the parent company in Korea.  (Carey Decl. Ex. A, Sprague Tr. at 12.)

- 6 –

When Michael Sprague learned that there would be a restatement of EPA estimates for MPG, he reviewed KMA's then-current advertising and did not find any advertisements highlighting incorrect MPG estimates that needed to be changed. (Carey Decl. Ex.A, Sprague Tr. at 57-9.)  When the marketing department became aware of weaknesses or strengths related to particular car models, they would pass that information onto the KMA Product Planning Group.  (Carey Decl. Ex. A, Sprague Tr. at 34-35, 101.)

KMA's Product Planning Group is headed by Orth Hedrick.  (Tr. of June 5, 2013 Tape-Recorded Interview of Orth Hedrick ("Hedrick Tr."), at 3-4, attached to Carey Decl. as Ex. C.)  The KMA Product Planning Group collects and collates U.S. consumer preferences and passes that information onto the Korean parent company. (Carey Decl. Ex. C, Hedrick Tr. at 4.)  It provides the Overseas Planning and Marketing Team in Korea with preferences for the U.S. market.  (Carey Decl. Ex. C, Hedrick Tr. at 13-14.) While the Product Planning Group does not plan or set the specifications for future vehicles, it does provide input to engineers and designers in Korea who design and manufacture the vehicles for distribution and sale.  (Carey Decl. Ex. C, Hedrick Tr. at 19-21.)  KMA's Product Planning Group had no involvement in testing or certification of EPA-estimated MPG.  (Carey Decl. Ex. C, Hedrick Tr. at 27.)  Its role in the restatement process was to update the PRG with the restated MPG estimates for the affected vehicles. (Carey Decl. Ex. C, Hedrick Tr. at 28, 56.)

The reimbursement program for KMA is run through the Consumer Affairs and Warranty Department, which is directed by Michelle Cameron.  Ms. Cameron's department is responsible for customer contacts that occur directly between KMA and consumers.  (Tr. of June 4-5, 2013 Tape-Recorded Interview of Michelle Cameron ("Cameron Tr.") at 8, attached to Carey Decl. as Ex. B.)  Ms. Cameron claimed that while there have been periods of increased consumer complaints about

- 7 -

the fuel efficiency of Kia vehicles, these periods coincide with times of high fuel prices, and not with the release of any particular vehicles or model years.  (Carey Decl. Ex. B, Cameron Tr. at 30-31.)   She claims she never saw MPG-related complaints reach a level that would cause her to bring the issue to the attention of other Kia departments.  (Carey Decl. Ex. B, Cameron Tr. at 31-32.)

Prior to the November 2012 restatement, Ms. Cameron claims that she was not aware that vehicle manufacturers did their own EPA MPG testing and certification. (Carey Decl. Ex. B, Cameron Tr. at 74-75.)  After the restatement, Ms. Cameron's department was involved with consumer communications and replacing Monroney labels to reflect the restated EPA MPG estimates.  (Carey Decl. Ex. B, Cameron Tr. at 82-83.)  Ms. Cameron's department tracked and supervised the Monroney label-replacement process.  (Carey Decl. Ex. B, Cameron Tr. at 95-97.)  At the same time, brochures relating to the affected vehicles were reprinted to reflect the restated MPG estimates.  (Carey Decl. Ex. B, Cameron Tr. at 166-67.)

### 2. Hyundai Motor America

According to national manager William Reedy, HMA's marketing group has no involvement in the development of vehicles and their specifications.  (Tr. of Aug. 29, 2013 Tape-Recorded Interview of William Reedy ("Reedy Tr."), at 32, attached to Carey Decl. as Ex. E.)  The information that marketing uses in its communications comes from the HMA product-planning group.  (Carey Decl. Ex. E, Reedy Tr. at 111-12.)  The "4 for 40" advertising campaign, which focused on four Hyundai vehicles that attained 40 MPG EPA estimates, was created by Innocean, an advertising company that is owned by HMC.  (Carey Decl. Ex. E, Reedy Tr. at 31, 46-49; 110.)  Innocean, upon review of the various vehicle specifications for the Hyundai product line, observed that four vehicles were rated at 40 MPG and developed the "4 for 40" advertisements.  (*Id.*)   According to Ms. Reedy, HMC did not direct the development of this content.  (*Id.*)

- 8 –

MDL Case No.: 2:13-ml-2424-GW-FFM

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND ORDER DIRECTING NOTICE TO THE CLASS

1    HMA's Director of Product Planning, Scott Margason, was interviewed as part

2    of the confirmatory discovery process.  (Tr. of Aug. 29, 2013 Tape-Recorded

3    Interview of Scott Margason ("Margason Tr.") at 5, attached to Carey Decl. as Ex.

4    D.)   HMA Product Planning interfaces with HMC's Overseas Product Marketing

5    Team, which provides input to HMC for the development of future vehicles.  (Carey

6    Decl. Ex. D, Margason Tr. at 14, 102-103.)   HMA Product Planning had no

7    involvement in the setting or checking of EPA MPG estimates.  (Carey Decl. Ex. D,

8    Margason Tr. at 48, 136.)   According to Mr. Margason, Product Planning first

9    learned of the issues surrounding the EPA MPG estimates at the same time that it

10   learned HMC would be restating the MPG estimates.  (Carey Decl. Ex. D, Margason

11   Tr. at 57.)   HMA Product Planning's role in the restatement process was to make

12   sure that the information contained on new Monroney labels accurately reflected the

13   restated MPG for the affected vehicles, based on MPG information it received from

14   HMC.  (Carey Decl. Ex. D, Margason Tr. at 48, 134; Tr. of Aug. 30, 2013 Tape-

15   Recorded Interview of John Krafcik ("Krafcik Tr.") at 13-14, attached to Carey Decl.

16   as Ex. F.)

17       HMA President and CEO, John Krafcik, was interviewed by Plaintiffs as part

18   of the confirmatory discovery process.  (Carey Decl. Ex. F, Krafcik Tr. at 4.)  HMA

19   did not have any involvement in EPA MPG testing and certification.  (Carey Decl.

20   Ex. F, Krafcik Tr. at 10.)  Prior to the restatement at issue here, Mr. Krafcik claims

21   that he had no knowledge of the coastdown testing component of calculating EPA

22   MPG estimates.  (Carey Decl. Ex. F, Krafcik Tr. at 9.)  Mr. Krafcik also claims that

23   before the restatement he also had no knowledge of HMC's Energy Efficiency

24   Group ("EEE"), an HMC group newly founded in 2008, which was involved in

25   calculating and certifying the EPA MPG estimates at issue in this case.  (Carey Decl.

26   Ex. F, Krafcik Tr. at 12-13; Tr. of Sept. 12, 2013 Tape-Recorded Interview of

27   Kwang-Yeon Kim ("Kim Tr."), at 8-9, attached to Carey Decl. as Ex. G; Carey Decl.

28

- 9 –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

at Ex. K HKMCST0008398.)  Mr. Krafcik states that he first learned that EPA was questioning Hyundai's MPG estimates in July 2012, at a meeting with members of the HMC Research and Development ("R&D") team.  (Carey Decl. Ex. F, Krafcik Tr. at 38-39.)  HMA then changed its advertising focus away from fuel economy for the summer selling season.  (Carey Decl. Ex. F, Krafcik Tr. at 40-41.)

### 3.    Hyundai/Kia Motor Corporation

EPA testing and certification for new vehicle model years was performed in South Korea by engineers in the EEE group of the parent HMC corporation.  (Carey Decl. Ex. G, Kim Tr. at 5, 9.)  Mr. Kim, who was interviewed as part of the confirmatory discovery process, was in charge of HMC's EEE group, which was responsible for the coastdown testing for all Hyundai and Kia vehicles as of January 2009.   (Carey Decl. Ex. G, Kim Tr. at 3-5, 9; Carey Decl. at Ex. K HKMCST0008398.)  Testing was physically completed at HMC's Namyang R&D facility.   (Carey Decl. at Ex. J HKMCST0008212, Carey Decl. at Ex. K HKMCST0008397.)  In 2006, the testing protocol was updated from SAE J1263 to SAE J2263.  (Carey Decl. at Ex. J HKMCST0008211.)

