1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
      Shon Morgan (Bar No. 187736)
2      shonmorgan@quinnemanuel.com
      Joseph R. Ashby (Bar No. 248579)
3      josephashby@quinnemanuel.com
      865 South Figueroa Street, 10th Floor
4   Los Angeles, California  90017-2543
      Telephone:   (213) 443-3000
5   Facsimile:    (213) 443-3100

6      Karin Kramer (Bar No. 87346)
       karinkramer@quinnemanuel.com
7   50 California Street, 22nd Floor
      San Francisco, California 94111
8   Telephone:   (415) 875-6600
      Facsimile:   (415) 875-6700

9
    Attorneys for Defendant Hyundai Motor
10  America and Hyundai Motor Company

11  [LIST OF COUNSEL CONTINUED ON
    NEXT PAGE]

12
                  UNITED STATES DISTRICT COURT
13                CENTRAL DISTRICT OF CALIFORNIA
                         WESTERN DIVISION

14

15  In Re:                              No. MDL 13-02424-GW (FFMx)

16  HYUNDAI AND KIA FUEL                **PUBLIC REDACTED VERSION**
    ECONOMY LITIGATION
17                                       **DEFENDANTS' JOINDER AND**
                                         **REPLY IN SUPPORT OF**
18  ―――――――――――――――――――                  **MOTION FOR PRELIMINARY**
                                         **APPROVAL OF CLASS**
    THIS DOCUMENT RELATES TO:            **SETTLEMENT**
19
    ALL ACTIONS                          [DECLARATIONS OF ALAN
20                                       VASQUEZ AND JOSEPH R.
                                         ASHBY, AND REQUEST FOR
21                                       JUDICIAL NOTICE FILED
                                         CONCURRENTLY]
22
                                         Date:        June 26, 2014
23                                       Time:        9 a.m.
                                         Courtroom:   10
24                                       Hon. George H. Wu

25

26

27

28

1 | DYKEMA GOSSETT PLLC
   James P. Feeney (219045)
2 |   *jfeeney@dykema.com*
   Benjamin W. Jeffers (P57161)
3 |   *bjeffers@dykema.com*
   Dommond E. Lonnie (142662)
4 |   *dlonnie@dykema.com*
  333 S. Grand Avenue, Suite 2100
5 | Los Angeles, California 90071
  Telephone:  (213) 487-1800
6 | Facsimile:  (213) 487-1850

7 | Attorneys for Defendant Kia Motors America, Inc.

8 |

9 | HOGAN LOVELLS US LLP
   Dean Hansell (Bar No. 93831)
10 |   dean.hansell@hoganlovells.com
   1999 Avenue of the Stars, Suite 1400
11 | Los Angeles, California 90067
   Telephone: (310) 785-4665
12 | Facsimile: (310) 785-4601

13 |   Michael L. Kidney (*pro hac vice*)
   michael.kidney@hoganlovells.com
14 | 555 Thirteenth St., NW
   Washington, DC 20004
15 | Telephone: (202) 637-5883
   Facsimile: (202) 637-5910

16 |

17 | Attorneys for Defendants Hyundai Motor
   America and Hyundai Motor Company

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................... 1

BRIEF SUMMARY OF THE SETTLEMENT ........................................... 2

RELEVANT BACKGROUND .................................................................. 3

ARGUMENT .............................................................................................. 6

I.  A CLAIMS-MADE SETTLEMENT IS NECESSARY AND APPROPRIATE ...................................................................................... 6

    A.  Courts Routinely Approve Claims-Made Settlements ............... 6

    B.  The Proposed Claims Process is Simple and Minimizes Any Burden on Class Members ...................................................... 6

    C.  There is Little Risk of High Rates of Unclaimed Funds .......... 8

    D.  Collusive Concerns Are Absent ............................................. 10

II.  REVERSION OF CLAIMED BUT UNSPENT FUNDS IS APPROPRIATE HERE ......................................................................... 10

III.  IT IS PROPER AND BENEFICIAL TO THE CLASS TO ALLOW HMA AND KMA TO ADMINISTER THE SETTLEMENT ..................... 12

IV.  THE EXTENSIVE CONFIRMATORY DISCOVERY ENABLED FULL EVALUATION OF THE SETTLEMENT ................................... 15

V.  THE PROPOSED NOTICE IS ADEQUATE AND PROVIDES THE REQUIRED INFORMATION ................................................................. 18

VI.  THE ADDITIONAL ARGUMENTS BY THE *GENTRY* PLAINTIFFS ARE WITHOUT MERIT ........................................................................ 20

    A.  The Informal and Biased Poll by the *Gentry* Plaintiffs Has No Bearing on the Fairness and Adequacy of the Settlement ................... 20

    B.  Defendants Provided the Required Notice to the U.S. and State Attorneys General ............................................................... 21

    C.  The Opt-Out Remedy Provides Additional Protection for Class Members ...................................................................... 21

    D.  Class Members Cannot Both Object to the Settlement and Opt Out ........................................................................................ 22

    E.  A Lemon Law Buyback Remedy is Not Feasible ....................... 23

CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Beattie v. Westmoreland Agency,*
  2007 WL 2436817 (E.D. Wis. Aug. 22, 2007) ..................................... 14

*Bellows v. NCO Fin. Sys., Inc.,*
  2008 WL 5458986 (S.D. Cal. Dec. 10, 2008) ..................................... 17

*In re Bluetooth Headset Prods. Liab. Litig.,*
  654 F.3d 935 (9th Cir. 2011) ................................................................ 12

*Castillo v. Gen. Motors Corp.,*
  2008 WL 8585691 (E.D. Cal. Sept. 8, 2008) ..................................... 14

*Clesceri v. Beach City Investigations & Protective Servs.,*
  2011 WL 320998 (C.D. Cal. Jan. 27, 2011) ....................................... 16

*In re Conn. Gen. Life Ins. Co. Litig.,*
  1997 WL 910387 (C.D. Cal. Feb. 13, 1997) ....................................... 16

*In re Corrugated Container Antitrust Litig.,*
  643 F.2d 195 (5th Cir. 1981) ................................................................ 22

*Eddings v. Health Net, Inc.,*
  2013 WL 169895 (C.D. Cal. Jan. 16, 2013) ....................................... 21

*Eisen v. Porsche Cars N. Am., Inc.,*
  2014 WL 439006 (C.D. Cal. Jan. 30, 2014) ....................................... 22

*Ewald v. W. Asset Mgmt., Inc.,*
  2007 WL 3171397 (E.D. Wis. Oct. 26, 2007) ..................................... 14

*In re Gen. Motors Corp. Engine Interchange Litig.*
  594 F.2d 1106 (7th Cir. 1979) .............................................................. 22

*In re Gen. Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,*
  55 F.3d 768 (3d Cir. 1995) .................................................................... 22

*Harris v. Vector Mktg. Corp.,*
  2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ........................... 11, 20, 21

*Kakani v. Oracle Corp.,*
  2007 WL 1793774 (N.D. Cal. June 19, 2007) ..................................... 12

*Kay Co. v. Equitable Prod. Co.,*
  2010 WL 1734869 (S.D.W. Va. Apr. 28, 2010) ................................. 21

*Laguna v. Coverall N. Am. Inc.,*
  2014 WL 2465049 (9th Cir. June 3, 2014) ........................................... 11

*Malta v. Fed. Home Loan Mortg. Corp.*,
   2013 WL 444619 (S.D. Cal. Feb. 5, 2013) ........................................................ 18

*Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*,
   834 F.2d 677 (7th Cir. 1987) ........................................................................... 23

