QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Shon Morgan (Bar No. 187736)
  shonmorgan@quinnemanuel.com
  Joseph R. Ashby (Bar No. 248579)
  josephashby@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:    (213) 443-3100

  Karin Kramer (Bar No. 87346)
  karinkramer@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:   (415) 875-6600
Facsimile:    (415) 875-6700

Attorneys for Defendant Hyundai Motor
America and Hyundai Motor Company

[LIST OF COUNSEL CONTINUED ON
NEXT PAGE]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| In Re:<br><br>HYUNDAI AND KIA FUEL ECONOMY LITIGATION<br><br>―――――――――――――<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | **PUBLIC REDACTED VERSION**<br><br>No. MDL 13-02424-GW (FFMx)<br><br>**SETTLING PARTIES' SUPPLEMENTAL REPLY BRIEF IN SUPPORT OF PRELIMINARY APPROVAL OF CLASS SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS**<br><br>Date:          July 24 2014<br>Time:          9:30 a.m.<br>Courtroom:   10<br>Hon. George H. Wu |

DYKEMA GOSSETT PLLC
    James P. Feeney (Bar No. 219045)
    *jfeeney@dykema.com*
    Benjamin W. Jeffers (*pro hac vice*)
    *bjeffers@dykema.com*
    Dommond E. Lonnie (Bar No. 142662)
    *dlonnie@dykema.com*
333 S. Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: (213) 487-1800
Facsimile: (213) 487-1850

Attorneys for Defendant Kia Motors
America, Inc.

HOGAN LOVELLS US LLP
    Dean Hansell (Bar No. 93831)
    dean.hansell@hoganlovells.com
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 785-4665
Facsimile: (310) 785-4601

    Michael L. Kidney (*pro hac vice*)
    michael.kidney@hoganlovells.com
555 Thirteenth St., NW
Washington, DC 20004
Telephone: (202) 637-5883
Facsimile: (202) 637-5910

Attorneys for Defendants Hyundai Motor
America and Hyundai Motor Company

HAGENS BERMAN SOBOL SHAPIRO LLP
    Robert B. Carey (*pro hac vice*)
    *rob@hbsslaw.com*
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone:  (602) 840-5900
Facsimile:  (602) 840-3012

Attorneys for Plaintiff Kaylene P. Brady, et al.
and Nicole Marie Hunter, et al.

MCCUNEWRIGHT LLP
    Richard D. McCune (Bar No. 132124)
    *rdm@mccunewright.com*
2068 Orange Tree Lane, Suite 216
Redlands, CA 92374
Telephone:  (909) 557-1250
Facsimile:  (909) 557-1275

Attorneys for Plaintiffs Lillian E. Levoff, Thomas
Ganim, and Dan Baldeschi

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ...................................................................................................... 2

I. THE REVISED NOTICES CONTAIN THE RELEVANT INFORMATION AND ARE DESIGNED TO CAPTURE RECIPIENTS' ATTENTION ................................................................... 2

    A. The Revised Short-Form Mailer is Accurate and Performs Its Essential Function ................................................................ 2

    B. The Proposed Email Notice is Appropriate ........................... 5

    C. The Revised Long-Form Notice is Sufficiently Clear and Concise ...................................................................................... 6

II. THE CLAIM FORMS ARE SIMPLE, DIRECT AND COMPREHENSIVE ..................................................................... 8

    A. The Online Claim Form is Proper ........................................... 8

    B. The Paper Claim Form is Appropriate ................................... 9

    C. Requiring Class Members to Submit a Claim is Proper in the Context of this Settlement .............................................. 10

III. *SETTLING PLAINTIFFS:* THE *KRAUTH* PLAINTIFFS FAIL TO ACCOUNT FOR THE RELATIONSHIP BETWEEN THE PROPOSED SETTLEMENT AND THE REIMBURSEMENT PROGRAM, WHICH REINFORCE ONE ANOTHER AND SUFFICIENTLY COMPENSATE CLASS MEMBERS .............................. 11

    A. A Claims Process Is Necessary to Preserve the Rights of Consumers and Expand Their Options .............................. 12

    B. Any Overall Valuation of the Settlement Depends Upon Participation in Both the Reimbursement Program and the Lump-Sum Program, Facts Not Yet Known ..................... 13

    C. It Is Settling Plaintiffs' Position That Litigation and Settlement Have Caused Defendants to Establish and Promote Their Reimbursement Program......................................................... 13

    D. Defendants Have Not Conceded Uniform Liability to the Class ........ 14

IV. *SETTLING PLAINTIFFS:* THE LUMP-SUM SETTLEMENT PAYMENTS PROVIDE ADEQUATE COMPENSATION TO CLASS MEMBERS UNDER REASONABLE ASSUMPTIONS .............................. 14

|  | A. | The Methodology for Deriving the Lump-Sum Payment Amounts Appropriately Incorporated EPA Fuel Cost Estimates ......... 14 |
|  | B. | The Compensation for Used and Former Vehicle Owners Is Fair, Reasonable, and Adequate ................................................................ 16 |

V.  *SETTLING PLAINTIFFS:*  SETTLING PLAINTIFFS HAVE MADE REALISTIC ESTIMATES OF THE MAXIMUM POTENTIAL RECOVERY ................................................................................ 17

    A.  The Use of EPA Fuel Cost Estimates Provides a Sound Basis to Estimate Potential Actual Damages ................................................ 17

    B.  The Settling Plaintiffs Appropriately Accounted for the Limited Possibility of Punitive Damages ............................................... 18

    C.  The Proposed Settlement Appropriately Accounts for Marginal Claims of Purchase Price Inflation and Diminution in Vehicle Value ................................................................................... 19

VI.  THE SETTLING PLAINTIFFS PROVIDED THE OVERALL LUMP SUM PAYMENT TOTAL .................................................... 20

VII.  *DEFENDANTS:*  THE VIRGINIA SUBCLASS URGED BY *GENTRY*'S COUNSEL CANNOT BENEFIT CLASS MEMBERS WHOSE STATUTE OF LIMITATIONS HAS EXPIRED ......................... 21

    A.  A Virginia Subclass Would Not Toll the Limitations Period .............. 21

    B.  Due Process Does Not Require the Court to Ensure that Opt-Out Plaintiffs Have Viable Claims ................................................ 25

VIII.  CONFLICT OF LAWS ANALYSIS IS UNNECESSARY FOR SETTLEMENT APPROVAL .......................................................... 26

    A.  The Unchallenged Case Law Cited By Settling Parties Confirms Settlement Approval Does Not Require a Conflict of Laws Analysis .............................................................................. 26

    B.  The *Gentry* Plaintiffs Have Failed to Demonstrate An Actual Conflict of Laws Exists ............................................................ 27

IX.  THE EMAILS FROM VIRGINIANS DO NOT DEMONSTRATE OPPOSITION TO THE SETTLEMENT ........................................... 29

X.  CONFIRMATORY DISCOVERY HAS PROVIDED SUFFICIENT INFORMATION ABOUT DEFENDANTS' TESTING ..................... 31

XI.  POST-NOVEMBER 2, 2012 PURCHASERS CANNOT BE FORCED INTO THE PROPOSED SETTLEMENT ....................................... 33

CONCLUSION .................................................................................. 33

# TABLE OF AUTHORITIES

**Page**

## Cases

*Al Shimari v. CACI Int'l, Inc.*,
  933 F. Supp. 2d 793 (E.D. Va. 2013) ............................................................ 23, 26

*Am. Online, Inc. v. Superior Court*,
  90 Cal. App. 4th 1 (2001) ............................................................................. 29

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ...................................................................................... 27

*American Pipe & Construction Co. v. Utah*,
  414 U.S. 538 (1974) ................................................................................ 22, 26

*Casey v. Merck & Co.*,
  283 Va. 411 (2012) .......................................................................... 22, 23, 24, 25

*Churchill Vill., L.L.C. v. Gen. Elec.*,
  362 F.3d 566 (9th Cir. 2004) ........................................................................ 6

*Class Plaintiffs v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ..................................................................... 14

*Crown, Cork & Seal Co. v. Parker*,
  462 U.S. 345 (1983) ................................................................................ 23, 26

*Doe 1 v. AOL LLC*,
  552 F.3d 1077 (9th Cir. 2009) ..................................................................... 28

*Flick v. Wyeth LLC*,
  2012 WL 4458181 (W.D. Va. June 6, 2012) ............................................... 24

*Glasser v. Volkswagen of Am., Inc.*,
  645 F.3d 1084 (9th Cir. 2011) ....................................................................... 8

*Gould v. Alleco, Inc.*,
  883 F.2d 281 (4th Cir. 1989) ....................................................................... 31

*Great Rivers Co-op. of Se. Iowa v. Farmland Indus., Inc.*,
  59 F.3d 764 (8th Cir. 1995) ......................................................................... 29

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .................................................................. 8, 27

*Holt v. Globalinx Pet LLC*,
  2014 WL 347016 (C.D. Cal. Jan. 30, 2014) ............................................... 28

*Husted v. Volkswagen of America, Inc.*,
  (Lynchburg Cir. Ct. 1999) ........................................................................... 23

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
2013 WL 5275618 (S.D. Cal. Sept. 17, 2013) ............................................ 31

*Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*,
230 Ariz. 592 (Ct. App. 2012), *cert. denied*, 133 S. Ct. 2804 (2013) ................ 19

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ................................................................ 24

*Parkinson v. Hyundai Motor Am.*,
258 F.R.D. 580 (C.D. Cal. 2008) ..................................................... 29

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985) ................................................................ 25

*Rodriguez v. W. Publ'g Corp.*,
564 F.3d 948 (9th Cir. 2009) ......................................................... 6

*Sanchez v. Lasership, Inc.*,
2012 WL 3730636 (E.D. Va. Aug. 27, 2012) ........................................... 24

*Schulte v. Fifth Third Bank*,
805 F. Supp. 2d 560 (N.D. Ill. 2011) ................................................. 10

*Shaffer v. Cont'l Cas. Co.*,
362 F. App'x 627 (9th Cir. 2010) ................................................... 6, 7

*Shames v. Hertz Corp.*,
2012 WL 5392159 (S.D. Cal. Nov. 5, 2012) ........................................... 10

*State, Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ................................................................ 19

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) .......................................................... 27

*Wade v. Danek Med., Inc.*,
182 F.3d 281 (4th Cir. 1999) ......................................................... 26

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) .......................................................... 26

*Washington Mutual Banks, FA v. Superior Court*,
103 Cal. Rptr. 2d 320 (2001) ......................................................... 27

*Yamada v. Nobel Biocare Holding AG*,
275 F.R.D. 573 (C.D. Cal. 2011) ..................................................... 28

**<u>Statutes</u>**

28 U.S.C. § 2072.................................................................................24

Va. Code § 59.1-207.1 .........................................................................24

Settling parties submit this supplemental reply in support of the motion for certification of a settlement class, (Dkt. No. 184), and motion for preliminary approval of class settlement, (Dkt. No. 185).

### **Preliminary Statement**

In accordance with the Court's comments, the settling parties have revised the notice documents and settlement website to increase clarity and simplicity for class members. Certain plaintiffs who reviewed the website provided helpful comments to further promote user-friendliness, and these changes are being incorporated. The *Krauth* plaintiffs, however, chose not to share their comments in advance, but rather waited to "complain" in their brief about supposed deficiencies. Many of these issues were already being addressed, as the *Krauth* plaintiffs were informed *before* they filed their brief.

Their issues with the notice documents consist primarily of non-substantive stylistic preferences—seeking to highlight different or additional text, moving the placement of the defendants' corporate logos, and the like. There is of course no single correct or best way to format such documents, and debate could continue endlessly about such issues. The proposed documents provide all necessary information, do so in accurate, clear, and sufficiently plain language, and conform to the spirit and intent of model notices and those approved in similar cases.

The chief issue raised by the only other objecting plaintiff group, the *Gentry* plaintiffs, also confirms the fairness of the proposed settlement. The *Gentry* group has consistently argued that the settlement undervalues the Virginia lemon law claim asserted in that action. However, that statute's short limitations period, combined with Virginia's refusal to recognize equitable tolling in the context of this pending class action, means the lemon law claims of the vast majority of the putative *Gentry* class are already time-barred. Thus, the supposed benefits of the Virginia lemon law (overstated by counsel in relation to California's similar statute

1    in any event) are unavailable to most Virginia consumers and a non-issue in

2    assessing the settlement.

3          The remaining issues raised by the *Krauth* and *Gentry* plaintiffs are addressed

4    below.  None go to core issues with the settlement, and all are misplaced in light of

5    the fact record.  As one would expect with a settlement process carefully supervised

6    by the Court and that involved the scrutiny and input of dozens of experienced

7    plaintiffs counsel groups who were not party to the original agreement, the proposed

8    settlement and administration procedures have been refined to provide an entirely

9    fair substantive result and execution process.  No basis exists to further delay

10   preliminary approval.

11                                    **<u>Argument</u>**

12   **I.    THE REVISED NOTICES CONTAIN THE RELEVANT**
     **INFORMATION AND ARE DESIGNED TO CAPTURE RECIPIENTS'**
13   **ATTENTION**

14         **A.    <u>The Revised Short-Form Mailer is Accurate and Performs Its</u>**
                   **<u>Essential Function</u>**
15
16         The *Krauth* plaintiffs' disputes with the short-form mailer derive largely from

17   an inaccurate portrayal of it, and their proposed replacement suffers substantial

     deficiencies such as the omission of language directing class members to the long
18
     form notice.  Each of their arguments is addressed below:
19
           *First*, they contend that "no particular text is in bold font," which "will deter
20
     Class Members from reading it."  (Dkt. No. 277, at 8:1-2).  This is simply untrue.
21
     The top of the short-form mailer—in bold, with enlarged font, and surrounded by a
22
     text box—bears the following message to induce recipients to continue reading:  "**If**
23
     **you purchased or leased certain 2011, 2012, or 2013 model year Hyundai**
24
     **vehicles, you may be entitled to money or other benefits from a proposed**
25
     **settlement.**"  (Dkt. No. 271-1, at 4).  The *Krauth* plaintiffs' proposed version, on the
26
     other hand, bolds nearly half the text, effectively emphasizing none of it.  (*See* Dkt.
27
     No. 277-1, at 2).  Their version also states in bolded text that "**You *are* entitled to**
28

**benefits under the settlement**." (*Id.* (emphasis added)).  This misleading language will be inaccurate for certain recipients, depending on amounts already received under the lifetime reimbursement program, whether they wish to receive anything other than a cash debit card, or whether they actually owned a class vehicle.  Accuracy should not yield to the *Krauth* plaintiffs' zeal for simplicity.

*Second*, the *Krauth* plaintiffs incorrectly assert that the Hyundai logo has been removed from the short-form mailer.  (Dkt. No. 277, at 8:6).  In fact, the logo has been enlarged and moved to more conspicuous locations on the exterior of the mailer.  (*See* Dkt. 271-1, at 2-3).

*Third*, the *Krauth* plaintiffs argue that the short-form mailer should include the recipient's vehicle model and "a precise amount of money" to avoid the appearance of junk mail.  (Dkt. No. 277, at 8:11-17).  However, junk mail is frequently targeted to specific products owned by customers, so including the vehicle model would do little to reduce misidentification.

With respect to actual compensation numbers, that information cannot be accurately pre-determined.  For instance, class members must first confirm whether they are a current or former owner, which will impact their compensation totals.  In addition, compensation for former owners is based on what they are entitled to under the reimbursement program, which varies according to actual mileage accrued.  And for all class members, amounts received under the reimbursement program are deducted from the settlement compensation.  Thus, to the extent reimbursement program claims are made after the short-form mailers have been sent, the amount stated on the mailer would be inaccurate and cannot be corrected; by contrast, the website can be updated in real-time.

Moreover, including compensation amounts on the short-form mailer will likely predispose class members toward particular payment options before they are fully educated about those options.  The short-form mailer necessarily cannot include information regarding the recipient's anticipated yearly mileage or

anticipated length of ownership, which are two factors that are essential to determining the most beneficial choice.  Because the website provides tools to assist class members in determining the option that maximizes their value, the compensation amounts should be conveyed to class members there rather than through a partial and potentially inaccurate summary on the mailer.

*Fourth*, the *Krauth* plaintiffs claim that the revised short-form mailer is "chock full of lawyer-talk," but cannot identify a single example.  (Dkt. No. 277, at 8:19-20).  This is unsurprising, because the mailer favors plain language over legalisms.  Notably, although the *Krauth* plaintiffs' diagram draws an arrow to the word "misrepresented" (*id*. at 7:11-12), their proposed version contains that word as well.  (Dkt. No. 277-1, at 2 ("Class members like you brought a lawsuit alleging Hyundai misrepresented the fuel economy of . . . .")).

*Fifth*, although the *Krauth* plaintiffs complain the language of the short-form mailer cannot fit on a single page (Dkt. No. 277, at 9:1-2), HMA has confirmed it does.

*Sixth*, the *Krauth* plaintiffs maintain that the mailer should be placed in an envelope because "bona fide correspondence that is truly important almost never arrives as a folded paper."  (*Id*. at 11:4-5).   No empirical evidence supports this assertion, and common sense suggests recipients are more likely to read the mailer if spared the step of opening a sealed envelope.

*Seventh*, the *Krauth* plaintiffs assert that because the phrase "Important Legal Notice" on the exterior of the mailer "reads like junk mail," the recipient's vehicle model should be included.  (*Id*. at 11:8-19).  However, the complete exterior text states that the mailer is an "Important Legal Notice from the United States District Court for the Central District of California."  (Dkt. No. 271-1, at 4).  The *Krauth* plaintiffs' proposed version eliminates identifying the Court's location in favor of stating the vehicle model.  But as noted above, junk is equally likely to target specific products owned by consumers.  Rather, the most attention-grabbing aspect

1  of the exterior text is the message that it comes from a court, which the settling

2  parties' version more forcefully conveys.

**B.**   **The Proposed Email Notice is Appropriate**

4  The *Krauth* plaintiffs also make four misplaced arguments regarding the

5  proposed email notice.  *First*, they contend the subject line should start with

6  "IMPORTANT" and include the recipient's vehicle model.  (Dkt. No. 277, at 12:13-

7  15).  However, a hallmark of spam is prefatory language exclaiming that the

8  contents are "important" or warning the reader not to discard the message.  And as

9  with the other documents, spam is just as likely to be tailored to the specific product

10 owned by the consumer, thus a reference to the recipient's vehicle model is not a

11 distinguishing feature.

