QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Shon Morgan (Bar No. 187736)
  shonmorgan@quinnemanuel.com
  Joseph R. Ashby (Bar No. 248579)
  josephashby@quinnemanuel.com
  John Lee (Bar No. 272229)
  johnlee@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

  Karin Kramer (Bar No. 87346)
  karinkramer@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Attorneys for Defendant Hyundai Motor
America and Hyundai Motor Company

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| In Re: | No. MDL 13-02424-GW (FFMx) |
| HYUNDAI AND KIA FUEL ECONOMY LITIGATION | **DECLARATION OF GARY GREENFIELD IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR FEES, EXPENSES, AND INCENTIVE AWARDS** |
| THIS DOCUMENT RELATES TO: | Date: March 19, 2015 |
| ALL ACTIONS | Time: 8:30 a.m. |
| | Courtroom: 10 |
| | Hon. George H. Wu |

# **TABLE OF CONTENTS**

**Page**

I.    BACKGROUND AND QUALIFICATIONS ....................................................... 1

II.    MOTIONS FOR FEES ............................................................................. 4

    A.    Legal Bill Analyses or Audits ....................................................... 5

    B.    Failure to Submit Time Records .................................................... 7

    C.    Lack of Specificity as to Work Performed ..................................... 9

III.    *KRAUTH/HASPER* MOTION ............................................................... 10

    A.    Involvement of Four Law Firms ................................................... 11

    B.    Time Sought for *Bird* ................................................................. 11

    C.    Reasonableness of Time and Fees ................................................ 12

    D.    Billing Rates ............................................................................... 14

        1.    Consumer Watchdog .......................................................... 14

        2.    CGL .................................................................................. 15

        3.    CPW ................................................................................. 16

        4.    DBBWC ............................................................................ 17

        5.    Pearl Declaration ............................................................... 17

IV.    *ESPINOSA* MOTION ............................................................................ 19

    A.    The Requested Multiplier ............................................................. 20

    B.    Billing Rates ............................................................................... 25

V.    VIRGINIA PLAINTIFFS' MOTION .......................................................... 26

    A.    Problem Areas Identified in the Virginia Lawyers' Time Entries ....... 27

VI.    NON-SETTLING PLAINTIFFS' MOTION .................................................. 30

    A.    Bonsignore, LLC ........................................................................ 30

        1.    Billing Rates ...................................................................... 32

<u>DECLARATION OF GARY GREENFIELD</u>

I, Gary Greenfield, declare as follows:

1.      I am making this Declaration as an expert witness in support of the oppositions of defendants Hyundai Motor America and Kia Motors America, Inc. ("defendants") to the motions for attorneys' fees and costs, and for incentive awards for plaintiffs, filed by various plaintiffs' counsel in this case, including counsel for *Espinosa*, *Krauth/Hasper*, the Virginia plaintiffs, and Bonsignore, LLC, representing certain Non-Settling Plaintiffs, and the Pomerantz and Shepherd firms seeking an incentive award for the plaintiff in *Gordon v. Hyundai Motor America* (collectively, the "Motions for Fees").  I have personal knowledge of the matters set forth herein and, if called upon to testify, could and would competently testify thereto.

## I.      BACKGROUND AND QUALIFICATIONS

2.      I am the founder of Litigation Cost Management ("LCM"), based in Oakland, California.  LCM commenced business in 1991.  LCM is in the business of consulting regarding legal fee-related issues.  As part of our business, we regularly conduct analyses of both legal and expert witness fees in litigation with regard to the reasonableness, appropriateness and allocation of time, fees and expenses being sought, as well as hourly rates.  We also consult with clients regarding how to manage their outside litigation more effectively and efficiently.  LCM works with both law firms and clients of law firms in undertaking its analyses and consulting about effective litigation management.

3.      Prior to starting LCM in January, 1991, I was a partner in the law firm of Shartsis, Friese & Ginsburg in San Francisco, California, where I was a litigator for fifteen years.  I became a partner in the firm in 1981.  During my career at my former law firm, I handled general commercial litigation, from pre-filing preparation and negotiations through trials and appeals.  I handled litigation of

varying types, including breach of contract, constitutional law, securities, class actions, fraud, bankruptcy litigation, intellectual property, unfair competition, and civil rights litigation.  I represented both plaintiffs and defendants.  I handled both contingency cases and cases where we were compensated on an hourly basis.  I graduated from the Boalt Hall School of Law in 1975 and received my undergraduate degree from Stanford University in 1971.

4.    Since LCM was founded, I have conducted several hundred analyses of the legal and expert witness fees and expenses in cases of various types and sizes.  These have included individual actions, multi-party suits and class actions.  The cases have included the full range of civil litigation, such as patent, copyright, trademark, real property, False Claims Act, ERISA bankruptcy, tax, breach of contract, securities, antitrust, environmental, insurance coverage and bad faith, discrimination, disability, civil rights, constitutional law, inverse condemnation, personal injury and products liability cases.  They have involved both individual and class actions.  I have myself been personally involved in, conducted analysis in and supervised each of these analyses.  As part of my work on these projects, I have prepared and submitted numerous reports on attorneys' fees issues, both on behalf of parties opposing fee applications and on behalf of law firms or clients seeking to recover their fees.

5.    I have qualified and testified previously as an expert witness in litigation regarding legal and expert witness fees on a number of occasions, again both on behalf of parties seeking to recover their attorneys' fees and parties opposing requests for attorneys' fees.

6.    I was appointed a Special Master to analyze and report to the San Francisco Superior Court regarding the fees and expenses of various law firms and experts in an insurance company conservation proceeding before that Court.

7.      As part of my work, I also consult with law firms and clients of law firms regarding law firm billing practices, effective litigation management, and legal bill analysis and auditing procedures.  I have lectured and conducted seminars for clients and law firms in each of these areas.

8.      I have taught or been a speaker at a number of programs regarding analysis of legal fees, legal bill auditing and litigation management.  I am an instructor for the National Association of Legal Fee Analysis.

9.      For purposes of my analyses in these various cases and my consulting work, we have received and analyzed the time entries, billing rates and expenses billed in many hundreds of cases, involving law firms and law offices across the country.  I receive and review bills and rate information in many cases beyond those I work on as an expert in litigation, and I also receive and review compilations of rates from various sources that I consider reliable indicators of rates in various markets.  I also regularly review cases and articles dealing with attorneys' fees, and litigation management issues, as well as databases, surveys, cases, and articles regarding billing rates being charged in the legal industry.  As a result, I am familiar with typical and commonly accepted billing practices among law firms, as well as the rates typically charged by lawyers of various experience levels and expertise both nationally and in various parts of the United States.

10.      As a result of my experience, I am familiar with the common and normal processes used by courts in analyzing requests for fees in numerous contexts.

