Robert B. Carey
*rob@hbsslaw.com*
John M. DeStefano *(pro hac vice pending)*
*johnd@hbsslaw.com*
Hagens Berman Sobol Shapiro LLP
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Tel. (602) 840-5900
Fax (602) 840-3012

Attorneys for Plaintiffs in the *Brady* and *Hunter* Actions

MCCUNEWRIGHT LLP
Richard D. McCune (Bar No. 132124)
*rdm@mccunewright.com*
2068 Orange Tree Lane, Suite 216
Redlands, CA 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Attorneys for Plaintiffs in the *Espinosa* Action

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE; HYUNDAI AND KIA FUEL ECONOMY LITIGATION | CASE NO. 2:13-ML-02424<br><br>**SEPARATE MEMORANDUM OF SETTLING PLAINTIFFS IN SUPPORT OF FINAL SETTLEMENT APPROVAL**<br><br>[PUBLIC REDACTED VERSION]<br><br>Date: June 11, 2015<br>Time: 9:30 a.m.<br><br>Courtroom: 10<br>Hon. George H. Wu |

010339-13 771133 V1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......................................................................................... 1

II. THE SETTLEMENT IS FAIR, REASONABLE, AND
ADEQUATE ................................................................................................. 1

    A. The Settlement Is Fair, Reasonable, and Adequate When
Compared to the Potential Recovery Available to the
Class ................................................................................................... 2

    B. The Lump-Sum Compensation Amounts Are Fair,
Reasonable, And Adequate ................................................................ 3

    C. The Settlement Offers Substantial Value to the Class
Above and Beyond the Lifetime Reimbursement
Program .............................................................................................. 4

    D. The Settlement Is Fair, Reasonable, and Adequate in
Light of the Risks of Proceeding with Litigation .............................. 6

        1. The Strength of Plaintiffs' Case and the Risk,
Expense, Complexity, and Likely Duration of
Further Litigation. ................................................................... 6

        2. The Risk of Maintaining Class Action Status
Throughout the Trial. .............................................................. 7

    E. The Settlement Was Informed by Substantial Discovery .................. 7

    F. Counsel Support the Settlement ......................................................... 9

    G. The Settlement was Negotiated in Good Faith And Lacks
Any Suggestion of Collusion ........................................................... 10

III. CONCLUSION ........................................................................................... 10

## I. INTRODUCTION

Plaintiffs Richard Williams, Thomas Ganim, Lillian Levoff, Nicole Hunter, Kaylene Brady, Travis Brissey, Ronald Burkard, Adam Cloutier, Steven Craig, John Dixson, Erin Fanthorpe, Eric Hadesh, Michael Keeth, John Kirk MacDonald, Michael Mandahl, Nicholas McDaniel, Mary Moran-Spicuzza, Gary Pincas, Brandon Potter, Thomas Purdy, Rocco Renghini, Michelle Singleton, Ken Smiley, Gregory Sonstein, Roman Starno, Gayle Stephenson, and Andres Villicana (collectively, "Settling Plaintiffs") hereby submit this Separate Memorandum in Support of Final Settlement Approval to show, as a matter of economic value, bargaining, and litigation context, that the settlement terms represent a fair, reasonable, and adequate compromise of class members' claims.

## II. THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

Under Federal Rule of Civil Procedure 23(e), the Court must approve all settlement agreements that will bind absent class members. *See Briggs v. United States*, 2010 WL 1759457, at *3 (N.D. Cal. Apr. 30, 2010). Final approval involves an assessment of whether the class action settlement, as a whole, is fundamentally fair, adequate, and reasonable. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004); *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

The Ninth Circuit has established various factors that guide the determination of whether the settlement is fair, adequate, and reasonable: 1) the strength of the plaintiffs' case; 2) the risk, expense, complexity, and likely duration of further litigation; 3) the risk of maintaining class action status throughout the trial; 4) the amount offered in settlement; 5) the extent of discovery completed; 6) the stage of the proceedings; 7) the experience and views of counsel; and 8) the reaction of the class members to the proposed settlement. *Hanlon*, 150 F.3d at 1026. Here, the economic value of the settlement, considered as a function of the bargaining and litigation

context, shows that this settlement is fair, adequate, and reasonable and should be approved.