As noted above, the EEE group was created in 2008.   The group was originally tasked with determining the effect that the various vehicle components had on fuel efficiency for the completed vehicle.  (Carey Decl. Ex. G, Kim Tr. at 8; Carey Decl. at Ex. K HKMCST0008398.)  The EEE would provide feedback for product planning and design based on test results.  (Carey Decl. Ex. G, Kim Tr. at 12-13.)  Mr. Joon-Ho Lee was a member of the EEE team specializing in analyzing how tires and friction affected fuel economy.  (Tr. of Sept. 13, 2013 Tape-Recorded Interview with Joon-Ho Lee ("Lee Tr.") at 5, attached to Carey Decl. as Ex. I.)  In response to an inquiry about the effect of tires on coastdown testing, Mr. Lee suggested changes to the coastdown testing protocol in May 2010.  (Carey Decl. Ex. I, Lee Tr. at 6-7; Carey Decl. Ex. G, Kim Tr. at 23; Ex. K HKMCST0008398.)  He

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

advised increasing the warm-up period for coastdown tests from 30 minutes to 60 minutes in order to put the tires at an equilibrium temperature and increase the consistency of coastdown results.  (Carey Decl. Ex. I, Lee Tr. 13.)   He also determined that keeping the tires warm between runs and running tests between 20 and 35 degrees Celsius would increase consistency.  (Carey Decl. Ex. I, Lee Tr. 14.) In summary, the protocol changes included the following: (1) narrowing the range of acceptable ambient temperature; (2) increasing the vehicle warm-up time prior to testing; (3) keeping the vehicle warmed-up between test runs; and (4) increasing the number of test run pairs.  (Carey Decl. Ex.G, Kim Tr. at23-24; Carey Decl. at Ex. K HKMCST0008405-8407.)   Mr. Lee claims he was not concerned with whether the additional warm-up would result in longer or shorter coastdown distances and thus higher or lower MPG estimates.  (Carey Decl. Ex. I, Lee Tr. 13.)  The first vehicle to be certified under the modified protocol was the Model Year 2011 Hyundai Elantra, which was tested in May 2010.  (Carey Decl. at Ex. K HKMCST0008404-8405.)

In a meeting in May 2012, Mr. Kim learned that the EPA's coastdown results for an in-use Elantra vehicle were materially different from the certified numbers provided by HKMC.  (Carey Decl. Ex. G, Kim Tr. at 25-27.)   HKMC then researched the cause of the differences.  (*See generally,* Carey Decl. at Ex. K HKCMST0008395-8412; Carey Decl. at Ex. J HKMCST0008209-8230.)  Mr. Kim tasked Jin-Ho Ha with researching why the EPA's coastdown results could have been different.  (Carey Decl. Ex. G, Kim Tr. at 28.)  This is when Mr. Kim claims that he first learned that Mr. Lee had made the changes described above to HKMC's coastdown testing protocol.  (Carey Decl. Ex. G, Kim Tr. at 24-26, 28.)  Mr. Kim claims that the changes to the coastdown testing methodology in 2010 were done to improve the accuracy of the coastdown tests.  (Carey Decl. Ex. G, Kim Tr. at 41; Carey Decl. at Ex. K HKMCST0008404.)  HKMC's communications with the EPA similarly state that the protocol changes aimed to increase the "reliability of the test

- 11 –

results" (Carey Decl. at Ex. J HKMCST0008216), and to "improve test accuracy and reduce test-to-test variation" (Carey Decl. at Ex. K HMCST0008404).

For most of the vehicles at issue, the May 2010 protocol changes were shown to be the possible cause of the differences. (*Id.*; Carey Decl. at Ex. K HKCMST0008410.)  HKMC's research revealed that the Model Year 2013 Santa Fe coastdown test results were further skewed by high-wind conditions during the testing in 2011.  (Carey Decl. at Ex. K HKCMST0008410.)  For certain Soul, Rio, Veloster, and Santa Fe vehicle models, however, the protocol changes were inadequate to explain the differences in the coastdown test results. (*Id.*)  Certain model Soul, Rio, and Veloster vehicles' coefficients were incorrectly calculated using single-direction coastdown test runs.  (Carey Decl. at Ex. K HKMCST0008410-8411.)

During the confirmatory discovery process in Korea, HKMC made the engineer responsible for this mistake, Ms. Chong Ah Kwon, available for interview. Ms. Chong Ah Kwon is a research and development engineer at Hyundai.  (Tr. of Sept. 13, 2013 Tape-Recorded Interview of Chong Ah Kwon ("Kwon Tr.") at 3, attached to Carey Decl. as Ex. H.)  Ms. Kwon began working in the EEE group in October 2008, and specifically worked on how the electronics packages for the chassis could be used to optimize fuel economy, including through the use of Intermittent Stop and Go (ISG) programming.  (Carey Decl. Ex. H, Kwon Tr. at 4-6.) Her work required her to measure the fuel-efficiency differences, if any, attributable to ISG packages.  (Carey Decl. Ex. H, Kwon Tr. at 5-7.)  To do that, she needed the coefficients derived from coastdown testing.  (Carey Decl. Ex. H, Kwon Tr. at 7-8.) Ms. Kwon claims that coefficients were available for many of the vehicles she was looking at, but not the the Veloster, Soul, and Rio.  (Carey Decl. Ex. H, Kwon Tr. at 7.)

– 12 –

Ms. Kwon asked a senior engineer about the process, and then set out to conduct the coastdown tests herself to obtain the needed coefficients. (Carey Decl. Ex. H, Kwon Tr. at 8-12.)  The senior engineer discussed the use of five sets of runs (a set including an upwind and immediately following downwind run), but Ms. Kwon misunderstood the requirement of matched sets. (Carey Decl. Ex. H, Kwon Tr. at 12-13.)  She received from the test driver at least ten coastdown times from the tests for each vehicle, and she entered into the spreadsheet tool the five longest coastdown times for each vehicle. (Carey Decl. Ex. H, Kwon Tr. at 21-22.)  From the spreadsheet, Ms. Kwon obtained the coastdown coefficient she needed for each vehicle for her testing and performed her ISG-related tests. (Carey Decl. Ex. H, Kwon Tr. at 23-24.)  Ms. Kwon claims that she had no idea that her coastdown test entries would later be used for purposes of EPA MPG certification; she states that she did the tests for her own use in measuring the effects of use of the ISG package in various model vehicles. (Carey Decl. Ex. H, Kwon Tr. at 13-14.)  She first learned that her coastdown tests were used for EPA certification in approximately August of 2012. (Carey Decl. Ex. H, Kwon Tr. at 25.)

**B.    Defendants' Reimbursement Program**

On November 2, 2012, Defendants issued a press release apologizing to their customers and stating that procedural errors at their joint testing operations overstated the fuel-economy ratings for approximately 900,000 Hyundai and Kia vehicles sold between 2010 and 2012; the EPA-estimated fuel-economy figures were reduced by an average of 3%.  Defendants informed customers that they corrected the test processes in response to the EPA and were initiating a reimbursement program to compensate past and current Hyundai or Kia vehicle owners for additional fuel costs incurred to date and in the future (the "Reimbursement Program").  The amount offered by the Reimbursement Program is based on the customer's vehicle model, odometer reading, and the average gas price in their area,

- 13 –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND ORDER DIRECTING NOTICE TO THE CLASS

and Defendants added 15% to the amount to account for the inconvenience caused by the mileage overstatements and the need to address it through the Reimbursement Program.   Customers are asked to visit their local Hyundai or Kia dealer on an ongoing basis so the dealer can verify the odometer reading and arrange for a debit card containing the Reimbursement Program amount to be sent to the customer.   The current deadline to register in the Reimbursement Program is December 31, 2013, but the program will continue for current owners for as long as they own their vehicle.