*McCaffrey v. Mortg. Sources, Corp.*,
   2011 WL 32436 (D. Kan. Jan. 5, 2011) ........................................................... 14

*McKandes v. CareFirst, Inc.*,
   Case No. 04-cv-743, Dkt. No. 81 (D. Md. June 5, 2008) ................................ 14

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ........................................................................... 16

*In re Mercury Interactive Corp. Sec. Litig.*,
   618 F.3d 988 (9th Cir. 2010) ........................................................................... 17

*Milligan v. Toyota Motor Sales U.S.A., Inc.*,
   2012 WL 10277179 (N.D. Cal. Jan. 6, 2012) .................................................. 22

*Minor v. FedEx Office & Print Servs., Inc.*,
   2013 WL 503268 (N.D. Cal. Feb. 8, 2013) ..................................................... 11

*Nguyen v. BMW of N. Am. LLC*,
   2012 WL 1677054 (N.D. Cal. Apr. 20, 2012) ................................................. 25

*Olden v. LaFarge Corp.*,
   472 F. Supp. 2d 922 (E.D. Mich. 2007) .................................................... 22, 23

*Otey v. CrowdFlower, Inc.*,
   2013 WL 4552493 (N.D. Cal. Aug. 27, 2013) ................................................ 18

*Paduano v. Am. Honda Motor Co.*,
   169 Cal. App. 4th 1453 (2009) ........................................................................ 24

*Peterson v. Mortg. Sources, Corp.*,
   2011 WL 3793963 (D. Kan. Aug. 25, 2011) ................................................... 14

*Pokorny v. Quixtar  Inc.*,
   2011 WL 2912864 (N.D. Cal. July 20, 2011) .................................................. 19

*Reaves v. Am. Honda Motor Co.*,
   2011 WL 255296 (N.J. Super. Ct. App. Div. Jan. 28, 2011) ........................... 24

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ........................................................................... 18

*Schaffer v. Litton Loan Servicing, LP*,
   2012 WL 10274679 (C.D. Cal. Nov. 13, 2012) ............................................... 18

*Schulte v. Fifth Third Bank*,
   805 F. Supp. 2d 560 (N.D. Ill. 2011) ................................................................. 6

*Shaffer v. Cont'l Cas. Co.*,
    362 F. App'x 627 (9th Cir. 2010) .......................................................... 18

*Shames v. Hertz Corp.*,
    2012 WL 5392159 (S.D. Cal. Nov. 5, 2012).......................................... 6

*Simpao v. Gov't of Guam*,
    369 F. App'x 837 (9th Cir. 2010) .......................................................... 19

*Six Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) .............................................................. 12

*In re TD Ameritrade Account Holder Litig.*,
    2011 WL 4079226 (N.D. Cal., Sept. 13, 2011)..................................... 18

*Thompson v. Metro. Life Ins. Co.*,
    216 F.R.D. 55 (S.D.N.Y. 2003).............................................................. 19

*In re Toyota Motor Corp. Unintended Acceleration Mktg.,*
    *Sales Practices, & Prods. Liab. Litig.*,
    2013 WL 3224585 (C.D. Cal. June 17, 2013)........................................ 7

*True v. Am. Honda Motor Co.*,
    2009 WL 838284 (C.D. Cal. Mar. 25, 2009) ................................... 13, 14

*Vasquez v. Coast Valley Roofing, Inc.*,
    670 F. Supp. 2d 1114 (E.D. Cal. 2009) ................................................ 16

*Wright v. Linkus Enters., Inc.*,
    259 F.R.D. 468 (E.D. Cal. 2009) .......................................................... 18

## **Rules/Statutes**

28 U.S.C. § 1715 ........................................................................................ 21

49 U.S.C. § 32908....................................................................................... 24

49 U.S.C. § 32919....................................................................................... 24

Cal. Bus. & Prof. Code § 17200 ................................................................ 11

Cal. Bus. & Prof. Code § 17500 ................................................................ 11

Cal. Civ. Code § 1750................................................................................. 11

Fed. R. Civ. P. 23 ................................................................................*passim*

Va. Code § 59.1-207.13 ............................................................................. 25

Va. Code § 59.1-207.16 ............................................................................. 25

# **Other Authorities**

MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE,
  (10th ed. 2013).................................................................................................... 16

Defendants Hyundai Motor America ("HMA") and Kia Motors America, Inc. ("KMA") join in settling plaintiffs' motion for preliminary approval of class settlement (Dkt. No. 185) and offer this reply in support.[1]

## **Preliminary Statement**

The proposed class action settlement submitted for preliminary approval is the culmination of litigation this Court has overseen since January 2012 when the first case in this matter, *Espinosa,* was filed.  The proposed settlement provides compensation for reduced gas mileage and a straightforward claims process, provides swift and comprehensive relief, and represents a real and meaningful benefit to the class.  The motion practice in *Espinosa* and the extensive confirmatory discovery process in this MDL provide ample basis for the Court and counsel to confirm that the proposed settlement is fair, reasonable, and adequate.

Thirty-five plaintiffs groups have been presented with the settlement; thirty-two support (or do not oppose) it.  The three groups opposing the settlement have set themselves up as outliers from the outset of their participation.  The *Krauth* plaintiffs[2] are represented by counsel whose motion to intervene in the *Espinosa* suit was denied and who were later disappointed by the failure of one of their number to be selected as liaison counsel for plaintiffs in the MDL; unable to lead the case, they choose to try to undermine it and have been a regular voice of negativity throughout.[3]  The *Gentry* plaintiffs' counsel promised to create chaos if *Gentry* were

---

[1]   Defendants join for the limited purposes of settlement without admitting the substantive allegations.

[2]   The same four law firms represent the *Krauth* and *Hasper* plaintiffs and are referred to collectively as the *Krauth* plaintiffs.  The *Wilson* plaintiffs filed a one-sentence joinder in the *Krauth* plaintiffs' opposition and are treated as part of the *Krauth* plaintiffs for purposes of this reply.

[3]   Consumer Watchdog has been recognized as a professional objector, with an established history of attempting to opportunistically interject itself into agreed-upon settlements.  A California Superior Court judge has noted as much, finding
    (footnote continued)

1   transferred to the MDL, and since that transfer have refused to participate in any

2   substantive way, have failed to access the confirmatory discovery, and have taken

3   multiple steps to undermine the orderly processes of this Court, including by making

4   misrepresentations to their putative class members about the proposed settlement.

5   Neither plaintiff group provides any sound reason to disapprove this settlement and

6   delay relief to the settlement class.

7                              **Brief Summary of the Settlement**

8           The settlement offers a lump-sum cash payment to every class member in the

9   form of a debit card.  Also provided are three alternative forms of compensation in

10  recognition of the fact that not all class members are best served by a lump-sum

11  payment.  The three alternatives—remaining in the reimbursement program, dealer

12  service credit, and new car purchase credit—allow class members to select the form

13  of compensation that best fits their situation.  For example, the continuation of the

14  reimbursement program allows class members who expect to be long-term owners

15  and who are high mileage drivers to maximize their compensation because the

16  reimbursement program compensation is based on miles driven and continues as

17  long as the class member owns the car.  The claims process is simple:  Class

18  members will be mailed a short-form mailer to notify them of the settlement and

19  directing them to a website where most class members will be able to submit their

20  claim online.

21

22

23  _____

24  Consumer Watchdog's attempt to intervene in a class action in order to oppose a
    proposed settlement to be "another regrettable example of opportunism in the world

25  of objectors."  (*See* Declaration of Joseph R. Ashby, Exh. 1 at 9:14-22, 11:2-4)

26  (describing Consumer Watchdog's actions as "an effort to be enough of a pest so as

27  to motivate one or another of the settling parties to make arrangements that would
    cause the objecting to stop")).