12 *Second*, the *Krauth* plaintiffs argue that the "to" line should contain the

13 recipient's email address rather than being addressed to "Certain Current and

14 Former Owners and Lessees of Model Year 2011, 2012 and 2013 Hyundai

15 Vehicles."  (*Id*. at 12:17-19).  However, all spam is addressed to the recipient's

16 email address, which is hardly a unique identifier, because the sender must know it

17 to send the message in the first place.  By contrast, identifying the recipient as part

18 of a group of Hyundai or Kia vehicle owners immediately signals what the email

19 notice is about and makes it more likely the recipient will treat the message

20 seriously.

21 *Third*, the *Krauth* plaintiffs assert that the initial text of the proposed email

22 notice does not clearly explain the relationship between the settlement and the

23 reimbursement program.  (*Id*. at 12:25-26).  In fact, that text accomplishes exactly

24 what the Court suggested it should, which is to communicate "that participation in

25 the reimbursement program doesn't preclude further benefits under the settlement."

26 (Declaration of Joseph R. Ashby, Exh. 23 (6/26/14 Hearing Tr.) at 19:23-20:4; s*ee*

27 Dkt. No. 271-2 at 2 ("The proposed settlement described below offers benefits *in*

28 *addition to* participation in the Lifetime Reimbursement Program.") (emphasis

1  added)).  By contrast, *Krauth's* proposed language implies that participation in the

2  reimbursement program may be incompatible with participation in the settlement.

3  (Dkt. No. 277, at 13:8-9 (stating that the settlement "offers you *different*

4  compensation than the Lifetime Reimbursement Program") (emphasis added)).

5       *Fourth*, the *Krauth* plaintiffs raise a concern that the email notice will not be

6  read if sent as an attachment.  However, the text will appear in the body of the

7  email, not as an attachment.

8             **C.    The Revised Long-Form Notice is Sufficiently Clear and Concise**

9       The *Krauth* plaintiffs complain that the revised long-form notice, specifically

10  the summary chart on the first page, is confusing.  (Dkt. No. 277, at 13-14).

11  However, in their attempt to "use the fewest words"—which is not what the Court

12  asked the settling parties to do—the *Krauth* plaintiffs' proposed chart only creates

13  greater potential to confuse and mislead class members.  (*Compare id.* at 15, *with*

14  Dkt. No. 271-3, at 1-2).  *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962-63

15  (9th Cir. 2009) (holding settlement notices sufficient where they convey information

16  about a proposed settlement "neutrally, simply, and understandably").

17       In the Tentative Ruling and at the June 26 hearing, the Court asked the

18  settling parties to clarify the summary chart as to when class members had to act and

19  the effect of choosing each option on the availability of other options.  (Tentative

20  Ruling at 22 n.26; Ashby Decl., Exh. 23 (June 26 Hearing Tr.) at 20:7-22:9).  The

21  settling parties' summary chart does precisely this.  *See Churchill Vill., L.L.C. v.*

22  *Gen. Elec.*, 362 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally

23  describes the terms of the settlement in sufficient detail to alert those with adverse

24  viewpoints to investigate and to come forward and be heard." (internal quotation

25  marks omitted)).  Each box explains how choosing a particular option, such as the

26  lump-sum payment, will affect the availability of other options, such as participating

27  in the reimbursement program or in other suits against HMA or KMA.  (Dkt. No.

28  271-3 at 1-2).  *See Shaffer v. Cont'l Cas. Co.*, 362 F. App'x 627, 631 (9th Cir. 2010)

1   (finding notice requirement met where class members received a concise notice

2   describing the settlement benefits and the procedures for selecting among benefit

3   options).

4        By contrast, the *Krauth* plaintiffs' proposed chart does not explain the

5   interplay between choosing a lump-sum payment and participating in the

6   reimbursement program.  (Dkt. No. 277, at 15 (failing to explain that the lump-sum

7   payment and reimbursement program payments are mutually exclusive, or that

8   reimbursement program participants may still be entitled to settlement benefits other

9   than the lump-sum payment)).  It also fails to even mention the other two valuable

10  options offered under the proposed settlement agreement, *i.e.*, a dealer service credit

11  or a new car rebate certificate.  (*See id.*).  Nor does the *Krauth* plaintiffs' chart

12  explain that class members will only receive these benefits if the Court approves the

13  settlement.  Ultimately, the *Krauth* plaintiffs' "simplification" of the notice comes at

14  the expense of re-writing the proposed settlement agreement by making a lump sum

15  payment the default option.

16        But the lump sum is not necessarily the best option for every class member,

17  which is precisely why the settling parties did not make it the default relief.

18        Additionally, the *Krauth* plaintiffs make contradictory requests regarding the

19  inclusion of an attorneys' fees estimate in the long-form notice.  They argue that a

20  rough estimate of plaintiffs' fee request should be included in the notice, but also

21  that no fee mediation should occur until the Court has granted preliminary approval.

22  (Dkt. No. 277, at 14 n.4).  As the parties disclosed at the June 26 hearing, fee

23  mediations are scheduled for the end of July.  Mediation at this stage is entirely

24  proper because the only counsel participating in fee mediation are those who support

25  the settlement.  Thus, no risk exists that the fee mediation will create the appearance

26

27

28

of a *quid pro quo* in the form of defendants agreeing to pay fees to objecting counsel in exchange for support.[1]

## II.   THE CLAIM FORMS ARE SIMPLE, DIRECT AND COMPREHENSIVE

### A.   The Online Claim Form is Proper

The *Krauth* plaintiffs object to the online claims process because:  (i) they contend the online claim form should pre-populate mileage and sale date information for former owners; and (ii) certain information pertaining to former owners is currently absent.  (Dkt. No. 277, at 16-20).

With respect to pre-populating information, this is impossible in many instances because HMA lacks access to mileage or sale date data for vehicles sold through private party sales, including those involving non-Hyundai dealers. However, such information should be readily accessible to former owners because it is required to be recorded when a vehicle is sold, and former owners likely retained records from a recent major transaction such as a car sale.

As to the information viewable by a former owner through the claims website, settling plaintiffs raised these issues with defendants on July 14, and defendants are correcting the website.  The *Krauth* plaintiffs were informed of these efforts before filing their brief.  Unlike the other plaintiffs who provided comments to defendants,

---

[1]   The timing and structure of the fee mediation is consistent with case law that recognizes settling parties may properly discuss fees after settlement terms are agreed-upon.  *See, e.g.*, *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) (approving attorney fee award that was negotiated after the final settlement agreement was presented to the court but before preliminary approval of the settlement); *see also Glasser v. Volkswagen of Am., Inc.*, 645 F.3d 1084, 1088 (9th Cir. 2011) (approving attorney fee award negotiated after preliminary approval). Here, before any mediation will occur, the parties submitted the signed settlement agreement to the Court and made modifications to the notice and claim documents suggested by the Court.

the *Krauth* plaintiffs instead chose to raise these issues only in their brief. Many of these issues had already been identified and are being corrected.

In short, the website will: (i) inform class members of the amount they are eligible to receive after deducting any reimbursement program compensation; (ii) display to former owners options for the dealer service debit card and new car rebate certificate; and (iii) not direct former owners to visit a dealership to verify mileage.

## B.   The Paper Claim Form is Appropriate

The *Krauth* plaintiffs propose three unwarranted changes to the paper claim form. First, they assert that class members should not be required to provide their name on each page of the form. (Dkt. No. 277, at 20:20.) This is a quality control measure in the event pages become separated during claims processing; in light of this protective purpose, it is hardly burdensome for class members to write their last name and first initial on a few pages.

Second, the *Krauth* plaintiffs argue that paper forms requested by phone should be pre-populated with names, addresses and VIN numbers. (*Id*. at 20:22-23.) However, as discussed above, writing one's personal information takes mere seconds, and the VIN number is readily accessible to current owners on their vehicle, and on sales documents for former owners. Moreover, requiring class members to input VIN numbers is a security measure intended to prevent fraud, ensuring claims are made by actual class members.

Finally, they contend it is unclear "whether the 'maximum cash value' differs from the 'compensation amount in Schedule A.'" (*Id*. at 20:26-27.) However, the claim form expressly states that for current owners and lessees, the maximum cash value "can be found on Schedule A," while for former owners and lessees, the maximum cash value "can be determined by utilizing the reimbursement calculator located at www.HyundaiMPGClassSettlement.com." (Dkt. No. 271-4, at 5.) The *Krauth* plaintiffs identify no other example of purportedly "opaque language and

terminology" and cannot do so, because the claim form explains the compensation options and other pertinent information in simple and direct language.

### C. Requiring Class Members to Submit a Claim is Proper in the Context of this Settlement

The *Krauth* plaintiffs seem to suggest an "explanation" is necessary to justify a claims form process where defendants have purportedly "conceded uniform liability." (Dkt. No. 277, at 4:3-9). Of course, no such concession has been made, nor do defendants believe it would be warranted by the facts. Moreover, "there is nothing inherently objectionable with a claims-submission process." *Shames v. Hertz Corp.*, 2012 WL 5392159, at *9 (S.D. Cal. Nov. 5, 2012); *see also Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 593 (N.D. Ill. 2011) ("[T]here is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment."). "[C]lass action settlements often include this process, and courts routinely approve claims-made settlements." *Shames*, 2012 WL 5392159, at *9. And claims processes are also routinely endorsed where the defendant can identify a large portion of the class. *Id.* (rejecting objector's argument that the claims process was "too cumbersome" because the defendants knew who was in the class).