11.      Attached hereto as Exhibit 1 is my Resume.

**Materials Reviewed**

12.      In order to undertake my analysis, I reviewed the following Motions:  the *Espinosa* motion for award of attorneys fees, reimbursement of litigation expenses, and service award to representative plaintiffs; the

*Krauth/Hasper* motion for payment of attorneys' fees, reimbursement of expenses and compensation to named plaintiffs; the Virginia plaintiffs' motion for payment of attorneys fees, expert witness fees, and out-of-pocket costs; and the motion of certain Non-Settling Plaintiffs for attorneys' fees and expenses.  I also reviewed the supporting materials, including the memoranda of points and authorities, declarations and exhibits supporting each Motion.

## II.    MOTIONS FOR FEES

13.    A party seeking fees from an opponent in litigation has the burden of proving that the fees and expenses being sought are reasonable,[1] appropriate[2] and compensable.[3]  The starting point for "private attorney general" and most other types of cases where attorneys' fees are sought is the "lodestar"—the reasonable hours billed multiplied by the appropriate rates for the billers.  In a class action, before counsel is entitled to any portion of their lodestar, they must first show that they provided a benefit to the class.  That is especially important where multiple counsel claim an entitlement to fees.

14.    Even after the benefit is shown, the hours in the lodestar are not simply all of the hours billed, but rather the <u>reasonable</u> hours billed.  One starts with the hours billed, eliminates time that is duplicative, unnecessary, inappropriate to

---

[1] I use the term "reasonable" to refer to time and expenses that are reasonable to have billed or incurred in terms of amount and are necessary for the prosecution or defense of an action or claim.

[2] I use the term "appropriate" to refer to time and expenses that are appropriate to have billed—for example, even if the fees and expenses are otherwise within the range of reasonableness for a case, it is generally considered inappropriate to bill office rent to a client.

[3] I use the term "compensable" to refer to time or expenses which are recoverable in a case where some but not all of a case may be subject to the recovery of attorneys' fees.

bill or non-compensable in the individual case,[4] and then considers other factors set out in the Rules of Professional Conduct and case law, such as unusual timing demands of a case, the novelty and difficulty of the questions, the results obtained or benefit conferred, any of which can impact whether the hours worked were reasonable under the circumstances.  In order to determine the reasonable hours billed, the trial court must carefully review attorney documentation of the hours expended.

15.     The lodestar, once calculated, is presumed to provide full and reasonable compensation, with a fee enhancement to be awarded only in rare and exceptional cases.

16.     A party seeking fees must provide documentation of the fees and expenses requested, which allows the Court and opponent to evaluate whether the fees and expenses sought are reasonable, appropriate and compensable.  There is a legion of cases which reiterate that the information provided must be adequate and that fees and expenses are properly reduced or denied for inadequate documentation.

A.     **Legal Bill Analyses or Audits**

17.     The purpose of a legal bill analysis or "audit" (as these analyses have come to be known) on motions such as this is to assist in verifying and assessing the reasonableness, appropriateness and compensability of fees being sought.

18.     Among the areas commonly evaluated in a legal bill analysis are:

---

[4] The United States Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983), still a seminal case in the area of legal fees, stated that a party seeking fees from an opponent has the same obligation to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission.

        a.      Whether the time and related fees are being sought in areas for which attorneys' fees are compensable in a case where fees are only recoverable for a portion of the case;

        b.      Whether there are errors in the bills or other compilations of time or fees filed in support of the request for fees;

        c.      How the case is staffed both overall and in particular how aspects of the case are handled;

        d.      Whether the time billed for particular activities or projects appears reasonable;

        e.      Whether inappropriate time is sought, such as time for work which could be performed by secretarial or clerical personnel;

        f.      Whether time for law firm administrative work is being sought;

        g.      Whether work is being performed by personnel at appropriate rates; and

        h.      Whether the time records contain reasonably sufficient information.

19.     These are all areas that are of concern to clients seeking to manage their outside legal fees cost-effectively, but are equally important to parties being asked to pay an opponent's fees in litigation.  These areas have been the subject of analysis by numerous courts in reviews of motions for legal fees and are commonly addressed by billing guidelines used by courts (most notably bankruptcy courts, which review fee requests in many cases and contexts) and by clients that are trying to manage their litigation cost effectively.

20.     The Motions involve requests for fees where there has been no fee-paying client with an interest in reviewing and evaluating the time and fees to determine whether they are reasonable.[5]  It is particularly important for an opponent and the Court to have adequate documentation and information to analyze the time spent in situations such as that presented here, since no one else has undertaken or will undertake an analysis of the substantial amounts sought on the Motions to determine whether they are reasonable.[6]

**B.     Failure to Submit Time Records**

21.     As stated above, parties seeking fees are entitled only to reasonable fees (assuming they are entitled to fees at all).  The materials they file in support of a request for fees must afford the party from whom the fees are being sought the opportunity to analyze the request, and enable the Court to determine whether the time upon which the fee request is based is reasonable and necessary to the litigation, appropriate to bill, and recoverable in the particular case.

22.     The standard practice on motions for fees is for the party seeking fees to provide the bills or contemporaneous time entries that reflect the work done in the particular case.  I am aware of the concerns regarding disclosing privileged information in time entries filed in support of requests for fees.  However, that is a concern in many cases, and it is dealt with in virtually all cases by privileged information being redacted where necessary.  The extent of the redaction can be an issue (some firms redact far more than is truly confidential or privileged), but the

---

[5] That is true for each of the Motions.

[6] Clients who are paying the legal fees in commercial litigation commonly review the bills, are able to raise questions about any time billed, and may have billing guidelines indicating what types of billing practices to avoid.  That does not occur in cases such as this, making it critical that any time entries are produced so that the opponent and Court can review and analyze the time and fees and that they be produced in a manner that allows adequate time for their analysis.

1  typical manner in which concerns regarding privilege are dealt with is through

2  redaction, not by failing to provide time entries altogether.

3        23.    In connection with the *Krauth/Hasper* and *Espinosa* Motions, as

4  well as the Bonsignore firm's fee request, plaintiffs' counsel did not provide the

5  time records underlying their requests for fees.  Instead, they provided general and

6  often vague and ambiguous summaries of what they did.  The summaries do not, for

7  the most part, indicate who did what and how much time was spent on particular

8  tasks, with multiple tasks being lumped together.  For these Motions, it is not

9  possible to determine how much time (and therefore what fees are being sought) for

10  what work, who did the work, and whether the time spent and resulting fees were

11  reasonable.

12        24.    It should be noted that this is not a situation where time entries

13  reflecting the work do not exist.  Plaintiffs' counsel have time records and have

14  offered to produce them if requested by the Court, in some cases *in camera,* but

15  identify no acceptable reason why they did not do so before.  (Antonini Decl., ¶ 10;

16  Anderson Decl., ¶ 7; Murphy Decl., page 2, n.1; Campora Decl., ¶ 8; McCune Decl.,

17  ¶ 32).  Plaintiffs' counsel have simply made the strategic decision not to provide the

18  time entries despite seeking, in several of the Motions, millions of dollars in fees.[7]

19  The Courts have routinely significantly reduced or denied all fees under these

20  circumstances.[8]

21  ———————————————

22     [7] While I have no personal knowledge of plaintiffs' counsel's intent, it would be
obvious to any experienced litigator and particularly one who has ever been

23  involved in any type of fee motion (which is clearly the case for most of plaintiffs'
counsel here) that the methodology adopted here creates virtually insurmountable

24  impediments to a full and thorough analysis of the time and fees sought.