### A.   The Settlement Is Fair, Reasonable, and Adequate When Compared to the Potential Recovery Available to the Class

As previously explained, the aggregate potential damages in this case consist of compensatory damages for the anticipated increased fuel cost over the term of vehicle ownership plus punitive damages (if any) if Plaintiffs were to show intentional deception on the part of Defendants. (Dkt. No. 297, at 1-3) Aggregating EPA-estimated fuel costs for class members on a per vehicle basis and then totaling for all vehicles results in an estimated classwide annual fuel cost of approximately $32,000,000 for Hyundai vehicles and $39,000,000 for Kia vehicles, or $71,000,000 classwide. (Dkt. No. 297, at 2.) Assuming a 6-year average term of ownership and 15% discount to present value yields compensation of $362,100,000, to be reduced by amounts paid under Defendants' reimbursement program. (Dkt. No. 297, at 2.) Class members owning 4x40 vehicles may be able to recover additional amounts, though their claims face additional hurdles at the merits and certification phases. (Dkt. No. 271, at 16-17.)

Under current Supreme Court doctrine, punitive damages would be limited in a ratio of 9:1 to compensatory damages, and perhaps even a 1:1 ratio because of the economic nature of the dispute. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."); *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 230 Ariz. 592, 612 (Ct. App. 2012), *cert. denied*, 133 S. Ct. 2804 (2013) (vacating punitive damages award in economic loss case on federal due process grounds and directing entry of punitive damages in 1:1 ratio to actual damages). Settling Plaintiffs heavily discount both the possibility and likely calculation of punitive damages because the evidence of reprehensible conduct to support such an award is marginal. (Dkt. No.

284, at 18-19; Dkt. No. 297, at 2-3.)  Settling Plaintiffs possessed and relied upon the best evidence available during negotiations: how unusual and unlikely it was for the Kia Soul's rating to jump by 4 MPG in one model year without a dramatic engineering breakthrough.  (Dkt. No. 185-1, at 24-25.)

**B.     The Lump-Sum Compensation Amounts Are Fair, Reasonable, And Adequate**

The Settling Parties used the EPA annual fuel cost discrepancy as a benchmark for calculating the lump-sum settlement benefits available to each class member.  The Hyundai settlement was negotiated first, with agreement upon an aggregate amount, $210 million, to represent the total lump-sum cash compensation available to class members.  (Dkt. No. 297, at 3.)

The parties did not agree on a precise formula for calculating each lump-sum payment.  (Dkt. No. 297, at 4.)  Instead, they agreed to a fair allocation which, subject to minor variations, generally tracked the annual fuel cost increase for each vehicle.  (Dkt. No. 297, at 4.)  Lump sum amounts approximate the accumulated fuel cost discrepancy over a 4.75-year term of ownership for current original owners, assuming 15,000 miles driven each year, and gas prices between $3.00 and $3.70.  (Dkt. No. 297, at 4.)[1]  Kia agreed to implement a parallel schedule of compensation built around similar assumptions resulting in compensation for fuel cost over approximately 4.75 years of ownership.  (Dkt. No. 297, at 4.)[2]  Since the negotiation of the settlement, falling gas prices have made these assumptions even more favorable to consumers.[3]

---

[1] Because lease durations are usually shorter, a shorter ownership period was used for lessees, and non-original owners received half the lump-sum amount.  To achieve allocation of the full $210 million, many of the lump-sum values were adjusted upward by some slight amount. (Dkt. No. 297, at 4.)

[2] Because of rounding conventions and other nuances of the EPA's evolving fuel cost calculation, some class vehicles with only slight MPG discrepancies showed no difference in EPA estimated fuel cost before and after the November 2, 2012 restatement.  Defendants agreed that in those cases, a modest fuel cost difference would be assigned for purposes of calculating the lump-sum benefit.  These

SEPARATE MEMORANDUM OF SETTLING                - 3 -
PLAINTIFFS IN SUPPORT OF FINAL
SETTLEMENT APPROVAL
010339-13  771133 V1                                                                    Case No. 2:13-ML-02424

**C.  The Settlement Offers Substantial Value to the Class Above and Beyond the Lifetime Reimbursement Program**

Using Defendants' reports on actual class participation in the settlement and the reimbursement program as of February 28, 2015, expert economist Dwight Duncan evaluated the incremental difference between the value of Defendants' Reimbursement Program and the value of the lump-sum settlement benefits. The valuation now accounts for lump-sum payments actually claimed by class members, new car rebates and service credits actually claimed by class members, and first claims under the Lifetime Reimbursement Program that resulted from the extension of the program deadline.



adjustments increased the compensation available to the class.  In addition, compensation amounts were rounded off to multiples of $5.  (Dkt. No. 297, at 4-5.)