### E.   The Market Effects of the Announcement

The November 2012 restatement hurt the market standing of some but not all affected Hyundai and Kia vehicles.   For example, the restatement caused the 2013 Hyundai Veloster, the 2013 Hyundai Elantra GT, the 2013 Kia Rio, the 2013 Kia Soul, and the 2011 Kia Sorento to lose class-leading fuel economy ratings.   (Carey Decl. at Ex. N HMAST2004827, HMAST2004849; Carey Decl. at Ex. P KMAST0006182, KMAST0006184; Carey Decl. at Ex. R KMAST0016055, KMAST0016056; Carey Decl. at Ex. Q KMAST0006229, KMAST0006231; Carey Decl. at Ex. S KMAST0016717; Carey Decl. at Ex. T KMAST0026778.)   Other models were not so affected because they were not class leaders in fuel economy, and because the restated fuel economy estimate was not so drastic.   The 2013 Hyundai Elantra moved from 33 MPG to 32 MPG (combined), maintaining the second-best rating in its class.   (Carey Decl. at Ex. O HMAST2032670, HMAST2032649.)   Similarly, the 2012 Hyundai Azera remained at 23 MPG, still trailing the leader in its class.   (Carey Decl. at Ex.M HMAST0085158.)   The 2011 Hyundai Sonata HEV and 2012 Hyundai Tucson remained class leaders in fuel economy even after the restatement.   (Carey Decl. at Ex. L HMAST0084982; Carey Decl. at Ex. W HMAST0085531.)

- 14 –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

Hyundai and Kia both experienced declining market share in the U.S. in 2013, and the announcement arguably contributed to this decline.[3]   Unit sales of Kia vehicles declined slightly but remained above 2011 levels.[4]   At the same time, the announcement did not cause all sales to decline.  Sales of Hyundai vehicles increased after the November 2, 2012 announcement, with overall Hyundai sales improving over results from the previous two twelve-month periods.[5]   For November and December 2012, the months immediately following the announcement, Hyundai's U.S. sales increased to 53,487 and 59,435 units respectively.[6]   These sales represented a 13% improvement over sales results for November and December of 2011 and a 32% increase with respect to November and December of 2010.[7]   Car sales typically peak in the spring and summer for current-year models, and 2013 saw

---

[3] Kia Motors, 2013 3Q Business Results, App. at 10 (Oct. 25, 2013); Kia Motors, 2013 1H Business Results, App. at 10 (Jul. 26, 2013); Kia Motors, 1Q 2013 Earnings Overview App. at 11 (Apr. 26, 2013). Kia's quarterly sales reports are available at http://www.kmcir.com/eng/library/quarterly.asp (last visited Dec. 23, 2013).  *See also* Hyundai Motor Company, 2013 U.S. Retail Sales, 2012 U.S. Retail Sales, *available at* http://worldwide.hyundai.com/WW/Corporate/InvestorRelations/ IRActivities/SalesPerformance/USRetailSales/index.html (last visited Dec. 23, 2013).  Statements concerning sales data are based upon Defendants' publicly available sources, and are subject to verification.

[4] For the twelve months ending October 2013, Kia U.S. sales totaled 536,370. This number fell below the previous twelve month total of 557,763, but remained well above the 462,140 cars sold in the twelve months ending October 2011.  Kia publishes data on U.S. retail sales at http://www.kmcir.com/eng/library/monthly.asp (last visited Dec. 23, 2013).

[5] Hyundai US sales totaled 714,695 for the twelve month period ending October 2013, 690,460 for the period ending October 2012, and 630,841 for the period ending October 2011.  *See* Hyundai Motor Company, 2013 U.S. Retail Sales, 2012 U.S. Retail Sales, 2011 U.S. Retail Sales, and 2010 U.S. Retail Sales, *available at* http://worldwide.hyundai.com/WW/Corporate/InvestorRelations/IRActivities/SalesP erformance/USRetailSales/index.html (last visited Dec. 23, 2013).

[6] *See id.* 2012 U.S. Retail Sales.

[7] *See id.* 2011 U.S. Retail Sales and 2010 U.S. Retail Sales.

- 15 –

this trend continue for Hyundai.   Sales jumped in February 2013 and remained strong through the end of the summer.[8]

Many vehicles affected by the announcement continued to show competitive sales performance.  Sales of the Hyundai Elantra, an affected vehicle, overtook the rest of the fleet, more than doubling from January to May 2013 and remaining strong for the rest of selling season.[9] Sales of the Santa Fe, another affected vehicle, likewise increased into the summer months during that same period of time.[10]  Sales of both of these vehicles outpaced sales from the previous year by a wide margin.[11] The Kia Rio also showed strong performance, with sales improving over the previous year and more than doubling over a two-year period, despite its restated gas mileage.[12]   Meanwhile, sales of the 2013 Sonata fell short, even though the 2013 Sonata, a flagship model, was not subject to the announcement.[13]

---

[8] *See id.* 2013 U.S. Retail Sales.

[9] *See id.* 2013 U.S. Retail Sales.

[10] *See id.* 2013 U.S. Retail Sales.

[11] *See id.* 2013 U.S. Retail Sales, 2012 U.S. Retail Sales, 2011 U.S. Retail Sales, 2010 U.S. Retail Sales.  Santa Fe sales totaled 75,431 for the twelve month period ending October 2011, and 68,194 for the twelve-month period ending October 2012. In the twelve months after the announcement, Santa Fe sales reached 84,971. Elantra sales totaled 182,649 for the twelve-month period ending October 2011, and 192,526 for the twelve-month period ending October 2012.  In the twelve months following the announcement, Elantra sales reached 244,416.

[12] Kia reports selling 40,949 Rio units in the twelve-month period ending October 2013, up from 39,752 units for the twelve-month period ending October 2012 and 17,707 units for the period ending October 2011.  *See* Kia Retail Sales by Country 2013, Retail Sales by Country 2012, and Retail Sales by Country 2011, *available at* http://www.kmcir.com/eng/library/monthly.asp (last visited Dec. 23, 2013).

[13] Sonata sales totaled 222,948 for the twelve-month period ending October 2011, and 225,127 for the twelve-month period ending October 2012.  In the twelve months following the announcement, Sonata sales declined to 211,060.  *See* Hyundai Motor Company, 2013 U.S. Retail Sales, 2012 U.S. Retail Sales, 2011 U.S. Retail Sales, and 2010 U.S. Retail Sales, *available at* http://worldwide.hyundai.com/WW/Corporate/InvestorRelations/IRActivities/SalesPerformance/USRetailSales/index.html (last visited Dec. 23, 2013).

### F.    The Proposed Settlement

The parties' Settlement Agreement in principle was negotiated over multiple sessions with the assistance of the Honorable Stephen J. Sundvold (Ret.).   The Settlement Agreement proposes certification of a nationwide Settlement Class consisting of all current and former owners and lessees of a Class Vehicle (defined below) who were the owner or lessee, on or before November 2, 2012, of such Class Vehicle that was registered in the District of Columbia or one of the fifty (50) states of the United States.[14]  *See, e.g.*, *Lundell v. Dell Inc.*, No. CIVA C05-3970, 2006 WL 3507938, at * (N.D. Cal. Dec. 5, 2006) (certifying nationwide settlement class).  The Class Vehicles are as follows:

| Hyundai Vehicles | Kia Vehicles |
|---|---|
| 2012 & 2013 Accent | 2011 & 2012 Optima HEV |
| 2012 & 2013 Azera | 2012 & 2013 Rio |
| 2011, 2012 & 2013 Elantra | 2012 & 2013 Sorento (GDI engine) |
| 2013 Elantra Coupe | 2012 & 2013 Soul |
| 2013 Elantra GT | 2012 & 2013 Soul ECO |
| 2012 & 2013 Genesis | 2012 & 2013 Sportage |
| 2013 Santa Fe Sport | |
| 2011 & 2012 Sonata HEV | |
| 2012 & 2013 Tucson | |
| 2012 & 2013 Veloster | |

---

[14]  The following are excluded from the Class: (i) Rental Fleet Owners; (ii) government entities, except to the extent that a government entity is the owner or lessee of a Fleet Class Vehicle (in which case such government entity is not excluded from the Class); (iii) judges assigned to the MDL Litigation, including the judge or judges assigned to any lawsuit prior to the transfer of that lawsuit to the MDL Litigation; and (iv) persons who have previously executed a release of HMA or KMA that includes a claim concerning the fuel economy of such Class Vehicle.  (*See* Exhibit 1, Settlement Agreement §§ 1.4, 2.1.)