28

**Relevant Background**

     **The first lawsuit regarding the fuel economy of Hyundai vehicles was the** ***Espinosa* action filed by McCuneWright in January, 2012.**  Before the November 2, 2012 announcement restating fuel economy estimates, a motion to dismiss had been decided, discovery had been undertaken, and the *Espinosa* plaintiffs had filed a motion for class certification.  (Dkt. No. 185-1 at 2:4-19, 30:9-14).  In December, 2012, when the Court denied the *Krauth* plaintiffs' motion to intervene in *Espinosa*, the Court found that McCuneWright had "been actively and adequately litigating this case for almost a full year,"  without anybody trying to "elbow them out."  (Declaration of Joseph R. Ashby, Exh. 5 (Dec. 28, 2012 Op.) at 11; *see also* Exh. 4 (Nov. 29, 2012 Tr.) at 25:9-11).

     **The *Krauth* group's counsel entered the litigation with a California state court action six months after *Espinosa*, and expressly disclaimed that it was challenging the accuracy of the EPA fuel economy estimates.**  The *Krauth* counsel group filed *Bird*, a California state court action, on July 3, 2012.  (Ashby Decl., ¶ 3 & Exh. 2).  They filed *Krauth* in federal court on November 6, 2012, parroting the claims made in *Bird* and adding allegations based on the November 2, 2012 announcement, and then tried, and failed, to intervene in *Espinosa*.  (Ashby Decl., ¶¶ 4-6 & Exhs. 3, 5).

     **The *Gentry* plaintiffs filed their action months after the other actions in the MDL and have refused to participate in the confirmatory discovery process.**  *Gentry* was filed in the Western District of Virginia on August 14, 2013—six months after the creation of the MDL, nine months after the November 2 announcement, and nineteen months after *Espinosa* was filed.  (*See* Ashby Decl., ¶ 12).  On October 30, 2013, HMA noticed *Gentry* to the Judicial Panel on Multidistrict Litigation as a potential tag-along action.  (*Id.*)  On November 6, the Panel conditionally transferred *Gentry* to the MDL.  (*Id.*)  That same day, HMA offered to provide the MDL discovery to the *Gentry* plaintiffs.  (*Id.*,¶ 12 & Exh. 10).

*Gentry* counsel refused to participate in or cooperate with the MDL proceedings and instead promised to disrupt them.  (*Id.*, Exhs. 11, 12; Dkt. No. 242-15).

On November 14, 2013, the Virginia federal court stayed *Gentry* pending the Panel's transfer decision.  (*Id.*, Exhs. 13, 14).  Counsel for *Gentry* then set on a course to circumvent the stay by filing two more state court actions on behalf of the same people as are in the putative *Gentry* class and alleging the same claims against HMA.  (Ashby Decl., Exhs. 16, 17).  HMA removed these actions, known as *Abdurahman* and *Abdul-Mumit,* noticed them for transfer to the MDL, and on June 4, 2014, the Panel transferred them to this Court.[4]  (*Id.*, ¶¶ 15-17).

**<u>The confirmatory discovery process in the MDL has provided ample information to permit the Court and the parties to assess the class settlement.</u>**[5]

The confirmatory discovery process began on April 18, 2013, with the disclosure of the material terms for the settlement and mediation materials to the counsel for plaintiffs who had not participated in the settlement discussions.  (Ashby Decl, ¶ 9).  The confirmatory discovery led to:

- production of more than 300,000 pages by defendants;

- eleven under-oath interviews on the record; and

- privilege logs for interviewees' documents and data.

Defendants sought an efficient discovery process that provided the information needed by plaintiffs' counsel and the Court to assess the settlement, while avoiding the expense, needless disputes, and inefficiencies that all too often occur in

---

[4]  HMA provided a more detailed account of the *Gentry* plaintiffs' counsel's conduct in its opposition to the *Gentry* plaintiffs' motion of suggestion of remand. (Dkt. No. 242 at 1:26-4:28).

[5]  In addition to the *Krauth* plaintiffs, HMA and the *Brady* plaintiffs each separately filed motions with the Panel on February 19, 2013, requesting the creation of an MDL.  (Ashby Decl., ¶¶ 7-8 & Exhs. 6, 7).

1  discovery.  (Ashby Decl., Exh. 9 (6/6/13 Tr.) at 10:23-11:8).  The process that

2  occurred was the product of negotiation among the parties.

3      Many counsel participated actively in the interviews, both in the United States

4  and Korea, and had full opportunity to explore issues they deemed important.  The

5  interviews were continued several times to ensure that plaintiffs had the documents

6  they wanted and adequate opportunity to review them before the interviews began.

7      The Court also presided over a robust discovery motion practice.

8  **<u>Confirmatory discovery did not find any evidence that Hyundai or Kia</u>**

9  **<u>knew their EPA fuel economy estimates were overstated or that the procedural</u>**

10  **<u>errors that resulted in the overstatements were intentional.</u>**  Relying on a

11  handful of documents combed from 300,000 pages, the *Krauth* plaintiffs argue that

12  the allegedly misstated fuel economy estimates were the product of intentional

13  misconduct.  (*Krauth* Opp. at 8:21-9:23).                                  ███████████

14  █████████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████████

16  ███████████████████████████████  The *Krauth*

17  plaintiffs do not and cannot █████████████████████████████████

18  █████████████████████████████████████████████████

19  ██████████████████████████████████

20  ████████████████  As to Mr. Krafcik, HMA's then-CEO, the *Krauth*

21  plaintiffs ████████████████████████████████████

22  █████████████████████████████████████████████████████

23  ███████████████████████████████████████████

24  ██████████████████████████████████████████████

25  ████████████████████████████

26      When all was said and done, the combined EPA MPG for most Hyundai and

27  Kia vehicles was restated by 1-2 miles.  Even after the restatement, there were

28  vehicles in the affected group that still retained the status of mileage leader in their

class.  The settlement before the Court more than makes up for any shortfall class members may have experienced.

## Argument

### I.  A CLAIMS-MADE SETTLEMENT IS NECESSARY AND APPROPRIATE

#### A.  Courts Routinely Approve Claims-Made Settlements

The proposed settlement agreement offers a choice among several distinct remedies that consumers will value differently based on their own circumstances and preferences.  For consumers to exercise this preference, a claims-made settlement is not only appropriate but necessary.

Even were that not the case, "there is nothing inherently objectionable with a claim-submission process."  *Shames v. Hertz Corp.*, 2012 WL 5392159, at *9 (S.D. Cal. Nov. 5, 2012); *see also Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 590-94 (N.D. Ill. 2011) ("[T]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment.").  In *Shames*, an objector argued, as the *Krauth* plaintiffs do here, that the claims process was "too cumbersome" because the defendants knew who was in the class and could "send the cash option to everyone in the class who does not make a claim requesting the non-cash option."  2012 WL 5392159, at *9.  The court rejected these concerns, reasoning that "class action settlements often include this process, and courts routinely approve claims-made settlements."  *Id.*

#### B.  The Proposed Claims Process is Simple and Minimizes Any Burden on Class Members

The *Krauth* plaintiffs mischaracterize the proposed claims process.  The process is designed to minimize the burden on class members and enable them to efficiently make their compensation choices.  It does not, as the *Krauth* plaintiffs contend, require class members to "jump through several hoops" in a complicated seven-step procedure.  (*Krauth* Opp. at 21:21-22:6).  Rather, for a large majority of

1  the class members, the online process only requires that they: (i) verify their

2  identity; (ii) fill in their personal and vehicle information; and (iii) submit their form

3  by clicking on a button. (Dkt. No. 226-1 at 19-26).