The settlement is structured to allow class members to choose the most beneficial settlement option based on each class member's personal circumstances and preference. A process that defaults class members to a certain option will discourage them from reviewing the settlement claim website and evaluating which option is most appropriate. The settlement claims website has been constructed to simplify the claims process while enabling class members to easily assess which option maximizes their benefit.

Additionally, the *Krauth* plaintiffs' proposal that class members be sent the lump-sum payment by default directs consumers in a particular direction, which might not be in their best interest. For example, high-mileage drivers and/or long-

1    term owners might receive more compensation by remaining in the lifetime

2    reimbursement program.   Alternatively, class members who plan to buy a new

3    Hyundai or Kia vehicle would likely benefit most from the new car rebate

4    certificate.  The settlement is designed to allow class members the ability to exercise

5    a choice and provide options that best fit individual circumstances.  A default option

6    discourages class members from making that informed determination.

7           Moreover, the *Krauth* plaintiffs' proposal for default lump sum payments

8    would not simply modify the notice documents, it would re-write the terms of the

9    settling parties' heavily negotiated agreement.

10   **III.   *SETTLING PLAINTIFFS:* THE *KRAUTH* PLAINTIFFS FAIL TO
     ACCOUNT FOR THE RELATIONSHIP BETWEEN THE PROPOSED
     SETTLEMENT AND THE REIMBURSEMENT PROGRAM, WHICH
11   REINFORCE ONE ANOTHER AND SUFFICIENTLY COMPENSATE
     CLASS MEMBERS[2]**

12

13          The proposed settlement complements the reimbursement program, it is not

14   independent of it.  The existence of the reimbursement program increases the relief

15   available to class members, and the settling plaintiffs believe that the reimbursement

16   program, as augmented by an additional cash component for 4 x 40 owners,

17   provides adequate compensation to a certain segment of class members who can

18   make substantial claims—long-term owners, high mileage drivers, and drivers

19   facing high regional gas prices.  By expanding the range of compensation options

20   and promoting consumer participation, the proposed settlement and reimbursement

21   program reinforce one another.  Yet the *Krauth* plaintiffs object to the proposed

22   settlement as though it existed wholly independent of the reimbursement program.

23   (Dkt. No. 277, at 28:15-30:25).  They assume that the aim of the proposed

24   settlement, and the aim of this case, is to erase or supplant the reimbursement

25   program.  As the Court has already recognized, this is not the case.

26   _____

27       [2]   Section III is solely on behalf of settling plaintiffs.

28

### A. A Claims Process Is Necessary to Preserve the Rights of Consumers and Expand Their Options

First, the *Krauth* plaintiffs continue to urge that no claims process is appropriate. Instead, they propose a mechanism that would provide lump-sum payments to consumers by default, whether or not they had already enrolled in the reimbursement program. The lump-sum payment may be the principal feature of the settlement, but it is not the only form of relief available to class members. Over half the class has already signed up for the reimbursement program. For many of them, the program is sufficient and may provide more compensation than the lump-sum. If anything, it would be less fair to the class if the settlement nullified that initial choice. The *Krauth* plaintiffs wrongly assume that the reimbursement program is a detriment to the class.

In fact, the *Krauth* plaintiffs' own proposal fails to eliminate a claims process because it would require a claims process for consumers to elect back into the reimbursement program or to elect alternative compensation. Such an approach might make sense if the reimbursement program failed to offer legitimate compensation, but it does for many consumers. For some, the reimbursement program will be the most valuable option, and so eliminating the claims process will not "maximize the likelihood that Class members get the compensation to which they are entitled by virtue of this settlement." (Dkt. No. 277, at 5:7-8.) Class members should not have to select the same program twice.

Further, the *Krauth* plaintiffs falsely assert that defendants can pre-calculate all lump-sum payment amounts. However, owners must verify the status of their ownership (current original, current non-original, or former) to determine the appropriate level of compensation. Defendants do not receive notice of every vehicle resale. Former owners must provide additional information about the miles driven. The settling parties cannot bargain away these realities.

**B.**     **Any Overall Valuation of the Settlement Depends Upon Participation in Both the Reimbursement Program and the Lump-Sum Program, Facts Not Yet Known**

Any calculation of the aggregate value of the settlement will depend upon relative participation rates in the reimbursement program and the settlement itself. To that extent, the overall valuation of the settlement is not known and will become clearer through the claims process.  The *Krauth* plaintiffs agree with settling plaintiffs and the Court that this calculation is uncertain.  But the *Krauth* plaintiffs are wrong to assert that "the total amount of compensation delivered by the proposed settlement matters greatly to the class" at this stage.  (Dkt. No. 277, at 28:15-17).  The settlement makes equivalent benefits available to all class members regardless of the participation rate.  At the level of the individual class members, those benefits are reasonable, adequate, and fair.  Aggregate numbers may become relevant to final approval, but preliminary approval can be granted upon a showing that the settlement has a potential for final approval, without resolving every uncertainty.

**C.**     **It Is Settling Plaintiffs' Position That Litigation and Settlement Have Caused Defendants to Establish and Promote Their Reimbursement Program**

While the reimbursement program is not technically a term of the settlement, the settling plaintiffs believe that the settlement has had the salutary effect of promoting participation in the program.  First, the reimbursement program arose in a climate of active and threatened litigation against defendants, including the settling plaintiffs' *Espinosa* case.  The *Krauth* plaintiffs point out that the reimbursement program preceded this MDL (Dkt. No. 277, at 2:22-24), but it did not precede the onset of litigation.  There is no reason to disregard it altogether, as the *Krauth* plaintiffs urge.  (Dkt. No. 277, at 29:20-30:25).

Second, the logistics of the settlement promote consumer participation in the reimbursement program.  Defendants have extended the deadline for participating in the program through the settlement claims period.  The settlement claim form

1   expressly permits consumers to opt into or remain in the program.  Settling plaintiffs
2   negotiated with full knowledge of the reimbursement program and crafted the
3   enhancement and acceleration of benefits to complement it.  While defendants no
4   doubt have some motivation to promote participation, settling plaintiffs believe the
5   availability of notice and additional relief for class members has further incentivized
6   them to market and promote participation.

7              **D.     Defendants Have Not Conceded Uniform Liability to the Class**

8          The *Krauth* plaintiffs continue to misrepresent that defendants "concede
9   uniform liability to the class."  As the settling plaintiffs already explained, there is
10  no such concession, admission, or stipulation.  Defendants still deny that they
11  violated EPA regulations, and have raised other defenses both to the merits and to
12  class certification.

13         Disregarding this fact, the *Krauth* plaintiffs appear wedded to the view that a
14  protracted, winner-take-all struggle is preferable to the terms of the proposed
15  settlement.  Their counsel's desire for protracted delays, more risks and recognition
16  at consumers' expense should not take precedence over securing meaningful relief
17  for the class as settling plaintiffs have done.  Nor should it take precedence over the
18  "strong judicial policy that favors settlements, particularly where complex class
19  action litigation is concerned."  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268,
20  1276 (9th Cir. 1992) (citation omitted).

21  **IV.    *SETTLING PLAINTIFFS:* THE LUMP-SUM SETTLEMENT
         PAYMENTS PROVIDE ADEQUATE COMPENSATION TO CLASS
22       MEMBERS UNDER REASONABLE ASSUMPTIONS[3]**

23         **A.     The Methodology for Deriving the Lump-Sum Payment Amounts
                Appropriately Incorporated EPA Fuel Cost Estimates**

24
25         The proposed settlement provides class members with a lump-sum payment

26  option generally correlated to anticipated increased fuel costs over a typical term of
    _____

27     [3]  Section IV is solely on behalf of settling plaintiffs.

28

1  ownership.  Because the claims in this case hinge upon the contents of the

2  Monroney stickers and consumers' reliance upon the stickers, the settling parties

3  used EPA estimated annual fuel costs as a negotiating assumption.  These fuel cost

4  estimates incorporate fluctuating gas prices and assume that drivers log 15,000 miles

5  per year.[4]  Differences in fuel cost estimates also turn on the EPA's evolving fuel

6  cost formula.  The settling parties' agreement considered a 4.75-year term of

7  ownership, just three months shy of the EPA's assumption of 5 years for cost

8  projection.  The 4.75-year term is supported by a number of factors, including the

9  risk of litigation.  The fuel cost assumptions are visible on the EPA sticker for the

10  particular vehicle.  The EPA cost is sometimes rounded to the nearest $50,

11  sometimes not, which also impacts the calculation.

12      This context answers the *Krauth* plaintiffs' challenges to the lump sum

13  amounts.  For example, the EPA estimated annual fuel cost for the 2013 Kia Sorento

14  (2WD A-6 2.4L GDI) changed by $50, which would add up to $237 over 4.75 years.