25     [8] *See, e.g., J & J Sports Productions, Inc. v. Napuri*, 2013 WL 4428573, at *1-2

26  (N.D. Cal. Aug. 15, 2013) ("In determining the reasonable hours, counsel bears the
burden of submitting detailed time records justifying the hours claimed to have been

27      (footnote continued)

28

25.      Nor is an *in camera* submission of billing records appropriate.  In order for the process to be thorough as well as fair, defendants (and I, on their behalf) need to be able to review the time entries to identify any areas that may be unreasonable, inappropriate or non-compensable, and the time entries should have been provided to defendants with adequate time to allow for their analysis.  The Court should not be expected to undertake such a time-consuming review.  Providing time records when a motion is filed is the typical course for fee motions, rather than one side presenting materials to the Court for *ex parte* review.  It is neither practical nor appropriate for the Court itself, in a case of this magnitude, to review the bills to analyze and assess whether there are many of the problems one looks for when analyzing legal fees.

26.      *Espinosa* counsel states in his Declaration that, if required by the Court, he will file a more detailed lodestar (presumably meaning time records) but seeks permission to do so "under seal."  I assume this means that, unlike the *in camera* inspection suggested by the *Krauth/Hasper* plaintiffs' counsel, the time records would be under seal but available to defendants and me to review subject to any applicable protective order.  While preferable to an *in camera* review, those time records should have been supplied prior to the hearing with sufficient time allowed for an adequate review.

## C.      Lack of Specificity as to Work Performed

27.      Another problem with the Motions which had no accompanying time records is that the summaries of the work provided rarely identify which billers

---

expended.  Where the documentation is inadequate, the district court may reduce the award accordingly.  Absent the submission of detailed contemporaneous time records justifying the hours claimed to have been expended on this case, the Court gives little weight to the figures provided by Plaintiff.") (internal citations and quotations omitted).

at which firms did which work.  Such summaries might be acceptable if time entries were provided, but the lack of identification of the billers under the circumstances presented by these Motions, in conjunction with the lack of time entries, exacerbates the problems caused by the lack of time records.

28.    In sum, the problems created by plaintiffs' methodology in these Motions include the following:

a.    It is impossible to fully assess the reasonableness of the time billed for any tasks or projects in the litigation (and therefore for the litigation overall), including whether time was billed on particular tasks or projects which was excessive, whether there was unnecessary duplication within or among the plaintiffs' firms, whether work was handled by billers at appropriate rates, whether there was unnecessary work done, etc.;

b.    It is impossible to determine the extent of non-compensable time being sought;

c.    It is impossible to determine if inappropriate time was billed; and

d.    It is impossible to identify any errors in the bills, such as whether work was billed to the completely wrong matter (a common occurrence in cases).

29.    I will now address the individual Motions.

## III.    *KRAUTH/HASPER* MOTION

30.    The importance of having time entries and clear information about what was done is highlighted by the fact that, even *without* time entries, I was able to identify some problems with the reasonableness, appropriateness and compensability of the time claimed by plaintiffs' counsel.  However, the full extent of these problems—and what others may exist—cannot be determined based on the materials filed.

### A.    Involvement of Four Law Firms

31.    The fact that four law firms (in both *Bird* and the MDL) worked on the litigation and substantial fees are being sought for each firm is itself a red flag for potentially unreasonable time and fees.[9]  Among the major contributors to excessive time on cases are unnecessary duplication, excessive inter-personnel communication, and time spent at inappropriate rates, all of which are made far more likely by having multiple law firms working on cases.  It is almost inevitable that, with work being done by four firms, multiple personnel will be reviewing and revising work product, communicating with each other and reviewing communications, even if not necessary.

32.    The absence of time entries precludes thorough analysis by defendants of the impact of having four different law firms involved.  Moreover, other than their representations that they attempted to avoid duplication (a representation that is made in virtually all cases), plaintiffs have provided no evidence to support their claim that it was reasonable to employ four law firms to prosecute this litigation and that there was no unnecessary duplication among them, In fact, as discussed below, there is evidence even in the cursory materials provided of unnecessary duplication.

### B.    Time Sought for *Bird*

33.    Plaintiffs are seeking fees totaling $539,632 for work in *Bird*. Putting aside the question of whether plaintiffs are entitled to the time and fees billed in *Bird* at all (defendants contend they are not), it is common where there are multiple cases being worked on for billers to bill time worked in one case to another,

---

[9] Multiple counsel on a case is not *per se* improper.  However, plaintiffs have failed to show why it was necessary in this instance to have multiple firms, let alone four.

typically in error.  In short, there may be time billed in the federal cases that in fact relates to *Bird*, but defendants have no way to determine or quantify the full extent of those fees.[10]

## C.    Reasonableness of Time and Fees

34.    Even given the lack of time entries and the ambiguous manner in which counsel describe who did what work, it is apparent that there was substantial duplication of efforts (often involving all four firms), as well as work being done at what appear to be inappropriate rates.

35.    For example, it appears that Consumer Watchdog personnel and CGL participated in all four United States interviews of Hyundai witnesses (Antonini Decl., ¶ 78; Anderson Decl., ¶ 34), and CPM participated in three (Murphy Decl., ¶ 13).

36.    As another example, both Ms. Antonini of Consumer Watchdog and someone from CGL listened to and took notes of one or more witness interviews of Korean personnel.  (Antonini Decl., ¶ 82; Anderson Decl., ¶ 35). There is no reason why two lawyers need to be listening to and taking notes of interviews, particularly since they were transcribed.

37.    Further, Consumer Watchdog "monitored" interviews undertaken by CPW and CGL (Antonini Decl., ¶¶ 79-80).  No reason is given for why it was necessary or appropriate to bill for Consumer Watchdog to be "monitoring" the interviews taken by its own co-counsel.  It is possible that CGL and CPM personnel (in addition to Consumer Watchdog personnel) were at both interviews, which would mean that <u>three</u> attorneys from different firms were billing

---

[10] It is extremely common (indeed it is the norm) to find errors in bills, including time billed to the wrong matter.

1  their time for these interviews, but, as with most of their time explanations, the

2  description of the work provided by plaintiffs' counsel makes this unclear.