[3] *See* U.S. Energy Information Admin., U.S. Gasoline and Diesel Retail Prices, http://www.eia.gov/dnav/pet/pet_pri_gnd_dcus_nus_m.htm (showing decline in price of regular gasoline from $3.406 in September 2014 to $2.216 in February 2015) (last visited Mar. 26, 2015).

1

2

3 

4

5

6

7 The two valuations total $97 million.

8 Defendants have also committed to provide notice to approximately 900,000
9 class members by email, regular mail, and flyers distributed to authorized dealerships.
10 Defendants attest that the mailing of the short-form notice resulted in a cost of
11 $623,326.  (*See* Zielomski Decl., ¶ 4; King Decl., ¶ 4.) While estimates will vary and
12 some might disagree with a given valuation, even half of $97 million would represent
13 significant value—as does Defendants' agreement to pay Plaintiffs' attorney's fees
14 and expenses separately and in addition.

15 The litigation and the Settlement have promoted Reimbursement Program
16 participation and have given Hyundai and Kia stronger incentives to attract customers
17 to the Reimbursement Program. Before the Settlement, Defendants compensated class
18 members under the Reimbursement Program or not at all—and non-payment would be
19 the competitive option. Defendants' natural incentive is now to include class members
20 in the Program to foster goodwill, public relations, and long-term customer
21 relationships.  Thus, the Settlement has caused Defendants to extend the deadline to
22 register for the Reimbursement Program from December 31, 2013, until July 6, 2015,
23 and the valuation of settlement benefits accounts for the number of first
24 Reimbursement Program claims that were filed after the original deadline.

25

26

27

28

SEPARATE MEMORANDUM OF SETTLING  - 5 -
PLAINTIFFS IN SUPPORT OF FINAL
SETTLEMENT APPROVAL
010339-13  771133 V1                                                                                      Case No. 2:13-ML-02424

**D.   The Settlement Is Fair, Reasonable, and Adequate in Light of the Risks of Proceeding with Litigation**

**1.   The Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation.**

Plaintiffs generally allege that Defendants misstated the EPA-mandated fuel-efficiency ratings of their vehicles and, as a result, made unfair and deceptive misstatements to the consumers who purchased them. The inaccuracies resulted from process changes and flaws in coastdown testing procedures that are specified in federal law, and they prevented consumers from making a fair comparison of different vehicles using the uniform EPA fuel efficiency standard.

Plaintiffs conducted settlement negotiations assuming a solid probability that they could prove deceptive conduct on the part of the Defendants, given the magnitude of some of the MPG discrepancies and unrealistic improvements in some MPG ratings. (Dkt. No. 185-1, at 24-25.) Plaintiffs contend that Defendants very likely noticed and chose to ignore such aberrational differences in their existing product line. Plaintiffs attacked Defendants' use of a 40 MPG fuel economy milestone to promote sales of certain vehicles and demanded compensatory damages beyond the Defendants' self-fashioned pay-as-you-go Reimbursement Program. Although the case for punitive damages was not overwhelming, it placed additional pressure on Defendants to ensure that settlement compensation was robust.

At the same time, Defendants were expected to challenge the legal and factual basis of Plaintiffs' claims. Defendants would have challenged the materiality of varying changes in fuel economy ratings and would have continued to raise preemption arguments. Though Defendants have now agreed to pay sizeable penalties to the EPA, they have maintained the position that their actual testing procedures complied with EPA regulatory requirements.[4] Defendants would have argued that

---

[4] Consent Decree, *United States v. Hyundai Motor Co.*, No. 14-CV-1837, dkt. No. 2-1, at 3-4 (D.D.C. Nov. 3, 2014).

regardless, any mistakes were unintentional.  And Defendants would have argued that their Reimbursement Program provides an adequate remedy on its own.  Both sides faced risks in proceeding to litigate this case, and the Settlement is fair to the class in light of these risks.  *See* NEWBERG ON CLASS ACTIONS § 11:50 (4th ed. 2002) ("In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."); *accord Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004).