(*See* Exhibit 1, Settlement Agreement §§ 1.4, 2.1.)

Under the proposed Settlement, a Class member may elect continued participation in the Reimbursement Program, a lump-sum payment, a dealer service debit card, or a new car rebate certificate. (*Id*. §§ 3.1, 3.2.)  If a Class member elects the lump-sum payment, he will no longer be entitled to receive further compensation pursuant to the Reimbursement Program, and the lump-sum-payment amount will be reduced by the amount the Class member has already received through the Reimbursement Program. (*Id*. §§ 5.1, 5.2.)  If the lump-sum payment is less than the amount the Class member has received through the Reimbursement Program, the Class member must remain in the Reimbursement Program. (*Id*. § 5.3.)

The lump-sum payment amount will be in the form of a cash debit card that may be used like a credit card or used at an ATM; the Class member may transfer the entire balance of the debit card to a checking or other bank account; there will be no issuer fees imposed on the Class member; and the debit card will be non-transferrable and will expire one year after it is issued. (*Id*. § 3.2.1.)  The dealer service credit compensation will be in the form of a debit card valued at 150% of the amount that otherwise would be paid as a cash debit card; it may only be used at an authorized Hyundai or Kia dealer towards any merchandise, parts, or service; there will be no issuer fees imposed on the Class member; and the debit card will be non-transferrable and will expire two years after it is issued. (*Id*. § 3.2.2.)  The new car rebate certificate will be in the form of a certificate valued at 200% of the amount that otherwise would be paid as a cash debit card; it may only be used toward the purchase of a new Hyundai or Kia vehicle; there will be no issuer fees imposed on the Class member; and the certificate will be non-transferrable (except to a family member) and will expire three years after it is issued. (*Id*. § 3.2.3.)  The value of any debit card, dealer service credit card, and new car rebate certificate will remain

– 18 –

Defendants' property until expended, and upon expiration, the value will become Defendants' permanent property. (*Id.* § 3.2.4.)

The Class members are entitled to the following benefits under the proposed Settlement:

- Current original owners will receive compensation in the amount set forth in the Settlement Agreement (Exhibit B for Hyundai Class Vehicles, and Exhibit C for Kia Class Vehicles) in accordance with the specific Class Vehicle(s) the current original owner owns. (*Id.* § 3.1.1.)

- Current non-original owners will receive compensation which is one-half of the amount set forth in the Settlement Agreement (Exhibit B for Hyundai Class Vehicles, and Exhibit C for Kia Class Vehicles) with respect to the specific Class Vehicle(s) the current non-original owner owns. (*Id.* § 3.1.2.)

- Former owners will receive compensation in the amount they are qualified to receive pursuant to the Reimbursement Program, except that they shall also be entitled to a lump-sum payment, a dealer service debit card, or a new car rebate voucher. (*Id.* §§ 3.1.3, 3.2.)

- Current lessees will receive compensation in the amount set forth in the Settlement Agreement (Exhibit B for Hyundai Class Vehicles, and Exhibit C for Kia Class Vehicles) in accordance with the specific Class Vehicle the current lessee leases. (*Id.* § 3.1.4.)

- Former lessees will receive compensation in the amount that they are qualified to receive pursuant to the Reimbursement Program, except that they shall also be entitled to a lump-sum payment, a dealer service debit card, or a new car rebate voucher. (*Id.* §§ 3.1.5, 3.2.)

- Current fleet owners will receive compensation in the amount set forth in the Settlement Agreement (Exhibit B for Hyundai Class Vehicles, and Exhibit C for Kia Class Vehicles) in accordance with the specific Class Vehicles the fleet owner owns. (*Id.* § 3.1.6.)

- Former fleet owners will receive compensation in the amount they are qualified to receive pursuant to the Reimbursement Program, except that

– 19 –

they shall also be entitled to a lump-sum payment, a dealer service debit card, or a new car rebate voucher. (*Id*. §§ 3.1.7, 3.2.)

- Any current original owner, current lessee, or current fleet owner of an Elantra, Accent, Veloster, or Sonata Hybrid Class Vehicle who either remains in the Reimbursement Program or elects benefits under the proposed settlement will receive the following additional compensation: (i) $100 for a current original owner, or (ii) $50 for a current lessee or current fleet owner. Like the other compensation under the settlement, this compensation will be in the form of a debit card that may be used like a credit card or used at an ATM. These Class members shall also be entitled to a lump-sum payment, a dealer service debit card, or a new car rebate voucher. (*Id*. §§ 3.1.8, 3.2.)

In exchange for the benefits provided by the Defendants under the proposed Settlement, Class members will release the Defendants from all claims that arise from or relate to fuel economy or mileage performance, including marketing or advertising of fuel economy or mileage performance. (*Id*. §§ 13.1, 13.2.) The release expressly excludes claims for personal injury, damage to tangible property other than a Class Vehicle, or any and all claims pertaining to anything other than the Class Vehicles. (*Id*. § 13.1.)

The Settlement Agreement proposes that Notice of this proposed settlement be disseminated to the Settlement Class by first-class mail. (*Id*. § 11.1.) The Notice will be mailed to every Class member whose current address is reasonably ascertained from an available R.L. Polk & Company database. (*Id*.) Mailing will be completed at the sole expense of Defendants. (*Id*.)

The draft Notice, which is attached as Exhibit G to the Settlement Agreement, provides the claim form that Class members must complete, sign, and submit to obtain settlement benefits, and it enables Class members to exclude themselves from the Settlement by mailing a letter stating their intention to an address stated in the Notice. (*Id*. §§ 11.1-11.5; Ex. G.) The draft Notice also explains the process by which Class members can object to the Settlement Agreement and informs them that

– 20 –

they are permitted to attend the Fairness Hearing, either with or without counsel.  (*Id.* § 11.6; Ex. G.)  The claims period will be nine months, measured from the date the Notice is mailed, and Defendants will also request that dealers apprise customers who are members of the Class of the availability of settlement relief, including by distributing flyers to Class members receiving vehicle service.  (*Id.* §§ 4, 6.2, Ex. D.)

In addition, the proposed Settlement requires Defendants to establish and maintain a website dedicated to the Settlement, which will enable Class members to access and download the Class Notice, find answers to frequently asked questions, and obtain other relevant information about the Settlement.  (*Id.* §§ 11.2, 11.3.)  The proposed Settlement further requires Defendants to establish and maintain a toll-free customer service number that Class members may call for further information about the Settlement and how to obtain settlement benefits.  (*Id.* §§ 11.2, 11.4.)  The draft Notice includes the toll-free phone number.  (*Id.* at Ex. G.)

The proposed Settlement also provides that HMA and KMA shall pay Plaintiffs' reasonable attorneys' fees in an amount to be separately negotiated and approved by the Court.  (*Id.* § 12.1.)  Beyond that agreement, the parties did not discuss attorneys' fees prior to or in connection with the execution of the Settlement Agreement or the confirmatory discovery process.  (*Id.* §§ 12.2, 12.4.)