4         In *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales*

5  *Practices, and Products Liability Litigation*, the objectors also argued that the

6  claims process at issue was onerous. 2013 WL 3224585, at *18 (C.D. Cal. June 17,

7  2013). The court rejected that argument, finding that a claims process requiring

8  "class members [to] download a claim form or request in writing a claim form,

9  complete the form, and mail it back to the settlement administrator is not onerous."

10  *Id*. Here, the proposed process is even simpler:

11  •   For most class members, the claim form submission occurs entirely online
12       with the click of a button. The only class members who are required to
         submit additional documentation for verification purposes are: (i) those who
13       changed addresses and (ii) former owners or lessees. (Dkt. No. 226-1 at 24-
         26). This is the very type of claims process the *Krauth* plaintiffs previously
14       proposed. (Dkt. No. 211-3 at 7 (Jan. 22, 2014 letter from *Krauth* plaintiffs to
15       liaison counsel): ("Procedures for online Claim Form submission should be
         established.")).
16

17  •   The process for opting out is simple, straightforward, and entirely typical for
         a class action opt-out procedure. A class member need only read the pertinent
18       section in the long form notice and mail an opt-out notice to settling
19       plaintiffs' counsel. (*See* Dkt. No. 185-2 at 67-68).

20  •   The long form notice clearly states the consequences of not filing a claim
21       form: "Unless you exclude yourself, you give up the right to sue HMA,
         KMA, Hyundai America Technical Center, Inc., . . . Hyundai Motor
22       Company, Kia Motor Corporation, all affiliates of the Hyundai Motor Group,
         and any other related entity for the claims that this Settlement resolves."
23       (Dkt. No. 185-2 at 68). The notice further details the procedure by which
24       class members can exclude themselves. (*Id*. at 67-68).

25  •   The long form notice and the settlement short-form mailer both state the
26       deadlines for submission of the claim form and opting out, and the long form
         notice also provides class members who have questions regarding the
27       settlement with phone numbers to call. (*See* Dkt. No. 185-2 at 63, 67; Dkt.
28       No. 226-1 at 17).

- The *Krauth* plaintiffs mischaracterize what is explained to class members concerning the compensation options. (*See Krauth* Opp. at 23:3-11). The long form notice informs class members that their compensation will be "less any amount already received pursuant to the Lifetime Reimbursement Program." (Dkt. No. 185-2 at 64-65). Moreover, the notice expressly states that former owners and lessees are entitled to the compensation they "would receive pursuant to the Lifetime Reimbursement Program." (*Id.*)

- The *Krauth* plaintiffs incorrectly assert that the claim form fails to disclose that the "4x40" payment is forfeited if class members elect the lump sum option. (*Krauth* Opp. at 23:6-9). In fact, the "4x40" payment is *included* in the lump sum option. (Dkt. No. 185-2 at 66).

- The *Krauth* plaintiffs contend that the claims process is "onerous and convoluted" because, in addition to the online option, class members can also request a printed claim form by phone. (*Krauth* Opp. at 23:11-15). Multiple options for submitting claims are provided for class members' convenience. Class members can submit their claim forms online, print out and mail them, or call and request a claim form to be sent by mail. (*See* Dkt. No. 226-1 at 17).

- There is no requirement that estimates be provided regarding the number of class members eligible for certain options, and this information has no relevance. The operative question is whether the compensation amount for each class member provided for under the proposed settlement is adequate, rather than the aggregate total.

## C.    There is Little Risk of High Rates of Unclaimed Funds

This is a high value settlement—a point the *Krauth* plaintiffs fail to address. Class members may choose to remain part of the reimbursement program, or to receive a lump-sum payment via debit card, a dealer service credit, or a new car rebate certificate. (Settlement Agreement §§ 3.2.1-3.2.3). The value of the lump-sum payment varies based on the model of the vehicle and whether it was bought or leased. For Hyundai owners and lessees, the average lump sum payment is $353, with some owners eligible for more than $700. (*Id.*, Exhs. B, I). The average lump sum payment for Kia's retail customers is $667 with some owners eligible for more than $1,400. (*Id.*, Exh. C, J). The dealer service credit is valued at 150% of the

lump sum payment.  (*Id.*, § 3.2.2).  The new car rebate certificate is valued at 200% of the lump sum payment.  (*Id.* § 3.2.3).  For all options, the per-claimant value is significant and will encourage class members to submit claims.

In addition to the motivation provided by the high value of the remedial options, the proposed claims process minimizes the risk of high rates of unclaimed funds.  The parties will provide direct notice of the proposed settlement to nearly the entire class.[6]  Every class member whose current address is available in the R.L. Polk & Company database will receive a short-form mailer informing them of the settlement.  (*Id.*, § 11.1; Settlement Agreement, Second Addendum § 1.9).  In addition to other available sources for address information, defendants posses updated postal addresses for the majority of Class Members who registered for the voluntary reimbursement program since November 2, 2012.

Existing data further demonstrates that a claims made process will not diminish participation.  The voluntary reimbursement program is a claims-made process as well—claimants must register online and visit a dealership to have their mileage validated.  These steps have not deterred claimants, as the high participation rate noted above shows.  The proposed settlement adds benefits beyond the reimbursement program and provides additional monetary relief to the owners and lessees of certain vehicles.  These additional benefits ensure there will not be high rates of unclaimed benefits.

---

[6]  In addition to mailing the short-form mailer, the proposed settlement agreement takes the extra step of requiring defendants to request that dealers distribute flyers regarding the availability of settlement relief to class members who have not submitted an electronic claim or claim form.  (Settlement Agreement § 6.2 & Exh. E; Settlement Agreement, Second Addendum § 1.8).  This effort further ensures that class members will be informed of the settlement.

### D.    Collusive Concerns Are Absent

There is no risk of collusion or impropriety.  The parties purposefully delayed the attorneys' fees-and-costs negotiations until after the conclusion of settlement negotiations and the confirmatory discovery process.  (Dkt. No. 185-1 at 36.) Additionally, there are no pending applications for attorney fees that the Court is being asked simultaneously to approve.  Defendants have not capped their exposure, and plaintiffs have not sought fees based on a hypothetical value.

## II.    REVERSION OF CLAIMED BUT UNSPENT FUNDS IS APPROPRIATE HERE

The reversionary aspect of the settlement is part of a package of give-and-take provisions negotiated by the parties and in which defendants have given much. Defendants have not capped their exposure.  They have agreed to bear the full risk that 100% of class members will make claims, with no *pro rata* reduction for a high claims rate.  In the context of a negotiated resolution with no findings of wrongdoing, there is nothing inappropriate about offsetting this significant exposure with a reversionary interest in unclaimed funds.  Class members will have significant time to use their funds—one to three years, depending on the chosen remedy.  (Settlement Agreement, §§ 3.2.1-3.2.3).

The *Krauth* plaintiffs argue that defendants should not be permitted to retain unclaimed funds because they are "admitted wrongdoers" and the objective of the consumer statutes is to deter wrongful conduct.  (*Krauth* Opp. at 13:13.)  Their analysis is off-base on both points.

As explained earlier, the record developed through the confirmatory discovery process shows there were at most arguable errors in testing, as opposed to any intentional misconduct.  Plaintiffs engaged in extensive confirmatory discovery with the explicit purpose of ferreting out evidence of intent that might raise punitive considerations.  (*See* Ashby Decl., Exh. 8 at 32:5-8 ("MR. CAREY: One point on the punitive issue.  That is the elephant in the room.  Everybody knows it.  That is

why we are going to go to Korea where the test track is to tie down those issues")).