15  (Declaration of Robert Carey, Ex. A-B).  The $235 Sorento lump-sum payment

16  corresponds to that cost.[5]  Addressing the value of the settlement and the expected

17  value of class members claims at trial, settling plaintiffs also cited the 2012 Hyundai

18  Tucson as an example because it was assigned an $87 fuel cost discrepancy which

19  _____

20      [4]  *See* U.S Dep't of Energy, EPA, *Gasoline Vehicles: Learn More About the New*
21  *Label*, http://www.fueleconomy.gov/feg/label/learn-more-gasoline-
   label.shtml#estimated-annual-fuel-cost  (last visited July 20, 2014).

22      [5]  Similarly, the *Krauth* plaintiffs have assumed an elevated fuel price of $4.00
23  per gallon in estimating the additional fuel cost for the 2012 Elantra, but that
   assumption differs from the EPA's historical standards of $3.00 and $3.70 per
24  gallon in the 2011-2012 production timeframe.  *See* U.S Dep't of Energy, EPA, *Fuel*
   *Economy Guide: Model Year 2011* at i (sample sticker showing $3.00/gallon),
25  *available at* http://www.fueleconomy.gov/feg/FEG2011.pdf (last visited July 21,
26  2014); U.S Dep't of Energy, EPA, *Fuel Economy Guide: Model Year 2012* at i
   (sample sticker showing $3.70/gallon), *available at* http://www.fueleconomy.gov/
27  feg/pdfs/guides/FEG2012.pdf (last visited July 21, 2014).

28

approximates the class average.  In fact, though its MPG ratings changed slightly, the Tucson is one of a handful of class vehicles whose  revised Monroney sticker shows no change in the EPA estimated annual fuel cost.  (Carey Decl. Ex. C-D). Rather than take the position that these class members receive no compensation, Defendants agreed to assign an $87 annual fuel cost assumption in deriving the lump-sum payment for current original owners of the Tucson.

## B.   The Compensation for Used and Former Vehicle Owners Is Fair, Reasonable, and Adequate

The *Krauth* plaintiffs make brief objections to the compensation for current non-original owners, which is one-half the amount available to current original owners.  The reduction in the amount accounts for the fact that the Monroney sticker must only be displayed in new vehicles.  Non-original owner class members would face additional challenges in litigation because the extent of their reliance on the Monroney numbers is less clear and potentially individualized.  Moreover, defendants do not directly benefit from or promote the sale of used vehicles. Defendants would be expected to raise additional defenses and challenges to class certification which justify a discount in the compensation afforded to these class members.  The *Krauth* plaintiffs query how many non-original owners exist, but this is a question that only the owners can answer by way of the claims process.

As to the additional 4x40 compensation, settling plaintiffs have already explained that the $100 (and $50 for current lessees, given their more limited term of ownership) reflects the settlement value of potential false advertising claims relating to the 4 x 40 ad campaign in light of the existence of the reimbursement program and proposed settlement.  While these claims cover a slightly different range of conduct by defendants, the fundamental fuel cost recovery is the same as for non-4 x 40 class members.  The additional amount reflects the increased possibility of punitive or inflated price damages, discounted by the increased risks

1    of federal preemption and denials of class certification that could attend such a

2    claim.

3         The proposed settlement affords 4 x 40 compensation to former owners who

4    sold their cars after February 12, 2013.  In practical effect, this date simply

5    establishes the class of 4 x 40 owners as of February 12, 2013, when the settling

6    parties first reached agreement on the terms of the settlement.  The intent was to

7    preserve the rights of 4 x 40 owners to the additional compensation during the time

8    that confirmatory discovery took place and settlement documents were prepared.

9    (Other former owners were designated as of December 23, 2013, but their rights

10   were protected because the proposed settlement permitted former owners to recover

11   actual fuel costs incurred over time.)

12   **V.   *SETTLING PLAINTIFFS:*  SETTLING PLAINTIFFS HAVE MADE
     REALISTIC ESTIMATES OF THE MAXIMUM POTENTIAL
13   RECOVERY[6]**

14       **A.   <u>The Use of EPA Fuel Cost Estimates Provides a Sound Basis to
     Estimate Potential Actual Damages</u>**

15

16        The settling plaintiffs used EPA fuel cost estimates to determine the annual

17   fuel cost difference for each vehicle.  As noted above, those estimates provide a

18   basis for calculating both appropriate lump-sum payment amounts and the likely

19   outcome of a jury verdict on each class member's claim.  And because these

20   numbers appear on the Monroney stickers, they provide an appropriate framework

21   for determining the value of increased fuel process classwide because plaintiffs'

22   claims focus on the discrepancy in Monroney sticker ratings.

23        The *Krauth* plaintiffs object to this approach by cherry-picking different

24   assumptions, increasing the length of ownership to 71.4 months and assuming 5%

25   diminution in value.  (Dkt. No. 277, at 25:17-26:13, 27:8-28:14).  These new

26   assumptions do not help the analysis.  There is no merit to the *Krauth* plaintiffs'

27       [6]   Section V is solely on behalf of settling plaintiffs.

28

challenge to the length-of-ownership assumption.  Their 71.4 month ownership statistic applies to new cars across all brands, not Hyundai/Kia vehicles.[7]  Other reports suggest that the average length of ownership for Hyundai/Kia vehicles is less than six years.[8]  The 10-year warranty period reflects the useful or economic life of the vehicle and is distinct from the expected term of ownership.  Nor do the *Krauth* Plaintiffs cite any evidence or data to support their assumption that vehicle owners would experience a 5% diminution in value because of the restatement.

The goal of the settlement was not to compensate an "average" length of ownership, but to make available a cash award without the inconvenience of the reimbursement program.  The settlement addresses the claims of a typical medium-term owner who might benefit from the lump-sum payment.  Longer-term owners are at no disadvantage because the reimbursement program offers them full compensation for their actual fuel costs.  The *Krauth* plaintiffs fail to show why the settlement is not fair, reasonable, and adequate as to the claims of a typical vehicle owner it seeks to vindicate.

## B.    The Settling Plaintiffs Appropriately Accounted for the Limited Possibility of Punitive Damages

Contrary to what the *Krauth* plaintiffs assert, settling plaintiffs have explained why punitive damages would be hotly contested.  Defendants would be expected to challenge the lack of evidence that they acted with evil intent.  Defendants would argue that consumer reliance is unclear, and that sales increased after the restatement.  (Dkt. No. 185-1, at 14-16, 24-26).  Defendants will also claim that they

---

[7]  *See* Jerry Hirsch, *Americans Keep Their New Cars for Almost Six Years*, L.A. Times, Feb. 21, 2012, http://articles.latimes.com/2012/feb/21/business/la-fi-mo-HOLDING-cars-longer-20120221.

[8]  *See Nine Cars Americans Keep the Longest*, 24/7 WALL ST., Nov. 6, 2012, http://247wallst.com/special-report/2012/11/06/nine-cars-americans-keep-the-longest/ (failing to list Hyundai or Kia among car brands the average consumer keeps for 6 years or more).

1   voluntarily established the reimbursement program to make things right for

2   consumers.  While higher punitive damages ratios are possible in the abstract,

3   plaintiffs would need to present solid evidence of reprehensible conduct to support

4   them, evidence which confirmatory discovery at best confirmed as a disputed issue.

5   There is simply no clear and conclusive evidence of a company-wide strategy to

6   inflate fuel economy numbers to achieve key marketing outcomes that would ensure

7   a finding of punitive damages.  Defendants will also argue that this is a case where

8   the challenged conduct—misstatements of a single performance characteristic—

9   neither defeated the purpose of the transaction nor placed consumers in physical

10  danger.  Proceeding to trial carries a significant risk that punitive damages—if

11  any—would be limited to a 1:1 ratio on due process grounds.  *See, e.g.*, *Nardelli v.*

12  *Metro. Grp. Prop. & Cas. Ins. Co.*, 230 Ariz. 592, 612 (Ct. App. 2012), *cert. denied*,

13  133 S. Ct. 2804 (2013) (vacating punitive damages award in economic loss case on

14  federal due process grounds and directing entry of punitive damages in 1:1 ratio to

15  actual damages); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425

16  (2003) ("When compensatory damages are substantial, then a lesser ratio, perhaps

17  only equal to compensatory damages, can reach the outermost limit of the due

18  process guarantee.").   While the outcome is unknown, proceeding to trial and

19  obtaining a punitive damages award would all but guarantee years of delay in class

20  members obtaining the benefit of the recovery.

21      **C.   The Proposed Settlement Appropriately Accounts for Marginal**
            **Claims of Purchase Price Inflation and Diminution in Vehicle**
22          **Value**

23          The *Krauth* plaintiffs make vague objections to the use of fuel cost as a

24  measure of diminished value, and the uncertainty surrounding purchase price

25  inflation.  Settling plaintiffs have pointed to a cost measure of diminished value to

26  illustrate that the settlement accounts for that loss: economically, the cost of a car,

27  including any increased fuel costs, is part of the value of a car to a consumer.  (*See*

28

1  Dkt. No. 271, at 16-18).  Otherwise, settling plaintiffs have seen no evidence of

2  compensable reductions in value, and the *Krauth* plaintiffs point to none.[9]

3        As to the inflation of purchase price for 4 x 40 vehicles, settling plaintiffs

4  proffered rough estimates of a possible form of proof using hedonic regression

5  analysis.  The *Krauth* plaintiffs make the general objection that no expert report has

6  been produced, apparently taking the position that full expert analysis and discovery

7  must be completed before a case can be settled.  That of course is not required, and

8  such a requirement would virtually ensure that no case could settle until the eve of

9  trial.  Plaintiffs consulted an expert in the course of active litigation on this issue,

10  and have a sufficient basis for providing a ballpark estimate of the potential

11  damages under an inflated purchase price damage analysis.  The position further

12  ignores the existence of the reimbursement program, which further reduces the

13  significance of purchase price differences because it gives consumers a pathway to

14  full value.