3       38.    It appears that three of the firms—DBBWC, Consumer

4  Watchdog, and CGL—all worked on motions to compel discovery (Campora Decl.,

5  ¶ 3(a); Antonini Decl., ¶ 39; Anderson Decl., ¶ 14), even though the apparent

6  primary firm on that task, DBBWC, had its senior lawyers preparing the motion.  It

7  is not normally reasonable to have three law firms working on a motion to compel

8  discovery, particularly when the people with primary responsibility for it are senior

9  people in their firm, and no reason is provided as to why it was reasonable or

10  necessary in this case.

11       39.    In addition, $600 per hour (the rate being sought by the DBBWC

12  lawyers who worked on the case) to do low to mid-level associate work (motions to

13  compel discovery) is unreasonable to bill to a client or an opponent in a fee-shifting

14  case.  It is even more unreasonable to bill at those rates when co-counsel at CGL

15  then bills to review and revise the work.  (Anderson Decl., ¶ 14).

16       40.    The importance of these examples is not just that they indicate

17  unreasonable or excessive time on those particular projects.  They also demonstrate

18  the overall attitude and approach of plaintiffs' counsel in handling the case, which

19  appears to have contributed to excessive and unreasonable fees, the full extent of

20  which cannot be confirmed or tied down without access to the time entries.  As

21  stated above, the fact that plaintiffs' counsel had no client with a stake in managing

22  the case and keeping the fees cost-effective means that plaintiffs' counsel were free

23  to bill as they saw fit, unconstrained by client oversight.  They compound this with a

24  lack of information, which disables any *post hoc* attempt to provide such oversight

25  and impose some constraint over the time billed and fees.

26       41.    Another red flag of potentially unreasonable and excessive time

27  billed by the *Krauth/Hasper* attorneys is the overall number of hours they billed.  I

28

have reviewed the materials filed in support of the *Espinosa* Motion.  While similar issues exist with respect to that Motion in terms of the failure by counsel to supply time entries, the overall hours being sought by *Krauth/Hasper* counsel—over 5,000 hours for the period from January 2012 through December 2014 (*Krauth/Hasper* Mot. at 2)—appears excessive on its face, particularly given that counsel in *Espinosa* billed approximately 3,000 hours for roughly the same period.  (*Espinosa* Mot. at 17-18).  This differential reflects the impact of deploying four firms.  It is difficult to see why it was necessary (or reasonable), for example, to have four firms involved in confirmatory discovery or in "improving the settlement agreement," yet all four firms billed substantial time to both areas.  (*Krauth*/Hasper Mot. at 2).

42.     In summary, while the full extent of the problems with the plaintiffs' request for fees cannot be thoroughly analyzed without time entries, the foregoing demonstrates the unreliability of plaintiffs' evidence of the reasonableness of their time and fees.

**D.     Billing Rates**

1.     Consumer Watchdog

43.     The lodestar is initially determined by the reasonable number of hours worked at the appropriate rates for the billers, determined by what comparable lawyers receive for comparable work in the market.  This involves analyzing not only the particular lawyer's background, experience, expertise and reputation, but also what they did in the particular case since, as discussed above, it is inappropriate to be compensating a lawyer at a senior rate for work that could appropriately be performed with similar efficiency by a biller at a lower rate.  As with all issues related to determining the lodestar, the party seeking fees has the burden of proof as to the appropriate rates to be applied.

44.     The rate sought for Harvey Rosenfeld of Consumer Watchdog is $925 per hour, the highest rate of anyone seeking fees in this matter.  Consumer

Watchdog provides no foundation for that rate, or, in fact, any rate, since there is no information provided as to what Mr. Rosenfeld did in the litigation (although it appears that he signed the two letters attached as Exhibits F and G to the Antonini Declaration), what litigation he has handled that would justify the rate being sought, any decisions according him that rate or any rate, nor anything else that would make it appear that a client would hire him at $925 per hour to handle this litigation (or any litigation).   There is in fact no mention anywhere in the Motion of anything he did in the case despite the fact that plaintiffs are seeking compensation for a very substantial amount of his time:  806.50 hours.  (Antonini Declaration, Exh. B).  There is, in sum, no basis upon which to determine what legal experience or expertise he has, or what he did in the litigation, which makes him comparable to lawyers receiving $925 per hour.

45.    The rate sought for Paula Pressley is $650 per hour for 175.30 hours of time.  Again, there is no basis for that rate since there is no indication of what she did in the case.  Although the Consumer Watchdog Resume attached as Exhibit A to the Antonini Declaration indicates that Ms. Pressley has been involved in various types of litigation and is "one of the lead attorneys in a certified class action," there is no indication that she has been awarded $650 per hour (or any rate) by any court in any case, nor is any other information provided to support a finding that she is comparable to lawyers receiving $650 per hour for comparable work in the market.  For example, in the *Espinosa* Motion, the rate sought for Mr. McCune is $650 per hour, and, based on the information provided on that Motion, he appears to be far more experienced in consumer class actions than Ms. Pressley.

2.    <u>CGL</u>

46.    Time for eight billers from CGL is being sought on the Motion, with rates ranging from $200 per hour to $850 per hour.  However, of the 1,255

DECLARATION OF GARY GREENFIELD IN OPPOSITION TO THE PLAINTIFFS' MOTIONS FOR FEES, EXPENSES, AND INCENTIVE AWARDS

hours of attorney time, 99% (all but 6.5 hours) are billed at $575 or more, ranging up to $850 per hour.

47.    First, there is absolutely no information provided about any of the billers regarding their experience, expertise, reputation or anything else that provides a foundation for or justifies the rates sought.  For example, plaintiffs seek compensation for 157.25 hours of Mr. Cuneo's time at $850 per hour and 112.75 hours of Ms. Cuneo's time at $725 per hour (Anderson Decl., Exh. A), but there is no information provided either about their backgrounds or what either did in the case to justify those rates. [11]  Again, it is important to know both what background and experience justifies rates in a case and also what the biller did so it can be determined whether the rate sought is appropriate for the level of work performed. That is not apparent for Mr. or Ms. Cuneo, nor any other biller from CGL.  The Anderson Declaration does not identify who did what on the case, let alone what work was done at what rate. [12]  This is particularly inappropriate given that, for all but 6.5 hours of the work, the average lawyer rate sought on the case is $725 per hour and the blended rate (average rate for each hour billed) for each lawyer on the case is $622 per hour.  These rates are very high for a case of this type.

48.    Moreover, one has to consider why, if CGL is as prominent a firm specializing in class actions as it claims to be (Anderson Decl., ¶¶ 4-5), it was necessary to bring in a fourth firm—CPW—to participate in the litigation.

3.    <u>CPW</u>

---

[11] Simply providing a general description of the law firm's work is not sufficient since that does not provide any information about the particular lawyers on the case.

[12] The Antonini Declaration sporadically identifies specific billers from CGL who did particular work in conjunction with the witness interviews.  But her Declaration otherwise fails to identify who did what as well, as discussed earlier.