### 2. The Risk of Maintaining Class Action Status Throughout the Trial.

Although the Court has certified a Settlement Class (Dkt. No. 319), it has not certified a litigation class in this MDL.  Recent decisions illustrate the risks to Plaintiffs and the class of proceeding to litigate certification issues on behalf of a nationwide class.[5] While Plaintiffs continue to believe the current claims can be certified, the risk of non-certification is plain and underscores the benefits to the class of entering into a settlement at this stage of the litigation.

### E. The Settlement Was Informed by Substantial Discovery

If the parties have sufficient information sharing and cooperation in providing access to necessary data, the settlement may be deemed fair, reasonable, and adequate. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  It is well-established that parties can acquire sufficient information in the absence of formal

---

[5] *See, e.g.*, *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012); *Daigle v. Ford Motor Co.*, No. 09-3214 (MJD/LIB), 2012 WL 3113854 (D. Minn. July 31, 2012); *Corder v. Ford Motor Co.*, 283 F.R.D. 337 (W.D. Ky. 2012); *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012); *In re Ford Motor Co. E-350 Van Products Liab. Litig.*, MDL No. 1687, 2012 WL 379944 (D.N.J. Feb. 6, 2012); *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581 (9th Cir. 2012); *Am. Honda Motor Co. v. Superior Court*, 199 Cal. App. 4th 1367 (Cal. App. 2d Dist. 2011); *Lloyd v. Gen. Motors Corp.*, 275 F.R.D. 224 (D. Md. 2011), 266 F.R.D. 98 (D. Md. 2010); *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498 (S.D.N.Y. 2011), No. 09 Civ. 11(PAE), 2012 WL 2359964 (S.D.N.Y. June 19, 2012).

discovery and based on only informal means of acquiring information. *See id.* ("In the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement." (*quoting Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998))).

Settlement negotiations in this case came after a more than a year of vigorous litigation in the *Espinosa* action. The Court had partially denied HMA's motion to dismiss and allowed discovery to proceed. Plaintiffs had reviewed approximately 30,000 documents, Plaintiff and expert depositions had occurred, and a motion to certify the class was pending.

Realistic damages assessments were possible based on information about regional fuel costs, Class Vehicle MPG ratings, and average vehicle ownership periods and annual mileage. The Settling Plaintiffs had all of this information prior to negotiating the Settlement. Most of the necessary information is publicly available, and any missing information was supplied by the documents provided by HMA and KMA. (Dkt. No. 185-1, at 30-31.)

The parties conducted extensive additional confirmatory discovery before the final settlement documents were signed. That discovery involved written document requests to Defendants, the production of hundreds of thousands of documents, and deposition-style interviews in both the U.S. and Korea. Documents provided detailed information about the nature and scope of flawed MPG testing, the number of affected vehicles, and the number and content of consumer complaints, as well as documents produced to the EPA and state attorneys general in earlier investigations. The interviews involved key personnel ranging from engineers close to the issues all the way up to senior executives. (Dkt. No. 185-1, at 31.)

Discovery proceeded with the scrutiny and participation of dozens of non-settling plaintiffs. Disputes were resolved by the Court through motion practice. Plaintiffs reserved the right to re-negotiate or rescind the settlement if discovery

showed that Defendants' conduct was substantially or materially different than represented and anticipated. Settling Plaintiffs did not attempt to negotiate the amount of attorney's fees to be paid until discovery was complete, and no agreement has been reached on the payment of fees to counsel in *Espinosa.* (Dkt. No. 185-1, at 31; Dkt. No. 377.)

With the benefit of this discovery, the Settling Parties are confident in their assessment of the merits of the case and the events that gave rise to it. It therefore provides sufficient background and information necessary to evaluate the fairness, adequacy, and reasonableness of the proposed Settlement. *See Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 460 (affirming final approval of settlement).