## II.     ARGUMENT

### A.     The Court Should Preliminarily Approve The Proposed Settlement.

Federal Rule of Civil Procedure 23(e), requires judicial approval for any settlement agreement that will bind absent class members.  *See* Fed. R. Civ. P. 23(e); *see also Briggs v. United States*, No. C 07–05760 WHA, 2010 WL 1759457, at *3 (N.D. Cal. Apr. 30, 2010).  The Court must take three steps in considering approval of the proposed Settlement: (1) the Court must preliminarily approve the proposed Settlement; (2) members of the Class must be given notice of it; and (3) a final hearing must be held, after which the Court must decide whether the tentative

- 21 –

Settlement is fair, reasonable, and adequate.  *See* MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632, at 320-21 (4th ed. 2004) ("MANUAL (FOURTH)").  The decision to approve a proposed class-action settlement is within the sound discretion of the district court judge "because he is exposed to the litigants, and their strategies, positions, and proof."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000).  *See also Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *accord Bruno v. Quten Research Inst., LLC*, No. SACV 11–00173 DOC (Ex), 2013 WL 990495, at *1 (C.D. Cal. Mar. 13, 2013).

The sole inquiry at the preliminary-approval stage is "'whether a proposed settlement is fundamentally fair, adequate, and reasonable,' recognizing that '[i]t is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness.'"  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) (*quoting Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).  But the ultimate question of fairness, reasonableness, and adequacy is answered at the final-approval stage, after notice of the settlement has been given to class members and they have had an opportunity to comment on the settlement.  *See* 5 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 23.83(1), at 23-336.2 to 23-339 (3d ed. 2002).  Preliminary approval is merely the prerequisite to providing notice to the class so that all class members are "afforded a full and fair opportunity to consider the proposed [settlement] and develop a response."  *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983).  *See also Misra v. Decision One Mortgage Co.*, No. SA CV 07-0994 DOC (RCx), 2009 WL 4581276, at *3, 9 (C.D. Cal. Apr. 13, 2009) ("To determine whether preliminary approval is appropriate, the settlement need only be *potentially* fair, as the Court will make a final determination of its adequacy at the hearing on Final Approval, after such time as any party has had a chance to object and/or opt out.") (Emphasis in original; citation omitted.)

Courts have consistently noted that the standard for preliminary approval is *less rigorous* than the analysis at final approval. Preliminary approval is appropriate as long as the proposed settlement falls "within the range of possible judicial approval." A. CONTE & H.B. NEWBERG, NEWBERG ON CLASS ACTIONS § 11:25 (4th ed. 2002) ("NEWBERG") (*citing* MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.41 (3rd ed. 1995) ("MANUAL (THIRD)")); MANUAL (FOURTH) § 21.632, at 321. Courts employ a "threshold of plausibility" standard intended to identify conspicuous defects. *Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 1793774, at *6 (N.D. Cal. June 19, 2007). Unless the Court's initial examination "disclose[s] grounds to doubt its fairness or other obvious deficiencies," the Court should order that notice of a formal fairness hearing be given to settlement Class members under Rule 23(e). *West v. Circle K Stores, Inc.*, No. CIV. S-04-0438 WBS GGH, 2006 WL 1652598, at *11 (E.D. Cal. June 13, 2006) (citation omitted); MANUAL (FOURTH) § 21.632, at 321-22.

### 1.  The proposed Settlement is sufficiently fair, reasonable, and adequate for preliminary approval.

To determine whether a proposed settlement is fair, adequate, and reasonable, a district court must ultimately consider several factors, including: (i) the strength of the plaintiffs' case; (ii) the risk, expense, complexity, and likely duration of further litigation; (iii) the risk of maintaining class-action status throughout the trial; (iv) the amount offered in settlement; (v) the extent of discovery completed and the stage of the proceedings; (vi) the experience and views of counsel; (vii) the presence of a governmental participant;[15] and (viii) the reaction of the class members to the proposed settlement. *Staton*, 327 F.3d at 959 (internal citation and quotation marks omitted). The proposed Settlement is fair, adequate, and reasonable after analysis of each of these factors.

---

[15] This factor does not apply at the preliminary-approval stage.

- 23 –

### i.        The Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation

The heart of Plaintiffs' claims is that Defendants adopted, promulgated, represented, and benefited from inaccurate fuel-efficiency ratings, which were caused by Defendants' process changes and flaws for coastdown tests outlined and specified in federal law.  Fuel-efficiency ratings exist to establish realistic—and more importantly, identically calculated—estimates that consumers can use for comparison of fuel efficiency between manufacturers when purchasing a new vehicle.  Uniformity of the testing process across the entire industry is critical; otherwise, the EPA MPG estimates would be useless for their intended purpose. Plaintiffs each purchased or leased a car whose EPA fuel-economy ratings and advertised fuel-efficiency numbers were inaccurate and higher than they would have been if the EPA's standardized test procedures had been followed.

Plaintiffs conducted settlement negotiations assuming a solid probability that they could prove deceptive conduct on the part of the Defendants.  Defendants' overstatements significantly increased the fuel-efficiency ratings for numerous vehicles, and the overstatements propelled many of those vehicles to class-leading market positions.  Some models showed such remarkable gains in fuel efficiency ratings as to raise serious questions as to their legitimacy. For example, the 2012 Kia Soul's highway fuel economy rating was overstated by as much as 6 MPG, representing a 4 MPG gain over the previous model-year.  (Carey Decl. at Ex. R KMAST0016056; Carey Decl. at Ex. T KMAST0026780; Carey Decl. at Ex. V KMAST0030693.)  The 2012 Kia Rio's highway fuel economy rating was similarly overstated by 4 MPG, topping the 2011 model-year MPG by the same amount. (Carey Decl. at Ex. R KMAST0016056, Carey Decl. at Ex. U KMAST0027444.) Progress in fuel efficiency is generally incremental, resting upon the optimization of traditional car components.  Dramatic increases are extremely unusual absent a

- 24 –

radical technological breakthrough.  Plaintiffs contend that Defendants very likely noticed and chose to ignore such aberrational differences in their existing product line.

These circumstances prompted Plaintiffs to undertake a detailed investigation into Defendants' testing and marketing decisions. A scheme to achieve top-of-class status would confer additional marketing advantages, as would a scheme to propel numerous vehicles (including Optima, Sonata, Accent, Elantra, Veloster, and Rio models) above the 40 MPG fuel economy milestone.  (Carey Decl. at Ex. R KMAST0016055-16056.)  These benefits and profits would not be accounted for in a damages model limited to the value of the extra fuel to be purchased by class members.  Hence, Plaintiffs have negotiated a settlement which will compensate class members beyond the pay-as-you-go Reimbursement Program that Defendants offered.

At the same time, changes in fuel efficiency alone do not appear to have determined consumer preferences.  Vehicles affected by the November 2012 announcement enjoyed a strong sales record in the months following the announcement and generally sold better than cars not included in the announcement. This was the case even though Defendants acted to review their marketing materials and correct misstatements regarding fuel economy.  While Defendants deny that the overstatement materially affected consumer preferences and have characterized the overstatement as the result of unintentional testing mistakes, Plaintiffs assessed the value of the settlement understanding that Defendants faced potential exposure to punitive damages for knowing concealment.

Plaintiffs and their counsel believe their claims are meritorious, but Defendants have raised and would continue to raise challenges to the legal and factual basis for such claims.  For example, Defendants would be expected to challenge the materiality of changes in fuel economy ratings, as well as consumers'

- 25 –

right to expect vehicles to achieve a given level of fuel economy under varying use conditions.  Defendants have argued that Plaintiffs' claims are federally preempted and would be expected to continue to defend on that basis as well.  Defendants also might argue that the 2010 changes in the precise coastdown testing procedures were consistent with the EPA-mandated testing protocol (SAE J2263), and that the tabulation mistake concerning certain vehicles was unintentional.  Although the parties differ as to the likelihood of Plaintiffs ultimately prevailing at trial and on appeal, it is apparent that both sides bear some risk in proceeding to litigate the case.