In the end, every group of plaintiffs (except *Krauth*) who examined the evidence, and had an opportunity to assess the credibility of the witnesses found no adjustment needed to be made to the settlement compensation based on the evidence. In addition, the California consumer statutes referenced in the Settling Plaintiffs' complaints have no scienter requirement; liability can be imposed absent intent. *See, e.g.*, Cal. Bus. & Prof. Code §§ 17200, *et seq*; Cal. Bus. & Prof. Code §§ 17500, *et seq*; Cal. Civ. Code §§ 1750, *et seq*. The *Krauth* plaintiffs' reliance on intentional misconduct to object to the reversion is thus unwarranted.

Courts have approved claims made settlements coupled with a reversion of undistributed funds to the defendants. *See Minor v. FedEx Office & Print Servs., Inc.*, 2013 WL 503268, at *4-5 (N.D. Cal. Feb. 8, 2013) (granting preliminary approval of a settlement agreement that included a reversion clause). Reversions allow for a settlement that offers a higher per-claimant value, and settlements with such provisions are common. *See id.*; *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at *13 (N.D. Cal. Apr. 29, 2011). In *Laguna v. Coverall North America, Inc.*, 2014 WL 2465049, *5 (9th Cir. June 3, 2014), the Ninth Circuit affirmed the district court's approval of a settlement agreement that included a reversion clause. The district court had balanced the presence of the clause with the overall benefits of the settlement to conclude the agreement was fair, reasonable, and adequate. *Id.*

The cases cited by the *Krauth* plaintiffs do not support a different outcome. (*Krauth* Opp. at 13-14). In *Harris* the court granted preliminary approval of a claims-made reversionary settlement, even while that recognizing the underlying statute authorized a civil penalty, "which evidences a deterrent effect." 2011 WL 1627973, at *12  The court stated: "[a]s the parties' correctly point out, courts routinely approve settlement agreements that include such provisions." *Id.* at *13 (citing cases).

In *Six Mexican Workers v. Arizona Citrus Growers*, the Ninth Circuit
addressed the possibility of allowing funds to escheat to the government pursuant to
a federal statute that permits unclaimed money deposited with the court to revert to
the government after five years.  904 F.2d 1301, 1308 (9th Cir. 1990).  Although the
court acknowledged that reversion would contradict statutes where the goals were
deterrence or disgorgement, it also held that reverting unclaimed funds to the
defendant may be permissible in other situations.  More specifically, "reversion to
the defendant may be appropriate when deterrence is not a goal of the statute or is
not required by the circumstances."  *Id.*

*Kakani v. Oracle Corp.*, 2007 WL 1793774 (N.D. Cal. June 19, 2007) and  *In
re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011)
involved settlement terms and issues distinct from those here.  *Kakani* was a wage-
and-hour class action where, unlike here, the defendant capped its exposure.  2007
WL 1793774, at *1 (noting that the defendant would pay only those who submitted
claims up to a total of nine million dollars less $2.25 million in fees).  The court was
also concerned that a significant proportion of all workers would not submit timely
claims, *id.* at *6, which is unlikely to be an issue here.  *See supra* Section I.C.  In
*Bluetooth*, the issue was whether reversion of a portion of a fee agreement that the
court does not award is evidence of collusion.  654 F.3d at 947.  Here, there is no
agreement regarding fees.

### III.    IT IS PROPER AND BENEFICIAL TO THE CLASS TO ALLOW HMA AND KMA TO ADMINISTER THE SETTLEMENT

The law fully supports defendant-administered settlements.  Self
administration allows for efficiencies, cost savings, and most importantly, careful
attention to the process for the benefit of the class members.

The *Krauth* plaintiffs' argument that defendants should not be permitted to
administer the settlement is based on boilerplate statements of law and fails to give
due regard to defendants' voluntary decision to offer a reimbursement program to its

1  customers and the compelling interest automobile manufacturers have in

2  maintaining customer goodwill and loyalty.  In addition to their goal of making

3  things right for affected owners and lessees due to the MPG restatement, defendants

4  have a significant long-term interest in maintaining an ongoing positive relationship

5  with their customers.  There is simply no reason why defendants would want to

6  alienate potential repeat customers and referral sources through an onerous or

7  frustrating claims process, and therefore have worked with settling plaintiffs'

8  counsel to design a claims process that is workable for all involved.

9      It also conflicts with their counsel's own past practices in supporting self-

10  administered settlements under analogous circumstances.  And it fails to

11  acknowledge the efficiencies inherent in permitting defendants to administer this

12  particular settlement where they already have done much relevant legwork in

13  conjunction with the voluntary reimbursement program they implemented.  Despite

14  their argument here, some of the same attorneys representing the *Krauth* plaintiffs

15  supported a settlement in which a defendant automaker was placed in charge of

16  administering the claims.  In *True v. American Honda Motor Co.*, the *Krauth*

17  plaintiffs' counsel negotiated and reached a nationwide class settlement with Honda

18  over claims relating to advertised fuel efficiency of the Honda Civic Hybrid.  2009

19  WL 838284 (C.D. Cal. Mar. 25, 2009).  As part of the settlement, Honda was named

20  as the "Claims Administrator" and given authority to "send the notice and claims

21  forms to class members, attempt to locate class members no longer at their original

22  addresses, provide notice via a website, and assist class members with the claims

23  process through a telephone Helpline"—the same role that the *Krauth* plaintiffs

24  argue HMA and KMA should not have here.  *Id.* at *9; (Dkt. No. 236, at 15:7-12).

25  The court approved the process.  *Id.*[7]

---

27      [7]  The court did not approve settlement in that instance because it lacked
28  information on the strengths and weaknesses of the plaintiffs' case, and the size of
   (footnote continued)

1  Other courts also have approved settlements in which the defendant serves as
2  settlement administrator.  In a case concerning alleged defective design of vehicles'
3  transmissions, General Motors was given authority to "determine if [a class
4  member] is eligible for any of the relief available" under the settlement.  *Castillo v.*
5  *Gen. Motors Corp.*, 2008 WL 8585691, at *7 (E.D. Cal. Sept. 8, 2008).  In *Peterson*
6  *v. Mortgage Sources, Corp.*, the court approved a class settlement that defined the
7  "claims administrator" as "defendant and/or counsel for defendant."  2011 WL
8  3793963 (D. Kan. Aug. 25, 2011); *McCaffrey v. Mortg. Sources, Corp.*, 2011 WL
9  32436, at *1 n.4 (D. Kan. Jan. 5, 2011); *see also Ewald v. W. Asset Mgmt., Inc.*,
10  2007 WL 3171397, at *3 (E.D. Wis. Oct. 26, 2007) ("[C]hecks representing the
11  distribution . . . will be sent by Defendant (or, at Defendant's sole discretion, their
12  designated claims administrator) to those class members entitled to a distribution
13  under the terms of the Settlement."); *Beattie v. Westmoreland Agency*, 2007 WL
14  2436817, at *2 (E.D. Wis. Aug. 22, 2007) (same); *McKandes v. CareFirst, Inc.*,
15  Case No. 04-cv-743, Dkt. No. 81 (D. Md. June 5, 2008) (Request For Judicial
16  Notice, Exh. 1) (approving settlement in which defendant was the administrator).
17  The *Krauth* plaintiffs offer nothing other than a conclusory allegation that
18  HMA and KMA have "an obvious [but unidentified] pecuniary interest in
19  discouraging [c]lass [m]embers from participating in the" settlement.  (Dkt.
20  No. 236, at 15:19-20.)  There is no credible argument that HMA and KMA could
21  improperly deny claims because the settlement specifically lists the compensation
22  amount to which each class member is entitled based on his or her vehicle.
23  Defendants have no discretion to alter the compensation amounts.  Moreover, the
24  *Krauth* plaintiffs' unsupported implications that defendants would act contrary to

the total fund—information before the Court here.  *See* 2009 WL 838284, at *6, 8.
The parties in *True* eventually moved to dismiss the case in favor of a settlement
reached in state court.