15  **VI.   THE SETTLING PLAINTIFFS PROVIDED THE OVERALL LUMP
       SUM PAYMENT TOTAL**

16

17        The *Krauth* plaintiffs inaccurately portray the reference to the $392 million

18  figure in the settling parties' opening brief.  (Dkt. No. 277, at 28-29).  The settling

19  parties opening supplemental brief acknowledged that the $392 million figure did

20  not reflect deductions for payments through the lifetime reimbursement program:

21  "If all class members submit claims under the settlement, the class will recover

22  $392M in cash before deductions for compensation already paid through the lifetime

23      [9]   Defendants are also expected to argue that there has been no diminution in

24  value.  (*See* Dkt. No. 271, at 18, n.13 (citing Bengt Halvorson, Did MPG

25  Overstatement Affect Hyundai And Kia Resale Values?, The Car Connection (Feb.
    24, 2014), http://www.thecarconnection.com/news/1090530_did-mpg-

26  overstatement-affect-hyundai-and-kia-resale-values  (last visited July 21, 2014)

27  (describing Kelly BlueBook official's conclusion that "resale values were 'virtually
    indistinguishable' before and after November 2012" for Hyundai and Kia vehicles).

28

reimbursement program are made." (Dkt. No. 271, at 15:1-3). Although defendants have been producing updated information about participation in the reimbursement program on a monthly basis, the *Krauth* plaintiffs speculate about the participation levels. Defendants have disbursed approximately ██████████ ████████████████ through the reimbursement program. (Ashby Decl. Exhs. 24, 25). If that amount is deducted from overall potential lump sum payment, the remaining amount is approximately ████████████ The remaining amount represents the total if every class member selects the cash debit card. The amount will be greater if class members select the dealer debit card or the new car rebate certificate.

## VII. *DEFENDANTS:* THE VIRGINIA SUBCLASS URGED BY *GENTRY*'S COUNSEL CANNOT BENEFIT CLASS MEMBERS WHOSE STATUTE OF LIMITATIONS HAS EXPIRED[10]

### A. A Virginia Subclass Would Not Toll the Limitations Period

Suddenly cognizant that the purported *Gentry* class suffers a crippling statute of limitations problem under the very Virginia state jurisprudence its counsel has been trumpeting, the *Gentry* plaintiffs now ask this Court to take the unusual step of singling out Virginia for subclass treatment in the proposed settlement. This effort is improper for two reasons. First, it is futile because Virginia state law does not recognize equitable tolling in this circumstance even were this Court to certify a subclass; thus, any time-barred claims will remain so regardless of a Virginia subclass. Second, even were it not futile, the procedural device of Rule 23 certification cannot be employed to restore claims barred under Virginia law. To do so would allow certification to alter state law rights, which *Gentry's* counsel concedes is impermissible.

---

[10]   Section VII is solely on behalf of defendants.

1    The Supreme Court of Virginia recently discussed the effect—or more

2  accurately, non-effect—of putative class actions on tolling of absent class members'

3  claims under circumstances similar to those here in *Casey v. Merck & Co.*, 283 Va.

4  411, 416 (2012).  There, a nationwide consumer class action was filed in federal

5  court in Tennessee and transferred to an MDL in New York where it was eventually

6  dismissed. *Id.* at 414.[11]  Before dismissal, four Virginians not named as plaintiffs in

7  the earlier class action filed individual suits in federal court in New York asserting

8  claims under Virginia state law. *Id.*  It was undisputed that unless a tolling principle

9  applied these plaintiffs' claims were time barred. *Id.* at 415.

10    The Virginia Supreme Court held that the pendency of a class action does not

11  toll Virginia's statute of limitations for absent class members. *Id.* at 416, 419.  This

12  is because "for tolling to be permitted, the subsequently filed action must be filed by

13  the same party in interest on the same cause of action in the same right." *Id.* at 417.

14  According to the Court, under Virginia law a suit brought by a different named

15  plaintiff is not a suit by the same party in interest. *Id.* at 417-18.  The exception for

16  suits brought by "a recognized representative" does not apply to Virginia state law

17  claims in the class action context because:

18       Virginia jurisprudence does not recognize class actions.  *Under
         Virginia law, a class representative who files a putative class action is*
19       *not recognized as having standing to sue in a representative capacity*
         *on behalf of the unnamed members of the putative class.*  Thus, under
20       Virginia law, there is no identity of parties between the named plaintiff
         in a putative class action and the named plaintiff in a subsequent action
21       filed by a putative class member individually.

22  *Id.* at 417-18 (emphasis added).[12]

23

24  _____

25  [11]  The tolling issue was presented to the Virginia Supreme Court as certified
     questions from the Court of Appeals for the Second Circuit. *Casey*, 283 Va. at 414-
26  15.

27  [12]  Virginia's stance on tolling in the class action context differs from the
     prevailing view that follows *American Pipe & Construction Co. v. Utah*, 414 U.S.
28  (footnote continued)

1    Significantly, the *Casey* court did not carve out any exception applicable to a

2    class action that was certified after the statute of limitations expired (the situation

3    *Gentry* urges here), even though it was a proposition the unsuccessful *Casey*

4    plaintiffs had advocated.  *Id.* at 414 ("[T]he plaintiffs claimed that

5    the *Wolfe* putative class action, which was filed within the two-year limitation

6    period, tolled the running of the Virginia statute of limitations on their individual

7    actions because they would have been members of the proposed class had

8    certification been granted.").  In short, the *Casey* court did not rule against the

9    plaintiffs there because no class had been certified in the district court case, rather it

10   deemed their claims barred because no equitable tolling doctrine applies *at all* to

11   Virginia claims of absent class members in a putative class action pending in

12   another jurisdiction.  Because *Casey* broadly rejected any tolling doctrine applicable

13   to putative class actions pending outside of Virginia, certification now of a Virginia

14   subclass in the MDL would not revive stale Virginia lemon law claims.

15       The Virginia lemon law claims asserted in *Gentry* have an 18-month statute

16   of limitations.  Va. Code § 59.1-207.11.  Because no tolling doctrine under Virginia

17   law applies, the lemon law claims of putative class members who acquired their

18   vehicles before November 3, 2012 had to have been filed by May 2, 2014, and are

19   now barred.[13]  *See also Al Shimari v. CACI Int'l, Inc.*, 933 F. Supp. 2d 793, 802

_____

21   538 (1974), and *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983), where the
22   filing of a class action tolls the statute of limitations for absent class members.

23   [13]  The *Gentry* plaintiffs cite *Husted v. Volkswagen of America, Inc.*, an
     unreported decision from the Circuit Court for the City of Lynchburg, Virginia, for
24   the proposition that the 18-month limitations period for lemon law claims can be
     extended under certain circumstances.  But in *Husted,* unlike here, before the
25   statutory period lapsed, the defendant had undertaken efforts to repair the plaintiff's
     vehicle, it had extended the warranty, and the defendant had been given notice of the
26   plaintiff's complaint.  (Dkt. No. 276-9 (Exh. 9 to *Gentry* plaintiffs' supplemental
     brief), at 4:1-20).

1  (E.D. Va. 2013) (for unnamed putative members of class action who later sued

2  individually, statute of limitations was not tolled during pendency of the class

3  action); *Sanchez v. Lasership, Inc.*, 2012 WL 3730636, at *2 (E.D. Va. Aug. 27,

4  2012) ("Virginia does not recognize equitable tolling of a statute of limitations for

5  unnamed, putative class plaintiffs."); *Flick v. Wyeth LLC*, 2012 WL 4458181, at *2-

6  3 (W.D. Va. June 6, 2012) (decision by the *Gentry* transferor court rejecting

7  argument that statute of limitations is tolled for absent class members).  Certifying

8  *Gentry* or any other Virginia subclass cannot change this result because "unnamed

9  putative class members . . . are not recognized under Virginia law as plaintiffs *or*

10  *represented plaintiffs* in the original action."  *Casey*, 283 Va. at 418-19 (emphasis

11  added).  Thus, it does not matter what class is certified in this settlement and

12  whether it includes a Virginia subclass—under any circumstance, pre-November 3,

13  2012 Virginia lemon law claims are barred and cannot be raised by absent class

14  members who opt-out, with the limited exception of class members who timely filed

15  a lawsuit on their own behalf.

16        Even could certification of a Virginia subclass revive claims barred under

17  Virginia state law, it is impermissible to use the procedural device of Rule 23 to

18  modify rights provided under state law, a point *Gentry* concedes.  (*See* Dkt. No. 276,

19  at 4); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999) ("[R]rules of procedure

20  shall not abridge, enlarge or modify any substantive right . . . .") (quotations

21  omitted); 28 U.S.C. § 2072(b).  For this reason also, the Court should decline

22  *Gentry's* invitation to certify a separate Virginia subclass.