49. The rates sought by lawyers at CPW range from $360 to $775 per hour. Approximately two-thirds of the work (429.60 out of 678.3 hours) was performed by Ms. Murphy, who filed the Declaration in support of the Motion and for whose time $500 per hour is sought. Background information is provided for the major billers on the case, but there is no identification in the Murphy Declaration (and little in the Antonini Declaration) as to who at CPW did what work. It cannot determine whether work was being performed at the appropriate rate.

### 4. DBBWC

50. The fourth firm for whom fees are sought is DBBWC. They became involved at the time *Bird* was filed. Two senior lawyers at DBBWC (Mr. Campora and Mr. Sheffer) performed work in *Bird* as well as the MDL. The rate sought for both is $600 per hour.

51. There is no information provided that indicates that either Mr. Campora or Mr. Sheffer have extensive experience in this type of litigation. Mr. Campora does state that DBBWC has been engaged in consumer class actions and that, in one case, "DBBWC attorney's lodestar rates" were approved by the Court (the Order is not attached to the Campora Declaration), but he does not state (which is what one would expect if it were the case) that either Mr. Campora or Mr. Sheffer were involved in those cases, and there is no indication that a rate of $600 per hour was approved in that case (or any case) for either Mr. Campora or Mr. Sheffer. Moreover, because they undertook work that could have been performed by lower level personnel, a rate of $600 per hour is not appropriate. In addition, their involvement in this litigation was unreasonable, given that Consumer Watchdog had already brought in two other firms with class action experience.

### 5. Pearl Declaration

52. The *Krauth* plaintiffs have submitted a declaration from an attorney, Richard M. Pearl, who opined that "the rates that Plaintiffs' counsel are

requesting in this matter are well in line with the non-contingent market rates charged by Los Angeles Area attorneys of equivalent experience, skill, and expertise for comparable services."  Mr. Pearl, however, provides no analysis or explanation for how he arrived at that conclusion.  Instead, he simply provides a list of selected attorney rates that have been approved by courts.  Several courts have addressed this approach by Mr. Pearl in other cases.[13]

---

[13]   *See Lota by Lota v. Home Depot U.S.A., Inc.* 2013 WL 6870006, at *16 (N.D. Cal. Dec. 31, 2013) (criticizing Pearl's declaration because while it did "provide some basis of comparison of reasonable rates for attorneys with 30+ years of experience, these rates do not take into account whether the work performed was similar in nature. . . .With regard to the list of standard hourly rates for various California firms . . . these numbers, upon first glance, support the reasonableness of [counsel's] requested fee.  However, Mr. Pearl does not provide any information regarding the practice areas of attorneys included in the survey, which is necessary information in order for the Court to make a *meaningful comparison* regarding whether the work was *similar* to that of [counsel].  Mr. Pearl also references surveys on legal rates, including a Valeo 2012 Halftime Report showing that the 2012 average partner rate in San Francisco was $675. . . .  These articles and surveys likewise do not provide information that allows the Court to determine whether the work performed was similar in nature.  If based on average billing rates for attorneys in big law firms, these quoted numbers presumably include rates for non-employment litigators and, even more dissimilarly, transactional attorneys.").

*Muniz v. United Parcel Service, Inc.*, 2011 WL 3740808, at *9 (N.D. Cal. Aug. 23, 2011) (finding Mr. Pearl's declaration did not justify the proffered attorney rate because, despite providing "a list of attorneys' hourly rates found to be reasonable by other courts, along with those attorneys' years of experience," Pearl did not "indicate those attorneys' skills or reputation. . . . Even Mr. Pearl's declaration demonstrates that an attorney's number of years in practice does not necessarily correlate with the appropriate hourly rate for that attorney.").

*Barrett v. Clark*, 2001 WL 35914950 (Cal. Sup. Ct. Oct. 5, 2001) (finding Pearl's declaration "unhelpful" because "[w]hile Mr. Pearl offers a lengthy summary of attorney rates awarded to various San Francisco Bay Area law firms in 2001, that summary provides little analysis of how those cases compare with the instant case, and offers no instruction to this Court on how to compare overhead
      (footnote continued)

1

## IV.    *ESPINOSA* MOTION

2      53.    In the *Espinosa* Motion, plaintiffs are seeking a lodestar of

3  $1,836,210 in fees based on a total of 3,029.40 hours, as well as $93,550.02 in

4  expenses.

5      54.    As with the *Krauth/Hasper* Motion, the absence of time records

6  and the general and ambiguous nature of the descriptions (in terms of who did what)

7  prevent any type of thorough analysis of the reasonableness of the claimed time.

8  Even the cursory materials provided, however, show evidence of unreasonable and

9  excessive billing.

10      55.    For example, according to the McCune Declaration, counsel

11  "engaged in significant fact discovery" (McCune Decl., ¶ 14), including the review

12  of 30,000 documents, *id.*, but there is no indication of who did this work and

13  therefore if it was billed at $200, $450 or $650 per hour, the three rates sought by

14  plaintiffs' counsel (before application of any multiplier).  Yet that is crucial to

15  determining whether the time billed and resulting fees sought are reasonable.

16      56.    Nor can one determine how many personnel worked on the

17  various projects, either within the firm or in conjunction with firms representing

18  other plaintiffs in the MDL proceeding.

19      57.    In summary, absent the time records and adequate time to review

20  and analyze them, one cannot assess whether the time billed and resulting fees

21  claimed are reasonable, appropriate and compensable.

22

23

24

25  _____

26  expenses borne by the listed San Francisco Bay Area law firms (all of which are

27  medium to large-sized firms) with that of [counsel's] firm.").

28

## A.    <u>The Requested Multiplier</u>

58.    The *Espinosa* counsel seek a multiplier of three.  This is not an appropriate case for the application of an enhancement multiplier at all, let alone a multiplier of three.[14]

59.    First, it must be noted that the lodestar in a case is the presumptively reasonable and appropriate compensation, and enhancement multipliers are only applied in the rare and exceptional case where the lodestar does not reflect reasonable and appropriate compensation.  Based on my understanding of the facts and circumstances underlying this litigation, counsel for the *Espinosa* plaintiffs are not entitled to a multiplier.

60.    The *Espinosa* litigation was filed on January 6, 2012.  On September 14, 2012, the *Espinosa* plaintiffs moved for certification of a nationwide class based on claims that defendant Hyundai had failed to adequately disclose that fuel economy representations made in Hyundai's advertisements were EPA estimates rather than real world fuel economy numbers.

61.    During the parties' briefing on the *Espinosa* plaintiffs' class certification motion, Hyundai and Kia made their November 2, 2012 announcement that, following an EPA investigation, they were voluntarily restating the fuel economy estimates for certain vehicle due to procedural errors in fuel economy testing.  Following that announcement, over 50 putative class actions were filed across the country asserting claims based on the restatement of fuel economy estimates.  It is my understanding that in January 2013, counsel for the *Brady* and *Hunter* plaintiffs entered into settlement negotiations with Hyundai.