**F.     Counsel Support the Settlement**

Counsel for Plaintiffs and Defendants support the approval of the Settlement—a fact that confers a presumption of validity on the proposed Settlement. *See Hughes v. Microsoft Corp.*, Nos. C98–1646C, 2001 WL 34089697, at *7 (W.D. Wash. Mar. 26, 2001). "Great weight" is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation. *DIRECTV*, 221 F.R.D. at 528; s*ee also Clesceri*, 2011 WL 320998, at *10 ("Courts give weight to counsels' opinions regarding the fairness of a settlement, when it is negotiated by experienced counsel."); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 720 F. Supp. 1379, 1392 (D. Ariz. 1989) ("Counsels' opinions warrant great weight both because of their considerable familiarity with this litigation and because of their extensive experience in similar actions."), *aff'd sub nom. Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992).

Counsel for Settling Plaintiffs and Defendants support approval of the proposed Settlement, as set forth in the attached declarations of Robert B. Carey (Carey Decl. ¶¶ 6-8) and Richard D. McCune (McCune Decl. ¶¶ 7-9). This factor weighs heavily in favor of approving the proposed Settlement.

### G. The Settlement was Negotiated in Good Faith And Lacks Any Suggestion of Collusion

Proposed settlements are entitled to "an initial presumption of fairness" when the settlement has been "negotiated at arm's length by counsel for the class." 4 Newberg on Class Actions § 11:41. The parties' proposed settlement here is the result of extensive, mediated negotiations conducted at arm's length among informed, sophisticated counsel. The negotiations spanned many months, augmented by briefing on numerous issues raised by both sides, and the lengthy period of confirmatory discovery. (Dkt. No. 185-1, at 29-32, 35-37.)

To ensure there could be no appearance of collusion or impropriety, the parties delayed negotiations of the attorneys' fees until after the settlement was in place. (Dkt. No. 185-1, at 36.) By doing so, the parties avoided the potential conflict of interest that arises when both negotiations—the settlement and the fees— occur at the same time. *See Manual for Complex Litigation 4th* § 21.7 ("Separate negotiation of the class settlement before an agreement on fees is generally preferable."); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 334-35 (3d Cir. 1998) (affirming final approval of class settlement and fee award where parties negotiated settlement agreement prior to negotiating attorneys' fees); *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1078 (C.D. Cal. 2010) (holding that concurrent negotiation of the class settlement and attorneys' fees weighed against approving the settlement).

Thus, the settlement bears all of the earmarks of good faith and none of collusion.

### III. CONCLUSION

For the foregoing reasons and those stated in the Settling Parties' Joint Memorandum in Support of Final Approval, the Court should approve the proposed settlement.

| | | |
|---|---|---|
| 1 | DATED:  March 30, 2015 | HAGENS BERMAN SOBOL SHAPIRO LLP |
| 2 | | By   /s/ Robert B. Carey |
| 3 | | Robert B. Carey<br>John M. DeStefano *(pro hac vice pending)* |
| 4 | | 11 West Jefferson Street, Suite 1000<br>Phoenix, AZ  85003 |
| 5 | | Tel. (602) 840-5900<br>Fax (602) 840-3012 |
| 6 | | *rob@hbsslaw.com* |
| 7 | | *johnd@hbsslaw.com* |
| 8 | | Attorneys for Plaintiffs in the *Brady* and *Hunter* Actions |
| 9 | | |
| 10 | DATED:  March 30, 2015 | MCCUNEWRIGHT LLP |
| 11 | | |
| 12 | | By   /s/ Richard D. McCune |
| 13 | | Richard D. McCune (Bar No. 132124)<br>2068 Orange Tree Lane, Suite 216<br>Redlands, CA 92374 |
| 14 | | Telephone:  (909) 557-1250<br>Facsimile:  (909) 557-1275 |
| 15 | | *rdm@mccunewright.com* |
| 16 | | Attorneys for Plaintiffs in the *Espinosa* Action |

SEPARATE MEMORANDUM OF SETTLING
PLAINTIFFS IN SUPPORT OF FINAL
SETTLEMENT APPROVAL

- 11 -

010339-13  771133 V1

Case No. 2:13-ML-02424

# CERTIFICATE OF SERVICE

I, Robert B. Carey, hereby certify that on March 30, 2015, a true and correct copy of the foregoing document was filed electronically with the Clerk of Courts at my direction using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/Robert B. Carey