Through its Reimbursement Program, Defendants have addressed some of the issues involved in this litigation, and Defendants contend they made sufficient disclosures about the flawed EPA testing and the resulting inaccuracy of the fuel-efficiency ratings.  Plaintiffs contend, however, that the Reimbursement Program is insufficient because it does not account for the time value of money and it places Class members in the inappropriate and inconvenient position of bearing the burden of proving their losses on an annual basis.  The proposed Settlement strikes a balance between the parties' positions on the scope and substance of the Reimbursement Program by adding benefits not found in the Reimbursement Program, such as a lump-sum payment, a dealer service credit, and a new car rebate certificate.  The proposed settlement also provides additional monetary relief to the owners and lessees of the Hyundai Elantra, Accent, Veloster and Sonata Hybrid above the reimbursement program, as those models were the subject of a targeted MPG advertising campaign.  The proposed Settlement thus provides immediate certainty and valuable benefits to the Class members, rather than forcing them to wait years for all litigation and appeals to be fully resolved at the risk of recovering nothing.

If this case is not settled, it would be necessary to continue, as Defendants have done since the inception of this lawsuit, to raise objections to the legal and factual basis for expanding Defendants' liability beyond the relief set forth in the

- 26 –

Reimbursement Program.  Such an inquiry would necessarily involve an enormous amount of discovery, including expert testimony regarding the coastdown testing protocol, as well as the scope of Defendants' alleged knowledge of the changes to the coastdown testing protocol.  The proposed Settlement, on the other hand, balances these costs, risks, and potential for delay against the benefits of settlement, achieving a settlement that is fair and desirable to the Class.  *See* NEWBERG § 11:50 ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."); *accord Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004).

This factor weighs in favor of preliminary approval of the Settlement because, though Plaintiffs' case is strong, continued litigation will be long, expensive, and complex, and will necessarily present a risk that Plaintiffs may not prevail.

### ii.     The Risk Of Maintaining Class-Action Status Throughout The Trial.

A litigation class has not been certified in this MDL.  Additionally, there is a group of plaintiffs who do not support the proposed Settlement, and this could cause issues with maintaining class-action status.  Furthermore, there are several recent decisions denying class certification in vehicle cases involving similar class-certification issues, which demonstrates that there is a high degree of risk that class-action status could not be maintained throughout litigation.  *See, e.g., Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012); *Daigle v. Ford Motor Co.*, No. 09-3214 (MJD/LIB), 2012 WL 3113854 (D. Minn. July 31, 2012); *Corder v. Ford Motor Co.*, 283 F.R.D. 337 (W.D. Ky. 2012); *Edwards v. Ford Motor Co.*, No. 11-CV-1058-MMA(BLM), 2012 WL 2866424 (S.D. Cal. June 12, 2012); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012); *In re Ford Motor Co. E-350 Van Products Liab. Litig.*, MDL No. 1687, 2012 WL 379944 (D.N.J. Feb. 6,

2012); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012); *Am. Honda Motor Co. v. Superior Court*, 199 Cal. App. 4th 1367 (Cal. App. 2d Dist. 2011); *Lloyd v. Gen. Motors Corp.*, 275 F.R.D. 224 (D. Md. 2011), 266 F.R.D. 98 (D. Md. 2010); *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498 (S.D.N.Y. 2011), No. 09 Civ. 11(PAE), 2012 WL 2359964 (S.D.N.Y. June 19, 2012).

### iii.    The Amount or Type of Relief Offered in Settlement.

The proposed Settlement has high value and provides substantial economic and non-monetary benefits to the Class in comparison to what Plaintiffs and the Class could achieve through a successful trial.  Plaintiffs have steadfastly sought reimbursement for economic damages as a lump-sum payment, and as a result, the Class will receive significant cash payments via debit cards.  (Exhibits B and C; Settlement Agreement § 3.2.1.)  The cash value of the debit cards exceeds the estimated present value of the "pay-as-you-go" Reimbursement Program for a significant proportion of vehicle owners, in addition to conferring an advantage of immediate payment without the burden of seeking repeated reimbursement from the deal.[16]  The debit card also protects the current owner from potential loss associated with selling a vehicle before the Reimbursement Program benefit can be obtained.

Alternatively, Class members can elect a dealer service credit at 150% of the cash value to which they would otherwise be entitled pursuant to the lump-sum-payment calculation, or a new car rebate certificate at 200% of the cash value to which they would otherwise be entitled pursuant to the lump-sum-payment calculation.  (Settlement Agreement §§ 3.2.2., 3.2.3.)  While Courts often question the true value of coupon/credit awards in class settlements, here, the consumer's

---

[16] The parties continue to gather data relating to ongoing Reimbursement Program participation rates.  Upon consideration of this and additional background data relating to Reimbursement Program benefits, Plaintiffs intend to present additional details reflecting the relative benefits of the proposed settlement against the Reimbursement Program at the final fairness hearing stage.

ability to choose his/her remedy makes this option very valuable.  Consumers who can and will actually use the 150%-200% credits will elect to do so and get a bonus, but those who do not will still get 100% of their damages as cash.  Additionally, those Class members who wish to stay in the current "pay-as-you-go" Reimbursement Program are free to do so.  (*Id*. § 3.1.8.)

There are also non-monetary benefits provided to the Class by the proposed Settlement.  Defendants will request that Hyundai and Kia dealers apprise customers who are members of the Class of the availability of settlement relief, including by distributing flyers to Class members receiving vehicle service.  (*Id*. § 6.2.)  This heightened level of disclosure is attributable to the filing of this litigation, and it is considered a non-monetary benefit.  *See Finkel v. Am. Oil & Gas, Inc.*, 10-cv-01808-CMA-MEH, 2012 WL 171038, at *2 (D. Colo. Jan. 20, 2012) (*citing Merola v. Atl. Richfield Co.*, 515 F.2d 165, 169-70 (3d Cir. 1975), and *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1165 (Del. 1989)).

It is likely that a successful result at trial would not garner a better result than that achieved by the proposed Settlement.  But even if it did, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair."  *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982) (*citing Flinn v. FMC Corp.*, 528 F.2d 1169, 1173-74 (4th Cir. 1975)).  In light of the uncertainties of trial, the value of the Settlement plainly meets (and exceeds) the adequacy standard and renders this factor supportive of the proposed Settlement.

### iv. The Extent Of Discovery Completed And The Stage Of The Proceedings.

If the parties have sufficient information sharing and cooperation in providing access to necessary data, the settlement may be deemed fair, reasonable, and adequate.  *Misra*, 2009 WL 4581276, at *8 (*citing Mego*, 213 F.3d at 459).  It is

- 29 –

well-established that parties can acquire sufficient information in the absence of formal discovery and based on only informal means of acquiring information. *See Clesceri v. Beach City Investigations & Protective Servs.*, No. CV-10-3873-JST (RZx), 2011 WL 320998, at *9 (C.D. Cal. Jan. 27, 2011) ("In the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement." (*quoting Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998))).

Here, by the time settlement negotiations began, the *Espinosa* action had been actively litigated for more than a year. The Espinosa Plaintiffs had filed two amended complaints, this Court had made a substantive ruling in response to HMA's motion to dismiss; the parties had conducted extensive pre-trial discovery including the review of approximately 30,000 documents; Plaintiff and expert depositions had occurred; and the parties had fully briefed and argued a motion for class certification. Furthermore, to evaluate the economic-loss portion of the Class members' claims in the MDL and establish the elements of damage, the Settling Plaintiffs only needed to know fuel costs by region, the Class members' actual mileage or their mileage in the aggregate, the Class Vehicles' fuel-economy ratings, and the ownership periods of the Class Vehicles (with adjustments for fleet and leased vehicles). The Settling Plaintiffs had all of this information prior to negotiating the Settlement. Most of the necessary information is publicly available from NHTSA and the Department of Transportation, and any missing information was supplied by the documents provided by HMA and KMA. This makes it very easy to figure out what the Class members' damages are in advance, and discovery was not needed to calculate the damages—certainly not in the aggregate and likely not individually—because the Class members will provide the requisite information. The value of the Settlement comes from the lump-sum payment to Class members and increased participation by

- 30 –

Class members through various methods of notification, including the Class Notice as well as notice from individual Hyundai and Kia dealers regarding the Settlement.