DEFENDANTS' REPLY ISO OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

the interests of their customers is flatly disproven by HMA's and KMA's actions to date:  As part of the restatement of the EPA fuel economy estimates for the affected vehicles, HMA and KMA immediately and voluntarily initiated their reimbursement programs, sent notices to all affected owners and lessees, and, through toll-free and online support, assisted customers with making claims.  The result of HMA's and KMA's efforts are very high participation rates in the reimbursement programs of both defendants.  The *Krauth* plaintiffs do not cite any evidence of issues with defendants' administration of these programs.

Given that this proposed class settlement conceptually overlays the companies' existing goodwill mileage reimbursement plans, which have been self-administered for the past 19 months, it makes even more sense that their personnel would be most adept at administering the settlement and anticipating and responding to their customers' questions and issues.  Defendants already have personnel trained to assist customers with applying for and participating in the voluntary reimbursement program.  As personnel of defendants, they have a keener interest in ensuring the claims process runs smoothly than a third-party administrator who will have no ongoing relationship with defendants' customers.  HMA and KMA have class member contact information for notice purposes and have already used this information to notify customers of the reimbursement program.  As a result, the claims under the proposed settlement can proceed efficiently with trained and knowledgeable personnel who are highly motivated to ensure customer satisfaction.

## IV.    THE EXTENSIVE CONFIRMATORY DISCOVERY ENABLED FULL EVALUATION OF THE SETTLEMENT

Where, as here, the parties reach an agreement-in-principle relatively early in the process and then confirm the fairness and adequacy of the terms with follow-up discovery, the benefits to the class, defendants, and the Court from streamlining the procedure are well-recognized.  For the class, proceeding in this fashion generally means swifter relief, less risk, and more resources available for settlement.

Case No. 2:13-ml-02424-GW (FFMx)
DEFENDANTS' REPLY ISO OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

1   Accordingly, courts approve confirmatory discovery in circumstances like those
2   here.  *See, e.g.*, *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1120
3   (E.D. Cal. 2009) ("The Settlement provides for confirmatory discovery to be
4   conducted during the approval process. . . . Plaintiffs . . . are conducting this
5   confirmatory discovery to ensure the fairness of the Settlement for the class and to
6   fully carry out their obligations to the class and the Court."); *In re Conn. Gen. Life*
7   *Ins. Co. Litig.*, 1997 WL 910387, at *14 (C.D. Cal. Feb. 13, 1997) (permitting
8   confirmatory discovery to verify information provided during the settlement
9   negotiations).
10          The objective of confirmatory discovery is to provide sufficient information
11   to evaluate the fairness and adequacy of the settlement.  *See Vasquez*, 670 F. Supp.
12   2d at 1120 (noting that plaintiffs conducted confirmatory discovery to examine the
13   fairness of the settlement).  Formal discovery is unnecessary "where the parties have
14   sufficient information to make an informed decision about settlement," and is not a
15   "necessary ticket to the bargaining table." *In re Mego Fin. Corp. Sec. Litig.*, 213
16   F.3d 454, 459 (9th Cir. 2000) (affirming district court's finding that plaintiffs had
17   sufficient information to make an informed decision about the settlement even
18   though extensive formal discovery had not been completed).  Full-blown litigation
19   discovery can be notoriously overdone and wasteful; the virtue of confirmatory
20   discovery is that it can be accomplished in a more targeted and cooperative manner.
21   MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE, § 6.12 (10th ed. 2013)
22   (confirmatory discovery "can be accomplished with reasonable document
23   production and . . . interviews of certain key defense witnesses"); *see also Clesceri*
24   *v. Beach City Investigations & Protective Servs.*, 2011 WL 320998, at *9 (C.D. Cal.
25   Jan. 27, 2011) (preliminarily approving settlement where parties engaged in
26   significant informal discovery, including reviewing hundreds of pages of documents
27   and conducting informal interviews).
28

1    This Court has overseen a robust confirmatory discovery process since

2  February 2013 which, in many respects, has resembled formal discovery.

3  Defendants produced more than 300,000 pages of documents.  Plaintiffs conducted

4  under-oath interviews of eleven company representatives in the United States and

5  Korea, including the then-CEO of HMA.  The parties engaged in meet and confer

6  exchanges, discovery motion practice, and hearings before the Court.  These efforts

7  have enabled the parties to have a "clear view of the strengths and weaknesses of

8  their cases."  *Bellows v. NCO Fin. Sys., Inc.*, 2008 WL 5458986, at *8 (S.D. Cal.

9  Dec. 10, 2008) (citation omitted).

10    All but three of the plaintiff groups have been satisfied with this process and

11  found it permitted sufficient evaluation of the fairness and adequacy of the

12  settlement.  *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 990 (9th

13  Cir. 2010) (noting that counsel "conducted confirmatory discovery, which included

14  document review, two additional depositions and an additional interview in order to

15  ensure that there was a factual basis for settling the case for the amount stipulated").

16  The complaints of the three outlier plaintiff groups are not credible.  The *Krauth*

17  plaintiffs' complaints (joined by the *Wilson* plaintiffs) about the discovery process

18  merely continue their campaign of objecting to virtually everything.  The *Gentry*

19  plaintiffs refused to participate in confirmatory discovery altogether, asserting a

20  phantom concern that the Rule 408 confidentiality agreement every other plaintiff

21  group signed would somehow insulate against full formal discovery should there be

22  no settlement.  The agreement says no such thing, and defendants assured *Gentry's*

23  counsel that was not the intent of the Rule 408 undertaking.  Importantly, although

24  both plaintiff groups complain about the process, **neither has identified any**

25  **particular information not provided in the confirmatory discovery process that**

26  **they purportedly need to evaluate the settlement.**

27

28

## V.   THE PROPOSED NOTICE IS ADEQUATE AND PROVIDES THE REQUIRED INFORMATION

A settlement notice is satisfactory if it "neutrally, simply, and understandably" conveys the "essentials of the proposed settlement." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962-63 (9th Cir. 2009). The notice proposed by the Settling Parties does just that. It includes precisely what is required: "information about the nature of the litigation, the scope of the class involved, and claims against [d]efendants," and a statement that the settlement might affect the legal rights of potential class members. *Wright v. Linkus Enters., Inc.*, 259 F.R.D. 468, 475 (E.D. Cal. 2009); *see also Shaffer v. Cont'l Cas. Co.*, 362 F. App'x 627, 631 (9th Cir. 2010).

**Postcard-style notice is appropriate.** California courts approve the use of postcard-style mailers to notify class members of proposed settlements. *See, e.g.*, *Malta v. Fed. Home Loan Mortg. Corp.*, 2013 WL 444619, at *11 (S.D. Cal. Feb. 5, 2013); *Schaffer v. Litton Loan Servicing, LP*, 2012 WL 10274679, at *8 (C.D. Cal. Nov. 13, 2012); *In re TD Ameritrade Account Holder Litig.*, 2011 WL 4079226, at *10 (N.D. Cal., Sept. 13, 2011). Postcard-style notices, such as the short-form mailer here, need not inform class members of all of the "steps they need to take to obtain compensation" (*Krauth Opp.* at 20); directing recipients to a website, phone number, or mailing address to obtain more information satisfies Rule 23. *See, e.g.*, *Malta*, 2013 WL 444619, at *11; *Schaffer*, 2012 WL 10274679, at *8; *TD Ameritrade*, 2011 WL 4079226, at *10.