23        Finally, the fact that the vast majority of Virginia consumers' lemon law

24  claims are barred also neutralizes the main line of attack levied by *Gentry*'*s* counsel

25  throughout these proceedings—that Virginia's lemon law offers superior remedies.

26  Although that contention is itself demonstrably false, it is of no moment because

27  most Virginia consumers can no longer assert these supposedly superior claims.

28  Indeed, the proposed settlement should properly be viewed as very generous to

putative Virginia class members because it compensates them regardless that certain of their claims are now barred.

### B. Due Process Does Not Require the Court to Ensure that Opt-Out Plaintiffs Have Viable Claims

The *Gentry* plaintiffs argue that unless a Virginia subclass is certified, Virginia class members will be denied due process of law because approving the proposed settlement and certifying the *Espinosa*, *Brady*, and *Hunter* classes would create a statute of limitations defense against Virginia lemon law claims that would not otherwise exist.  (Dkt. No. 276, at 4-8).  As explained above, the Virginia class members' lemon law claims are time-barred regardless of which classes are certified or whether the settlement is approved.  And in any event, the right to opt out is not dependent on the ability to pursue an individual claim after doing so.

The opt-out requirement is one of the "minimal procedural due process protection[s]" required when settling parties seek to bind absent class members concerning claims for money damages.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (holding that due process requires that absent class members receive "notice plus an opportunity to be heard and participate in the litigation" in addition to the right to opt out).  The purpose of these protections is to prevent class members from being bound without representation or input.  *See id.* Due process is satisfied so long as class members can choose not to be bound by the class action, *regardless* of the action they choose to take after opting out.

In fact, states–such as Virginia–that do not recognize tolling based on class actions in other jurisdictions do so with the understanding that in-state plaintiffs *may be required* to file "protective" individual suits in order to prevent their claims from being time barred.  *See Wade v. Danek Med., Inc.*, 182 F.3d 281, 286-87 (4th Cir. 1999) (explaining that states deciding whether to permit cross-jurisdictional equitable tolling must weigh the likelihood of protective individual suits against the likelihood of suits by out-of-state plaintiffs seeking to take advantage of the cross-

1   jurisdictional tolling rule).  The purpose of equitable tolling is *not* to protect the due

2   process rights of class members; rather, *American Pipe*, its progeny, and related

3   state court decisions simply do not treat tolling as a due process issue.  *See, e.g.*, *Am.*

4   *Pipe. & Constr. Co. v. Utah*, 414 U.S. 538, 553-54 (1974); *Crown, Cork & Seal Co.,*

5   *Inc. v. Parker*, 462 U.S. 345, 353 (1983) (same); *Casey v. Merck & Co., Inc.*, 283

6   Va. 411, 417-18 (2012) (same); *Al Shimari v. CACI Int'l, Inc.*, 933 F. Supp. 2d 793,

7   801-02 (E.D. Va. 2013) (applying bar on equitable tolling where doing so time-

8   barred plaintiffs' claims and without ever discussing due process).  Thus, the fact

9   that under *Casey* the claims of Virginia residents who opt-out of the settlement will

10  be time barred does not violate due process.

## VIII.  CONFLICT OF LAWS ANALYSIS IS UNNECESSARY FOR SETTLEMENT APPROVAL

### A.   The Unchallenged Case Law Cited By Settling Parties Confirms Settlement Approval Does Not Require a Conflict of Laws Analysis

14      The *Gentry* plaintiffs' argument that this Court must conduct a choice of law

15  analysis continues to overlook the established Ninth Circuit precedent (and that of

16  other federal appellate courts) that no such analysis is required to certify a *settlement*

17  class.  Although litigation classes may present issues with manageability, this

18  concern is absent from the predominance inquiry for settlement-only classes.  *See In*

19  *re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) ("[W]hen

20  dealing with variations in state laws, the same concerns with regards to case

21  manageability that arise with litigation classes are not present with settlement

22  classes . . . those variations are irrelevant to certification of a settlement class."

23  (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997))); *Sullivan v. DB*

24  *Invs., Inc.*, 667 F.3d 273, 303 (3d Cir. 2011) ("Because we are presented with a

25  settlement class certification, we are not as concerned with formulating some

26  prediction as to how [variances in state law] would play out at trial, for the proposal

27  is that there be no trial." (citation and quotation marks omitted) (alteration in

28  original)).  As the Ninth Circuit recognized in *Hanlon v. Chrysler Corp.*, 150 F.3d

1011 (9th Cir. 1998), differences in state consumer protection and lemon laws do not defeat predominance for settlement classes. *Id.* at 1022-23 (upholding certification of settlement class).

Tellingly, the *Gentry* plaintiffs do not even address this authority discussed in the settling parties' supplemental brief in support of preliminary approval. (Dkt. No. 271, at 5:24-8:4). Instead, they insist the choice-of-law analysis must be undertaken to assess manageability for the due process rights of notice and the right to opt out. (Dkt. No. 276, at 15:12-15.). Yet they present no legal authority that supports this position. Indeed, the primary case the *Gentry* plaintiffs rely on, *Washington Mutual Bank, FA v. Superior Court*, 103 Cal. Rptr. 2d 320 (2001), considered certification for purposes of trial. *Id.* at 337 ("[W]hen an enforceable choice-of-law agreement is involved, the burden rests upon the party seeking nationwide class certification to identify any variations of applicable state law and to meaningfully demonstrate how a ***trial*** on the class causes of action can be conducted fairly and efficiently in light of those variations." (emphasis added)). The *Gentry* plaintiffs are simply recasting adequacy of notice and counsel arguments to justify the necessity of a choice of law analysis. (*See, e.g.*, Dkt. No. 276, at 15:15-17 ("The Court must consider the content of the notice to the over 10,000 Virginians who purchased their Elantras prior to November 2, 2012."); *id*. at 16:12-13 ("For these purposes McCune Wright and Hagens Berman are not adequate class counsel. While the Court's holding regarding the experience of these firms in class action law is correct, that does not mean they are adequate class counsel for the Virginia Plaintiffs.")). Neither of these considerations, however, require the court to conduct a choice-of-law analysis for purposes of settlement.

## B. The *Gentry* Plaintiffs Have Failed to Demonstrate An Actual Conflict of Laws Exists

The *Gentry* plaintiffs further maintain that material differences exist between California and Virginia law, which preclude approval of the settlement. Yet they

still fail to meet their "burden for demonstrating that an actual conflict of laws exists between jurisdictions." *Holt v. Globalinx Pet LLC*, 2014 WL 347016, at *5 (C.D. Cal. Jan. 30, 2014) (requiring objectors to show material differences in the law "as shown on the facts of the case"). First, they suggest that California's lemon law does not provide adequate protection to consumers because "California has a large and important number of motor vehicle manufacturers doing business there." (Dkt. No. 276, at 17:15-16). They similarly claim that, compared to Virginia's statute, California's Consumer Protection Act "does not provide as generous/onerous of a punitive damages statute in the circumstances of this case," and that such variations are not "insignificant." (*Id.* at 18:17-19; *id.* at 19:4). Even were Virginia's lemon law more favorable, that does not weigh against settlement approval given the substantial countervailing risk that the Virginia class members' claims are barred by the Virginia statute of limitations. *See supra* section VII.

Moreover, contrary to the *Gentry* plaintiffs' suggestion, California law is sufficiently protective of consumers. Although a choice-of-law analysis is not required, a comparison of California and Virginia laws reveals that Virginia consumers would be well-served by applying California law to their claims. *See Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009) (describing "California's strong public policy to protect consumers against unfair and deceptive business practices"). In fact, courts have repeatedly recognized California's consumer protection statutes as "among the strongest in the country." *Yamada v. Nobel Biocare Holding AG*, 275 F.R.D. 573, 581 (C.D. Cal. 2011); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) (applying California consumer protection laws extraterritorially in recognition that they are among the strongest in the country). In comparison, Virginia law "provides significantly less consumer protection to its citizens than California law." *Am. Online, Inc. v. Superior Court*, 90 Cal. App. 4th 1, 15 (2001) (declining to enforce forum selection clause and choice of law clauses designating Virginia because Virginia law was less protective

of the plaintiff consumers than California law).  Thus, the *Gentry* plaintiffs'
objection to the settlement based on any purported inadequacy in California laws is
meritless.

## IX.   THE EMAILS FROM VIRGINIANS DO NOT DEMONSTRATE OPPOSITION TO THE SETTLEMENT

The *Gentry* plaintiffs argue that their counsel has received more than 450
"written communications rejecting" the settlement.  (Dkt. No. 276, at 8:21-22).
Their counsel appears to have sent an email to many Virginians attaching a letter
with his one-sided perspective of the settlement, his original 70-page brief in
opposition to the settlement (which the Court struck as over-length), a copy of the
amended complaint filed in *Gentry*, and an unknown exhibit.[14]  (*See* Dkt. No. 276-1,
at 33).  It is unclear whether the actual settlement agreement was included.  The
responses to this email—appended as Exhibits 1-8 to the *Gentry* plaintiffs'
supplemental brief (without redacting personal information)—contain views of the
settlement based solely on the way the *Gentry* counsel presented the settlement.
Rather than reflect putative class members' opposition, however, these responses
demonstrate the campaign of misinformation *Gentry's* counsel has undertaken to
sabotage the work of the settling parties in the MDL.