---

[14] Multipliers can either be "negative" multipliers (thereby reducing the lodestar) or enhancement multipliers (increasing the lodestar.)

62.     On November 16, 2012, after the restatement announcement had triggered the filing of lawsuits against Hyundai and Kia, the *Espinosa* plaintiffs filed a reply brief in support of their motion for class certification.  On reply, the *Espinosa* plaintiffs attempted to shift their theory of the case to reflect the claims of the post-November 2, 2012 cases alleging the misstatement of EPA fuel economy estimates.

63.     The Court tentatively ruled that the plaintiffs' attempt to change their theory of the case on reply was impermissible, and stated that any class in *Espinosa* would be limited to California consumers.  After a round of supplemental briefing, the Court expressed skepticism about whether any class could be certified at all due to reliance issues.  The Court ordered a second round of supplemental briefing to address its concerns regarding the viability of class certification.

64.     Rather than filing a second supplemental brief, *Espinosa* counsel opted to join the settlement negotiations that were already underway between the *Brady/Hunter* counsel and Hyundai.   Shortly thereafter, *Espinosa* was transferred into the MDL and a settlement in principle was reached.

65.     There is nothing rare or exceptional about this case.  The mere fact that an MDL was formed does not make the case rare or exceptional.  MDL proceedings are common and there was nothing unusual about this one.  To the contrary, *Espinosa* represents a straightforward false advertising case, which benefited enormously from being included in the MDL.  There were no novel theories pursued, the litigation was not extensive, settlement was quick, and the costs of the litigation were spread out among the many MDL counsel, thus lessening any single counsel's risk.  Moreover, the case benefited from the EPA investigation and defendants' voluntarily decision to compensate their customers, which I am told were not the result of the *Espinosa* litigation.

66.     The conduct of other plaintiffs' counsel, in particular their fee agreements, supports the conclusion that this is not the type of exceptional case that warrants a multiplier.   It is my understanding that a large majority of the plaintiffs' counsel have agreed to accept a negative multiplier of their lodestar amounts.  The only counsel requesting a positive multiplier are the *Brady/Hunter* counsel, who initiated and led settlement negotiations on behalf of the class.  The *Brady/Hunter* counsel agreed to a very modest multiplier of 1.22.  All other counsel—including liaison counsel, who I understand played a much more prominent role in the case than *Espinosa* counsel—have agreed to a negative multiplier, that is, less than their claimed lodestar.

67.     The *Espinosa* plaintiffs have submitted a declaration from William Rubenstein in support of their request for a multiplier of three.  Professor Rubenstein contends that two factors justify a multiplier of three.

68.     First, Professor Rubenstein states that the risk undertaken by counsel supports the requested multiplier.  That conclusion is flawed.  While *Espinosa* was in fact the first of the cases filed that ultimately ended up in the MDL, it was not the first case filed on the theory at the heart of the MDL (testing errors) and only ended up in the MDL on a "close call."  (Dkt. No. 1 at 2).  Any risk that counsel took in filing their case was no more extraordinary than the risk in any contingent fee litigation, and in fact, on the theory they were pursuing, may have proved to be unfounded.  Before the November 2 announcement by defendants, *Espinosa* was litigated as an advertising disclosure case.  Those claims faced serious problems at the class certification stage.

69.     The *Espinosa* plaintiffs were beneficiaries of the November 2 announcement and their subsequent inclusion in the MDL.  Professor Rubenstein's assertion that *Espinosa* did not "piggyback" on other cases is not borne out by the facts.  Following the November 2 announcement, *Espinosa* was in effect a tagalong

DECLARATION OF GARY GREENFIELD IN OPPOSITION TO THE PLAINTIFFS'
MOTIONS FOR FEES, EXPENSES, AND INCENTIVE AWARDS

case as to the claims that were actually the subject of the settlement. Any risk associated with *Espinosa* disappeared following the November 2 announcement, and thus cannot justify a multiplier for subsequent work performed by counsel. And prior to November 2, any risk undertaken by counsel was unfounded, as counsel failed to secure class certification. Risk that does not achieve anything does not support a fee enhancement for counsel.

70.     The second factor that Professor Rubenstein contends justifies a multiplier of three is the "value" that counsel "produced for their clients." This analysis is also flawed for a number of reasons.

71.     Professor Rubenstein assumes without foundation that the settlement is worth $400 million. This assumed figure does not deduct the value of the voluntary reimbursement program, which was instituted by defendants prior to the settlement. The *Brady/Hunter* plaintiffs, in connection with their fee motion, have submitted expert opinion on the incremental value of the settlement, apart from the voluntary reimbursement program. Their expert concluded that the incremental value of the Hyundai portion of the settlement is $46,276,112, while the incremental value of the Kia portion of the settlement is $32,874,104. Defendants would not necessarily agree that the value of the settlement is that high, but even accepting those numbers as correct, *Espinosa* only filed suit against Hyundai, which substantially diminishes the value of the settlement to which the *Espinosa* case can claim to have contributed. Thus, the amount of the benefit used by Professor Rubinstein to justify the multiplier is grossly overstated.

72.     Professor Rubenstein also assumes that *Espinosa* counsel is responsible for the value obtained on behalf of the entire class. In fact, *Espinosa* asserted claims against only Hyundai (not Kia), and involved only four of the 72 class vehicles that are included in the settlement. In addition, Professor Rubenstein overstates the value of the "4x40" compensation attributable to *Espinosa*, as

*Espinosa* involved only one of the four cars whose owners are entitled to the additional compensation. *Espinosa* thus represented a fraction of the claims at issue, further diminishing the value of the settlement to which the *Espinosa* case can claim to have contributed.

73.     Professor Rubenstein also incorrectly attributes a lion's share of the credit for achieving the settlement to *Espinosa* counsel.  In fact, the settlement negotiations were led by *Brady/Hunter* counsel on behalf of the class.  It is my understanding that *Espinosa* counsel did not even participate in the first two settlement meetings which led to the mediation.

74.     Professor Rubenstein further justifies a multiplier of three based on a percentage cross-check.  This is a misapplication of the percentage method for calculating fees, which is available only in common fund cases.  There is no common fund here, as the settlement does not have either a minimum payout or a cap on the funds available to pay claims.  Unlike with a common fund, defendants will pay counsel's fees, and those amounts are not deducted from the class recovery. I also understand that the Court acknowledged there is no fund in this case.  (June 26, 2014 Hearing Transcript at 42:8-18).

75.     For this reason, *Espinosa* is not in line with the cases referenced by Professor Rubenstein where large multipliers were permitted.  In those cases, which involved common funds, fee requests were based in the first instance on the 25% of the fund benchmark rule.  The amount of the multiplier in these cases was thus generally a product of the initial application of the percentage of the fund calculation.[15]  The *Espinosa* plaintiffs' approach is backwards, as they begin with

---

[15]   *See*, *e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002) (multiplier is used to cross-check the reasonableness of a request for a percentage of a common fund).

the lodestar in the first instance, and then apply an arbitrary multiplier that they

contend is within the range of multipliers allowed by courts in common fund cases.