Thus, while this case settled relatively early in the proceedings, the parties have conducted extensive formal and informal discovery: Defendants have produced hundreds of thousands of documents and data pursuant to written requests from Plaintiffs, giving the parties access to a substantial amount of detailed information concerning the nature and scope of the flawed testing, including the number of affected vehicles and the number and content of consumer complaints. Disputes on written discovery were resolved by negotiation and motion practice. Documents produced included materials previously requested by the EPA and various state attorneys general in the course of their investigations.  Plaintiffs took eleven interviews of key personnel from HMA, KMA, and HKMC—including the most senior executives of each American subsidiary, senior engineers at the South Korean parent companies, and an engineer responsible for testing mistakes which led to the overstatement.  Plaintiffs travelled to South Korea to inspect the testing ground, tour the R&D facility, and interview the engineers and managers involved in coastdown testing.

Representatives of non-settling plaintiffs participated in document and in-person discovery efforts.   Plaintiffs reserved the right to re-negotiate or rescind the settlement if discovery showed that Defendants' conduct was substantially or materially different than represented and anticipated.  For this same reason, Plaintiffs have not negotiated or requested a settlement regarding their claim for attorney's fees, and attorney's fees will not be addressed until discovery is complete.

The fruits of this discovery have enabled the parties to assess the merits of their case and arrive at a fair, reasonable, and adequate resolution.  Documents and interviews illustrate the issues and problems in HKMC's testing procedures which led to the overstatements.  Both parties are confident that they have identified the

- 31 –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND ORDER DIRECTING NOTICE TO THE CLASS

specific process changes and process mistakes at the heart of the dispute.  Plaintiffs have diligently evaluated and examined the sequence of events giving rise to their claims, as well as Defendants' position regarding the interpretation and application of EPA regulations.  While facts will always be subject to interpretation, discovery to date has enabled the parties to understand in great detail the objective sequence of events that would form the basis for the adjudication of this lawsuit.  Discovery to date therefore provides sufficient background and information necessary to evaluate the fairness, adequacy, and reasonableness of the proposed Settlement.  *See Misra*, 2009 WL 4581276, at *8; *see also Clesceri*, 2011 WL 320998, at *9, 12 (preliminarily approving the settlement where the parties conducted significant informal discovery, and the plaintiff reviewed hundreds of pages of documents and conducted numerous informal interviews regarding the background of the case) (internal quotation marks omitted).

Throughout their "investigation, discovery and research," Plaintiffs' counsel "presented the court [and the non-settling plaintiffs] with documentation supporting" the proposed Settlement.  *See Mego*, 213 F.3d at 459.  Therefore, Plaintiffs believe they have reviewed the necessary data to make an informed decision about the benefits of the proposed Settlement, and the Court should find that sufficient discovery took place.

### v.        The Experience And Views Of Counsel.

Counsel for Plaintiffs and Defendants support the approval of the Settlement—a fact that confers a presumption of validity on the proposed Settlement.  *See Hughes v. Microsoft Corp.*, Nos. C98–1646C, 2001 WL 34089697, at *7 (W.D. Wash. Mar. 26, 2001).  "Great weight" is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.  *DIRECTV*, 221 F.R.D. at 528.  *See also Clesceri*, 2011 WL 320998, at *10 ("Courts give weight to counsels' opinions regarding the fairness of a settlement, when it is

- 32 –

negotiated by experienced counsel."); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1392 (D. Ariz. 1989), *aff'd sub nom. Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ("Counsels' opinions warrant great weight both because of their considerable familiarity with this litigation and because of their extensive experience in similar actions.").   This is because "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation."  *In re Pac. Enter. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995).   Therefore, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel."  *DIRECTV*, 221 F.R.D. at 528 (*quoting Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)).

In this case, counsel for Plaintiffs and Defendants support approval of the proposed Settlement.  Counsel for the Hunter and Brady Plaintiffs has set forth the basis for its recommendation in the Carey Declaration, attached hereto as Exhibit 2, and counsel for the Espinosa Plaintiffs has set forth the basis for its recommendation in the Declaration of Richard D. McCune, attached hereto as Exhibit 3.  Therefore, this factor weighs heavily in favor of preliminarily approving the terms of the proposed Settlement.

### vi. The Reaction Of The Class Members To The Proposed Settlement.

At the preliminary-approval stage, the reaction of class members to the proposed settlement is usually not known because notice has not yet been sent to the class.  As such, this factor is not as meaningful a consideration now as it may be at the final fairness hearing where Class members will have an opportunity to object to the proposed settlement.  The parties will provide further evidence of the reaction of the Class members before the Settlement fairness hearing.

– 33 –

Importantly, in a complex class-action litigation such as this, granting preliminary approval and directing notice to class members where the class has not been certified prior to settlement may actually enhance class members' opt-out rights. *See In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 205-06 (S.D.N.Y. 1995). The court explained that "because the right to exclusion [from the class] is provided simultaneously with the opportunity to accept or reject the terms of a proposed settlement," class members have a more concrete basis upon which to decide what they will sacrifice by opting out. *Id.*; *see also In re Baldwin-United Corp.*, 105 F.R.D. 475, 481 (S.D.N.Y. 1984). The putative Class members in this case will likewise benefit from the simultaneous class certification[17] and Notice of proposed Settlement, militating in favor of preliminary approval.

### 2. The Proposed Settlement Is The Result Of Extensive, Arm's-Length Negotiations Conducted By Highly Experienced Counsel.

In addition to the factors discussed above, the Court must also be satisfied that "the settlement is not the product of collusion among the negotiating parties" when, as here, the "settlement agreement is negotiated prior to formal class certification." *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011). *See also Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 301-02 (E.D. Cal. 2011) ("Preliminary approval of a settlement and notice to the proposed class is appropriate: '[i]f [1] the proposed settlement appears to be the product of serious, informed, noncollusive negotiations, [2] has no obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives or segments of the class, and [4] falls with the range of possible approval . . . .'" (*quoting In re Tableware Antitrust Litig.*, 484 F.Supp.2d 1078, 1079 (N.D. Cal. 2007) (adding numbers))).

---

[17] Plaintiffs have filed concomitantly with this joint motion a motion for class certification.

- 34 –

The factors considered here include whether the settlement was the product of arm's-length negotiations between experienced, capable counsel;[18] the end result achieved;[19] and whether counsel are to receive a disproportionate distribution of the settlement under a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds where fees not awarded revert to the defendants rather than to the class.[20]

Here, the proposed Settlement is the product of extensive, months-long negotiations conducted at arm's-length among well-informed, sophisticated counsel, over multiple sessions with the assistance of the Honorable Stephen J. Sundvold (Ret.).  (Carey Decl. ¶¶ 9-10)  Plaintiffs' counsel met with Hyundai representatives in person to discuss claims and settlement possibilities on November 14, 2012, and December 14, 2012.  (*Id.* at  ¶ 10)  Two mediation sessions followed with Hyundai on January 16, 2013 and February 12, 2013, and a third occurred that also included claims against Kia on March 21, 2013. (*Id.* at  ¶ 10.)   Negotiators for both sides

---

[18]  *See* NEWBERG § 11:41 (a proposed settlement is entitled to "an initial presumption of fairness" when the settlement has been "negotiated at arm's length by counsel for the class"); *Hughes*, 2001 WL 34089697, at *7 ("A presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced capable counsel after meaningful discovery." (*quoting* MANUAL (THIRD) § 30.42)); *City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996) ("When sufficient discovery has been provided and the parties have bargained at arms-length, there is a presumption in favor of the settlement."); *Flinn*, 528 F.2d at 1173 ("While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement.").

[19] *See Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987) ("Rather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation . . . . The proof of the pudding was indeed in the eating."); *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987) ("The most important consideration is the strength of plaintiffs' case on the merits weighed against the amount offered in settlement.") (*citing* 7A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1797 (1972)).

[20]  *See In re Bluetooth*, 654 F.3d at 947-49.

- 35 –

1   were in frequent contact by phone and email during this time to discuss substantive

2   settlement issues and ongoing discovery efforts. (*Id.* at ¶ 10.)