**Email notice is not required.** Rule 23 does not require that notice be sent by email or any other particular means. Instead, Rule 23 requires the "best notice that is practicable under the circumstances" that is directed "in a reasonable manner to all class members who would be bound." Fed. R. Civ. P. 23(c)(2)(B), (e)(1). Although email notice may be preferable where "the claims at issue involve conduct that takes place exclusively online," *Otey v. CrowdFlower, Inc.*, 2013 WL 4552493,

at *5 (N.D. Cal. Aug. 27, 2013), courts in other circumstances have noted that postcard-style notices may be superior to email notices. *See*, *e.g.*, *Pokorny v. Quixtar Inc.*, 2011 WL 2912864, at *3 (N.D. Cal. July 20, 2011). Here, where the transactions do not take place online and defendants have access to physical addresses, recently updated for the majority of the class, postcard-style notices are the form of notification most likely to reach proposed class members.

**The proposed notice need not disclose the amount of attorneys fees.** A settlement notice need not include the amount of proposed attorneys' fees where, as here, there has been no negotiation over attorneys' fees and it is not possible to state a specific amount in the notice. *See Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 67 (S.D.N.Y. 2003). The parties have scheduled mediations relating to attorneys' fees on July 30 and 31 with Judge Sundvold. To the extent an agreement regarding fees is reached, the parties will promptly inform the Court and suggest any changes necessary to the Long Form Notice posted at the settlement website. In the interim, the parties suggest that if any short-form mailers are dispatched, the settlement websites will advise class members to check back for future information regarding fees being sought. Further, any motion for fees ultimately filed in the case will be posted to the settlement websites.

**The short-form mailer text is legible and adequate.** The *Krauth* plaintiffs take issue with the appearance of the short-form mailer as they imagine it will look, specifically the font size and placement. (*Krauth* Opp. at 19-20). Their argument is based on model notices that parties settling lawsuits are not required to emulate. *See Simpao v. Gov't of Guam*, 369 F. App'x 837, 839 (9th Cir. 2010) ("Although the notice did not mirror the models provided by the Federal Judicial Center, the notice was satisfactory because it generally describe[d] the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." (quotation omitted)). Fed. R. Civ. P. 23(c)(2)(B) contains no font size or style requirements for a proposed notice. The Settling Parties will

submit a mock-up of the short-form mailer before the preliminary approval hearing,
which will show that the proposed notice can be presented legibly on a sheet of
paper that, once folded, will be 5" x 7".

      **The Dealer Flyer is adequate**.  The Dealer Flyer represents an **additional**
notification effort that defendants agreed to undertake.  It is not required by law and
need not be provided at all.  Consequently, Settling Parties need not show that it will
reach class members—that is the purpose of the short-form mailer.  The flyer
provides sufficient and clear information about the settlement.

      **The Settling Parties have provided the long-form notice**. The Settling
Parties provided a copy of the long-form notice and identified the specific changes
in the second addendum, and will provide a revised version of the long-form notice,
reflecting the changes identified in the second addendum, before the preliminary
approval hearing.

## VI.   THE ADDITIONAL ARGUMENTS BY THE *GENTRY* PLAINTIFFS ARE WITHOUT MERIT

### A.   <u>The Informal and Biased Poll by the *Gentry* Plaintiffs Has No Bearing on the Fairness and Adequacy of the Settlement</u>

      The *Gentry* plaintiffs urge the Court to disapprove the settlement because of
an alleged "negative reaction" of their purported class members to the settlement.
The reaction they speak of supposedly consists of 600 responses to their counsel's
request for feedback from his clients, of which "92.4% of these individuals indicated
that they would reject the settlement as currently proposed." (*Gentry* Opp. at 14-
15).  Missing from the argument is any exhibit showing how counsel represented the
settlement to the purported class.  Given past misrepresentations made regarding the
settlement by this same counsel, there is no reason to assume that either the
settlement or the risks of rejecting the settlement were accurately represented.  (*See*
Ashby Decl., Exh. 15).  In any event, before formal notice of settlement, such a one-
sided straw poll carries no weight in evaluating the fairness and adequacy of the
proposal before the Court.  *Harris,*, 2011 WL 1627973, at *16 ("Because the class

ha[s] not been notified of the settlement," it is difficult at this time to "undertake any evaluation of the class's reaction to the settlement, including the number and substance of any objections."); *Eddings v. Health Net, Inc.*, 2013 WL 169895, at *5 (C.D. Cal. Jan. 16, 2013) (granting preliminary approval and requiring class members' reactions to  settlement be submitted via declarations before the fairness hearing).

## B. **Defendants Provided the Required Notice to the U.S. and State Attorneys General**

Contrary to the unfounded speculation of the *Gentry* plaintiffs, defendants timely notified the U.S. Attorney General and attorneys general for the fifty states and the District of Columbia.  (Declaration of Alan Vasquez, ¶¶ 3,4).  Defendants served the notice on January 2, 2014, thus satisfying the requirement of providing notice 90 days before final approval.  (*Id.*, ¶¶ 3, 4 (§ 1715(b) notice mailed on Jan. 2, 2014)); 28 U.S.C. § 1715(d) (court may grant final approval 90 days after § 1715(b) notice is served).  The *Gentry* plaintiffs' additional argument, that the absence of affirmative support from state officials weighs against approval, is not supported by federal law, nor do the *Gentry* plaintiffs cite any authority.  The absence of affirmative support from state or federal officials does not preclude the Court from approving the class settlement.  *See Kay Co. v. Equitable Prod. Co.*, 2010 WL 1734869, at *4 (S.D.W. Va. Apr. 28, 2010) (granting final approval to a class settlement and proceeding in the absence of affirmative support from state or federal officials because "more than 100 days have passed since service was perfected and since there have been no adverse comments from any of the aforesaid State or Federal officials, the Court [finds] that compliance with CAFA is satisfactory").

## C. **The Opt-Out Remedy Provides Additional Protection for Class Members**

The *Gentry* plaintiffs argue that the opt-out mechanism "is no substitute for compliance with Rule 23."  (*Gentry* Opp. at 15).  But it is not meant as a substitute

1  for Rule 23.  Rather, it is another component of Rule 23 that enhances the

2  protections provided to class members.  "Federal courts routinely hold that the opt-

3  out remedy is sufficient to protect class members who are unhappy with the

4  negotiated class action settlement terms."  *Eisen v. Porsche Cars N. Am., Inc.*, 2014

5  WL 439006, at *7 (C.D. Cal. Jan. 30, 2014) (*citing Milligan v. Toyota Motor Sales

6  U.S.A., Inc.,* 2012 WL 10277179, at *7 (N.D. Cal. Jan. 6, 2012) (overruling multiple

7  objections to a class action settlement, noting that objectors "could have simply

8  opted out")).[8]  Should certain class members prefer not to participate, the opt-out

9  remedy enables those individuals to not be bound by the settlement's terms.

10  **D.    Class Members Cannot Both Object to the Settlement and Opt Out**

11  The *Gentry* plaintiffs seek the right to both object to the settlement and later

12  opt out, depending on the outcome of their objections.  (*Gentry* Opp. at 16-18).