A majority of the responses evidence a material misunderstanding about the
settlement and its benefits.  For example, none of these putative class members
appear to be aware that the settlement provides three options for receiving the lump
sum payment: a debit card, a dealer service card valued at 150% of the lump sum, or

---

[14]   Based on the apparent misrepresentations about the settlement made to
Virginia consumers, settling parties reserve the right to seek a corrective notice
under Rule 23(d) with respect to Virginia consumers.  *See, e.g.*, *Great Rivers Co-op.
of Se. Iowa v. Farmland Indus., Inc.*, 59 F.3d 764, 766 (8th Cir. 1995) (recognizing
Court's power to order curative notice to class members at the expense of those who
created the need for the curative notice).

a new-car certificate worth 200% of the lump sum payment. *Gentry's* counsel did not inform them of these options.   Their views of the settlement would likely have been more favorable had they been provided this information through a Court-approved notice rather than the self-serving portrayal of *Gentry's* counsel.

As another example, some individuals appear to believe the settlement is insufficient because they plan to own their vehicle for many years or drive it for many thousands of miles.  (*E.g.*, Dkt. Nos. 276-3, at 8; 276-5, at 49; 276-7, at 7). Their statements evidence *Gentry* counsel's failure to inform them they have the option to continue with the reimbursement program as long as they own their vehicle.  For some, this option will provide greater overall compensation than the lump sum payment because of the total number of miles they plan to drive.  Had they received the Court-approved notice, they would have been aware of the favorable options available to them.

Some putative class members also seem to believe the cut-off date for inclusion in the settlement is November 2011, not November 2, 2012.  (*E.g.*, Dkt. Nos. 276-1, at 26; 276-2, at 24).  Others believe they need to pay *Gentry's* counsel a fee out of the compensation they will receive through the settlement.  (*E.g.*, Dkt. No. 276-1, at 37).  Both beliefs are incorrect, and the accurate facts are stated in the proposed notice documents.  With the correct information, their perception of the settlement would almost certainly be different.

Besides reflecting an incorrect understanding of the settlement terms, about 73 of the emails do not even oppose the settlement.  Some only state that they want to continue hearing about the case "whatever the outcome may be;" others admit they did not read the documents they were sent; and some appear to support any resolution that will provide them with compensation—including the settlement. (*E.g.*, Dkt. Nos. 276-3, at 35; 276-3, at 45; 276-4, at 30; 276-5, at 17).  Thus, even under the *Gentry* counsel's own tally, there are far fewer negative responses to his one-sided rendition of the settlement than he contends.

Finally, the emails are not indicative of putative class member views because at least 64 of them are not from putative class members. (*E.g.*, Dkt. No. 276-1, at 11; Dkt. No. 276-2, at 5; 276-3, at 11).[15]  Counsel has given many individuals who purchased or leased their vehicles after HMA's November 2, 2012 announcement the false impression that they have legitimate claims and may receive some remuneration under the settlement, but because of their purchase date, they are not within the scope of the settlement.  Because they are not putative class members, they do not have standing to challenge the settlement and their views are irrelevant to preliminary approval.  *In re Hydroxycut Mktg. & Sales Practices Litig.*, 2013 WL 5275618, at *1-5 (S.D. Cal. Sept. 17, 2013); *see also Gould v. Alleco, Inc.*, 883 F.2d 281, 284 (4th Cir. 1989) (Rule 23 "clearly contemplates allowing only class members to object to settlement proposals").

## X.   CONFIRMATORY DISCOVERY HAS PROVIDED SUFFICIENT INFORMATION ABOUT DEFENDANTS' TESTING

The *Gentry* plaintiffs, who refused to participate in confirmatory discovery until very recently, now claim the process did not address the "critical factual issue" of what HMA knew about the "real world" mileage testing and when did it know it. (Dkt. No. 276, at 11:11-17).  According to the *Gentry* plaintiffs, without this information, it is not possible to assess whether HMA could possibly be liable for treble damages due to willful violations of the Virginia Consumer Protection Act. (*Id.* at 12:13-15).

Contrary to *Gentry's* apparent assumption that no other counsel raised the issue of purported "real world fuel economy," the Second Amended Complaint in *Espinosa*—filed more than a year before *Gentry*—alleged, for example: "The MPG

---

[15]  This statement reflects the number of emails that expressly discuss ineligibility due to purchase date.  Likely, many other respondents also fall into this excluded group.

1    figure provided by HYUNDAI in advertisements are not real world driving

2    estimates. . . . [T]he miles per gallon under EPA test conditions grossly overstates

3    actual expected highway mileage in real world driving conditions."  (Case No. 2:12-

4    cv-00800, Dkt. No. 40, at ¶ 42.  *See also id*. ¶¶ 43, 45, 47, 54, 55).  Counsel for the

5    *Espinosa* plaintiffs participated in the confirmatory discovery process, including

6    taking the under oath recorded interview of HMA's then CEO and one of the

7    interviewees in South Korea.  Additionally, in confirmatory discovery the plaintiffs

8    broadly sought testing documents, for example, "Produce ALL DOCUMENTS

9    AND COMMUNICATIONS RELATED TO [HYUNDAI/KIA]'S FUEL

10   ECONOMY testing AND retesting materials, protocols, guidelines, AND

11   procedures for the AFFECTED VEHICLES, INCLUDING DOCUMENTS

12   identifying the locations and dates, in the U.S. AND abroad, where FUEL

13   ECONOMY testing was performed on the AFFECTED VEHICLES AND the

14   departments, personnel, AND entities that conducted or were responsible for such

15   testing."  (Dkt. No. 128-2, at 21).  Thus, the presence of plaintiffs' counsel

16   considering "real world fuel economy" claims dates back to *Espinosa*, and that

17   broad view of the relevant facts informed what plaintiffs sought in confirmatory

18   discovery.

19          Despite being invited to participate in the confirmatory discovery process

20   after the Panel conditionally transferred *Gentry*, the *Gentry* plaintiffs refused to do

21   so based on unfounded concerns about the Rule 408 confidentiality agreement.  Two

22   weeks after the June 26 preliminary approval hearing, they signed the Rule 408

23   agreement (without modifications) and now have access to the confirmatory

24   discovery materials.  After seven months of opting not to engage in the process, and

25   without having had sufficient time to assess the confirmatory discovery materials,

26   they now launch a baseless attack that "essential facts have not been determined, or

27   even sought."  (Dkt. No. 276, at 12:8-9).

28

**XI.   POST-NOVEMBER 2, 2012 PURCHASERS CANNOT BE FORCED INTO THE PROPOSED SETTLEMENT**

The *Krauth* plaintiffs state that HMA and KMA must accommodate the claims of individuals who acquired their vehicles after November 2, 2012 based on allegedly inaccurate window stickers.  However, by definition these consumers are not included in the proposed settlement, and no release of their claims is being sought.  (*See* Dkt. No. 185-2, at 5 (including within the definition of class members only individuals who owned or leased class vehicles "on or before November 2, 2012")).  Among other legitimate reasons to exclude these buyers from the settlement are the individualized questions of reliance that would invariably plague the claims of post-November 2, 2012 purchasers.  (*See* Dkt. No. 253, at 9:11-20). No basis exists to shoehorn differently situated individuals into the existing settlement when their claims are not being affected in any way.

<u>Conclusion</u>

For the reasons set forth herein, settling parties respectfully request the Court grant the *Espinosa*, *Hunter*, and *Brady* plaintiffs' motion to certify a settlement class and motion for preliminary approval of class settlement.

DATED:  July 21, 2014               QUINN EMANUEL URQUHART & SULLIVAN, LLP


                                   By _/s/ Shon Morgan_____
                                        Shon Morgan
                                        Attorneys for Defendants Hyundai Motor
                                        America and Hyundai Motor Company

-33-

1   DATED:  July 21, 2014            DYKEMA GOSSETT PLLC

2

3

4                                    By  /s/ James P. Feeney
                                         James P. Feeney
5                                        Attorneys for Defendant Kia Motors
                                         America, Inc.
6

7   DATED:  July 21, 2014            HAGENS BERMAN SOBOL SHAPIRO LLP

8

9

10                                   By  /s/ Robert B. Carey
                                         Robert B. Carey
11                                       Attorneys for Plaintiff Kaylene P. Brady,
                                         et al. and Nicole Marie Hunter. et al.
12

13  DATED:  July 21, 2014            MCCUNEWRIGHT,  LLP

14

15

16                                   By  /s/ Richard D. McCune
                                         Richard D. McCune
17                                       Attorneys for Plaintiffs Lillian E. Levoff,
                                         Thomas Ganim. and Dan Baldeschi
18

19

20

21

22  **C.D. Cal. L. R. 5-4.3.4(a)(2)(i) Attestation**

23  I attest that the e-signatures of Robert B. Carey and Richard D. McCune were added

24  with the authorization of their co-counsel, John DeStefano.  I further attest that the

25  e-signature of James P. Feeney was added with authorization conveyed by his co-

26  counsel, Benjamin W. Jeffers.

27                                        /s/ Shon Morgan

28