76.     *Espinosa* represents essentially the opposite of the type of rare

and exceptional case that justifies a fee enhancement.  The EPA's investigation and

defendants' November 2 announcement removed any risk from the case, and the

settlement followed shortly thereafter.  The only risk undertaken by *Espinosa*

counsel was with respect to the claims they failed to obtain class certification for.

Those efforts do not justify any multiplier, much less a multiplier of three.

**B.**    **Billing Rates**

77.     Plaintiffs' counsel is seeking $650 per hour for Mr. McCune and

for Ms. Kusel, $450 per hour for Mr. Kim and $200 for Ms. Smith.

78.     In the McCune Declaration, the only basis for the rates sought

are a reference to cases where *defendants'* counsel (Quinn Emanuel Urquhart &

Sullivan, LLP) has sought fees and a page from a National Law Journal article

regarding the range of rates at various firms across the country that have high rates.

However, this does not demonstrate that the rates sought in those cases (*e.g.*, a

patent dispute between Apple and Samsung) or the range of rates regularly charged

by other law firms, as reported in a news article, reflects work by comparable

lawyers for comparable work.

79.     If it is assumed that Mr. McCune is entitled to $650 per hour,

then a $650 per hour rate for Ms. Kusel is excessive, given that she does not have

the same level of reputation, experience or expertise as Mr. McCune.   In assessing

the propriety of her rate, Professor Rubinstein states that Ms. Kusel has 19 years of

experience.  (Rubinstein Decl., ¶ 29)  However, while she graduated from law

school approximately 19 years ago, Ms. Kusel has been a litigator for only

approximately 11 years.

80.    *Espinosa* counsel is also seeking recovery of expert witness fees of $27,066.33.  This is typically not a recoverable cost in fee-shifting litigation.

## V.    VIRGINIA PLAINTIFFS' MOTION

81.    The Virginia plaintiffs' Motion was filed by plaintiffs' counsel in three actions, a putative class action and two mass actions brought under Virginia law.  The putative class action was removed to federal court and consolidated into the MDL proceeding.  The Virginia plaintiffs' Motion seeks legal fees of $760,350 based on 2,457.6 hours and expenses in the amount of $39,822.79.  The time was billed by two lawyers, James B. Feinman, for whom $350 per hour is sought and Andrew D. Finnicum, for whom $250 per hour is sought.  Both Mr. Feinman and Mr. Finnicum filed Declarations and their time entries were attached as Exhibits 1 and 2 to the memorandum of points and authorities in support of the Virginia plaintiffs' Motion.

82.    Even assuming counsel for the Virginia plaintiffs were entitled to fees in the first instance (defendants contend they are not), their application does not support the fees they seek.

83.    First, it should be noted that counsel for the Virginia plaintiffs regularly (but not always) "block-billed" their time, meaning that they combined the time for multiple tasks (typically all the tasks in a day) into one time entry.  Block-billing prevents the precise quantification of time involved in the various individual tasks.  For that reason, block-billing has been frequently criticized by courts reviewing requests for fees and has been the subject of numerous programs and articles over the years criticizing the practice as well.  As a result, lawyers (and particularly those who commonly seek fees) are well aware of the problems that block-billing creates for opponents and courts trying to analyze fee requests.  To the extent they continue to engage in this practice, they should not be allowed to

1    complain about any imprecise quantifications of areas of their fees since they have

2    created the problem.

3           84.    A second billing practice, which compounds the first, is that

4    these counsel bill in quarter hour increments.  Billing in that manner can result in a

5    significant inflation of fees over the course of the case if every task is billed at .25

6    hours, which appears to be counsel's practice.  The block-billing prevents

7    identification of all the instances where this was the case, but, to take a few

8    examples, there were billings of .25 hours for reviewing a return of service

9    (Finnegan 8/28/13 entry) and receiving Notices of Appearance of counsel and

10   notating their file (Feinman 1/14/14 and 1/15/14 entries).

11       **A.    Problem Areas Identified in the Virginia Lawyers' Time Entries**

12          85.    As discussed above, one problem area in complex litigation is

13   unnecessary duplication.  Here, there were several hearings in Los Angeles in the

14   MDL proceeding attended by both Mr. Feinman and Mr. Finnicum.[16]  Many other

15   counsel, by contrast, took advantage of the Court's invitation to appear at hearings

16   by telephone.  Moreover, one trip by the Virginia lawyers extended over four days,

17   with both lawyers billing for activities such as traveling to the Court on the day

18   before the hearing to familiarize themselves with the location of the court and

19   introducing themselves to the security personnel, driving themselves back and forth

20   to their hotel and rental car agency, etc.  (Feinman and Finnicum 6/24/14 through

21   6/27/14 time entries).  Not only is it inappropriate to bill for this type of activity, but

22   this illustrates that counsel took the approach of billing every possible activity,

23   whether appropriately billable or not, which reflects on the reasonableness of their

24   overall time billed, since one cannot determine what other similar activities they

25   chose to bill over the course of the case but did not specifically describe within the

---

[16] Mr. Finnicum sat in on a third by telephone.

time entries.  Even if it were reasonable for both to attend the hearing, it is does not appear reasonable for this to require a four-day trip (which involved not only time but also travel expenses, such as hotel and meal expenses, for both).  These particular billings provide a window into the approach that Virginia counsel apparently took in this matter, knowing that their own clients would not be footing the bill.

86.    Mr. Feinman and Mr. Finnicum also both traveled to Los Angeles for the July 24, 2014 hearing, this time spending three days on the trip. (Feinman and Finnicum 7/23/24 through 7/25/14 entries).  Neither of their Declarations provides any justification for why both were needed for another multi-day cross-country trip (and in fact, Mr. Finnicum sat in telephonically on another hearing that Mr. Feinberg went to Los Angeles to attend, Finnicum 8/21/14 entry).

87.    Both Mr. Feinman and Mr. Finnicum billed for researching and dealing with the Virginia State Bar Association on the allegedly "unauthorized practice of law by California class action attorneys not licensed in Virginia." (Feinman 12/20/13 and 12/24/13 entries and Finnicum 12/24/13 entry).  I am informed and believe that there was never any issue raised about defense counsel appearing *pro hac vice* in the Virginia cases, and, in any event, there is no reason why it would be appropriate to recover this time from defendants.