3          The negotiations involved the evaluation of the documents received and of the

4   information garnered from interviews taken during the settlement-discovery phase.

5   (*Id.* at ¶ 10.)  The parties demonstrated that they were fully prepared to litigate this

6   case through final judgment; in fact, the Espinosa Plaintiffs have engaged a full

7   round of briefing on the merits of motions to dismiss and have briefed their motion

8   for class certification.  (*Id.* at ¶ 10; Dkt. 6 at Ex. 2.)  Plaintiffs' counsel have

9   represented consumers in a number of significant class actions against Hyundai and

10  Kia.  Two of these actions are presently ongoing, while Plaintiffs' counsel negotiated

11  successful, court-approved settlements in others.[21]  In short the litigation has been

12  contested since its inception and settlement negotiations were similarly adversarial.

13         Although Defendants have agreed to separately pay an award of attorneys'

14  fees and costs, the fees-and-costs negotiations were purposefully delayed by the

15  parties until ***after*** the parties concluded settlement negotiations, and after the

16  confirmatory discovery process.  (*See* Settlement Agreement § 12; Carey Decl. ¶ 12;

17  McCune Decl. ¶ 22.)  Such practice is seen as generally preferable because the

18  simultaneous negotiation of class relief and attorneys' fees creates a potential

19  conflict of interest.  *See* MANUAL (FOURTH) § 21.7 ("Separate negotiation of the class

20  settlement before an agreement on fees is generally preferable."); *see also In re*

21  *Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 334-35

22  (3d Cir. 1998) (affirming final approval of class settlement and fee award where

23

---

24         [21] *See Irwin v. Hyundai Motor Am., Inc.*, Case No. CV2003-020169 (Maricopa
County Super. Ct.) (settlement); *Kearney v. Hyundai Motor Co.*, Case No. 09-CV-
25  1298 (C.D. Cal.) (settlement); *Cirulli v. Hyundai Motor Co.*, Case No. 08-CV-0854
(C.D. Cal.) (settlement);  *Anderson v. Hyundai Motor Co.*, Case No. 13-CV-1842
26  (C.D. Cal.) (pending); *Sims v. Kia Motors Am., et al.*, Case No. 13-CV-1791 (C.D.
Cal.) (pending).
27

28

- 36 –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS

"[t]here [was] no indication the parties began to negotiate attorneys' fees until after they had finished negotiating the settlement agreement.").

Since attorneys' fees and costs will be determined separately and apart from the negotiations that have led to the proposed Settlement and after the confirmatory discovery process, and since any fees and costs not awarded to Plaintiffs' counsel will not revert to Defendants, there is no risk of collusion or impropriety.

For all of these reasons, the Court should preliminarily approve the proposed Settlement.

### B.      The Proposed Notice Is Adequate And Should Be Approved.

Reasonable notice must be provided to Class members to allow them an opportunity to object to the proposed Settlement. *See Durrett v. Hous. Auth. of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990); *see also* FED. R. CIV. P. 23(c)(2)(b), 23(e)(1).   Rule 23(e)(1) requires that the Court direct notice of the proposed Settlement "in a reasonable manner."   In a settlement class maintained under Rule 23(b)(3), as here, notice must meet the requirements of both Rule 23(c)(2) and Rule 23(e), but since "[t]he requirements of Rule 23(c)(2) are stricter than the requirements of Rule 23(e) and arguably stricter than the due process clause," the plan for dissemination of notice need only satisfy Rule 23(c)(2). *Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 324-25 (E.D. Pa. 1993).   Under Rule 23(c)(2)(B), notice to the Class must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort,"[22] although actual notice is not required.[23]

To satisfy Rule 23(c)(2), Rule 23(e), due process, and bind all members of the Class, the Notice must:

1.      Describe the essential terms of the proposed settlement;

---

[22] *See also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

[23] *See Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND ORDER DIRECTING NOTICE TO THE CLASS

2.      Disclose any special benefits provided to the class representatives;

3.      Provide information regarding attorneys' fees;

4.      Indicate the time and place of the hearing to consider approval of the settlement, and the method for objecting to (or, if permitted, for opting out of) the settlement;

5.      Explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set out those variations; and

6.      Prominently display the address and phone number of class counsel and the procedure for making inquiries.

MANUAL (THIRD) § 30.212.  *See also Churchill Vill., LLC v. General Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" (*quoting Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir.1980))).

Here, the form of Notice proposed is clear, precise, informative, and complies with the foregoing standards.  (*See* Settlement Agreement § 11 and Ex. G.)  Plaintiffs propose to disseminate the Notice by mailing it via first-class mail to every Class member whose current address is reasonably ascertainable from an available R.L. Polk & Company database.  (*Id.* § 11.1.)  Such a process satisfies the requirements of due process.  *See Sullivan v. Am. Express Publ'g Corp.*, No. SACV 09-142-JST (ANx), 2011 WL 2600702, at *8 (C.D. Cal. June 30, 2011) ("Notice by mail has been found by the Supreme Court to be sufficient if the notice is 'reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" (*quoting Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950))).  Furthermore, the proposed Notice builds upon the illustrative form suggested by the Federal Judicial Center for consumer class settlements and clearly lays out the claims, class eligibility, and a member's legal rights and duties.  Federal Judicial Center, Class Action Notices

- 38 –

1  Page, Federal Judicial Center, http://www.fjc.gov/public/home.nsf/autoframe?

2  openform&url_l=/public/home.nsf/inavgeneral?openpage&url_r=/public/home.nsf/p

3  ages/376 (last visited December 23, 2013).

4          The proposed Notice will, therefore, fairly and accurately inform the Class

5  members of the terms of the proposed settlement and provide sufficient opportunity

6  for them to make informed decisions regarding their rights.  Accordingly, the Court

7  should approve the proposed Notice and direct its dissemination.

8  **III.   CONCLUSION**

9          For the foregoing reasons, Plaintiffs request that the Court (1) grant

10 preliminary approval to the parties' Settlement Agreement, and (2) approve and

11 order the proposed form and method of notice.

12

13 DATED: December 23, 2013          **HAGENS BERMAN SOBOL SHAPIRO LLP**

14                                   By  /s/Robert B. Carey

15                                   Robert B. Carey

16                                   *rob@hbsslaw.com*

17                                   Hagens Berman Sobol Shapiro LLP
                                     11 West Jefferson Street, Suite 1000
18                                   Phoenix, AZ  85003

19                                   Tel. (602) 840-5900
                                     Fax (602) 840-3012
20

21                                   Elaine T. Byszewski (SBN 222304)
                                     *elaine@hbsslaw.com*
22                                   301 North Lake Avenue, Suite 203

23                                   Pasadena, CA  91101
                                     Tel. (213) 330-7150
24                                   Fax (213) 330-7152

25                                   Steve W. Berman

26                                   *steve@hbsslaw.com*
                                     Hagens Berman Sobol Shapiro LLP
27

28                                         - 39 –

1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel. (206) 623-7292
Fax. (206) 623-0594

*Attorneys for Plaintiff Kaylene P. Brady, et al. and Nicole Marie Hunter, et al.*

DATED: December 23, 2013        **MCCUNEWRIGHT LLP**

By   /s/Richard D. McCune

Richard D. McCune
*rdm@mccunewright.com*
McCuneWright LLP
2068 Orange Tree Lane, Suite 216
Redlands, CA  92374
Tel. (909) 557-1250
Fax (909) 557-1275

*Attorneys for Plaintiffs Kehlie R. Espinosa, Lillian E. Levoff, Thomas Ganim, and Dan Baldeschi*

- 40 –

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I, Robert B. Carey, hereby certify that on December 23, 2013, a true and correct copy of the foregoing Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of Class Settlement and Order Directing Notice To Class was filed electronically with the Clerk of Courts at my direction using the CM/ECF system, which will send notification of such filing to all counsel of record.

_/s/Robert B. Carey_____

- 41 –

MDL Case No.: 2:13-ml-2424-GW-FFM

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT
AND ORDER DIRECTING NOTICE TO THE CLASS