13  Their position is contrary to law and based on a failure to appreciate how objections

14  fit into the class action process.  Rule 23(e)(5) provides that a class member's

15  objection to a settlement can be withdrawn only with leave of the court.  Fed. R.

16  Civ. P. 23(e)(5).  "[A] corollary of that rule is that a party ought not be able to spoil

17  a settlement by interposing objections and then leave the litigation."  *Olden v.*

---

18

19  [8]  The *Gentry* plaintiffs' own authority undermines their position.  In *In re
    General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation*, the

20  court stated: "[T]he use of the settlement class in some sense enhances plaintiffs'
    right to opt out.  Since the plaintiff is offered the opportunity to opt out of the class

21  simultaneously with the opportunity to accept or reject the settlement offer, which is
    supposed to be accompanied by all information on settlement, the plaintiff knows

22  exactly what result he or she sacrifices when opting out."  55 F.3d 768, 792 (3d Cir.

23  1995).

24  Moreover, in *In re Corrugated Container Antitrust Litigation*, the court
    addressed the propriety of basing the fairness of a settlement on the number of opt-

25  out requests, which is not being advocated here.  643 F.2d 195, 218 (5th Cir. 1981).
    And *In re General Motors Corp. Engine Interchange Litigation* is inapposite

26  because the opt-out provision in that case extinguished the federal claims of class

27  members requesting exclusion.  594 F.2d 1106, 1136-37 (7th Cir. 1979).

28

DEFENDANTS' REPLY ISO OF MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT

*LaFarge Corp.*, 472 F. Supp. 2d 922, 931 (E.D. Mich. 2007).  Accordingly, "[i]f an absent class member (or even a class representative) desires to affect the settlement by filing objections, then the objector must abide the result and be bound by the consequences."  *Id.*

The *Gentry* plaintiffs' argument that class members should maintain both options is based on a misreading of Rule 23(e)(4).  That rule provides, if a class action was **previously** certified under Rule 23(b)(3), then the absence of an opt-out provision in a **later** settlement can be the basis for denying approval of the settlement.  Fed. R. Civ. P. 23(e)(4).  Because this action has not been previously certified, the rule is inapplicable here.  Moreover, Rule 23(e)(4) does not, as the *Gentry* plaintiffs contend, require multiple opt-out opportunities per se; instead, it requires only that the settlement itself offer an opt-out opportunity even if one was previously provided.  *Id.*  The proposed settlement here meets that requirement.

### E.     <u>A Lemon Law Buyback Remedy is Not Feasible</u>

The *Gentry*  plaintiffs oppose the settlement on the additional ground that the compensation guaranteed to class members is inferior to the "average amount recoverable by each member of the *Gentry* class," which the *Gentry* plaintiffs' counsel asserts is "the average retail price of the Elantra" ($18,500), with the possibility of trebling.  (*Gentry* Opp. at 8).  The premise of the *Gentry* plaintiffs' argument is that class members should give up their assured compensation under the settlement, which provides for any losses the restated fuel economy estimates may cause them, in return for the speculative and remote possibility that they may be able to certify a Lemon Law claim.  *See Mars Steel Corp. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*, 834 F.2d 677, 682 (7th Cir. 1987) (court not required to take at face value objecting counsel's alternative assessment of the value of the case).  Their argument ignores the many obstacles to certifying such a class or surviving summary judgment on a Lemon Law claim on these facts.

1    The first obstacle to the claim is that it depends upon establishing a warranty,

2   which is not possible here.  EPA-MPG estimates do not constitute a warranty.  To

3   claim otherwise violates the prohibition on imposing state fuel economy regimes

4   that differ from the EPA-mandated requirements.  *See* 49 U.S.C. §§ 32908(d),

5   32919(b).  Turning an advertising statement regarding fuel economy into a warranty

6   is exactly what the *Gentry* plaintiffs attempt, as the statements upon which they

7   rely—the 38 and 40 MPG highway figures—*are* the EPA fuel economy estimates.

8   Sections 32908 and 32919 expressly prohibit such warranties and preempt the

9   *Gentry* plaintiffs' claims.[9]  *See Paduano v. Am. Honda Motor Co.*, 169 Cal. App.

10  4th 1453, 1468 n.9 (2009) (holding that plaintiffs "may not directly challenge the

11  accuracy of the EPA estimates by way of state law causes of action"); *Reaves v. Am.*

12  *Honda Motor Co.*, 2011 WL 255296, at *6 (N.J. Super. Ct. App. Div. Jan. 28, 2011)

13  (*per curiam*) (federal law preempted "state lemon law claim based on

14  misrepresentation of the estimated mpg contained in the [EPA-required window]

15  sticker").

16    The Lemon Law claim is also poised to fail because it is unsuited for class

17  treatment.  In addition to the need to show which advertisements or other materials

18  they saw or relied on, Lemon Law claimants must show: (1) that each plaintiff

19  notified the manufacturer "of the need for the correction or repair of the

20  nonconformity," (2) that this action was "commenced within eighteen months

21  following the date of original delivery of the motor vehicle to the consumer" or that

22

23    [9]  The Shimp Declaration (*Gentry* Opp., Exh. 1) upon which the *Gentry*
24  plaintiffs rely in their opposition to preliminary approval of the settlement are
    unhelpful and irrelevant.  The issue is whether the settlement is fair, not whether the
25  vehicles' on-board mileage calculators are accurate.  Even if the on-board mileage
    calculators were inaccurate, that does not save the *Gentry* plaintiffs' preempted and
26  inadequately pled Lemon Law claim.  In another context, defendants would make a
27  *Daubert* objection to this declaration, but such an objection is not necessary for the
    issues raised by preliminary approval.

28

each plaintiff made "good faith attempts to settle the dispute" that would extend this statutory period; (3) that each plaintiff made a reasonable number of attempts to have their vehicle repaired; and (4) that the "use, market value, or safety" of each plaintiff's vehicle was "significantly impair[ed]."  Va. Code §§ 59.1-207.13, 59.1-207.16.  Determining whether each member of the class meets these requirements would permeate the case with individual issues.  *See Nguyen v. BMW of N. Am. LLC*, 2012 WL 1677054, at *2 (N.D. Cal. Apr. 20, 2012) ("It is doubtful that any lemon law recovery could have been included or secured through this class action, as lemon law claims tend to involve inherently individual issues.").  Added to the complexity wrought by the individual issues is the fact that the proposed class counsel, who promotes his Lemon Law experience, is silent with respect to his class action experience, and does not appear to have any; his website does not mention it. http://www.jamesfeinman.com/ (last visited June 12, 2014).  His lack of experience, combined with the fact that he made misrepresentations to the class about the settlement, casts doubt on whether *Gentry* could satisfy the adequacy of representation requirement of Rule 23.

### Conclusion

For the reasons set forth herein, defendants respectfully request the Court grant the *Espinosa*, *Hunter*, and *Brady* plaintiffs' motion for preliminary approval of class settlement.

DATED:  June 13, 2014

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By   */s/ Shon Morgan*
 Shon Morgan
 Attorneys for Defendants Hyundai
 Motor America and Hyundai Motor
 Company

1

2
DATED:  June 13, 2014                    DYKEMA GOSSETT PLLC

3
                                        By   /s/ James P. Feeney
                                             James P. Feeney
4
                                             Attorneys for Defendant Kia Motors
                                             America, Inc.
5

6

7
**C.D. Cal. L. R. 5-4.3.4(a)(2)(i) Attestation**

8
I attest that the e-signature of James P. Feeney was added with authorization

9
conveyed by email from his co-counsel, Benjamin W. Jeffers.

10
                                             /s/ Shon Morgan
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28