88.    In addition, there was time billed for secretarial and clerical types of activities, which are not appropriate to bill to a defendant in a fee-shifting case, any more than to a fee-paying client.  For example, there are billings for preparing and signing checks (Feinman 8/16/13, 11/25/13, 1/9/14, 3/17/14 entries); preparing the Summons (Feinman 8/14/13 entry); arranging service of process (Feinman 8/15/13 entry); filing of pleading**s,** motions and other materials in Court (Feinman 11/13/13, 11/26/13, 2/13/14, 2/17/14, 5/29/14, 5/30/14, 6/12/14, 6/20/14 (two entries), 8/8/14, 8/15/14, 9/18/14, 10/2/14, 10/16/14, 10/17/14 and 10/22/14

entries and Finnicum 10/16/14 and 10/17/14 entries)[17]; and sending faxes (Feinman 12/10/13 entry).[18]

89.     There was also work which, if not secretarial or clerical, should have been performed by paralegals, *e.g.*, preparing and filing DVD-R Exhibit One A to Complaint (Feinman 10/16/13 entry); organizing mailings to putative class members (Feinman 11/11/13, 12/18/03 entries); locating and organizing documents (Feinman 5/29/14 entry); twice for traveling to the Post Office to mail the Petition for Appeal (at apparently 2.5 hours per trip) (Feinman 9/12/14 and 9/13/14 entries); data entry and organizing files and information re new clients (Finnicum 12/2/13 through 12/11/13 entries).[19]

90.     Another problem with the Virginia counsel's time entries is the lack of specificity regarding research undertaken, typically by Mr. Finnicum.  Not all legal research is billable, particularly if it is basic research in an area of supposed expertise of counsel.  There were numerous time entries which simply said "research," "research re class actions," "research re Class Action Law," "research re Lemon Laws," "Legal Research re Federal Procedure," Legal Research re Federal Rules," "Legal Research re Discovery," "Legal Research re Upcoming Hearing" and the like.  (*See*, *e.g.*, Finnecum 7/29/13, 10/30/13, 12/18/13, 12/24/13, 12/26/13, 1/13/14, 2/11/14, 8/20/14 entries)  Without more information about the subject-

---

[17] There were so many entries for filing of materials in Court that it would appear that it was their general practice to bill for that time even if the time were not identified as such in the time entry.

[18] In today's legal world, it is common for lawyers to be undertaking tasks that used to be secretarial or clerical work, such as word processing, etc.  However, that does not make the time billable and it is particularly problematic where, as discussed later in the text, it appears that counsel's practice is to bill each task at .25 hours no matter how minor and brief.

[19] Mr. Feinman states that they did not bill for paralegal time on the case, but that does not justify billing for paralegal work performed by lawyers at lawyer rates.

matter of the research, there is inadequate evidence from which it can be determined that the time was appropriate to bill (because not basic research) or reasonable in terms of the time spent.[20]  I am informed and believe that Virginia counsel did not have previous class action experience, and there is nothing in their Declarations that indicates they did.  Billing defendants to learn the basic law and procedures relevant to class actions is not appropriate.

91.    Expert witness fees are normally not recoverable either as costs or as expenses in fee-shifting cases.  It appears that at least $1,377.50 is being sought as expenses for amounts paid to consultants Espey and Shimp (Exhibit 3 to the Virginia plaintiffs' Motion) and an additional $227.92 for expenses related to their work.  *Id.*

## VI.    NON-SETTLING PLAINTIFFS' MOTION

92.    A Motion has been filed by a group of plaintiffs referred to as the Non-Settling Plaintiffs ("NSPs").  Counsel for most of the NSPs have settled their claims for fees.  I was asked to review the materials filed by the one firm (Bonsignore, LLC) that has not.[21]

### A.    **Bonsignore, LLC**

93.    The Bonsignore firm seeks compensation for 659.7 hours totaling $357,485.00 in fees, as well as $2,707.35 in expenses.  (Declaration of Robert J. Bonignore ("Bonsignore Decl."), Exh. 1.  There were six billers ranging in rates from $125 to $650 per hour.  Id.

---

[20] That is not to say that all the research entries had inadequate information; they did not (which demonstrates that providing adequate information is feasible.)  Nor is an occasional general entry about research a problem.  However, there were numerous entries where adequate information was not provided which interfered with analyzing whether the work was appropriately billable and the time reasonable.
[21] Most of the NSPs' counsel have negotiated fee agreements with defendants.

94.     As with several of the other firms seeking fees, although the Bonsignore attorneys maintained contemporaneous time records of their work (*see* Bonsignore Decl., ¶ 4), those records were not submitted in support of their Motion.

95.     This creates the same problem of inadequate evidence that plagues the other Motions, essentially that it precludes a thorough analysis of whether the time sought is reasonable, appropriate and compensable.  However, with the other Motions, there are indications even in the sparse Bonsignore submission of problems related to unreasonable and excessive billing, but the full extent of the problems cannot be determined due to the lack of proper documentation.

96.     For example, although the Bonsignore firm did not file its complaints until after the settling parties had announced their settlement, and all six complaints were virtually identical, there were six billers who billed to the case. This was in addition to eight billers from the Tate Law Firm, with whom they co-counseled.  (Declaration of Mark A. Tate, ¶ 4).  Although it cannot be determined what any of them did since no time records were filed, on its face, that appears to be substantial overstaffing.

97.     Mr. Bonsignore billed two-thirds of the overall hours on the case at the top rate of $650 per hour, and over two-thirds of the time on the case was spent on discovery (453.4 hours out of 659.7 hours).  (Bonsignore Decl., Exh. 1). He himself handled well over half of the discovery on the case (252.2 hours out of the 453.40 total in the firm's "Discovery" category, *see id.*).  Thus, the most senior and expensive biller on the case was handling discovery.

98.     Another indication of possible excessive billing on the case is that, in addition to the large number of billers, the overall blended rate sought for the

1    case is $542 per hour.  This reflects top-heavy staffing and is a very high rate for a

2    case of this type that had already settled and primarily involved discovery in the

3    form of document review and interviews, along with finalization of the preliminary

4    settlement.

5            99.     Moreover, because the time records the firm maintains were not

6    provided, there is no evidence that there was no unnecessary duplication or

7    excessive time claimed.

8           1.    <u>Billing Rates</u>

9           100.   There is no information provided to support the rates of any of

10    the billers other than for Mr. Bonsignore, so there is no basis for inclusion of their

11    time in the lodestar.  As with the other firms, general information about the firm, its

12    practices and its cases does not provide the necessary foundation for an award of

13    fees.

14           101.   In determining the appropriate rate to be applied to a biller, one

15    must consider what the biller did on the case.  Well over half of Mr. Bosignore's

16    time (58%), was devoted to discovery.  (Bonsignore Decl., Exh. 1).  Regardless of

17    whether a rate of $650 per hour is appropriate for high level work in a consumer

18    class action, it is clearly not appropriate for someone who is primarily performing

19    document review or other discovery functions.

20

21           I declare under penalty of perjury under the laws of the United States of

22    America that the foregoing is true and correct.

23           Executed February 5, 2015, at Alameda County, California.

24

25

26

27    Gary Greenfield

28

DECLARATION OF GARY GREENFIELD IN OPPOSITION TO THE PLAINTIFFS'
MOTIONS FOR FEES, EXPENSES, AND INCENTIVE AWARDS