1  HARVEY ROSENFIELD (SBN 123082)
   harvey@consumerwatchdog.org
2  PAMELA PRESSLEY (SBN 180362)
   pam@consumerwatchdog.org
3  LAURA ANTONINI (SBN 271658)
   laura@consumerwatchdog.org
4  **CONSUMER WATCHDOG**
   2701 Ocean Park Blvd., Suite 112
5  Santa Monica, CA 90405
   Tel: (310) 392-0522 / Fax: (310) 392-8874
6
7  JONATHAN W. CUNEO
   jonc@cuneolaw.com
8  WILLIAM ANDERSON
   wanderson@cuneolaw.com
9  **CUNEO GILBERT & LADUCA, LLP**
   507 C Street, NE
10 Washington, DC 20002
   Tel: (202) 789-3960 / Fax: (202) 789-1813

11 STEVE M. CAMPORA (SBN 110909)        NIALL P. McCARTHY (SBN 160175)
   scampora@dbbwlaw.com                 nmccarthy@cpmlegal.com
12 ROBERT A. BUCCOLA (SBN 112880)       ANNE MARIE MURPHY (SBN 202540)
   rbuccola@dbbwlaw.com                 amurphy@cpmlegal.com
13 CRAIG C. SHEFFER (SBN 131243)        ERIC J. BUESCHER (SBN 271323)
   csheffer@dbbwlaw.com                 ebuescher@cpmlegal.com
14 **DREYER BABICH BUCCOLA WOOD**       **COTCHETT, PITRE & McCARTHY, LLP**
   **CAMPORA, LLP**                     840 Malcolm Road
15 20 Bicentennial Circle               Burlingame, CA 94010
   Sacramento, CA 95826                 Tel: (650) 697-6000 / Fax: (650) 692-3606
16 Tel: (916) 379-3500 / Fax: (916) 379-3599

17 *Attorneys for the Krauth and Hasper, et al. Plaintiffs*

18 **UNITED STATES DISTRICT COURT**

19 **CENTRAL DISTRICT OF CALIFORNIA**

20 | IN RE: HYUNDAI AND KIA FUEL | Case No. 2:13-ml-02424-GW-FFM |
ECONOMY LITIGATION

21 **SUPPLEMENTAL DECLARATION OF LAURA ANTONINI IN SUPPORT OF *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR PAYMENT OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

25 | Date: | May 7, 2015 |
26 | Time: | 9:30 a.m. |
   | Judge: | Hon. George H. Wu |
27 | Courtroom: | 10 |

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

I.   PRE-FILING INVESTIGATION AND PREPARATION OF COMPLAINT IN *BIRD*. ........................................................................................................4

   A.  Researching, Drafting, and Filing the *Bird* Complaint. ....................4

II.  LITIGATION IN *BIRD*. ...........................................................................5

   A.  Discovery Requests and Motions. ......................................................5

   B.  Opposition to Hyundai's Demurrer to Complaint. ............................7

   C.  Responding to Consumers. .................................................................8

   D.  First Amended Complaint. ..................................................................9

   E.  Oppositions to Hyundai's Motions to Stay. .....................................10

   F.  Statements and Joint Stipulations Regarding the Status of the MDL. ..........11

   G.  Communications with Plaintiff in *Bird*. ........................................12

III. *KRAUTH* COMPLAINT, MDL PETITION, *HASPER* COMPLAINT. ............13

   A.  Research, Drafting, and Filing the *Krauth* Complaint. ..................13

   B.  MDL Petition. ...................................................................................14

   C.  Research, Drafting, and Filing the *Hasper* Complaint. .................16

IV.  SETTLEMENT ANNOUNCEMENT AND CONFIRMATORY DISCOVERY IN THE MDL. ...............................................................................................18

   A.  February, 2013 MDL Hearings. .......................................................18

   B.  Obtaining and Reviewing Pre-Settlement Discovery. .....................20

   C.  Revising and Drafting Document Requests. .....................................23

   D.  Reviewing and Assessing Defendants' Document Productions and Ensuring Non-Settling Plaintiffs' Participation in Interviews. ....25

   E.  Preparing for and Participating in Hyundai and Kia Witness Interviews. ....28

   F.  Moving to Compel Document Requests and Privilege Log. ...........30

V.   THE PROCESS OF IMPROVING THE SETTLEMENT ...............................32

   A.  Initial Settlement Analysis and Improvements. ...............................32

   B.  Opposition to Motion for Preliminary Approval. ............................35

   C.  Response to Settling Parties' Supplemental Brief in Support of Preliminary Approval. .......................................................................38

   D.  Further Notice and Claim and Settlement Improvements. ...............40

---

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

i

E.  Communications with Plaintiffs in *Krauth* and *Hasper*. ...............................43

F.  Responding to Consumers. .............................................................................44

G.  Analyzing the Claims Rate. ............................................................................45

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

i

I, Laura Antonini, declare as follows:

1.     I am an attorney licensed to practice in the State of California and admitted to the United States District Court, Central District of California; staff attorney for Consumer Watchdog; and one of the attorneys of record for Plaintiffs in *Krauth*, *Hasper* and *Bird*. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would competently testify to the truth thereof.

2.     I am submitting this declaration in support of the *Krauth/Hasper* Plaintiffs' Motion for Payment of Attorneys' Fees, Reimbursement of Expenses and Compensation to Named Plaintiffs (Dkt. 371) ("Motion"), filed on December 23, 2014; the *Krauth/Hasper* Plaintiffs' Reply in Support of the Motion (Dkt. 420) ("Reply"), filed on March 5, 2015; and the *Krauth/Hasper* Plaintiffs' Supplemental Brief in Support of the Motion ("Supplemental Brief"), filed concurrently herewith.

3.     Pursuant to the Court's order at the March 19, 2015 hearing, set forth below is a revised breakdown of the time spent by each Consumer Watchdog Legal Team attorney on each major "litigation event" since January, 2012.

4.     I submit this Declaration on behalf of myself and the attorneys who are counsel for the Plaintiffs in *Krauth, Hasper*, and *Bird* at Consumer Watchdog, Cuneo Gilbert & LaDuca, LLP ("CGL"), Dreyer Babich Buccola Wood Campora LLP ("DBBWC"), and Cotchett, Pitre & McCarthy, LLP ("CPM") ("Consumer Watchdog Legal Team").

5.     In preparing this Declaration, I exercised my billing judgment in categorizing the time records of Consumer Watchdog attorneys pursuant to the Court's directions at the March 9, 2015 hearing, in consultation with my colleagues Harvey Rosenfield and Pamela Pressley, who is the Litigation Director of Consumer Watchdog. I have reviewed all of Consumer Watchdog attorneys'

---

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

billing records in this proceeding and believe that the number of hours spent by Consumer Watchdog attorneys listed for each litigation event are accurate.

6.     My co-counsel at CGL, DBBWC, and CPM, who have personal knowledge of the facts stated herein, reviewed and categorized their own time records and provided me with the number of hours each attorney and paralegal at their firms spent on each litigation event. They also reviewed, edited, and approved the descriptions of work for each litigation event.  I am informed by my co-counsel that they exercised their billing judgment in categorizing their time records and calculating the hours listed in this Declaration pursuant to the Court's March 9, 2015 direction.

7.     The previously-filed Declarations of Laura Antonini (Dkt. No. 371-2), William Anderson (Dkt. 385-1), Anne Marie Murphy (Dkt. 385-2), and Steven M. Campora (Dkt. 371-3) in support of the Motion, and the Declaration of Laura Antonini in Support of the Reply (Dkt. 420-1), provide the Court with a detailed summary of the work performed by each firm on this case between January, 2012 and December 18, 2014.  I incorporate those Declarations by reference.

8.     The Consumer Watchdog Legal Team requested in its Motion a collective lodestar of $2,789,522.50 for 5,137.95 hours of legal work performed between January, 2012 and December 18, 2014.[1]

9.     In preparing this Declaration as directed by the Court, the Consumer Watchdog Legal Team attorneys reduced the actual lodestar reflected in their billing records by excluding time spent on tasks that were not executed in

---

[1] Neither the original Motion nor this revised request seeks compensation for the work performed by Consumer Watchdog investigating consumer complaints by Hyundai customers concerning mileage misrepresentations and communicating with the Environmental Protection Agency and the White House seeking government action.

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

connection with any of the discrete litigation events described below.[2] The Consumer Watchdog Legal team also did not include time in this revised request for the substantial time spent preparing its Motion, Reply, and this Supplemental Brief between November, 2014 and the date of this filing.

10.   This newly excluded time is roughly estimated at 662.45 hours ($301,003.25 in fees). The Consumer Watchdog Legal Team's revised lodestar for the litigation events listed below is $2,488,519.25 for 4,475.5 hours of legal work performed.

11.   As set forth in the Supplemental Brief, in order to meet the Court's directive the Consumer Watchdog Legal Team proposes an additional $1,538,519 reduction to the revised lodestar amount. The Consumer Watchdog Legal Team now requests an award of fees in the amount of $950,000 for 4,475.5 hours of legal work performed between January, 2012 and April 6, 2015. This revised request includes time spent since the filing of the Motion reviewing and analyzing the claims rate reports produced by Settling Parties starting on February 5, March 6, and March 31, 2015.  The Consumer Watchdog Legal Team's request of $950,000 represents a 65.94% reduction from the fees sought in its original Motion.

12.   **Allocation of resources.** With respect to the litigation against the Defendants, the Consumer Watchdog Legal Team divided tasks efficiently and assigned responsibility to avoid unnecessary duplication:

- Consumer Watchdog's lawyers developed the overall strategy in consultation with our colleagues at CGL, DBBWC and CPM.

---

[2] This reduction is in addition to the $70,432.50 fee reduction attorneys for Consumer Watchdog made to their lodestar in preparing the initial Motion. (Dkt. 371-2, ¶13).

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES; Case No. 2:13-ml-02424-GW-FFM**

- The Sacramento firm of DBBWC assumed day to day responsibility for the *Bird* litigation in Sacramento Superior Court, but was minimally involved in the MDL.

- Individual attorneys from CGL, CPM, and Consumer Watchdog were assigned the lead in various litigation events in the confirmatory discovery process in this MDL.

- Consumer Watchdog lawyers took the lead in noting deficiencies in and seeking improvements in the proposed settlement.

13.   For each litigation event listed below, attorneys from Consumer Watchdog, CGL, DBBWC, and CPM participated in teleconferences, and, in some instances, meetings, and communicated by email or telephone, regarding strategy. Also, in connection with each litigation event listed below, Consumer Watchdog Legal Team attorneys read and/or monitored correspondence and relevant documents filed with the Court.[3]

## I. PRE-FILING INVESTIGATION AND PREPARATION OF COMPLAINT IN *BIRD*.

### A. Researching, Drafting, and Filing the *Bird* Complaint.
### (January, 2012 - July, 2012)

14.   Between January, 2012 and July, 3, 2012, Consumer Watchdog attorney Pamela Pressley, William Anderson of CGL, and I worked on developing and filing the Class Action Complaint in *Bird v. Hyundai Motor America*, Sacramento Superior Court Case No. 34-2012-00127249.  The three of us divided tasks among ourselves, such as interviewing affected consumers, including

---

[3] Each litigation event described in this Declaration refers to a general time frame during which Consumer Watchdog Legal Team attorneys performed tasks in connection with the event. In a very small number of instances, the time listed in each category includes an attorneys' time from individual time records that reflect tasks performed in connection with a litigation event outside the general date range listed below.

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

4

potential lead plaintiffs, and reviewing various documents submitted by them. I
performed extensive research on Hyundai's advertisements about the fuel economy
of the Elantra, as well as legal research of potential violations of California law and
federal regulations governing disclosures in advertisements about fuel economy. I
worked with Ms. Pressley and Mr. Anderson in drafting and reviewing portions of
a demand letter pursuant to the Consumer Legal Remedies Act (California Civil
Code § 1750 et seq.) and the Class Action Complaint. Harvey Rosenfield of
Consumer Watchdog and Jon Cuneo of CGL reviewed final drafts of the CLRA
letter and Class Action Complaint.

15.     The number of hours and lodestar for each attorney for this work are
as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 2.1 | $925 | $1,942.50 |
| Pamela Pressley | 49.2 | $650 | $31,980.00 |
| Laura Antonini | 171.9 | $350 | $60,165.00 |
| **CWD Total**: | 223.2 | | $94,087.50 |
| Jon Cuneo | 7 | $850 | $5,950.00 |
| William Anderson | 51.25 | $575 | $29,468.50 |
| **CGL Total**: | 58.25 | | $35,418.50 |
| **TOTAL:** | **281.45** | | **$129,506.00** |

## II.  LITIGATION IN *BIRD*.

### A. Discovery Requests and Motions.

### (July 4, 2012 – May, 2013)

16.     Following the filing of the initial *Bird* complaint, I drafted, and Ms.
Pressley and Mr. Anderson reviewed and edited, Plaintiff's first set of Special
Interrogatories and Requests for Production, served on Hyundai on August 2, 2012.
After Hyundai refused to provide complete answers, attorneys at DBBWC[4] took

---

[4] In July, 2012, Consumer Watchdog and CGL recruited Sacramento-based
DBBWC to act as local co-counsel in *Bird*.

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS'
MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

5

the lead in meeting and conferring with Hyundai's counsel on all discovery issues, drafting an additional set of Requests for Production of Documents, and briefing seven discovery related motions (and arguing those that went to hearing) until *Bird* was stayed on May 2, 2013. These motions included: Motion to Compel Special Interrogatories (**won**), Motion to Compel Requests for Production of Documents, Set One (**won**), Opposition to Hyundai's Motion for a Protective Order (**won** on the majority of disputed provisions), Motion to Compel Requests for Production of Documents, Set Two (**won**), Opposition to Hyundai's Motion Regarding the Opt-Out Notice, Contacts Protocol, and Scope of Recipients (**won** on the majority of contested issues), Opposition to Hyundai's Motion to Quash and Protective Order re Plaintiff's Deposition Notice (case was stayed before Court ruled), and Motion to Compel Hyundai to Comply with the Sacramento Court's orders regarding document productions (case was stayed before Court ruled).

17.     Attorneys from Consumer Watchdog, CGL, DBBWC, and CPM[5] reviewed separate portions of the 11 document productions (22,200 pages) Hyundai made (or was compelled to make) during this period. During confirmatory discovery in the MDL, Hyundai produced as a set all of the documents it produced in *Bird* as a result of the Consumer Watchdog Legal Team's success in motion practice in *Bird*. These documents assisted all Plaintiffs' counsel in the MDL in assessing the adequacy of the proposed settlement. (*See* Reply at 5-7).

18.     Throughout this period, attorneys from Consumer Watchdog, CGL and CPM reviewed drafts of the documents prepared by DBBWC.

---

[5] After the November 2 EPA Announcement, Consumer Watchdog, CGL and DBBWC recruited CPM to assist in the Consumer Watchdog Legal Team's federal cases and the MDL Petition, as well as *Bird*.

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES; Case No. 2:13-ml-02424-GW-FFM**

19.    The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 11 | $925 | $10,175.00 |
| Pamela Pressley | 19.9 | $650 | $12,935.00 |
| Laura Antonini | 124.1 | $350 | $43,435.00 |
| **CWD Total**: | 155 | | $66,545.00 |
| Jon Cuneo | 0 | $850 | $0 |
| Bill Anderson | 75.75 | $575 | $43,556.25 |
| **CGL Total**: | 75.75 | | $43,556.25 |
| Steve Campora | 90 | $600 | $54,000.00 |
| Craig Sheffer | 69.1 | $600 | $41,460.00 |
| **DBBWC Total**: | 159.1 | | $95,460.00 |
| Niall McCarthy | 2.2 | $775 | $1,705.00 |
| Anne Marie Murphy | 9 | $500 | $4,500.00 |
| Eric Buescher | 6.5 | $360 | $2,340.00 |
| Valerie De Los Santos (Paralegal) | 35.5 | $225 | $7,987.50 |
| **CPM Total**: | 53.2 | | $16,532.50 |
| **TOTAL:** | **443.05** | | **$222,093.75** |

**B. Opposition to Hyundai's Demurrer to Complaint.**

**(September, 2012 – November, 2012)**

20.    Between September 7, 2012 and October, 2012, I conducted legal research for and drafted portions of an opposition to Hyundai's Demurrer to the Class Action Complaint, along with Mr. Anderson of CGL. Ms. Pressley reviewed drafts and participated in teleconferences and emails with Mr. Anderson and me regarding research on the opposition.

21.    Prior to the deadline for filing the opposition, the EPA made its November 2012 Announcement. In response, Mr. Anderson drafted a letter to Hyundai's counsel concerning positions taken by Hyundai in its Demurrer that conflicted with Hyundai's admission that it had misstated the fuel economy of the

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS'
MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

7

Elantra. Because the new information was relevant to rebutting Hyundai's arguments, the Consumer Watchdog Legal Team decided not to file the opposition, and chose instead to amend the Class Action Complaint in *Bird* to reflect Hyundai's admission.

22.   The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | .4 | $925 | $370.00 |
| Pamela Pressley | 3.9 | $650 | $2,535.00 |
| Laura Antonini | 50.3 | $350 | $17,605.00 |
| **CWD Total**: | 54.6 | | $20,510.00 |
| Jon Cuneo | 0 | $850 | $0 |
| Bill Anderson | 8 | $575 | $4,600.00 |
| **CGL Total**: | 8 | | $4,600.00 |
| Steve Campora | 13.8 | $600 | $8,280.00 |
| Craig Sheffer | 3.7 | $600 | $2,220.00 |
| **DBBWC Total**: | 17.5 | | $10,500.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 0 | $500 | $0 |
| Eric Buescher | 0 | $360 | $0 |
| Valerie De Los Santos (Paralegal) | 1.3 | $225 | $292.50 |
| **CPM Total**: | 1.3 | | $292.50 |
| **TOTAL:** | **81.4** | | **$35,902.50** |

**C. Responding to Consumers.**

**(July 4, 2012 – November 2, 2012)**

23.   Between the time *Bird* was filed on July 3, 2012 and the November 2012 EPA Announcement, I responded to numerous telephonic and email inquiries and complaints from consumers regarding the fuel economy of Hyundai vehicles received by Consumer Watchdog in response to the media attention generated by the *Bird* filing. Because of the large volume of complaints received during this

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

8

time, I drafted a standard letter, which Ms. Pressley reviewed and edited, to send to consumers inquiring about the *Bird* lawsuit. Mr. Rosenfield also received direct inquiries and complaints from consumers during this time, to which he either responded or forwarded to me.

24.     The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | .3 | $925 | $277.50 |
| Pamela Pressley | .4 | $650 | $260.00 |
| Laura Antonini | 6.4 | $350 | $2,240.00 |
| **CWD Total**: | 7.1 | | $2,777.50 |
| **TOTAL:** | 7.1 | | $2,777.50 |

**D. First Amended Complaint.**

**(November 2, 2012 – November 27, 2012)**

25.     The Consumer Watchdog Legal Team filed a First Amended Complaint on November 27, 2012. Following the November 2012 EPA Announcement, I conducted legal research for and drafted portions of the First Amended Complaint, along with Mr. Anderson of CGL. Ms. Pressley of Consumer Watchdog reviewed and revised drafts of the First Amended Complaint.

26.     The number of hours and lodestar for each attorney for this work are as follows:

//

//

//

///

///

///

///

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

9

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | .4 | $925 | $370.00 |
| Pamela Pressley | 4.9 | $650 | $3,185.00 |
| Laura Antonini | 28.4 | $350 | $9,940.00 |
| **CWD Total**: | 33.7 | | $13,495.00 |
| Jon Cuneo | 0 | $850 | $0 |
| William Anderson | 0 | $575 | $0 |
| **CGL Total**: | 0 | | $0 |
| Steve Campora | 1.75 | $600 | $1,050.00 |
| Craig Sheffer | 7.7 | $600 | $4,620.00 |
| **DBBWC Total**: | 9.45 | | $5,670.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 0 | $500 | $0 |
| Eric Buescher | 0 | $360 | $0 |
| **CPM Total**: | 0 | | $0 |
| **TOTAL:** | **43.15** | | **$19,165.00** |

**E. Oppositions to Hyundai's Motions to Stay.**

**(February 15, 2013 – May 2, 2013)**

27.     On February 15, 2013 (the day after the Settling Parties announced they had settled the MDL), Hyundai moved to stay *Bird*.  DBBWC attorneys took the lead in drafting and arguing the Opposition to Hyundai's Motion to Stay (**won**).

28.     On May 28, 2013, Hyundai moved to stay *Bird* a second time. DBBWC attorneys took the lead in drafting and arguing the Opposition to Hyundai's Motion for Reconsideration of the Sacramento Superior Court's ruling on its previous Motion to Stay.  After multiple rounds of briefing and two hearings, the Sacramento Superior Court stayed *Bird* on May 2, 2013, pending resolution of this MDL.

29.     Attorneys from Consumer Watchdog, CGL, and CPM divided up work to assist DBBWC attorneys in reviewing, editing and performing research for the drafts of the oppositions to Hyundai's motions to stay *Bird* they prepared.

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

10

30.    The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 1.9 | $925 | $1,757.50 |
| Pamela Pressley | 1.6 | $650 | $1,040.00 |
| Laura Antonini | 20 | $350 | $7,000.00 |
| **CWD Total**: | 23.5 | | $9,797.50 |
| Jon Cuneo | 0 | $850 | $0 |
| William Anderson | 5.5 | $575 | $3,162.50 |
| **CGL Total**: | 5.5 | | $3,162.50 |
| Steve Campora | 28.5 | $600 | $17,100.00 |
| Craig Sheffer | 30.8 | $600 | $18,480.00 |
| **DBBWC Total**: | 59.3 | | $35,580.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 8.1 | $500 | $4,050.00 |
| Eric Buescher | 0 | $360 | $0 |
| Valerie De Los Santos (Paralegal) | 0.5 | $225 | $112.50 |
| **CPM Total**: | 8.6 | | $4,162.50 |
| **TOTAL:** | **96.9** | | **$52,702.50** |

**F. Statements and Joint Stipulations Regarding the Status of the MDL. (May 2, 2013 – December 18, 2014)**

31.    After *Bird* was stayed, I drafted, and Mr. Rosenfield reviewed and edited, a lengthy description of the process and status of the MDL, as ordered by the Sacramento Superior Court, filed on July 3, 2013. Since then, I have been the primary contact person in communicating with Hyundai's counsel regarding seven joint stipulations to continue the stay in *Bird,* which also provided the Sacramento Superior Court with updates regarding the status of the MDL. I have also worked with Hyundai's counsel regarding six joint stipulations to stay scheduled case management conferences. I reviewed and revised these joint stipulations and

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

11

statements, and attorneys from CGL, DBBWC, and CPM reviewed my edits to these documents.

32.    The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 10.7 | $925 | $9,897.50 |
| Pamela Pressley | 1.9 | $650 | $1,235.00 |
| Laura Antonini | 29.9 | $350 | $10,465.00 |
| **CWD Total**: | 42.5 | | $21,597.50 |
| Jon Cuneo | 0 | $850 | $0 |
| William Anderson | 15 | $575 | $8,625.00 |
| **CGL Total**: | 15 | | $8,625.00 |
| Steve Campora | 2.25 | $600 | $1,350.00 |
| Craig Sheffer | 11.5 | $600 | $6,900.00 |
| **DBBWC Total**: | 13.75 | | $8,250.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 14.5 | $500 | $7,250.00 |
| Eric Buescher | 0.7 | $360 | $252.00 |
| Jon Hsieh | 2 | $360 | $720.00 |
| Valerie De Los Santos (Paralegal) | 6.5 | $225 | $1,462.50 |
| **CPM Total**: | 23.7 | | $9,684.50 |
| **TOTAL:** | **94.95** | | **$48,157.00** |

**G. Communications with Plaintiff in *Bird*.**

**(July 4, 2012 – December 18, 2014)**

33.    From July 4, 2012 to the present, I have been the primary contact person with our client in *Bird*, Louis Bird. For over three years, I have kept in routine contact with Mr. Bird by telephone and email, responding to his inquiries and updating him regarding the status of his case, the MDL and discussing the terms of the Settlement and his potential compensation under the Settlement and Voluntary Reimbursement Program.

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

12

34.    The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Laura Antonini | 4.3 | $350 | $1,505.00 |
| **CWD Total**: | 4.3 | | $1,505.00 |
| Valerie De Los Santos (Paralegal) | 1.5 | $225 | $337.5 |
| **CPM Total**: | 1.5 | | $337.5 |
| **TOTAL:** | **5.8** | | **$1,842.50** |

## III.  *KRAUTH* COMPLAINT, MDL PETITION, *HASPER* COMPLAINT.

### A. Research, Drafting, and Filing the *Krauth* Complaint.

### (November 2, 2012 – November 6, 2012)

35.    After the November 2 EPA Announcement, attorneys at Consumer Watchdog, CGL and DBBWC developed and filed the Class Action Complaint in *Krauth* against Hyundai on November 6, 2012 on behalf of a national class of 2011, 2012, and 2013 Hyundai Elantra owners and lessees, alleging causes of action under the CLRA, UCL, and FAL and for unjust enrichment.

36.    Mr. Anderson of CGL and I divided up work to review the November 2012 EPA Announcement, and Hyundai and Kia's simultaneous announcement that they were adjusting the mileage of more than a dozen models of their 2011, 2012, and 2013 vehicles and instituting the Voluntary Reimbursement Program, which required affected customers to repeatedly visit dealers to obtain compensation for extra fuel costs.

37.    After reviewing this research and consulting with our client, the Consumer Watchdog Legal Team concluded that the Voluntary Reimbursement Program did not adequately compensate affected consumers across the United States.

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

13

38.     Mr. Anderson and I drafted portions of the *Krauth* complaint. Ms. Pressley reviewed and edited drafts of the *Krauth* complaint. DBBWC attorneys reviewed the *Krauth* complaint and offered input into the substantive legal issues to include in the pleadings.

39.     The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 7.1 | $925 | $6,567.50 |
| Pamela Pressley | 6.3 | $650 | $4,095.00 |
| Laura Antonini | 26.8 | $350 | $9,380.00 |
| **CWD Total**: | 40.2 | | $20,042.50 |
| Jon Cuneo | 10 | $850 | $8,500.00 |
| William Anderson | 25.25 | $575 | $14,518.75 |
| Daniel Black (Paralegal) | 1.25 | $200 | $250.00 |
| Claire Peters (Paralegal) | 2 | $200 | $400.00 |
| **CGL Total**: | 38.50 | | $23,668.75 |
| Steve Campora | 1.5 | $600 | $900.00 |
| Craig Sheffer | 2.0 | $600 | $1,200.00 |
| **DBBWC Total**: | 3.5 | | $2,100.00 |
| Niall McCarthy | 6.8 | $775 | $5,270.00 |
| Anne Marie Murphy | 13.4 | $500 | $6,700.00 |
| Eric Buescher | 0 | $360 | $0 |
| **CPM Total**: | 20.2 | | $11,970.00 |
| **TOTAL:** | **102.4** | | **$57,781.25** |

**B. MDL Petition.**

**(November, 2012 – February, 2013)**

40.     When it became apparent that the November 2012 EPA Announcement had triggered similar filings in federal courts nationwide, the Consumer Watchdog Legal Team located and reviewed the various complaints

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS'
MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

14

filed against Defendants. After analyzing the allegations and relief sought in these complaints, and in consultation with our client, the Consumer Watchdog Legal Team concluded that the cases warranted coordination or consolidation in one federal court. The Consumer Watchdog Legal Team prepared and filed the MDL Petition that resulted in the consolidation of all cases in this MDL on November 19, 2012 on behalf of Plaintiff Gunther Krauth. Anne Marie Murphy and Eric Buescher of CPM took the lead in drafting the MDL Petition and the Reply in support of the MDL Petition, with the assistance of Mr. Anderson of CGL. Ms. Pressley and I also reviewed and edited the MDL filings.

41.     After Consumer Watchdog attorneys filed and served the MDL Petition on all parties in the related cases on November 19, 2012, I reviewed class action complaints and documents filed in the MDL proceeding related to the over 40 additional cases that were filed, and conferred with Mr. Rosenfield and co-counsel regarding the filings and the MDL hearing. In the aftermath of the November 2 EPA Announcement, Mr. Rosenfield's role in the litigation increased significantly. Mr. Rosenfield became the lead counsel on the Consumer Watchdog Legal Team, developing strategy and overseeing the litigation.

42.     On January 31, 2013, Mr. Cuneo prepared for and attended the MDL hearing and argued the MDL Petition, which resulted in these cases being consolidated together before this Court.

43.     The number of hours and lodestar for each attorney for this work are as follows:

//

//

//

//

//

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

15

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 52.3 | $925 | $48,377.50 |
| Pamela Pressley | 18 | $650 | $11,700.00 |
| Laura Antonini | 112.6 | $350 | $39,410.00 |
| **CWD Total**: | 182.9 | | $99,487.50 |
| Jon Cuneo | 32.5 | $850 | $40,375.00 |
| Sandra Cuneo | 6.25 | $725 | $4,531.25 |
| William Anderson | 23.25 | $575 | $42,118.75 |
| Claire Peters (paralegal) | 18 | $200 | $3,600.00 |
| Daniel Black (paralegal) | 2 | $200 | $400.00 |
| **CGL Total**: | 82 | | $91,025 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 20.7 | $600 | $12,420.00 |
| **DBBWC Total**: | 20.7 | | $12,420.00 |
| Niall McCarthy | 29.1 | $775 | $22,552.50 |
| Anne Marie Murphy | 69.7 | $500 | $34,850.00 |
| Eric Buescher | 17.4 | $360 | $6,264.00 |
| Antonio de Neochea (Law Clerk) | 3.1 | $150 | $465.00 |
| Valerie De Los Santos (Paralegal) | 35.2 | $225 | $7,920.00 |
| **CPM Total**: | 154.5 | | $72,051.50 |
| **TOTAL:** | **440.1** | | **$274,984.00** |

**C. Research, Drafting, and Filing the *Hasper* Complaint.**

**(November 2, 2012 – February, 2013)**

44.     Between November 2, 2012 and February 7, 2013, attorneys at Consumer Watchdog received a large volume of additional inquiries from customers of Hyundai and Kia concerning their vehicles. To address their circumstances, Consumer Watchdog attorneys, CGL, DBBWC, and CPM developed and filed the Class Action Complaint in *Hasper*, filed on February 7, 2013. Mr. Anderson and I divided up the task of reviewing and responding to the

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

16

complaints. We independently conducted dozens of telephonic conferences with consumers, including potential lead plaintiffs, and reviewed the documents submitted by them.  Of the consumers we interviewed, we retained 12 plaintiffs from eight states who owned or leased many of the affected models of Hyundai or Kia vehicles, representing

45.    During this time period Consumer Watchdog, CGL and CPM attorneys undertook discrete factual and legal research projects pertaining to the November 2, EPA Announcement. Mr. Anderson of CGL and I conducted research regarding Hyundai's and Kia's fuel economy representations for the different 2011, 2012, and 2013 model year vehicles included in the November 2012 EPA Announcement. Ms. Murphy and Mr. Buescher of CPM took the lead in researching various states' consumer protection laws to determine whether the cases could be prosecuted on behalf of a nationwide class, defining and identifying various state law classes based upon the consumer protection laws of each state, and researching various vehicles impacted by Defendants' conduct. Consumer Watchdog counsel, CGL attorneys and CPM attorneys drafted distinct portions of the *Hasper* complaint. DBBWC attorneys reviewed the *Hasper* complaint and offered input into the substantive legal issues to include in the complaint.

46.    After the *Hasper* complaint was filed, Ms. Murphy drafted demand letters to Defendants pursuant to the CLRA and Texas law.  Ms. Pressley reviewed and edited drafts of these letters.  The letters were sent on February 27, 2013.

47.    The number of hours and lodestar for each attorney for this work are as follows:

//

//

//

//

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 3.1 | $925 | $2,867.50 |
| Pamela Pressley | 21.1 | $650 | $13,715.00 |
| Laura Antonini | 126.4 | $350 | $44,240.00 |
| **CWD Total**: | 150.6 | | $60,822.50 |
| Jon Cuneo | 18 | $850 | $15,300.00 |
| Sandra Cuneo | 6.25 | $725 | $4,531.25 |
| William Anderson | 136.5 | $575 | $78,487.50 |
| Claire Peters (paralegal) | 2.5 | $200 | $500.00 |
| Daniel Black (paralegal) | 1.25 | $200 | $250.00 |
| **CGL Total**: | 164.50 | | $99,068.75 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 6.5 | $600 | $3,900.00 |
| **DBBWC Total**: | 6.5 | | $3,900.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 44.9 | $500 | $22,450.00 |
| Eric Buescher | 4.8 | $360 | $1,728.00 |
| **CPM Total**: | 49.7 | | $24,178.00 |
| **TOTAL:** | **371.3** | | **$187,969.25** |

## IV. SETTLEMENT ANNOUNCEMENT AND CONFIRMATORY DISCOVERY IN THE MDL.

### A. February, 2013 MDL Hearings.

**(February, 2013)**

48.     At the initial MDL hearing in this Court on February 14, 2013, attorneys from two law firms announced that they had met privately with Hyundai and reached a settlement of the case. At the hearing, Consumer Watchdog Legal Team attorneys asked the Court to order that the terms of the settlement be provided to all plaintiffs' counsel in the MDL, and the Court agreed, requiring the Settling Parties to provide the settlement terms within one week. (*See* **Exhibit A** (a

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

18

true and correct copy of a transcript excerpt from the February 14, 2013 hearing) at 30:19 – 34:4).

49.    The Settling Plaintiffs produced a two-page settlement term sheet on February 21, 2013 to Non-Settling Plaintiffs. Consumer Watchdog Legal Team attorneys reviewed the outline and determined that much information necessary to evaluate the terms was not included, particularly, the amounts of the Lump Sum Payments that would be paid to Class Members. On February 22, 2013, the Consumer Watchdog Legal Team drafted and sent a letter to Settling Plaintiffs requesting the Lump Sum Payment values and raising concerns regarding the claims process and reversionary nature of the settlement terms.

50.    At the next MDL hearing on February 28, 2013, prompted by the concerns expressed by the Consumer Watchdog Legal Team, the Court proposed to appoint a liaison counsel to attend, but not participate in, settlement negotiations on behalf of the Non-Settling Plaintiffs.  (*See* **Exhibit B** (a true and correct copy of a transcript excerpt from the February 28, 2013 hearing) at 15:16 -19:22; 33:2-9).

51.    The number of hours and lodestar for each attorney for this work are as follows:

//
//
//
//
//
//
//
//
//
//

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

19

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 23.2 | $925 | $21,460.00 |
| Pamela Pressley | 2.6 | $650 | $1,690.00 |
| Laura Antonini | 16.7 | $350 | $5,845.00 |
| **CWD Total**: | 42.5 | | $28,995.00 |
| Jon Cuneo | 16 | $850 | $13,600.00 |
| Sandra Cuneo | 6.5 | $725 | $4,481.25 |
| William Anderson | 14.75 | $575 | $8,481.25 |
| Claire Peters (Paralegal) | 3.25 | $200 | $650.00 |
| **CGL Total**: | 40.5 | | $27,443.75 |
| Steve Campora | 1.75 | $600 | $1,050.00 |
| Craig Sheffer | 3.1 | $600 | $1,860.00 |
| **DBBWC Total**: | 4.85 | | $2,910.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 0 | $500 | $0 |
| Eric Buescher | 0 | $360 | $0 |
| **CPM Total**: | 0 | | $0 |
| **TOTAL:** | **87.85** | | **$59,348.75** |

**B. Obtaining and Reviewing Pre-Settlement Discovery.**

**(March, 2013 – May, 2013)**

52.    After attorneys from each firm reviewed and executed the Rule 408 confidentiality agreement, on or around March 26, 2013, Hyundai produced a chart of the Lump Sum Payment values to the Non-Settling Plaintiffs.

53.    Ms. Murphy drafted and sent a letter to counsel for Kia on March 25, 2013, in anticipation of the status conference scheduled for March 28, 2013, requesting that Kia produce a Lump Sum Payment chart for Kia Class Vehicles. After Liaison Counsel was appointed, attorneys for the Consumer Watchdog Legal Team frequently communicated with Liaison Counsel inquiring about the Kia Lump Sum Payment values.  Kia did not produce this information until April 12, 2013.

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

20

54.     Mr. Rosenfield and I prepared for and attended the March 28, 2013 hearing. Since it was unclear how the values in the Lump Sum Payment chart for Hyundai vehicles were determined, Mr. Rosenfield urged the Court at the hearing to require the Settling Parties to provide information about the formulas   and to produce to Non-Settling Plaintiffs' counsel all of the information they had produced to Settling Plaintiffs' counsel for their settlement discussions. The Court agreed, further requiring Settling Parties to include non-settling plaintiffs' counsel in all aspects of the confirmatory discovery process, noting that when Non-Settling Plaintiffs' counsel "make a request for reasonable information, that information should be provided." (*Id*. at 14:16-22.) The Court also agreed with Mr. Rosenfield that Defendants should produce a privilege log of withheld documents. At the conclusion of the hearing, the Court appointed Mr. Eric Gibbs as Liaison Counsel, with the support of Consumer Watchdog Legal Team and other non-settling parties. (*See* **Exhibit C** (a true and correct copy of a transcript excerpt from the March 28, 2013 hearing) at 12:23 – 15:6; 40:16 – 41:1).

55.     Ms. Murphy of CPM, Ms. Cuneo of CGL and I prepared for and attended the April 11, 2013 hearing. Having received none of the documents produced to Settling Parties for the purpose of settlement negotiations at that time, Ms. Murphy insisted to the Court at the hearing that Defendants timely produce the all documents obtained by the Settling Plaintiffs prior to settlement. The Court confirmed the documents would be timely produced and also agreed with the Consumer Watchdog Legal Team that any additional discovery documents Defendants produced to the Settling Parties and Liaison Counsel would be produced to all Non-Settling Plaintiffs simultaneously. (*See* **Exhibit D** (a true and correct copy of a transcript excerpt from the April 11, 2013 hearing) at 12:23 - 14:19.)

---

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

21

56.     The Non-Settling Plaintiffs finally were given access to the pre-settlement discovery documents starting April 18, 2013. Consumer Watchdog, CGL, DBBWC, and CPM attorneys divided these documents for review to avoid duplication of effort. A memo prepared by Liaison Counsel summarizing the production was also reviewed.

57.     Mr. Rosenfield of Consumer Watchdog, Mr. Anderson of CGL and Ms. Murphy of CPM prepared for and attended the April 25, 2013 hearing. At the hearing, Mr. Rosenfield noted that none of the pre-settlement discovery documents revealed how the Defendants' inaccurate fuel economy data had led to the erroneous advertising campaign. In response, the Court stated, "I want the confirmatory discovery to go into that area." Liaison Counsel confirmed with the Court that Non-Settling Plaintiffs' counsel would be involved in drafting additional discovery requests. Specifically, Mr. Gibbs stated, "Mr. Rosenfield and his group have been involved in the calls, and they should weigh in on anything that goes out. Their voice ought to be heard. I agree with that." (*See* **Exhibit E** (a true and correct copy of a transcript excerpt from the April 25, 2013 hearing) at 23:5 - 24:13; 26:22-25; 31:2-12; 39:9 – 40:20).

58.     Following the hearing, Mr. Anderson, in consultation with Liaison Counsel, drafted a letter to Settling Plaintiffs' counsel, which was reviewed and sent by Consumer Watchdog on April 29, 2013, identifying in detail how the documents produced were insufficient to evaluate the settlement term sheet and demanding additional information. (The April 29, 2013 letter is attached to the Antonini Decl., ¶ 66, Exh. G (Dkt. 371-2)).

59.     Attorneys for the Consumer Watchdog Legal participated in approximately four teleconferences with Liaison Counsel and other Non-Settling Plaintiffs' counsel (March 27; April 9; April 23; and May 8) regarding the

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

22

settlement terms and the discovery conducted by Settling Plaintiffs prior to reaching the settlement.

60.   The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 52.6 | $925 | $48,655.00 |
| Pamela Pressley | 2.9 | $650 | $1,885.00 |
| Laura Antonini | 34.7 | $350 | $12,145.00 |
| **CWD Total**: | 90.2 | | $62,685.00 |
| Jon Cuneo | 11.25 | $850 | $9,562.50 |
| Sandra Cuneo | 33.75 | $725 | $24,468.75 |
| William Anderson | 83 | $575 | $47,725.00 |
| **CGL Total**: | 128 | | $81,756.25 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 10.5 | $600 | $6,300.00 |
| **DBBWC Total**: | 10.5 | | $6,300.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 47.5 | $500 | $23,750.00 |
| Eric Buescher | 0 | $360 | $0 |
| Valerie De Los Santos (Paralegal) | 26.8 | $225 | $6,030.00 |
| **CPM Total**: | 74.3 | | $29,780 |
| **TOTAL:** | **303** | | **$180,521.25** |

**C. Revising and Drafting Document Requests.**

**(May, 2013)**

61.   On or around May 16, 2013, Settling Parties provided a draft of additional document requests to Liaison Counsel and Non-Settling Plaintiffs. Mr. Anderson of CGL and I divided up tasks in reviewing and redlining the drafts prepared by Settling Plaintiffs, revising existing requests to capture additional, relevant information and adding document requests and search terms for

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

23

Defendants' ESI discovery searches. Mr. Rosenfield reviewed and supplemented our edits to the requests.

62. Consumer Watchdog, CGL, CPM and DBBWC attorneys communicated with Liaison Counsel, via email and during a May 22, 2013 teleconference with other Non-Settling Plaintiffs' counsel regarding the incorporation of their redlines into the final requests served on Hyundai on May 22, 2013 and Kia on May 24, 2013.

63. The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|----------|-----------|-------------|----------|
| Harvey Rosenfield | 21 | $925 | $19,425.00 |
| Pamela Pressley | 2.6 | $650 | $1,690.00 |
| Laura Antonini | 18 | $350 | $6,300.00 |
| **CWD Total**: | 41.6 | | $27,415.00 |
| Jon Cuneo | 10.75 | $850 | $9,137.50 |
| Sandra Cuneo | 2.25 | $725 | $1,631.25 |
| William Anderson | 22.5 | $575 | $12,937.50 |
| Claire Peters (paralegal) | 5 | $200 | $1,000.00 |
| **CGL Total**: | 40.5 | | $24,706.25 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 22.6 | $600 | $13,560.00 |
| **DBBWC Total**: | 22.6 | | $13,560.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 0.6 | $500 | $300.00 |
| Eric Buescher | 0 | $360 | $0 |
| **CPM Total**: | 0.6 | | $300.00 |
| **TOTAL:** | **105.3** | | **$65,981.25** |

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

24

**D. Reviewing and Assessing Defendants' Document Productions and Ensuring Non-Settling Plaintiffs' Participation in Interviews.**

**(May 24, 2013 – September, 2013)**

64.     Between May 24, 2013 and September, 2013, attorneys for the Consumer Watchdog Legal Team participated in approximately 15 teleconferences with Liaison Counsel and other Non-Settling Plaintiffs' counsel (May 31; June 2; June 3; June 12; June 18; June 25; July 29; August 7; August 12; August 13; August 14; August 16; August 21; August 27; September 23) regarding confirmatory discovery issues relating to document productions and witness interviews.[6] On these calls, and in letters and emails sent to Settling Plaintiffs and Liaison Counsel during this time, Mr. Rosenfield and I, along with Mr. Anderson of CGL and Ms. Murphy of CPM, continuously pressed to ensure: that Defendants or Settling Parties met deadlines for producing documents or written responses to inquiries from Non-Settling Plaintiffs' counsel; that all non-settling plaintiffs' counsel had enough time to coordinate and review documents prior to the interviews; and that all Non-Settling Plaintiffs' counsel had the opportunity to participate in the witness interviews.

65.     During this time, Consumer Watchdog, CGL, DBBWC and CPM attorneys reviewed multiple memos concerning discovery drafted by Liaison Counsel and other Non-Settling Plaintiffs' counsel who were assigned to review discovery documents. Consumer Watchdog counsel used these memos to help them evaluate the adequacy of the Defendants' document productions and, eventually, the fairness of the settlement.

66.     Mr. Rosenfield and I prepared for and attended the May 23, 2013 hearing. Mr. Anderson of CGL and Ms. Murphy of CPM appeared at the hearing by telephone. At this hearing, Mr. Rosenfield brought to the Court's attention the

---

[6] Time spent by the Consumer Watchdog Legal Team specifically preparing for and participating in the witness interviews is detailed in the next section.

SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES; Case No. 2:13-ml-02424-GW-FFM

25

issue of whether Defendants would comply with Rule 34 of the Federal Rules of Civil Procedure in producing documents. The Court agreed that discovery parameters needed to be established and ordered the parties to meet and confer on an approximation of Rule 34 procedures. Also at this hearing, Mr. Rosenfield coordinated with Liaison Counsel to object to the Settling Parties' plan to conduct interviews of Defendants' witnesses without Non-Settling Plaintiffs' counsel at the hearing. Liaison Counsel urged the Court to postpone the interviews until Non-Settling Plaintiffs' counsel received and had a reasonable chance to review the confirmatory discovery requested from the Defendants. The Court postponed the Korea interviews. (*See* **Exhibit F** (a true and correct copy of a transcript excerpt from the May 23, 2013 hearing) at 9:23 – 11:23; 14:13 – 15:5).

67.    Following the hearing, Mr. Rosenfield, drafted a May 24, 2013 letter to Liaison Counsel for transmission to the Settling Parties, urging that the Non-Settling Plaintiffs be given a reasonable period of time to review and assess documents produced by Defendants prior to any U.S. interviews going forward, and advocating that representatives of Non-Settling Plaintiffs be given the opportunity to attend and participate in the interview process. This letter also insisted that Defendants comply with Rule 34 of the Federal Rules of Civil Procedure in producing documents. (The May 24, 2013 letter is attached to the Antonini Decl., ¶¶68, 74, Exh. G (Dkt. 371-2)).

68.    After the Defendants then proposed to allow only Liaison Counsel to attend any interviews and ask limited questions, Mr. Rosenfield restated the Consumer Watchdog Legal Team's concerns about the interview process in a lengthy email to Liaison Counsel and all other Non-Settling Plaintiffs' counsel on May 30, 2013. Liaison Counsel worked to ensure that  the U.S. Hyundai interviews were postponed until Non-Settling Plaintiffs' counsel had time to review relevant discovery. Defendants further agreed that representatives of Non-Settling Plaintiffs'

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS'
MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

26

1   could question the witnesses and others could listen to the interviews and suggest

2   questions for the interviewers through a live chat room.

3       69.    Mr. Rosenfield and I prepared for and attended the hearing on June 6,

4   2013. In response to a May 30, 2013 letter from Defendants indicating they would

5   not be following Rule 34, Mr. Rosenfield, in consultation with Liaison Counsel,

6   raised the Rule 34 issue with the Court. Counsel for Defendants stated that

7   "[Defendants] understand that all the other same strictures [of Rule 34, except for

8   objections] appl[ied]" to their responses. Mr. Rosenfield also ensured with the

9   Court that the U.S. interviews were taken under oath. (*See* **Exhibit G** (a true and

10  correct copy of a transcript excerpt from the June 6, 2013 hearing) at 10:12 –

11  11:24; 26:19 – 28:18).

12      70.    Mr. Rosenfield and I prepared for and attended the hearing on August

13  15, 2013.  At that hearing, in response to Mr. Rosenfield's, Liaison Counsel's and

14  other Non-Settling Plaintiffs' counsel's comments, the Court encouraged the

15  parties to meet and confer regarding outstanding discovery issues and the

16  scheduled witness interviews. As a result, the Settling Parties agreed to vacate the

17  then-pending discovery schedule and postponing further discovery efforts until

18  after the interviews took place. (*See* **Exhibit H** (a true and correct copy of a

19  transcript excerpt from the August 15, 2013 hearing) at 14:15 – 36:19; *see* Dkts.

20  129, 140). Mr. Rosenfield and Ms. Murphy also attended the hearing on September

21  26, 2013, where the Court discussed scheduling matters related to discovery and

22  the Motion for Preliminary Approval.

23      71.    The number of hours and lodestar for each attorney for this work are

24  as follows:

25  //

26  //

27  //

28
    **SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS'
    MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 84.7 | $925 | $78,347.50 |
| Pamela Pressley | 3.9 | $650 | $2,535.00 |
| Laura Antonini | 80.6 | $350 | $28,210.00 |
| **CWD Total**: | 169.2 | | $109,092.50 |
| Jon Cuneo | 5.5 | $850 | $4,675.00 |
| Sandra Cuneo | 33.25 | $725 | $24,106.25 |
| William Anderson | 69.25 | $575 | $39,818.75 |
| **CGL Total**: | 108 | | $68,600.00 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 14.0 | $600 | $8,400.00 |
| **DBBWC Total**: | 14 | | $8,400.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 8.5 | $500 | $4,250.00 |
| Eric Buescher | 0 | $360 | $0 |
| **CPM Total**: | 8.5 | | $4,250.00 |
| **TOTAL:** | **299.7** | | **$190,342.50** |

## E. Preparing for and Participating in Hyundai and Kia Witness Interviews.

**(May, 2013 – September, 2013)**

72.     On June 4, 2013, I monitored the interview of a Kia witness and participated in the chat room of Non-Settling Plaintiffs' counsel and later drafted detailed notes about the interview for the Consumer Watchdog Legal Team.  Mr. Anderson did the same for other Kia witness interview on June 5, 2013.

73.     Prior to the U.S. Hyundai interviews and with Liaison Counsel's agreement, I drafted, and Mr. Rosenfield reviewed and edited, a memo for all Non-Settling Plaintiffs concerning the importance of the information sought in each of the written discovery requests in order to stimulate questioning on relevant topics at the interviews. This memo was sent to Liaison Counsel on August 24, 2013.

74.     At the direction of Liaison Counsel, the Consumer Watchdog Legal Team actively participated in each of the four U.S. interviews, where we sought

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

28

1  and obtained information relevant to the willfulness of the Defendants' conduct.
2  Ms. Murphy of CPM and Mr. Anderson of CGL interviewed two Hyundai
3  witnesses, on August 29 and 30, 2013, respectively. I also participated in the chat
4  room of Non-Settling Plaintiffs' counsel for those interviews and drafted extensive
5  notes about the interviews for the Consumer Watchdog Legal Team.

6       75.    On September 12, 2013, I listened to interviews of two witnesses in
7  Korea conducted by other Non-Settling Plaintiffs' counsel, participated in the chat
8  room and forwarded my detailed notes about the interview to the Consumer
9  Watchdog Legal Team.   Mr. Anderson did the same for other Kia witness
10  interviews in Korea on September 13.

11       76.    The number of hours and lodestar for each attorney for this work are
12  as follows:

13  //
14  //
15  //
16  //
17  //
18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //

28

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS'
MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 17.1 | $925 | $15,817.50 |
| Pamela Pressley | 0 | $650 | $0 |
| Laura Antonini | 65.8 | $350 | $23,030.00 |
| **CWD Total**: | 82.9 | | $38,847.50 |
| Jon Cuneo | 5 | $850 | $4,250.00 |
| Sandra Cuneo | 3.5 | $725 | $2,537.50 |
| William Anderson | 163.75 | $575 | $94,156.25 |
| **CGL Total**: | 172.25 | | $100,943.75 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 6.8 | $600 | $4,080.00 |
| **DBBWC Total**: | 6.8 | | $4,080.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 81.9 | $500 | $40,950.00 |
| Eric Buescher | 0 | $360 | $0 |
| Jennifer James (Paralegal) | 1.1 | $225.00 | $247.50 |
| Valerie De Los Santos (Paralegal) | 36.4 | $225.00 | $8,190.00 |
| **CPM Total**: | 119.4 | | $49,387.50 |
| **TOTAL**: | 381.35 | | $193,258.75 |

**F. Moving to Compel Document Requests and Privilege Log. (September, 2013 – January, 2014)**

77.    After considerable effort by the Consumer Watchdog Legal Team through communications with Liaison Counsel, Hyundai produced a privilege log. But the log was incomplete and questionable in numerous respects. In an attempt to informally resolve the issues, and with the agreement of Liaison Counsel, Mr. Anderson of CGL drafted meet and confer correspondence directed to Defendants challenging Hyundai's privilege log. I reviewed and edited drafts of the correspondence, as well as drafted or assisted in drafting separate correspondence to Defendants pursuing two discovery requests to which Defendants had refused to

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

30

respond (on October 16, 2013; November 7, 2013; December 10, 2013; and January 3, 2014).

78.   After attempts at informally resolving discovery issues with Hyundai failed, Mr. Anderson and I performed research for and drafted portions of the Joint Discovery Stipulation, filed November 21, 2013 (Dkt. 154), and a Supplemental Discovery Memorandum, filed November 25, 2013 (Dkt. 157). Mr. Anderson focused on the privilege log issues, while I focused on the two discovery requests. Mr. Rosenfield reviewed and edited our portions of the filings.

79.   Mr. Rosenfield, Mr. Anderson, and I prepared for and attended a December 9, 2013 hearing on the privilege log and document requests. Mr. Anderson argued at the hearing with respect to the privilege log challenge, and the Court required Hyundai to produce certain documents for which Hyundai claimed privilege for *in camera* review to assess the validity of Hyundai's privilege assertions.   At the hearing, the Court agreed that Mr. Anderson and Liaison Counsel would work together to select the documents listed on the privilege log for the Court to review. (*See* **Exhibit I** (a true and correct copy of a transcript excerpt from the December 9, 2013 hearing) at 9:16 – 14:8; 22:3-7).

80.   With regard to one of the document requests (concerning internal records relating to Consumer Watchdog), the Court in its Tentative Ruling (Dkt. 182, fn. 5) suggested revisions to the request, and granted at the hearing Mr. Rosenfield's request to amend the request to conform to the Court's comments. (*See* **Exhibit I** at 17:8 – 8:21). Subsequently, pursuant to the Court's comments, on December 10, 2013, I revised that document request and sent it to Defendants. Following Defendants' response, on January 3, 2014, I drafted meet and confer correspondence with Defendants regarding the request.

81.   Mr. Rosenfield, Mr. Anderson, and I prepared for and attended a January 10, 2014 scheduling conference where the privilege log and document

---

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

31

requests were discussed. At that hearing, the Court ordered a further document submission with respect to the privilege log and stated it would rule on the document request by January 17, 2014. (Dkt. 201). (The Court did not issue a ruling as to either issue until the hearing on July 24, 2014.)

82.  Mr. Rosenfield, Mr. Anderson and I participated in teleconferences and email communications with Liaison Counsel and other Non-Settling Plaintiffs' counsel regarding the Joint Discovery Stipulation and Supplemental Memorandum during this time frame.

83.  The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 56.9 | $925 | $52,632.50 |
| Pamela Pressley | 1.3 | $650 | $845.00 |
| Laura Antonini | 100.4 | $350 | $35,140.00 |
| **CWD Total**: | 158.6 | | $88,617.50 |
| Jon Cuneo | 1 | $850 | $850.00 |
| William Anderson | 58.75 | $575 | $33,781.25 |
| **CGL Total**: | 59.75 | | $34,631.25 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 2.5 | $600 | $1,500.00 |
| **DBBWC Total**: | 2.5 | | $1,500.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 1.3 | $500 | $650.00 |
| Eric Buescher | 0 | $360 | $0 |
| Valerie De Los Santos (Paralegal) | 2.2 | $225 | $495.00 |
| **CPM Total**: | 3.5 | | $1,145.00 |
| **TOTAL:** | **224.35** | | **$125,893.75** |

## V.  THE PROCESS OF IMPROVING THE SETTLEMENT

### A. Initial Settlement Analysis and Improvements.

### (December 23, 2013 – May, 2014)

SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES; Case No. 2:13-ml-02424-GW-FFM

32

84.     Defendants finally provided their Settlement Agreement on December 23, 2013. The Consumer Watchdog Legal Team divided up the task of assessing the Settlement Agreement. In developing our analysis of the monetary compensation available under the Settlement Agreement, I collected mileage information from our 14 named Plaintiffs in *Bird*, *Krauth*, and *Hasper* and undertook a detailed examination of the compensation each Plaintiff would receive under the Settlement and Voluntary Reimbursement Program. Mr. Anderson of CGL conducted an intensive and focused analysis of the proposed financial terms insofar as they concerned compensation for fuel. DBBWC attorneys assisted in reviewing the proposed settlement documents and evaluating the evidence discovered to date to propose changes in the terms of the settlement agreement that would better notify and compensate class members. CPM attorneys worked on the value of the settlement generally, consulting with various potential consulting experts on the diminution of value of the class members' vehicles, compared the settlement to Hyundai's "Voluntary Reimbursement Program" and analyzed other provisions of the settlement agreement.

85.     Pursuant to the Court's order to Non-Settling Plaintiffs, Consumer Watchdog, CPM and CGL attorneys divided up drafting sections of a detailed and lengthy analysis of the Settlement Agreement, which was transmitted to Liaison Counsel and all other Non-Settling Plaintiffs' counsel on January 22, 2014 and filed with the Court on January 30, 2014 by Liaison Counsel. (Dkt. 211-3).

86.     The Consumer Watchdog Legal Team's analysis raised serious issues regarding the notice and claims process, the amount of monetary compensation that would be available to Class Members, the provision permitting Hyundai and Kia to administer the settlement and keep unclaimed and expired funds, and myriad problems with the notice and claims forms. (Dkt. 211-3).

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

87.     Between January and May 2014, attorneys for Consumer Watchdog, CGL, DBBWC and CPM (like all other Non-Settling Plaintiffs' Counsel) reviewed meet and confer letters, memoranda, and emails between Liaison Counsel and Settling Plaintiffs and Defendants regarding many of the issues raised in Consumer Watchdog's January 22, 2014 analysis, and by other Non-Settling Plaintiffs. During this time, Consumer Watchdog counsel participated in five teleconferences with Liaison Counsel.

88.     The Settlement was amended twice during this period. First, on January 16, 2014, the Settlement Agreement was amended to extend the additional "4 x 40" compensation to certain qualified former owners. (Dkt. 206). Again, on May 2, 2014, the Settlement Agreement was amended to provide that Hyundai and Kia would send Class Members a postcard notice in lieu of the long form notice and claim form. (Dkt. 226-1, Exh. A). The second amendment also provided that Hyundai and Kia would establish an online claim form website so Class Members could electronically submit claims, as had been suggested in Consumer Watchdog's January 22, 2014 analysis. (*Id.* At § 1.2).

89.     Shortly after the second amendment to the Settlement Agreement in May, 2014, all but two of the other Non-Settling Plaintiffs' firms supported, no longer objected to, or did not state their position regarding, the Settlement.

90.     The number of hours and lodestar for each attorney for this work are as follows:

//

//

//

//

//

//

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 86.8 | $925 | $80,290.00 |
| Pamela Pressley | 1.4 | $650 | $910.00 |
| Laura Antonini | 160.9 | $350 | $56,315.00 |
| **CWD Total**: | 249.1 | | $137,515.00 |
| Jon Cuneo | 3.5 | $850 | $2,975.00 |
| Sandra Cuneo | 2.75 | $725 | $1,993.75 |
| William Anderson | 37.5 | $575 | $21,562.50 |
| **CGL Total**: | 43.75 | | $26,531.25 |
| Steve Campora | 1.25 | $600 | $750.00 |
| Craig Sheffer | 3.7 | $600 | $2,220.00 |
| **DBBWC Total**: | 4.95 | | $2,970.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Frank Pitre | 1.5 | $775 | $1,162.50 |
| Steve Williams | 1 | $700 | $700.00 |
| Anne Marie Murphy | 116.8 | $500 | $58,400.00 |
| Eric Buescher | 7.6 | $360 | $2,736.00 |
| Emanuel Townsend (Paralegal) | 14.5 | $225 | $3,262.50 |
| Valerie De Los Santos (Paralegal) | 6.8 | $225 | $1,530.00 |
| **CPM Total**: | 148.2 | | $67,791.00 |
| **TOTAL:** | **446** | | **$234,807.25** |

**B. Opposition to Motion for Preliminary Approval.**

**(April, 2014 – June, 2014)**

91.     Attorneys at Consumer Watchdog, CGL, DBBWC and CPM carefully reviewed the proposed settlement and, after consultations with our clients, concluded that the proposed settlement was not fair, reasonable, or adequate.

92.     In or about early May, Liaison Counsel informed Non-Settling Plaintiffs that he intended to support preliminary approval of the Settlement. Consumer Watchdog counsel informed Liaison Counsel and other Non-Settling Plaintiffs' counsel that the *Krauth/Hasper* Plaintiffs intended to oppose the motion

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

35

1    and, as requested by the Court in its April 7, 2014 minute order, offered to
2    coordinate with any counsel whose clients felt accordingly.

3        93.    I performed factual and legal research, and drafted, with the assistance
4    of Mr. Anderson of CGL, a 24-page Opposition to the Motion for Preliminary
5    Approval. (Dkt. 236). Mr. Rosenfield reviewed and edited drafts of the Opposition,
6    which was filed on May 30, 2014. CPM and DBBWC attorneys also reviewed final
7    documents. Of the 58 other firms not originally involved in the settlement, only the
8    Consumer Watchdog Legal Team and two others filed oppositions.[7]

9        94.    In response to issues raised in the *Krauth/Hasper* Plaintiffs'
10   Opposition, on June 24, 2014, Hyundai and Kia filed a second set of notice and
11   claim forms. (Dkt. 264). Defendants replaced their proposed postcard notice with a
12   short-form letter with larger font (Dkt. 264-2) as suggested by the Consumer
13   Watchdog Legal Team. On June 25, 2014, I drafted, and Mr. Rosenfield reviewed
14   and edited, a response, highlighting the problems with the revised short-form
15   mailer and providing a mocked-up example of a short-form mailer that would cure
16   the deficiencies. (Dkt. 266).

17       95.    Mr. Rosenfield and I prepared for and attended the hearing on the
18   Motion for Preliminary Approval on June 26, 2014. At the hearing, the Court
19   agreed with the Consumer Watchdog Legal Team that there were "major problems"
20   with the Settling Parties' proposed notice. The Court continued its ruling on the
21   Motion for Preliminary Approval, emphasizing the concerns raised by Consumer
22   Watchdog counsel that the notice documents did not contain relevant facts and

---

23
24   [7] Plaintiff in *Wilson v. Kia Motors America*, Case No. 2:13-cv-01625-GW-FFM
     (C.D. Cal.), represented by the law firm of Lewis G. Adler, Esquire, is the only
25   other plaintiff that joined in opposition to the settlement terms. (Dkt. 238.)
     Plaintiffs in *Gentry, et al. v. Hyundai Motor America*, Case No. 2:14-cv-01359-
26   GW-FFM (C.D. Cal.) also filed an opposition to the Settlement on behalf of a class
27   of Hyundai Elantra owners in Virginia, largely on the grounds that it improperly
     denied their rights. (Dkt. 234.)
28

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS'
MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

36

were not calculated to catch the attention of Class Members. (*See* Dkt. 267, June 26, 2014 Tentative Ruling, at 21). The Court ordered the Settling Parties to revise the format and content of the notice documents (and invited input from Non-Settling Plaintiffs on the revised documents). The Court specifically directed the Settling Parties to fix the misleading language in the "Table of Rights" on the first page of the long-form notice, a problem pointed out by the Consumer Watchdog Legal Team, to properly inform Class Members of their rights under the Settlement. The Court also ordered the Settling Parties to provide email notice to Class Members, an issue raised in the Consumer Watchdog Legal Team's January, 2014 analysis.(*See* **Exhibit J** (a true and correct copy of a transcript excerpt from the June 26, 2014 hearing) at 11:7-8, 20:17 – 22:9, 39:13-15, 50:23-25, 60:3-11; *see* Dkt. 211-3 at 8; Dkt. 266 at 3:24 – 5:2; Dkt. 267 at 22, fn. 26).

96.   The number of hours and lodestar for each attorney for this work are as follows:

//
//
//
//
//
//
//
//
//
//
//
//
//

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

37

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 158.3 | $925 | $146,427.50 |
| Pamela Pressley | 5.2 | $650 | $3,380.00 |
| Laura Antonini | 150.2 | $350 | $52,570.00 |
| **CWD Total**: | 313.7 | | $202,377.50 |
| Jon Cuneo | 2.5 | $850 | $2,125.00 |
| William Anderson | 31 | $575 | $17,825.00 |
| **CGL Total**: | 5.6 | | $19,950.00 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 4 | $600 | $2,400.00 |
| **DBBWC Total**: | 4 | | $2,400.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 0 | $500 | $0 |
| Eric Buescher | 0 | $360 | $0 |
| Valerie De Los Santos (Paralegal) | 2.4 | $225 | $540.00 |
| **CPM Total**: | 2.4 | | $540.00 |
| **TOTAL:** | **325.7** | | **$225,267.50** |

## C. Response to Settling Parties' Supplemental Brief in Support of Preliminary Approval.

**(July, 2014)**

97.     At the June 26, 2014 hearing, the Court ordered Settling Parties to file a supplemental brief addressing the issues raised by the Consumer Watchdog Legal Team in their Opposition to Motion for Preliminary Approval. In response to the Court's order at that hearing, I drafted, and Mr. Rosenfield reviewed and edited, a Response to Settling Parties' supplemental brief. (Dkt. 277). The Response explained how the Settling Parties' revised short-form mailer failed to include relevant information and was not calculated to catch the attention of the recipient. It also pointed out that Settling Parties had not provided information about how the Lump Sum Payments were calculated, which was required to evaluate the

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

38

1   monetary compensation under the Settlement. Counsel for CGL, CPM and
2   DBBWC reviewed and edited drafts of the response.

3        98.   Mr. Rosenfield and I prepared for and attended the July 24, 2014
4   hearing, at which the Court issued a tentative ruling stating that it "agree[d] with
5   the *Krauth* and *Hasper* plaintiffs that there are ways in which the notice forms and
6   claims website could be improved further." (July 24, 2104 Tentative Ruling at 4).
7   The Court addressed *each* of the issues raised by Consumer Watchdog counsel in
8   the Response brief and Mr. Rosenfield's comments at the hearing:

9   •   ordered the Settling Parties to revise their notice and claim forms
10       so they are not "overly complicated in their explanation of
11       settlement options" and they properly explain "how prior
12       participation in the Reimbursement Program affects a class
13       member's options" (July 24, 2104 Tentative Ruling at 4, fn. 1);

14  •   ordered the Settling Parties to provide a detailed explanation about
15       how they calculated the Lump Sum Payments (*see* Dkt. 297);

16  •   ordered the Settling Parties to submit reports on Class Member
17       participation after the claims process begins, and stated that the
18       Court would require a secondary notice if the claims rates were
19       low (*see* July 24, 2104 Tentative Ruling at 4, fn. 1);

20  •   directed the Settling Parties to include specific dollar amounts of
21       compensation potentially available under the Settlement to the
22       short-form mailer (*see* Dkt. No. 277);

23  •   directed Settling Parties to add language to the short-form mailer
24       explaining how the settlement affects Class Members' rights (*id.*).

25  (*See* **Exhibit K** (a true and correct copy of a transcript excerpt from the July 24,
26  2014 hearing) at 16:2-10, 17:10-22).

27

28

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

39

99.   The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 63.3 | $925 | $58,552.50 |
| Pamela Pressley | 4.6 | $650 | $2,990.00 |
| Laura Antonini | 81.2 | $350 | $28,420.00 |
| **CWD Total**: | 149.1 | | $89,962.50 |
| Jon Cuneo | 1.75 | $850 | $1,275.00 |
| William Anderson | 11.5 | $575 | $6,612.00 |
| **CGL Total**: | 13.25 | | $7,887.00 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 2 | $600 | $1,200.00 |
| **DBBWC Total**: | 2 | | $1,200.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 3.4 | $500 | $1,700.00 |
| Eric Buescher | 3.5 | $360 | $1,260.00 |
| Mallory Barr (Paralegal) | 0.3 | $225 | $67.50 |
| **CPM Total**: | 7.2 | | $3,027.50 |
| **TOTAL:** | **171.55** | | **$102,077.00** |

**D. Further Notice and Claim and Settlement Improvements.**

**(August, 2014 – November, 2014)**

100.   Even after the Court's June and July 2014 orders, the Consumer Watchdog Legal team identified deficiencies and proposed improvements to the notice and claim forms and process. As a result, the Court required multiple further rounds of revisions in order to ensure that the notice and claim documents were understandable and in an acceptable format. Between August and September 2014, I reviewed three additional sets of notice and claim forms (August 1; August 15; and September 12) and drafted four sets of line-by-line, word-for-word, redlined edits and comments on the revised notice and claim forms (August 11; August 18; August 25; and September 19), each time pointing out unnecessary, burdensome

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

40

steps; problems with the text that made the compensation options unclear; and typos and formatting issues. Mr. Rosenfield reviewed and edited drafts of comments and redlines to the notice and claim form documents. At the Court's direction, we submitted our comments and input through Liaison Counsel.

101.   Mr. Rosenfield and I prepared for and attended the August 21, 2013 hearing; I attended the September 10, 2014 hearing; and Mr. Rosenfield and I prepared for and attended the September 29, 2014 hearing. At these hearings, the Court and parties dedicated significant time to Consumer Watchdog's detailed comments about the confusing language in the notice and claim forms.

102.   At each of the hearings, the Court ordered the Settling Parties to revise the specific language in the notice and claim forms pursuant to Consumer Watchdog counsel's comments and suggestions. Some of the changes the Settling Parties made to the notice and claim forms and process during this time were in response to arguments in our comments forwarded by Liaison Counsel or made directly to the Court, including:

- Revising the short-form mailer so that crucial information appear in noticeable, bold text, such as the website address, where Class Members can learn about the Settlement and submit claims, as well as opt-out and objection deadlines (*see* Antonini Reply Decl., ¶14, Exhibit H (Dkt. 420-1));

- Eliminating unnecessary steps and clarifying compensation options in the paper and online claim form (*see, e.g.*, Dkt. 330 at 7:5-15);

- Clarifying for the Court and revising language in the long-form notice and paper claim form describing the compensation to which former owners and lessees are entitled (*see, e.g.,* Dkt. Nos. 277 at 24:13-27 and 311-1); and

**SUPP. DECLARATION OF LAURA ANTONINI ISO** *KRAUTH/HASPER* **PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

- Clarifying substantive Settlement terms and notice and claim form provisions regarding the difference between the Voluntary Program instituted by Defendants in conjunction with the EPA Announcement and the Lump Sum Payments offered by the settlement (*see, e.g.*, Dkt. 330 at 7:1-5).

(*See* **Exhibit L** (a true and correct copy of a transcript excerpt from the August 21, 2014 hearing) at 48:11 – 49:5; **Exhibit M** (a true and correct copy of a transcript excerpt from the September 10, 2014 hearing) at 16:12 – 17:16, 26:10-20; **Exhibit N** (a true and correct copy of a transcript excerpt from the September 29, 2014 hearing) at 16:4-11, 24:10-16, 26:11 – 35:9, 44:15 – 45:8).

103.   In response to Consumer Watchdog's filings and comments at hearings during this period, the Court also ordered the Defendants to submit a declaration on whether they could obtain vehicle registration information that would negate the need for a claim form for former owners, and a report ensuring they had informed their call center representatives to provide a telephone number for Settling Plaintiffs' counsel, since the information was not contained in the notice.  Defendants did so. (*See* Dkts. 320, 363).

104.   At the hearings between August and October, 2014, the Court either independently asked for the Consumer Watchdog Legal Team's input or readily granted our requests to submit input. (*See, e.g.,* **Exhibit L** at 51:17-24; **Exhibit M** at 36:1-17; **Exhibit N** at 46:21 – 47:3; **Exhibit O** (a true and correct copy of a transcript excerpt from the September 3, 2014 hearing) at 75:10-12).

105.   I also spent time reviewing the Defendants' online claim website based on sets of login credentials provided by Defendants for various prototypical Class Members. The Court readily granted my requests at multiple hearings for such credentials in order to test the site. (*See, e.g.,* **Exhibit L** at 29:3-10; Antonini Reply Decl., ¶16, Exhibit O (Dkt. 420-1)).

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

42

106. This pain-staking, but extremely important, process finally concluded on October 3, 2014, when the Court approved the notice and claim documents.

107. The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 31.3 | $925 | $28,952.50 |
| Pamela Pressley | 1.2 | $650 | $780.00 |
| Laura Antonini | 85.8 | $350 | $30,030.00 |
| **CWD Total**: | 118.3 | | $59,762.50 |
| Jon Cuneo | 0 | $850 | |
| William Anderson | 1.75 | $575 | $1,006.25 |
| **CGL Total**: | 1.75 | | $1,006.25 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 1.2 | $600 | $720.00 |
| **DBBWC Total**: | 1.2 | | $720.00 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 0 | $500 | $0 |
| Eric Buescher | 0 | $360 | $0 |
| **CPM Total**: | 0 | | $0 |
| **TOTAL:** | **121.25** | | **$61,488.75** |

**E. Communications with Plaintiffs in *Krauth* and *Hasper*.**

**(November 2, 2012 – December 18, 2014)**

108. From November 2, 2012 to the present, I have been the primary contact person with our 13 clients in *Krauth* and *Hasper*. For over two years, I have kept in routine contact with them by telephone and email, responding to their inquiries and updating them regarding the status of the MDL and discussing the terms of the Settlement and their potential compensation under the Settlement and Voluntary Reimbursement Program. Mr. Rosenfield and Mr. Anderson of CGL reviewed email updates I would send to clients during this period.

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

43

109.  The number of hours and lodestar for each attorney for this work are as follows:

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | .6 | $925 | $555.00 |
| Pamela Pressley | 0 | $650 | $0 |
| Laura Antonini | 21.4 | $350 | $7,490.00 |
| **CWD Total**: | 22 | | $8,045.00 |
| Jon Cuneo | 0 | $850 | $0 |
| William Anderson | 3.25 | $575 | $1,868.75 |
| **CGL Total**: | 3.25 | | $1,868.75 |
| **TOTAL:** | **25.25** | | **$9,913.75** |

**F. Responding to Consumers.**

**(February 7, 2013 – December 18, 2014)**

110.  Between the time *Hasper* was filed on February 7, 2013, and December 18, 2014, I responded to telephonic and email inquiries and complaints from Class Members complaining about the fuel economy of their vehicles and inquiring about the MDL. I continue to receive telephone calls and emails from consumers regarding the Settlement. Mr. Rosenfield also received a number of direct inquiries and complaints, to which he either responded or forwarded to me.

111.  The number of hours and lodestar for each attorney for this work are as follows:

///

///

///

///

///

///

///

///

SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES; Case No. 2:13-ml-02424-GW-FFM

44

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | .3 | $925 | $277.50 |
| Pamela Pressley | .5 | $650 | $325.00 |
| Laura Antonini | 4.6 | $350 | $1,610.00 |
| **CWD Total**: | 5.4 | | $2,212.50 |
| Jon Cuneo | 0 | $850 | $0 |
| William Anderson | 2 | $575 | $1,150.00 |
| **CGL Total**: | 2 | | $1,150.00 |
| Valerie De Los Santos (Paralegal) | 1.5 | $225 | $337.50 |
| **CPM Total**: | 1.5 | | $337.50 |
| **TOTAL:** | **8.9** | | **$3,700.00** |

**G. Analyzing the Claims Rate.**

**(February, 2015 – April, 2015)**

112.  The Court ordered the Settling Parties to submit reports on Class Member participation after the claims process begins. The Court stated that it would hold a status conference after Settling Parties had submitted all three reports. If the participation rates are low, the Court has suggested that it may require measures such as additional notice and extending the claims submission deadline in order to improve participation. (*See* July 24, 2104 Tentative Ruling at 4, fn. 1; Dkt. 353; Antonini Reply Decl., ¶20 (420-1)).

113.  As of March 31, 2015, Settling Parties have provided the three required claims rate reports to Plaintiffs' counsel.

114.  I reviewed all three reports and prepared an analysis of the claims rate, which I sent to the Consumer Watchdog Legal Team attorneys. Attorneys at Consumer Watchdog, CGL, DBBWC and CGL reviewed the analysis and communicated by telephone and email regarding the claims rate.

115.  The number of hours and lodestar for each attorney for this work are as follows:

**SUPP. DECLARATION OF LAURA ANTONINI ISO *KRAUTH/HASPER* PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

45

| Attorney | # of Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Harvey Rosenfield | 0.4 | $925 | $370.00 |
| Pamela Pressley | 0 | $650 | |
| Laura Antonini | 6.8 | $350 | $2,380.00 |
| **CWD Total**: | 7.2 | | $2,750.00 |
| Jon Cuneo | 0 | $850 | $0 |
| William Anderson | 0.5 | $575 | $287.50 |
| **CGL Total**: | 0.5 | | $287.50 |
| Steve Campora | 0 | $600 | $0 |
| Craig Sheffer | 0 | $600 | $0 |
| **DBBWC Total**: | 0 | | $0 |
| Niall McCarthy | 0 | $775 | $0 |
| Anne Marie Murphy | 0 | $500 | $0 |
| Eric Buescher | 0 | $360 | $0 |
| **CPM Total**: | 0 | | $0 |
| **TOTAL:** | **7.7** | | **$3,037.50** |

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of April, 2015 at Santa Monica, California.

By: _____

Laura Antonini

**SUPP. DECLARATION OF LAURA ANTONINI ISO** *KRAUTH/HASPER* **PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES;** Case No. 2:13-ml-02424-GW-FFM

46

# EXHIBIT A

14:16:25

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. GEORGE H. WU, JUDGE PRESIDING

KEHLIE R. ESPINOSA,  et al., on  )
behalf of themselves and all     )
others similarly situated,       )
                                 )
                   Plaintiffs,   )
                                 )
          vs.                    )  No. ML-13-02424-GW-FFM
                                 )
HYUNDAI MOTOR AMERICA, et al.,   )
                                 )
                   Defendants.   )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Thursday, February 14, 2013; 9:34 A.M.

Status Conference

Wil S. Wilcox, CSR 9178
Official U.S. District Court Reporter
312 North Spring Street, # 432-A
Los Angeles, California 90012
Phone: (213) 290-2849

10:09:48

1    I have at this point.  So if there are others, let me know.

2            MR. MORGAN:  By my count, there are 17 others.

3            THE COURT:  Okay.

4            MR. MORGAN:  That are waiting to come.

5            THE COURT:  All right.  So give me that list as

6    well on the -- as I've indicated on the 26th of February.

7            All right.

8            MS. GOLDSTEIN:  Thank you, Your Honor.

9            MR. MORGAN:  And then is it correct that the

10   supplemental briefing in *Espinosa* due on the 21st is not --

11           THE COURT:  I will stay the class certification

12   motion at this point so we can hopefully get the entire case

13   on one track.

14           Yes?

15           MR. McCARTHY:  Your Honor, if I could have the

16   floor for a moment.  Niall McCarthy on behalf of the *Krauth*

17   plaintiffs.

18           THE COURT:  Yes.

19           MR. McCARTHY:  Your Honor mentioned we are in a

20   bit of an unusual position.  We are at the first hearing

21   with the assignee court and there has been some reference to

22   a settlement in principle and settlement discussions being

23   at the advanced stages.

24           As one of the attorneys who has not been involved

25   in those discussions, I would make a simple request that

10:10:47

1  since there is an agreement in principle, the term sheet be

2  provided to other class counsel.

3          THE COURT:  Let me stop you.

4          Let me ask counsel for -- who are participating as

5  to the *Hyundai* one:  Is there any objection to providing

6  counsel -- all of plaintiffs' counsel with the term sheet?

7  I'm asking the parties who participated in the --

8          MR. MORGAN:  I would defer to the plaintiffs in

9  the first instance.  They are the ones who have to interact

10  with all the rest of the groups.

11          THE COURT:  Well, you do too.

12          MR. BERMAN:  Your Honor, I think in the spirit of

13  408, I don't want to breach any promises or relationships I

14  have with Hyundai, so I personally don't have a problem with

15  it.

16          THE COURT:  Okay.  Let me ask Hyundai:  Do you

17  have a problem with it?

18          MR. MORGAN:  I think the only issue right now,

19  Your Honor, is that -- although I think the main terms are

20  settled, there are --

21          THE COURT:  Was that --

22          MR. MORGAN:  Mr. Morgan, sorry.

23          THE COURT:  No, but is that a bottle of something?

24          MR. MORGAN:  Oh, it's just a water.  There was no

25  water here so I had to bring my own.

```
 1              THE COURT:  How do I know that's not vodka?

 2              MR. MORGAN:  It depends how long we go.

 3              THE COURT:  He will turn it into vodka.

 4              MR. MORGAN:  I think we would like it to be in a

 5    further developed state and in addition find out where the

 6    Kia folks stand before we open this up to the broader group.

 7    And I think the further we get down the road --

 8              THE COURT:  The problem, though, is that the more

 9    you do that, the more likely it is that they are going to

10    object.

11              MR. MORGAN:  Well, I think the more loose ends

12    that are tied down, the easier it is to head off those

13    objections.

14              THE COURT:  Well, let me ask this.  Would you be

15    satisfied with the general terms but not like, for example,

16    dollar figures?

17              MR. McCARTHY:  We just want to get what the core

18    negotiations, general terms are fine.  We are trying to

19    avoid the situation where we have some concerns and they are

20    not addressed at all.

21              THE COURT:  Sure.

22              MR. McCARTHY:  We have a lot of counsel with many

23    years of MDL experience who are on the outside right now.

24    We are just trying to make sure we avoid a problem

25    downstream.
```

10:13:02

1          THE COURT:  Let me ask:  Is there any problem with

2     giving them, like, the general scope but not, for example,

3     the specific dollar figures that either have been agreed or

4     are currently under discussion.  So not that but, for

5     example, whether or not, for example, whatever settlement

6     reached is going to have a full release and that would be

7     released to cover not only the currently known but all

8     claims arising from the factual circumstances of the

9     particular case?

10          MR. MORGAN:  I think that's fine, Your Honor.

11          THE COURT:  Okay.

12          MR. MORGAN:  What I'm not committing to, and I

13     don't think anybody wants to commit to, is having everybody

14     fully participate in the --

15          THE COURT:  No.  He's not asking for that at this

16     point in time.  All he's asking for is just for them to make

17     a more informed decision on the extent to which they might

18     object or will object to the settlement discussions that are

19     not all inclusive insofar as participation of all

20     plaintiffs' counsel.  I presume that's satisfactory?

21          MR. McCARTHY:  Yes, Your Honor.

22          Second point?

23          THE COURT:  Let me just ask:  How long will it

24     take before you get that information []and all counsel?

25          MR. MORGAN:  Certainly we can do it before the

10:14:04

1    26th.

2           THE COURT:  Okay.  How about if you give it to

3    them by, let's say, the 21st, a week from today?

4           Yes?

5           MR. McCARTHY:  On a procedural matter in terms of

6    case management, we also have another action filed.  It's

7    filed in the state court.  It was filed in July prior to the

8    announcement.  I believe it's the only state court action.

9    Defense is taking the position it was not removable.  And I

10   just want to make sure the court is aware of that when you

11   are contemplating the case going forward.

12          THE COURT:  Let me just indicate to counsel on the

13   phone:  When you talk, we can hear you.  So either don't

14   talk or go on a separate line.

15          Yes.  You were saying?

16          MR. McCARTHY:  Simply to make the court aware,

17   there is an action called the []Bird action that was filed

18   in July in state court.

19          THE COURT:  Where is it?

20          MR. McCARTHY:  Sacramento.

21          THE COURT:  Sacramento?

22          MR. McCARTHY:  Superior Court.

23          THE COURT:  What are they doing?

24          MR. McCARTHY:  Some discovery.

25          THE COURT:  Is it a nationwide class or is it a

# EXHIBIT B

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3    HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

4    _ _ _

5

6    **COPY**

7

8    *In Re:*                          )
     Hyundai and Kia Fuel Economy  ) No. MDL 13-2424-GW(FFMx)
9    Litigation                        )
                                       )
10                                     )
     _____)

11

12

13

14

15    REPORTER'S TRANSCRIPT OF PROCEEDINGS

16    LOS ANGELES, CALIFORNIA

17    THURSDAY, FEBRUARY 28, 2013

18    10:18 AM

19

20

21

22    _____

23    CINDY L. NIRENBERG, CSR 5059, FCRR
      U.S. Official Court Reporter
24    255 East Temple Street
      Los Angeles, CA 90012
25    *www.msfedreporter.com*

1   that, you know, if there is some major objection to even an

2   attempt to reach a settlement without a broader inclusion of

3   representation vis-a-vis plaintiffs' counsel, I would

4   entertain, I suppose, that type of presentation, although,

5   again, I don't know -- I mean, I'm just looking at, for

6   example, the initial terms -- the term sheet that was

7   proffered.  For example, if one set of attorneys are saying,

8   "Well, this cannot be done," or, "This is impossible," or,

9   "This is unfair for these reasons," obviously, a presentation

10   of that sort I'll undertake.

11          But, you know, whether or not the result of that will

12   be that I'm going to stop the settlement negotiations --

13   discussions that are going on at this point in time and/or

14   whether or not I throw in additional counsel at the bargaining

15   table, those are different questions.

16          MR. MCCARTHY:  Your Honor, the -- and we keep hearing

17   that we can't have too many people at the bargaining table.

18   Well, that's not the issue.  The core problem here is that

19   there's been no objective evaluation by the Court as to who

20   should be doing the negotiations.  We have a backwards process

21   here.  There's been no discovery done.  No one has testified

22   under oath.  We have had a process where the defendants have

23   selected who they want to negotiate with and that train is

24   moving forward.

25          What typically happens in these cases is the Court

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    sits down as fiduciary to the class, determines who in the best

2    interest of the class should be lead counsel, and if and when

3    that entity gets appointed, then there are settlement

4    negotiations.

5         THE COURT:  Well, no -- let me stop you, counsel.

6    Let me put it this way.  If, in fact, there is -- assuming that

7    what maybe is the somewhat implicit suggestion made by defense

8    counsel, he's saying that there may be, insofar as parties who

9    are currently participating in the settlement discussions

10   vis-a-vis Hyundai and those plaintiff's counsel, they may reach

11   a settlement within 60 days.

12        Obviously, all the terms of that settlement will have

13   to be explained to all of the plaintiffs' counsel, and then we

14   would start the process of making a determination as to whether

15   or not that settlement which was reached is fair to all parties

16   concerned.

17        And there is nothing to indicate that if a settlement

18   was reached in 60 days and is subjected to a Court's review,

19   whether or not that would be somehow disadvantageous or unfair

20   to any of the proposed parties because, certainly, even if I

21   decide that I don't like the way that -- you know, the

22   defendants and their selective -- the selective plaintiffs'

23   counsel that they're dealing with are going forward with this

24   process, even if I say I don't even like that process, in order

25   for me to even get it to a point where I appoint lead counsel

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   may take more than 60 days given the number, et cetera, et

 2   cetera.

 3           In other words, first of all, we have to define the

 4   subclasses, and we'd also have to define who is going to

 5   represent the subclasses, so -- and I've indicated that if the

 6   case goes forward, I'm going to do it in that fashion.  I'm not

 7   going to have a single firm representing everybody because I

 8   don't think that would be appropriate.  So --

 9           MR. MCCARTHY:  May I make one further point, Your

10   Honor --

11           THE COURT:  Sure.

12           MR. MCCARTHY:  -- and give you one example of why

13   this process does not work as designed?  The proposed

14   settlement has --

15           THE COURT:  Like I say, I don't see how you can say

16   it does not work as designed.  Now, you may say it may not work

17   in the end as it's currently going forward.  I can understand

18   that, but we don't know -- in other words, they may reach a

19   settlement that would be exactly the same settlement that you

20   would want to have if you were participating in the

21   negotiations.  We don't know that.

22           MR. MCCARTHY:  We certainly don't know the amount the

23   class is getting.

24           THE COURT:  But they're going to indicate -- they are

25   going to tell you that, obviously.  In fact, they are going to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    tell you that, I presume, prior to them saying that they have

2    reached a settlement in principle.

3             I presume that that's what you're saying.

4             MR. MORGAN:  Correct, Your Honor, subject to the

5    confidentiality issues you mentioned.

6             THE COURT:  So you're going to know the dollar figure

7    beforehand.

8             MR. MCCARTHY:  May I answer your question?

9             THE COURT:  Sure.

10            MR. MCCARTHY:  Putting aside the dollar figure --

11            THE COURT:  Well, actually, let me stop you.  You

12   were the one who threw that out, actually.

13            MR. MCCARTHY:  Sorry?

14            THE COURT:  You were the one who threw out the dollar

15   figure, so it wasn't my question, it was your question, so I

16   had him answer your question.

17            MR. MCCARTHY:  Putting the dollar figure aside, we

18   certainly are aware of other procedural terms.  One of those is

19   this is a claims-made settlement.  We don't agree with that.

20   We think that if discovery goes forward and the liability case

21   is strong, there may be no need for a claims-made settlement.

22            In fact, some of the counsel supporting this very

23   settlement were critical of the refund program because it was

24   claims-made.  So once a procedure like that goes forward

25   without any input of other counsel, it's difficult to reverse

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   it.  I appreciate what the Court is --

2          THE COURT:  Let me stop you.  Why?  Why is it

3   difficult?  If I find that a claims-made is unfair, I'll just

4   simply say that aspect is not flying.

5          In other words, it's up to the Court to decide

6   fairness, ultimately.  And I understand that you may not feel

7   that a claims-made is even, you know, appropriate.  But,

8   conversely, however, that's one of the things that I said, that

9   perhaps that, you know, there should be some liaison counsel

10   that deals with these issues such that, you know, the

11   discussions are imbued with these views of other plaintiffs'

12   counsel who are indicating, for example, that they feel that a

13   claims-made will never be appropriate.

14          But, conversely, that's one of the reasons why I

15   don't want too many plaintiffs' counsel involved because,

16   frankly, what will happen is that there will be a group of

17   plaintiffs' counsel who will say, "We're not going to go

18   forward if it's claims-made," and then some who say, "We do

19   want claims-made," in which case -- well, what happens at that

20   point in time?  We don't get any settlement and the matter

21   just, you know, gets litigated ad nauseam and then settles

22   just, you know, maybe two years down the road.

23          MR. MCCARTHY:  Well, let me give you one other

24   example, Your Honor.  And I appreciate the Court's time.

25          We've had a state court case pending since July, the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    all that strenuous because this stuff is confidential anyway.

2           And then I also want the plaintiffs' counsel to see

3    if they can agree upon the appointment or a suggestion to

4    appoint a liaison counsel vis-a-vis settlement only, the

5    settlements that are currently under discussion.  And I would

6    allow that liaison counsel to be present at settlement

7    discussions, although not to participate in the settlement

8    discussions themselves, et cetera, because I think there should

9    be some transparency in this regard.

10          My problem with having lots of plaintiffs' counsel

11   involved is not the transparency element, it's just simply if

12   you have too many people, everybody wants to talk.  And, you

13   know, only judges are allowed to talk a lot.

14       (Laughter.)

15          THE COURT:  Okay.  Now -- and what I also would be

16   proposing is since Kia is going to decide by the 21st, what I

17   would propose to have is another status conference on March the

18   28th to see where we are via both Kia -- no rhyme intended --

19   and also to see where we are in terms of a proposed settlement,

20   but with the understanding that if the settlement is not pretty

21   much, you know, on the table at that point in time, then I will

22   start scheduling discussions about subclasses and start

23   scheduling the beauty pageants, for lack of a better term.

24          That being said, does anybody have any other comments

25   or discussions or anything you want to say?

CERTIFICATE


    I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date: MARCH 4, 2013


                    _____

                    Cindy L. Nirenberg, CSR No. 5059

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

# EXHIBIT C

```
 1                      UNITED STATES OF AMERICA
                      UNITED STATES DISTRICT COURT
 2                   CENTRAL DISTRICT OF CALIFORNIA
                           WESTERN DIVISION
 3
                              -  -  -
 4                   HONORABLE GEORGE H. WU,
              UNITED STATES DISTRICT JUDGE PRESIDING
 5                            -  -  -

 6
     IN RE:  HYUNDAI and KIA          )   MDL
 7   FUEL ECONOMY LITIGATION          )   13-2424-GW(FFMx)
                                      )
 8                                    )
                                      )
 9                                    )
                                      )
10   _____)

11

12

13                    SCHEDULING CONFERENCE
                REPORTER'S TRANSCRIPT OF PROCEEDINGS
14                  THURSDAY, MARCH 28, 2013
                         A.M. SESSION
15                  LOS ANGELES, CALIFORNIA

16

17

18

19
                  SHERI S. KLEEGER, CSR 10340
20              FEDERAL OFFICIAL COURT REPORTER
                312 NORTH SPRING STREET, ROOM 402
21              LOS ANGELES, CALIFORNIA 90012
                    PH:  (213)894-6604
22

23

24

25
```

```
 1              So, that's another issue that I will discuss
 2    in a moment with counsel.
 3              The next one is the confidentiality
 4    agreement.
 5              Is there a problem with the confidentiality
 6    agreement at this point in time?
 7              MR. ROSENFIELD:  Your Honor, Harvey
 8    Rosenfield, Consumer Watchdog, counsel for the Krauth
 9    and Hasper plaintiffs, as well as the Byrd case in
10    Sacramento Superior Court.
11              There is no problem right now with the
12    confidentiality agreement.  We got it on last Monday.
13    We signed it.  And on Tuesday, we got the production of
14    the document that was promised to us at the last
15    hearing, which sets forth the compensation on a per
16    vehicle basis.
17              What I would like to -- I stood up to ask
18    for the Court to intervene on our behalf to talk about
19    the problem that is raised by what was produced under
20    that confidentiality agreement.
21              Would you permit me to speak to that now?
22              THE COURT:  I will give you 90 seconds.
23              MR. ROSENFIELD:  Okay.  The documents that
24    -- we have been trying to get the documents from the
25    defendants and from the Brady plaintiffs since they
```

1  first told us that there was a settlement before this

2  Court in February.

3           We were supposed to -- we got a term sheet

4  last month.  It has some general terms.  On Monday we

5  got the spreadsheet, which a flat spreadsheet.  That is,

6  Your Honor, it doesn't contain the formulas that were

7  used to populate the values.

8           There are many things we do not know from

9  that spreadsheet, that how those values in the

10 spreadsheet were calculated, how they compare with the

11 refund program that Hyundai adopted immediately after

12 the EPA announcement.  In other words, the informal

13 program that it announced to address consumers'

14 concerns.  No Kia data has been available.

15          We -- in a filing that the Brady group made

16 on March 7th, they wrote the Krauth group -- that refers

17 to us -- now seeks to play the role of spoiler even

18 before it --

19          THE COURT:  I saw that.

20          MR. ROSENFIELD:  Even before it has a

21 complete factual basis for assessing the settlement.

22          Now, we don't want to be a spoiler.  We want

23 to stand up and --

24          THE COURT:  Let me stop you.  Let me stop

25 you.

```
 1              I do agree with you in this sense.  As I
 2   have indicated, and I indicated earlier on, the parties
 3   who have reached a settlement, in order for them to make
 4   that settlement, or to finalize that settlement, pretty
 5   much have to minimize objections from other plaintiffs
 6   and other plaintiffs' counsel.
 7              And I do agree that insofar as informational
 8   materials are concerned, they cannot expect counsel in
 9   other cases to agree unless they have a specific basis
10   to formulate an agreement or a disagreement.
11              And I do understand that obviously
12   plaintiffs' counsel in different cases owe a duty to
13   their respective named plaintiff and potentially the
14   class, if ultimately the class is certified, you know,
15   to be informed.
16              So I would say that when you make a request
17   for reasonable information, that that information should
18   be provided.  And even the parties have agreed that
19   there can be discovery on stuff in regards to the
20   settlement so that if there is some recalcitrance on one
21   side or the other to get the materials, you can always
22   bring discovery.
23              But hopefully it won't come to that, because
24   hopefully the materials would be provided.
25              But I do agree with you that information
```

```
 1    should be shared, and that's the whole purpose of the
 2    confidentiality agreement.
 3              And that the information should be shared
 4    with counsel as soon as possible so that counsel can
 5    start formulating what the response is to the
 6    settlement.
 7              MR. ROSENFIELD:  Your Honor, may I
 8    respectfully ask the Court to order the defendants to
 9    provide all of the information about the settlement to
10    the plaintiffs who --
11              THE COURT:  My problem is I usually don't
12    agree to a general order of that sort, because I don't
13    know what that necessarily means.  And I don't think
14    that they will know -- necessarily know what it means.
15              MR. ROSENFIELD:  Well, excuse me, Your
16    Honor.  But to us it means whatever they've shared with
17    the Brady plaintiff team.
18              We would like to get everything.  We want to
19    independently assess all of the information that was
20    provided to the Brady team so we can avoid motions
21    practice with discovery.
22              THE COURT:  Let me ask you this -- well, let
23    me ask the counsel the question.  And also, is Mr. Gibbs
24    here?
25              MR. MORGAN:  It's my understanding -- this
```

```
 1   as well.  And that also will include any motions
 2   practice at this point in time.
 3              There will be no motions filed, for example,
 4   a defense motion to dismiss, or anything of that sort,
 5   or whatever.  Any motion will have to get prior approval
 6   of this Court before it can be filed.
 7              So we're focusing on just the stuff that we
 8   are focusing on at this point in time.
 9              Okay?
10              MR. MORGAN:  Thank you, Your Honor.
11              THE COURT:  All right.  Thank you.
12              And so let me ask this.  Can I appoint
13   Mr. Gibbs as liaison counsel?
14              MR. MORGAN:  No objection from the defense.
15              MR. BERMAN:  No objection, Your Honor.
16              THE COURT:  All right.  Is there any
17   objection from any plaintiffs' counsel at this point in
18   time with the understanding as to what his limited role
19   is?
20              MR. ROSENFIELD:  Thank you, Your Honor.
21              No objections from the Consumer Watchdog
22   team.
23              THE COURT:  Okay.  And any other plaintiff
24   counsel object?
25              Hearing nothing, he is now appointed as
```

1      liaison counsel.

2              Let me also ask both the defense counsel and

3      the McCune -- Hagen McCune conglomerate, and also

4      Mr. Gibbs.  And maybe perhaps Consumer Watchdog, or any

5      other plaintiffs' counsel, what I want you guys to do is

6      to talk amongst each other within the next two weeks

7      about some sort of process or some sort of, you know,

8      machinery that can be utilized to make sure that the

9      documents that are going to be exchanged, et cetera, are

10     placed somewhere where they don't have to be sent out in

11     individual packages.

12             That they can be viewed in a -- you know,

13     for example, Website or something of that sort.  And

14     hopefully it would be some Website where you couldn't

15     download anything and you couldn't -- and all you could

16     simply do is just simply read on the -- although that

17     may not be practicable if there's like thousands and

18     thousands of pages.  Again, something of that sort.

19             At least there may be some sort of record as

20     to who downloads, something like that.  Because again, I

21     am cognizant that there might be sensitivity so far as

22     confidential information is concerned.

23             All right.  So why don't you guys talk about

24     how that can be done it.

25             And so at this point in time, my

```
 1
 2                    CERTIFICATE OF REPORTER
 3
 4   COUNTY OF LOS ANGELES      )
 5                              )  SS.
 6   STATE OF CALIFORNIA        )
 7
 8   I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN AND FOR
 9   THE UNITED STATES DISTRICT COURT FOR THE CENTRAL
10   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT
11   TO SECTION 753, TITLE 28, UNITED STATES CODE, THE
12   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE
13   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE
14   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE
15   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE
16   JUDICIAL CONFERENCE OF THE UNITED STATES.
17
18
19   DATE:  MARCH 29, 2013
20
21   _____
22   SHERI S. KLEEGER, CSR
23   FEDERAL OFFICIAL COURT REPORTER
24
25
```

**<u>EXHIBIT D</u>**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


THE HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE PRESIDING


In Re:  HYUNDAI and KIA FUEL      )
ECONOMY LITIGATION                )
                                  )
                                  )    No. MDL 13-2424-GW
                                  )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

THURSDAY, APRIL 11, 2013


**SCHEDULING CONFERENCE**

_____

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
312 North Spring Street, Room 402A
Los Angeles, California 90012
(213) 620-1149

```
 1    of the preliminary approval motion, because that's their

 2    opportunity to say, Look, we've looked at everything they had,

 3    and liaison counsel -- neither --

 4            THE COURT:  The only problem with that is -- I don't

 5    mind necessarily doing it that way, but the only problem is it

 6    may result, if I agree with the nonsettling plaintiffs'

 7    argument, that we do two periods of discovery, which doesn't

 8    seem to me to be particularly helpful.  It might be better to

 9    resolve that issue early on so that this one set of discovery

10    goes out, and then everybody has to live with my decision in

11    that regard.  So it might be better to do it in that way.  I

12    just offer that as a suggestion.

13            MR. CAREY:  To clarify, Your Honor, I totally agree.

14    I'm assuming that the request that we're talking about here is

15    one that neither I nor Mr. Gibbs, erring on the side of

16    inclusion, decided we wanted --

17            THE COURT:  Yes, exactly.  What I would do at that

18    point in time is to make a ruling on that discovery request

19    prior to it being submitted to the defendant so they hopefully

20    don't have to have a lengthy -- lengthier period of discovery

21    in that regard.

22            Counsel, you're standing up there for a reason.

23            MS. MURPHY:  Anne Murphy.  I just want to make a

24    short comment.  There's been a couple questions that the court

25    has posed, and I wanted to just provide a little context.
```

```
 1    Those of us who are not within the camp of the settling
 2    plaintiffs or in Mr. -- or not with Mr. Gibbs's office, have
 3    had a very limited ability to review anything at this point.
 4    In fact, we've had one page produced to us, which was a flat
 5    spreadsheet.  I received the good news this morning that we are
 6    expected to get the Kia side of the spreadsheet and more detail
 7    on the two spread sheets tomorrow, which is certainly progress.
 8    But I want the court to understand that there may be silence
 9    amongst some of another other plaintiffs' counsel here today
10    and that's because we don't have the ability really to comment
11    on questions like how long we would need.
12            THE COURT:  Let me stop you.  I do expect -- in other
13    words, my understanding is, is that the nonsettling -- all of
14    the nonsettling plaintiffs' counsel who sign off on the
15    protective order will be getting within -- I think it's a week,
16    is it?
17            MS. MURPHY:  Right, and I'm not going to complain
18    about eight days.
19            THE COURT:  Hopefully, if there is a problem --
20    that's why I wanted to make sure that -- in other words, if
21    there are problems along the way, those problems are aired at
22    the time that they arise, because I don't want to have somebody
23    later on, for example, like five months down the road, saying,
24    Oh, we never got these documents, you know, because by then I
25    will say, No, this -- we have a system where you should have
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT
COURT REPORTER DEBORAH K. GACKLE

```
 1    gotten the documents.  If you didn't get them, you should have
 2    raised it at that point in time and remedied the situation
 3    rather than asking for some sort of stay at that point in time
 4    for these things which have been scheduled.  That's all I'm
 5    saying.
 6             MS. MURPHY:  One point of clarification, and then
 7    I'll sit down.  To clarify, we will be getting a copy of the
 8    discovery in real time so when it's served, we're going to get
 9    a copy the discovery?  I would hope that's what is -- the
10    procedure will be so we can see whether it's sufficient.
11             THE COURT:  I would think so because -- I mean,
12    that's the whole point of having liaison -- in other words,
13    you're -- nonsettling plaintiffs are going to be working
14    through the nonsettling liaison counsel to make sure that they
15    get copies of everything and summaries of everything that --
16    you know, that the plaintiffs' counsel will need to decide
17    whether or not they are going to be agreeing or not agreeing to
18    the proposed settlements.
19             MS. MURPHY:  Thank you.
20             THE COURT:  Okay.  Great.  All right.
21             Now, then, the other thing that I have a question on
22    was at this point in time, there was a discussion of a
23    consolidated complaint, and I don't know when that would be
24    done, and I don't know how that would be done because -- I
25    mean, I think it's obviously -- it probably has to be done at
```

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is a true and

4    correct transcript from the stenographic record of

5    the proceedings in the foregoing matter.

6

7                                         April 22, 2013

8    /S/_____        _____

9        Deborah K. Gackle                        Date
         Official Court Reporter
10       CSR No. 7106

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25


                 UNITED STATES DISTRICT COURT, CENTRAL DISTRICT
                    COURT REPORTER DEBORAH K. GACKLE

## **EXHIBIT E**

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3            HONORABLE GEORGE WU

4       UNITED STATES DISTRICT JUDGE PRESIDING

5                 – – –

6
   In Re:                        )
7  Hyundai and Kia Fuel Economy  )
   Litigation                    )
8                                 )  NO. MDL 13-2424 GW
                                  )
9                                 )
   _____)
10

11

12

13       REPORTER'S TRANSCRIPT OF PROCEEDINGS

14            LOS ANGELES, CALIFORNIA

15          THURSDAY, APRIL 25, 2013

16

17

18       _____

19          KATIE E. THIBODEAUX, CSR 9858
            U.S. Official Court Reporter
20          312 North Spring Street, #436
            Los Angeles, California 90012
21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    defendants to produce everything that exchanged between

2    them, but, you know, unless there is some reason not to,

3    I could say that probably it should be exchanged, but I

4    didn't order anybody to do anything yet?

5        MR. ROSENFIELD:  Your Honor, assuming that was the

6    intention, nothing that was produced indicates how this

7    mistake that led to incorrect advertising occurred.

8    There is no indication of was it an accident, was it done

9    intentionally to improve Hyundai and Kia's sales.

10       THE COURT:  Let me just stop you.  That type of

11   material, it seems to me, would go toward the

12   confirmatory discovery.  It really isn't toward the

13   settlement stuff because I don't think that either side

14   wants to focus on blame when they are trying to reach a

15   settlement.

16           Now, if, in fact, that factor was not

17   considered at all, then I would say, well, maybe

18   something in that regard should be looked into, but I

19   would view that material to be stuff that wouldn't be in

20   the database as it exists now.  It would be part of the

21   discovery for the confirmatory stage.

22       MR. ROSENFIELD:  That is kind of where I am

23   heading, your Honor, but I want to raise one point.  If

24   you don't have that information as a plaintiff's lawyer,

25   how can you make a determination on what the appropriate

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    amount of a settlement should be?  And the reason why --

 2         THE COURT:  Let me stop you.  You don't have to

 3    make the argument now.  You may have to make the argument

 4    if they don't produce it in the confirmatory stages, but

 5    one of the reasons that we have a liaison counsel is

 6    supposedly that, you know, if there are nonsettling

 7    plaintiff's counsel who want a particular area to be

 8    looked into, that is not to say that that area is

 9    definitely going to be looked into, but, you know, it is

10    something that if the parties, settling parties don't

11    look into it, I may say, well, that is something that I

12    think is a factor that should be looked into so I want

13    the confirmatory discovery to go into that area.

14         MR. ROSENFIELD:  And so, your Honor --

15         THE COURT:  Let me just stop you.  Which is part

16    of the reason I think they are going to Korea anyway,

17    isn't it?

18         MR. MORGAN:  Correct, your Honor.

19         THE COURT:  So I mean that is part of it.

20         MR. MANSFIELD:  Well, let's take that as an

21    example.  I am here standing at the podium to ask the

22    court to expand the number of people who can engage in

23    this process and participate in the discovery because

24    Korea is a good example.  It is not clear that those --

25    they are calling them interviews.  It is not clear that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    they are going to be on the record.  We don't know what
 2    questions are going to be asked.  We thought we were
 3    going to get a chance to participate in the development
 4    of the confirmatory discovery.  Now, in the latest status
 5    conference report, we see that it is going out today.
 6            So those of us on the outside, particularly,
 7    people in the states where consumers stand to gain treble
 8    damages if it can be shown that the company deliberately
 9    misled the public about the miles per gallon, those of us
10    who have been excluded have important information,
11    experience and expertise to offer, and I respectfully
12    request the court to allow some of us to participate
13    along with our liaison counsel in developing some of the
14    discovery so that we can get to the heart of what
15    happened.
16        THE COURT:  Well, let me ask Mr. Gibbs.  I thought
17    that there was going to be a process by which some if not
18    all of the confirmatory discovery would be shown to the
19    nonsettling plaintiff's counsel so they could indicate
20    whether or not they are satisfied with it.
21        MR. GIBBS:  Here is what the process has been.  I
22    sat in the initial Kia settlement conference.  There was
23    a lengthy presentation made about why the misrepresented
24    miles per gallon happened and the explanation for it.
25    The court is exactly right.  All of that should be
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    fleshed out through the confirmatory discovery.

2            I have held my weekly call with the group.  I

3    have explained this on several occasions.  We have had

4    lengthy conversations about the importance of the

5    discovery that goes to intent.  So that discovery is

6    under way.

7            The one thing that does seem to be off kilter

8    from the last conference is what we talked about was the

9    settling plaintiffs were going to make available their

10   written confirmatory discovery requests.  We would intake

11   those, circulate them, and my plan was within 24 hours

12   intake everyone's comments and thoughts about what the

13   scope of those requests ought to be, get them back to the

14   settling plaintiffs so they can be made available to the

15   defendants, and then we have a record that every

16   one agrees upon.

17           We haven't talked yet about how to staff the

18   interviews or the depositions or whatever those are going

19   to be.  Those are still a month or two away.  We need to

20   have those discussions, but, right now, it seems like the

21   focus needs to be on the written discovery.

22           Mr. Rosenfield and his group have been

23   involved in the calls, and they should weigh in on

24   anything that goes out.  Their voice ought to be heard.

25   I agree with that.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   targeted to what we want on this case.

2          THE COURT:  Okay.  But, for example, counsel for

3   Consumer Watchdog is saying, well, the -- it is unclear

4   to what extent the documents relate to any intentionality

5   in regards to the miscalculation as to fuel economy and

6   so therefore they want to have a specific set of

7   interrogatories or requests for production addressed

8   prior to the interviews, slash, depositions, so that you

9   know, those things can be answered in a timely fashion.

10         MR. CAREY:  Yes.  Sure.

11         THE COURT:  So all I am saying is is there an

12   opportunity for that to be done?

13         MR. CAREY:  I would assume most of those documents

14   would also be responsive to those issues that we raised

15   and anything left out would be produced by an RPD.

16         THE COURT:  Okay.  But also sometimes what will

17   happen, you may have a situation where even though,

18   because there are so many documents right now, thousands

19   and thousands of documents, questions as to, you know,

20   which documents relate to the particular issue becomes

21   important.  And so, therefore, you know, you may want to

22   have either interrogatories or request for production of

23   documents or request for admissions so that things are

24   identified in that context.  In other words, that, you

25   know, even if the documents have already been produced

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    we are talking about.

 2             MR. CAREY:  That is what I contemplated, your

 3    Honor.

 4             THE COURT:  So, in other words, you are

 5    contemplating a recorded.  Oh, that is fine.  If it is

 6    under oath and recorded, that is fine.

 7             MR. MORGAN:  Can I make a couple of other comments

 8    about the process.

 9             THE COURT:  Before you do, let me address this

10    with Mr. Gibbs.

11             Is there going to be an opportunity for the

12    nonsettling plaintiffs' counsel to interject or request

13    discovery, you know, something, written discovery before

14    it is actually served on the defendants so that it

15    doesn't have to be, you know, this multiple either layers

16    or multiple times for doing these discovery things.

17             MR. GIBBS:  Yes.  That is precisely what I had in

18    mind.  Just so your Honor knows what we did with the last

19    production is we had access to it.  I had a first year

20    lawyer who is quite skilled at this and understands this

21    case review those documents, prepare an index and a

22    summary that I reviewed, and we circulated it to the

23    group.  So everyone knew what was produced.

24             We flagged the documents that were worth

25    looking at, and I had calls from three or four firms
```

1    saying that worked about right.  I spent an hour looking

2    at the index and looking at the documents I flagged.  So

3    my intention is to continue with that process so long as

4    it is working.

5              If the productions are so large that we can't

6    keep up and it is going to delay, then I may expand the

7    people who are doing the initial reviews or work with

8    settling counsel or something like that.  But I think we

9    can figure that out.  The point is the eye of all this is

10   to make sure everyone is included, everyone has their

11   say, but it is done as efficiently as possible.

12             So ultimately what is going to happen is we

13   will have written discovery, we will make sure

14   everyone can weigh in on that, we will turn it around

15   quickly, and we will proceed.  Defendants will know what

16   the requests are before they finish the production.  So

17   we should have a complete production, I would say, before

18   May 30th.

19        THE COURT:  All right.  Let me ask Mr. Morgan, you

20   wanted to add something as well.

21        MR. MORGAN:  Sure.  With respect to the documents

22   that are being produced now with the confirmatory

23   discovery.  Although it is correct that Mr. Carey said we

24   gave him something in the nature of a 261 disclosure, it

25   wasn't a formal document and nor was it done in a vacuum

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                        CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  May 3, 2013

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT F**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

THE HON. GEORGE H. WU, JUDGE PRESIDING

In Re:                              )
      Hyundai and Kia Fuel Economy ) No. MDL 13-2424-GW(FFMx)
      Litigation                    )
                                    )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Los Angeles, California

Thursday, May 23, 2013; 9:34 A.M.

Scheduling Conference

Wil S. Wilcox, CSR 9178
Official U.S. District Court Reporter
312 North Spring Street, # 432-A
Los Angeles, California 90012
Phone: (213) 290-2849

1    both sides can say whether or not it's satisfactory.

2         MR. MORGAN:  Your Honor, Shon Morgan again.  The

3    response -- the process that has been in place is not here

4    are the documents.  It's, for instance, to use Your Honor's

5    example --

6         THE COURT:  Well, let me stop you.  You don't have

7    to convince me.  What you are going to have to do is

8    convince the non-settling plaintiffs' counsel as to what the

9    parameters are.  And this is something that it seems to me

10   either you guys are going to be able to do or you guys are

11   not going to be able to do.  If you guys are able to do it,

12   then put it down on paper, that's fine.  I have no problem

13   with that.

14        MR. MORGAN:  And that's fine.  With the first

15   round of document requests, I don't think we had any issues

16   with respect to this.  We went through this informal

17   process.  We've certainly not heard anything back from

18   Mr. Gibbs or from the settling plaintiffs about issues with

19   respect to our responses and those productions.

20        So, as far as we understand, the process is

21   working.  But if Mr. Gibbs has information from other

22   plaintiffs to the contrary, then we can discuss that.

23        MR. GIBBS:  Well, I think Your Honor hit the nail

24   on the head, which is the language that's in these requests

25   that were served yesterday arose yesterday evening at

1    6:00 o'clock, and no one really understands what it means.

2    So either we use Rule 34, which everyone understands, or we

3    sit down and we hash out a specific process that everyone

4    agrees with.  That's where we are.

5           And Mr. Rosenfield, it's his -- I mean, he raised

6    the issue, so if he wants to elaborate on that he's free to

7    do that.

8           THE COURT:  All right.  Let me hear from

9    Mr. Rosenfield.

10          MR. ROSENFIELD:  Thank you, Your Honor.

11    Harvey Rosenfield, Consumer Watchdog.

12          No, Your Honor's on the same page as we are.  I

13    guess the two things are we would want to have some

14    parameters.  For example, if we are not going to comply with

15    the Rule 34 process, then we'd want to know specifically

16    what they are not providing us and also a privilege log if

17    they are claiming it's privileged.

18          So we are willing to work with the parties and

19    Mr. Gibbs certainly to come up with a strategy that is

20    efficient and effective, but this confirmatory discovery, in

21    the way that Your Honor has structured this process, could

22    be the only time we will really ever have a chance to find

23    out what's going on in this case and where the settlement --

24    how the settlement evolved and whether it's a fair,

25    adequate, reasonable settlement.  So the discovery is

1  critical.

2  THE COURT:  No, I understand that.  And I'm not

3  disagreeing with that.

4  Let me put it this way.  Why don't the parties get

5  together and see if they can agree within the next week as

6  to what the parameters of this substitution for Rule 34.

7  And if you guys can agree, then just give it to me in a

8  document saying that this is a stipulation as to what it is.

9  If you can agree on most of it but there is just a

10  little bit left to resolve, I will be perfectly willing to

11  jump in and see if I can help the parties reach a resolution

12  so that everybody's in agreement with it.  But if it turns

13  out to be a major, major dispute, then it might be faster to

14  go under Rule 34 than it would be to do this.  But let's try

15  to do it initially and see if we can get it done because,

16  frankly, if it can be streamlined, that would be great.

17  So why don't we do that.  And I will give you guys

18  a week to see if you can do that however you guys want to do

19  it, but see if you can do it in a week.  And I will schedule

20  another status conference at some point in time to see if

21  you guys have done it or give you a date by which you can

22  give me something to sign off on insofar as what this

23  process is.

24  All right.  So that takes care of that aspect.

25  Are there any other discovery issues or problems at this

 1    because I think there could be limitations put on the scope

 2    of the stuff discussed.  But it might be a situation where

 3    they are going to have to be interviewed at least in some

 4    part again.

 5            Is that going to be a problem?

 6            MR. MORGAN:  Well, I think, Your Honor, we

 7    probably want to discuss with the clients whether to defer

 8    these for some period of time or do the process that Your

 9    Honor just discussed.

10            THE COURT:  Okay.

11            MR. MORGAN:  Certainly, I think, with respect to

12    the Korea --

13            THE COURT:  Yes.  I understand the Korea thing I

14    think we should be -- the parties should be fully prepared

15    for because that's going to take more time, effort,

16    coordination and cannot be done again necessarily.  So,

17    obviously, I think the Korea thing for the Korea people, it

18    has to be a full period for preparation.

19            But why don't we do this.  Why don't you guys

20    postpone at least the initial interviews until you guys at

21    least have had a chance -- because, let's say, in this next

22    week, I want the parties to discuss not only the things that

23    we already have talked about but the scheduling, whether or

24    not the scheduling was going to be postponed further or

25    whether or not the parties are going to be in agreement that

```
 1   these initial interviews are not going to be necessarily
 2   completed, they would still be left open to some extent
 3   for further questioning based upon the discovery that's
 4   going to be produced thereafter.  But I will let you guys
 5   talk about it and see if that's something to resolve.
 6            What else?
 7            MR. GIBBS:  I think that's it from the non-setting
 8   plaintiffs.
 9            THE COURT:  Okay.  Let me ask defense.  Anything
10   insofar as discovery vis-a-vis defense position?
11            MR. MORGAN:  I don't believe so, Your Honor.  We
12   do think that the additional documents that are going to be
13   produced in response to these new requests can probably be
14   done within the next two weeks.
15            THE COURT:  Okay.
16            MR. MORGAN:  We will make every effort to expedite
17   that as we have done before to keep, as Your Honor
18   mentioned, the Korea schedule on track.
19            THE COURT:  At this point in time, when is the
20   Korea thing scheduled for?
21            MR. MORGAN:  July 11th or 12th, I believe.
22            THE COURT:  All right.  Why don't we do this.  Let
23   me have you guys come back on the issue of -- let me ask.
24   If I set the matter back on calendar for June the 6th, will
25   that give you guys enough time to have discussed the
```

```
 1                          --oOo--

 2                        CERTIFICATE

 3

 4

 5          I hereby certify that pursuant to Section 753,

 6   Title 28, United States Code, the foregoing is a true and

 7   correct transcript of the stenographically reported

 8   proceedings held in the above-entitled matter and that the

 9   transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11

12   Date:  May 31, 2013

13

14
                          /s/ WIL S. WILCOX
15                       U.S. COURT REPORTER
                            CSR NO. 9178
16

17

18

19

20

21

22

23

24

25
```

**WIL S. WILCOX, OFFICIAL FEDERAL REPORTER**

**<u>EXHIBIT G</u>**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

- - -

HONORABLE GEORGE H. WU,
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

IN RE:  HYUNDAI and KIA        )    CERTIFIED COPY
FUEL ECONOMY LITIGATION        )
                               )
                               )    MDL
                               )    13-2424-GW(FFMx)
                               )
                               )
                               )
                               )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS
THURSDAY, JUNE 6, 2013
A.M. SESSION
LOS ANGELES, CALIFORNIA

SHERI S. KLEEGER, CSR 10340
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 402
LOS ANGELES, CALIFORNIA 90012
PH:  (213)894-6604

```
 1                MR. BONSIGNORE:  This is Robert Bonsignore.
 2    I represent Brown, and I'm in about twelve of the cases.
 3                I think that what's being described is
 4    actually the -- taken from the definition of liaison
 5    counsel.  So as presented, I don't think anyone should
 6    have a problem with it because you've already appointed
 7    a liaison, and this is just a continuation of the same
 8    thing.
 9                THE COURT:  All right.  Thank you.
10                And anybody have a position that is
11    different than that one?
12                MR. ROSENFIELD:  Your Honor, Harvey
13    Rosenfield, Consumer Watchdog for the Plaintiffs.
14                We're not against that approach in
15    principle.  I wanted to -- periodically throughout this
16    day, I might have some additional comments to make.
17                But I do want to say that with respect to
18    Rule 34, there is no disagreement that I've heard among
19    the non-settling parties about the fact that we all want
20    Rule 34 to apply in its entirety with the exception that
21    objections can be, for the moment, reserved so that we
22    can speed the process.
23                THE COURT:  Although that's not my -- maybe
24    I'm misperceiving.  Are the defendants agreeing to Rule
25    34 responses, except for the reservation of objections?
```

1           MR. MORGAN:  Again, in substance, I don't

2    know that there is any difference.  It defers to

3    requests on an informal basis and we're doing the same

4    plan, but our responses would be substantially, except

5    for the objections, the same as under Rule 34.

6           THE COURT:  Okay.

7           MR. MORGAN:  And we understand that all the

8    other same strictures apply.

9           THE COURT:  Okay.  Well, in that case then,

10   there doesn't seem to be a major problem.

11          Let me ask counsel.  You are again?

12          MR. CAREY:  Your Honor, I'm Rob Carey for

13   the settling parties.  I just wanted to echo the

14   concerns that I think it's imperative that Mr. Gibbs, or

15   someone, but I think he's the appropriate person, get

16   some authority.  Because it's --

17          THE COURT:  Apparently, he has the

18   authority, to the extent that we've already discussed,

19   at this point in time on the record.  So he has that

20   authority now.  If he didn't feel he had it before, he

21   has it now.

22          MR. CAREY:  And, Your Honor, would that go

23   to the scope of discovery as well?

24          THE COURT:  Yes.

25          MR. CAREY:  Okay.  Thank you.

 1          But I think defense counsel would also take

 2    the position that while in general you don't want

 3    questions to be re-asked, if there is something that a

 4    party wants to delve into in somewhat more detail, that

 5    is, you know, a non-settling plaintiff's counsel feels

 6    is essential in order for him or her to agree or resolve

 7    the issue whether or not they are going to reach a

 8    settlement, you would allow that to go forward, I

 9    presume.

10          MR. FEENEY:  Your Honor, Jim Feeney for Kia.

11          Not only would we do that, we would welcome

12    the opportunity to sit down with someone like Mr. Gibbs

13    and understand what it is that wants to be pursued, and

14    reach an agreement.

15          THE COURT:  Okay.  All right.  So that

16    answers that question.  So that issue has been done to

17    death now.  Even I'm bored with it.

18          All right.  What else?

19          MR. ROSENFIELD:  Your Honor, I think I have

20    two more points.  First, from what we could tell, the

21    Tuesday and Wednesday court interviews were not sworn --

22    the witnesses were not sworn under penalty of perjury.

23    That's very problematic.  The case law says it's

24    problematic for approving a settlement in this context.

25          It was references to the oath being -- an

```
 1    oath, but there was no oath and no raising of the hand,

 2    from what we could tell, and swearing under penalty of

 3    perjury.

 4                 THE COURT:  Let me stop you.  Let me hear

 5    from counsel.

 6                 MR. McCUNE:  Richard McCune for the

 7    plaintiffs.

 8                 We had a recorder there who was not a court

 9    reporter, so we didn't have someone to swear in.  What

10    we did with each witness is ask them if they were

11    agreeable to providing the testimony under oath,

12    understanding that this was going to be provided to the

13    Court.  And that's what we did.

14                 THE COURT:  Okay.  Let me just ask as a

15    general rule then, should these interviews be done under

16    oath and were not?

17                 Let me ask defense counsel.  Is there any

18    problem with having them done under oath?

19                 MR. MORGAN:  No.  But it's no different than

20    signing a declaration that says it's under penalty of

21    perjury.

22                 THE COURT:  Okay.

23                 MR. MORGAN:  It's the same procedure.  You

24    don't have to have a court reporter.

25                 THE COURT:  Let me ask.  So, in other words,
```

```
 1    at the end of this, they did state that their statements
 2    were made were under penalty of perjury or under oath?
 3             MR. FE:  Yes, they -- Mr. McCune.  Jim
 4    Feeney for Kia, Your Honor.  Mr. McCune asked each of
 5    the interviewees if they understood that these
 6    statements were being made with the effect of being
 7    under oath subject to the penalty of perjury -- I think
 8    he said penalty of perjury.  And they all agreed.
 9             If you want a certification, we can give
10    them a certification after the fact.  That's not an
11    issue.
12             THE COURT:  Okay.  That's not an issue.
13    But, you know, let's just put it this way, you know,
14    just put them under oath.  Pretty much all they need to
15    do, as if it was a declaration, just say these
16    statements are -- I mean, at the end just say I have
17    made those statements under oath to the best of my
18    ability.  Whatever.
19             MR. McCUNE:  The only difference in that,
20    Your Honor, at the beginning they said everything I'm
21    going to say is under oath.
22             THE COURT:  Okay.  Do it at the end too.
23             MR. McCUNE:  Okay.
24             THE COURT:  All right.  That takes care of
25    that.
```

1

2

3                    CERTIFICATE OF REPORTER

4

5    COUNTY OF LOS ANGELES      )

6                               )  SS.

7    STATE OF CALIFORNIA        )

8

9    I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN AND FOR

10   THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

11   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

12   TO SECTION 753, TITLE 28, UNITED STATES CODE, THE

13   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

14   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

15   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

16   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE

17   JUDICIAL CONFERENCE OF THE UNITED STATES.

18

19

20   DATE:  JUNE 11, 2013

21

22   /S/_____

23   SHERI S. KLEEGER, CSR

24   FEDERAL OFFICIAL COURT REPORTER

25

**EXHIBIT H**

1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA

3       WESTERN DIVISION

4

5 THE HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE PRESIDING

6

7 In Re:  HYUNDAI and KIA FUEL  )
  ECONOMY LITIGATION     )

8             )
             )  No. MDL 13-2424-GW

9             )
 _____)

10

11

12

13    REPORTER'S TRANSCRIPT OF PROCEEDINGS

14     LOS ANGELES, CALIFORNIA

15    THURSDAY, AUGUST 15, 2013

16

17      **SCHEDULING CONFERENCE**

18

19

20

21

22 _____

23     DEBORAH K. GACKLE, CSR, RPR
      United States Courthouse

24   312 North Spring Street, Room 402A
    Los Angeles, California 90012

25      (213) 620-1149

```
1    I want the papers on the 23rd.

2            MR. GIBBS:  Okay.

3            THE COURT:  And let me just ask -- and I presume that

4    the entire document won't be more than 30 pages -- I'm not

5    including attachments, but the substance of the arguments won't

6    be more than 30 pages.

7            MR. GIBBS:  Defendants use a lot of words.  It

8    shouldn't be 30 --

9            THE COURT:  Tell them to shut up.

10           MR. MORGAN:  I don't anticipate that at all, for the

11   reasons I just explained.  I don't think they're going to be

12   many disputes at all.  Most of these documents simply don't

13   exist.

14           THE COURT:  Okay.

15           MR. ROSENFIELD:  Your Honor, Harvey Rosenfield,

16   Consumer Watchdog --

17           THE COURT:  Yes.

18           MR. ROSENFIELD:  -- I must respectfully ask the court

19   to expand the deadlines and --

20           THE COURT:  I won't at this point in time.

21           MR. ROSENFIELD:  Then may I explain for the record

22   what I think --

23           THE COURT:  Sure.  This is what I'm indicating:

24   These interviews are not the be all, end all of them.  In other

25   words, if I find that there's a good basis to have other
```

1    interviews of these people, I'm going to order it.  So it's not

2    a -- this is just -- what I want to do is, to the extent

3    possible, to make this thing efficient, but unless I set some

4    dates, it's just going to go on and on and.  So, if possible,

5    the 29th and 30th, hopefully can go forward, but if it turns

6    out that I -- if I allow them to go forward on those dates and

7    it turns out that the plaintiffs' counsel, either the settling

8    plaintiffs' counsel or the nonsettling plaintiffs' counsel,

9    feel that they did not have certain information which needs --

10   necessities a further interview, I will order a further

11   interview.

12           MR. ROSENFIELD:  Your Honor, just a few nights ago,

13   production of apparently 16,000 pages was uploaded.  The

14   nonsettling plaintiffs, as opposed to liaison counsel, but the

15   remainder of the nonsettling plaintiffs received the memo that

16   Mr. Gibbs described several days ago that lays out the nature

17   of the discovery disputes.  I think -- and when this was raised

18   on the phone call between Mr. Gibbs and all of us who were the

19   nonsettling parties, yesterday, without exception, all of the

20   attorneys who represent nonsettling plaintiffs felt strongly

21   that they could not do their duty to their clients or to the

22   court to conduct an interview without the documents that we've

23   asked for.  So what the court is saying -- it's not that I'm

24   not hearing what you're saying.  You're saying, Well, I'll let

25   you come back, but given --

```
 1          THE COURT:  No, what I'm also saying is that I've

 2   looked at the discovery of the -- adequacy of the discovery

 3   that's been requested for the interviews.  If I find that

 4   the -- in other words, if there's no dispute as to the

 5   discovery that's already been conducted, there's plenty of time

 6   between now and the 29th and 30th to look at that stuff.

 7   Insofar as if there's other stuff that you've requested that

 8   has not been provided, then if I decide that, yes, those things

 9   are necessary, I will order them to be provided prior to the

10   interview; and if it turns out that providing that additional

11   information, if it's thousands of pages, well, it might very

12   well be that the production of, let's say, 5,000 pages

13   sometime, let's say, between the 23rd and the 29th of August,

14   it just physically is not possible for the counsel to review

15   them, I will order the interviews delayed.

16          MR. ROSENFIELD:  Your Honor, Mr. Gibbs has quite

17   efficiently divided up the document-review process among firms

18   so there's no duplication, and I think you've just touched on

19   it.  We do not think -- we still are reviewing -- the teams are

20   reviewing what has been produced as recently as few days ago,

21   so we don't know any way -- my concern is just effectively

22   providing you the document that you requested from Mr. Gibbs

23   within a week's time.  I think that is going to be very

24   difficult to provide a quality document.  We don't -- to

25   paraphrase a recent secretary of defense, We don't know what we
```

1    don't know yet.

2            THE COURT:  You have lots of minions.  There's so

3    many plaintiffs' firms on this.  Again, I'm a little bit

4    sympathetic but not overly sympathetic -- I'm no longer an

5    attorney, I don't have to do this, but when I was an attorney

6    and had to do it, you know, I remember staying up at nights and

7    looking at tons of paper and figuring out most of it was

8    worthless.  But, again, I do understand that if, based upon,

9    you know, what transpires, if I conclude that indeed there is a

10   wealth of information which has not been produced that is

11   necessary for the interviews, and, you know, if the defense

12   produces them and at a point in time which I feel cannot be

13   adequately reviewed, of course I'm going to continue the

14   interviews.  That is not -- I have not taken a position that

15   I'm not going to do that, I've indicated I want to see what is

16   out there, you know, and I don't have to see everything to

17   realize this.  I could see the representative stuff of what you

18   guys have looked at so far.  So I'm not really worried about

19   that, but I -- if possible, again, I want the time table to go

20   forward on an expeditious basis.

21           MR. MORGAN:  Your Honor, if I could clarify one

22   point --

23           MR. BONSIGNORE:  This is Robert Bonsignore.  I'd like

24   to clarify a point that Mr. Rosenfield just raised and the

25   defense counsel alluded to and identified the 800-pound gorilla

```
 1   in the room.  We have put minions.  I've devoted one person

 2   full time.  We've been working on hard as Mr. Gibbs has

 3   indicated.  The problem is that we spent a good portion of

 4   yesterday's conference call trying to figure out why we haven't

 5   come across documents that are useful; and as Your Honor has

 6   indicated, you know, as a lawyer we go through a lot of

 7   worthless documents and oftentimes the bulk of the documents

 8   that we get are worthless.  In this particular case, it's a

 9   stark -- this is an extreme example of receiving nothing,

10   absolutely nothing, that is worthwhile and that would assist

11   during the deposition -- I mean during the interview, and so

12   what we have is a situation, bluntly, where we don't believe

13   that we have been provided with relevant documents, we believe

14   that we've been provided with a lot of junk, and that's the

15   *Reader's Digest* version of the problem.

16           THE COURT:  Well, the problem is, again, I don't know

17   what the discovery requests have necessarily been, so, you

18   know, if you ask for things, I don't know whether or not those

19   things are things that would produce little gems and things of

20   that sort.  So, again, these are the materials that are going

21   to be presented to me in these papers.  I will take a look at

22   the discovery requests, which the parties are disputing, and --

23   et cetera; however, insofar as the production of materials that

24   have already taken place are concerned, again, you know, when a

25   party gets a discovery request, they're presumably not
```

```
 1   censoring their responses -- or if they are censoring, they're
 2   telling you how they've been censored.  So if you ask for
 3   something -- let's say -- we want all the complaints about fuel
 4   economy that were provided to the defendants between this
 5   period of time and that period of time, if you got nothing,
 6   then I would say, yeah, it seems to me that something smells
 7   funny; but if you've gotten stuff, the mere fact that, let's
 8   say, there is a, like, thousand of those complaints rather than
 9   10,000, well -- I mean, who is to say that the defendants have
10   hidden some complaints that you didn't get.  I mean, further
11   discovery down the road might show that, but at this point in
12   time, I'm not going to presume that the responses of the
13   defense are improper or not made in good faith, although maybe
14   at some point in time, based upon what the plaintiff showed to
15   me, I may conclude that, yeah, they didn't respond in good
16   faith to this thing, and if they haven't, I'll take measured
17   steps at that point in time.
18          But, again, at this point in time, I'm speaking a
19   little bit in a vacuum because I don't know what the discovery
20   disputes are at this point in time vis-a-vis the interviews
21   scheduled for the 29th and 30th of August.  There might be some
22   other requests that have been made that don't relate to that,
23   and I don't want to get into those at this point in time since
24   those can be put on the back burner for a moment; I want to
25   focus primarily on discovery stuff as to the 29th and 30th
```

```
 1    interviews.
 2              MR. GIBBS:  And I think we will all be better off if
 3    we present these disputes to Your Honor in the manner you
 4    suggested rather than making sweeping statements in open court.
 5    The --
 6              THE COURT:  Let me stop you.
 7              The defense counsel wants to say something.
 8              MR. MORGAN:  I have a couple of clarifying points.
 9    Mr. Rosenfield mentioned this resent production of 15,000 pages
10    of documents that he hasn't fully had a chance to review, those
11    don't relate in any way to the interviewees.  These were --
12    there was a nonparty entity that was subpoenaed by the EPA, an
13    individual employee of a nonparty entity.  He was deposed, and
14    in connection with that, produced documents, as we have
15    promised plaintiff we would produce anything that was produced
16    in connection with the EPA investigation in this case, and so
17    that was -- that production does not relate in any way to the
18    interviewees whose productions were completed in July.
19              THE COURT:  Let me ask this question.  It's going to
20    show you my ignorance.
21              What is the status of the EPA investigation?
22              MR. MORGAN:  It's ongoing.
23              THE COURT:  Is it a situation where the EPA is
24    expected to issue some sort of report or something?
25              MR. MORGAN:  I assume eventually they will issue --
```

```
 1    either not take action or request some sort of remedies.

 2            THE COURT:  I presume that the EPA investigator or

 3    investigators are aware of the present action?

 4            MR. MORGAN:  Correct.

 5            THE COURT:  Do they have any comments?

 6            MR. MORGAN:  Not that I'm aware of.

 7            THE COURT:  Oh, okay.  Just curious.

 8            Yes.

 9            MR. GIBBS:  One thing I want to flag -- and this is

10    mentioned in the papers -- is a gentleman named Mr. Babcock,

11    who is an employee of a Hyundai entity that's in the United

12    States that primarily interacts with the Korean entity.  He's

13    been deposed by the EPA.  Defendants have provided me with his

14    deposition transcript and placed some limitations on that

15    with -- which the nonsettling plaintiffs object to, but the

16    point I want to make is we, liaison counsel, in doing our own

17    work and investigation, identified him and told the defendants

18    we were going to want to interview him; he is not someone

19    they've designated.  As we're working through this, there's a

20    few other obvious people we're going to want to interview that

21    are beyond the scope of the interviewees that defendants have

22    hand selected.

23            We'll try to work through this.  The reason I'm

24    raising it now is it's likely going to come up, and I just know

25    there are going to be people we're going to want to talk to
```

```
 1   beyond these people, so that is going to -- that could impact

 2   the timing or it may not.  I don't know --

 3            THE COURT:  Timing of what?

 4            MR. GIBBS:  -- surprised --

 5            THE COURT:  The timing of what?

 6            MR. GIBBS:  The timing of getting this overall

 7   confirmatory discovery completed.  We haven't talked about --

 8            THE COURT:  As I've indicated, you know, the period

 9   of time to do discovery is so both sides can, you know, do that

10   which they feel they need to do.  If the nonsettling plaintiffs

11   have a very good reason to want to depose certain people in

12   order to take a final position on the settlement, I think the

13   defense has to recognize they're going to want to do that.

14   Now, if you want to depose 100 people, or something like that,

15   then I can understand -- or even 50 people, or even 20 people

16   even.  But there might be certain people, yeah, that in order

17   for the nonsettling plaintiffs to feel comfortable taking a

18   position finally one way or the other on the settlement, they

19   may want to do a couple of depositions.  I accept that.  That's

20   not a problem.  I presume the defense doesn't think it's a

21   problem.

22            MR. MORGAN:  We'll obviously want to evaluate whether

23   we think they have good cause, but, of course, if they want to

24   raise it --

25            THE COURT:  Okay.  What else?
```

```
 1          MR. MORGAN:  One logistical question, Your Honor.
 2   For the report on the 23rd, is there a deadline by which the
 3   parties should exchange sections?
 4          THE COURT:  I would say certainly the exchange would
 5   have to be, you know, by the 21st of August if you're going to
 6   give me something final, but let's say three o'clock on the
 7   23rd of August.
 8          MR. JEFFERS:  Your Honor, given that the scope of
 9   this paper that you want relates to disputes -- I'm sorry.  Ben
10   Jeffers -- is supposed to be tee'd up in connection with the
11   interviews, we need to understand what those limited objections
12   are that could relate to the interviews from plaintiffs'
13   perspective because I agree with Mr. Morgan, I don't know that
14   there really are that many, so I would prefer to have
15   plaintiffs' position to us first rather than mutual exchange,
16   because we'll responding in a vacuum --
17          THE COURT:  No, I presume that the -- in other words,
18   if the defense is going to be seeking some sort of protective
19   order, vis-a-vis something, they are going to exchange what
20   their protective orders, stuff like that -- sort -- you're
21   going to be showing that to the plaintiffs' counsel, but then,
22   in turn, the plaintiffs' counsel is only going to show you what
23   discovery they want vis-a-vis these interviews that are going
24   to occur at the end of this month.  So it's going to be
25   mutually exchanged.  If the defense doesn't have anything
```

```
1    vis-a-vis a protective order, then there's nothing for you guys

2    to show them, then it will be just a one way -- that they'll be

3    presenting stuff for you, and then you're going to be

4    responding --

5              MR. JEFFERS:  Fair enough, Your Honor.

6              MR. MORGAN:  Mr. Gibbs and our side can meet and

7    confer.

8              THE COURT:  And when I said, like, the 21st, I don't

9    necessarily mean the parties can't do stuff beforehand but no

10   later certainly then the 21st.  The 21st would seem to be the

11   falling-off-the-edge-of-the-cliff date.

12             MR. GIBBS:  We're going to need to get this underway.

13             THE COURT:  Yes, pretty soon, right away, yes.

14             MR. GIBBS:  That's clear.

15             THE COURT:  Now, is there anything else at this point

16   that I need to concern myself with?

17             MR. BONSIGNORE:  Your Honor, this is Robert

18   Bonsignore, again, with one last question.  I'm sorry.

19             THE COURT:  Sure.

20             MR. BONSIGNORE:  I just can't get my head around this

21   concept where the defense produces certain documents only to

22   liaison counsel but not to the rest of the settling parties,

23   and I just don't think it's right, and I'd like to formally

24   object; and I'm just wondering if that would be separate or if

25   that needs to be included in the limited 30 pages --
```

```
 1              THE COURT:  Let me stop.  My understanding is that
 2    the liaison counsel is talking with all of the nonsettling
 3    plaintiffs, and the way in which the liaison counsel is dealing
 4    with the -- collectively with the nonsettling plaintiffs is
 5    something that I'm leaving to the liaison counsel's discretion
 6    to some extent because that's why he's appointed as liaison
 7    counsel.  If, however, certain nonsettling plaintiffs are
 8    objecting to the way that he's doing things, they are free at
 9    any point in time to contact the court with their objections;
10    however, it seems to me that the whole point of having a
11    liaison counsel is that things are channeled through the
12    liaison counsel and from there to the other counsel.
13              So the mere fact that you haven't necessarily seen
14    everything does not bother me unless it's a situation where
15    you're making the request, and the liaison counsel is uniformly
16    saying, I'm not showing any other counsel anything; I'm keeping
17    everything to myself.  I presume he's not doing that.
18              MR. GIBBS:  There are three issues --
19              MR. BONSIGNORE:  I think the blame is on the -- not
20    on liaison counsel; I think he's under difficult circumstances
21    and doing a good job.
22              THE COURT:  Let me just say:  I had thought that
23    like, when, for example, discovery was being produced, I
24    thought the discovery was being produced, for example, to a
25    central database or something of that sort, and people can get
```

26

```
 1   access to the database; and so, therefore, as long as they

 2   signed off on confidentiality provisions, there's no access

 3   problem.

 4              MR. GIBBS:  That's correct.  There are three

 5   exceptions, and we flagged these in the filing.  Defendants

 6   have provided resumes of the people -- of interviewees that

 7   they're putting forth.  They limited the scope of the

 8   circulation of those resumes to me and the people that are

 9   doing the interviews for reasons of their own.

10              THE COURT:  Let me ask defense counsel:  Why are you

11   limiting the resumes?  I presume resumes are matters of public

12   record.

13              MR. MORGAN:  They're not.  They do contain personal

14   information --

15              THE COURT:  Well, obviously, the personal information

16   can be redacted, but, for example, educational experience,

17   dates of work and stuff like that, I mean, that stuff is not

18   confidential really.

19              MR. MORGAN:  We can redact those.  I think the point

20   was this was to expedite the interviews and --

21              THE COURT:  They'll give you a redacted version of

22   those resumes, taking out those portions which they did not

23   want other people to see, but other information, the general

24   information, about work experience, educational experience, all

25   that other type of stuff, that is free game, and you'll get
```

```
 1    that.  So that takes care of that problem.

 2              What else?

 3              MR. GIBBS:  There's a set of search terms that

 4    defendants have been using with respect to the EPA document

 5    requests that apply to the Korean entities in our case.  We've

 6    met -- and there was a lot of meeting and conferring, and

 7    ultimately what the defendants agreed to do was provide me with

 8    that list of search terms, which I -- with a caveat that I

 9    wouldn't circulate it beyond that.  I, of course, am going to

10    take it because I want to see it, and the position I took was,

11    I'm going to take it, but no one's rights are prejudiced with

12    respect to requesting that information from the court.  So the

13    other nonsettling plaintiffs have not seen the EPA search

14    terms --

15              THE COURT:  I promise, I'm really bad with computers,

16    so I don't understand what exactly you're saying.  In other

17    words, the documents themselves, the EPA documents, also have

18    put on the databases?

19              MR. GIBBS:  Yes, the documents have been produced,

20    but there is an underlying set of ESI search terms.

21              THE COURT:  What is an ESI search term?

22              MR. GIBBS:  The electronic information -- let me back

23    up.

24              In connection with the discovery that the EPA is

25    doing, the EPA has required defendants to use about two pages
```

```
 1    of search terms in connection with the ESI searches that
 2    defendants are doing.
 3              THE COURT:  I don't -- give me an example what a
 4    search term would be.  Like "fuel mileage"?
 5              MR. MORGAN:  MPG --
 6              THE COURT:  In other words, there's certain words or
 7    something like that?  I presume it's on the computer.  I
 8    presume that if you put a document -- these are on WordPerfect
 9    or Perfect, or whatever it is, you could always plug in the
10    term -- whatever term you want.  You don't have to be limited
11    by EPA's search terms, so what difference does it make?  Why do
12    you need the EPA's search terms in that situation?
13              MR. BONSIGNORE:  When we're trying to figure out why
14    we're not getting documents that are responsive to our request.
15    For example, during our hour-long discussion on that point
16    yesterday, we could have looked at the search terms and said,
17    Ah, the reason it's not in the request is because the EPA
18    didn't request it.
19              THE COURT:  In other words, what you're asking for is
20    you want to know what the EPA's document request was to the
21    defendants to understand what -- why the defendants produced
22    those documents to the EPA.
23              MR. BONSIGNORE:  There are documents that --
24              MR. CLOBES:  Your Honor, this is Bryan Clobes, if I
25    might.  I think I can --
```

```
 1          THE COURT:  Wait, wait, wait.  Let me stop all

 2   counsel.  Let me indicate to counsel:  If you're on the phone,

 3   you have to identify yourself before you speak, and also if two

 4   people speak on this telephone, my reporter cannot take down

 5   either of you.  So let me have the people on the phone, one of

 6   you speak first.

 7          MR. CLOBES:  Your Honor, this is Bryan Clobes --

 8          MR. BONSIGNORE:  Your Honor, if could just

 9   disclose --

10          THE COURT:  Wait, wait, wait, wait.  Again, Counsel,

11   you're speaking over yourselves.  So let me have the person who

12   has the older-sounding voice speak first.

13          MR. BONSIGNORE:  Okay.  This is Robert Bonsignore.  I

14   assume I'm the old man.

15          The only other issue that I raise there is why do the

16   defendants get the right to declare unobtainable an EPA

17   document?  It's not their work product.  They're just making a

18   job difficult.

19          THE COURT:  No, I may agree with you.  I was going to

20   ask the defense counsel that question.

21          But let me ask:  The other person on the phone who

22   was going to make a comment, what did you want to say?

23          MR. CLOBES:  Thank you, Your Honor. It's Bryan

24   Clobes.  I think I can make this much simpler and give more

25   clarity to why it is this is important.
```

```
 1              We -- in our document request, we asked the
 2    defendants to produce a variety of documents, and as a result
 3    our request, they're then responsible to then conduct searches
 4    for those documents.  I understand with respect to the Korean
 5    defendants and the Korean documents that their response is
 6    essentially, We've already done this.  We did it in response to
 7    the EPA's request for documents, and what we did was for the
 8    electronic information that our client has, we've run search
 9    terms.  We're going to give you the documents that we produced
10    in response to our running searches using those EPA search
11    terms; we're not going to do basically anything else.  So we're
12    not going to separately search for your documents that you
13    asked for; we're not going to look through any paper files or
14    folders or run any custodian searches --
15              THE COURT:  Let me stop you, Counsel.  Let me stop
16    you, Counsel.  I understand what you're saying.
17              Counsel, Counsel, Counsel --
18              MR. CLOBES:  There are the search terms that we ran
19    for the EPA, and we're going to impose that search on your
20    document request --
21              THE COURT:  Okay.  Sir, sir, I understand what you're
22    saying --
23              MR. CLOBES:  -- the EPA search terms are --
24              THE COURT:  Cut him off.
25              MR. CLOBES:  -- so we know what may be missing --
```

```
 1            THE COURT:  I understand what he's saying.

 2            Let me ask -- wait a second.

 3            Let me indicate to counsel:  I understand what you're

 4    saying.

 5            Let me ask the defense counsel:  Why can't you give

 6    them the EPA search request?

 7            MR. MORGAN:  Let me walk through this just so we're

 8    all on the same page.

 9            THE COURT:  Assuming that the EPA does not object.

10    If the EPA doesn't object, why do you care?

11            MR. MORGAN:  I'll explain.  Let me start with the

12    domestic documents.  We used the plaintiffs' search terms, so

13    let's be clear about that.  That was -- those were not search

14    terms that we came up with, not that the EPA came up with.  We

15    used the plaintiffs' own search terms for every domestic --

16            THE COURT:  Okay.  So that answers insofar as

17    domestic.  Insofar as Korean --

18            MR. MORGAN:  The Korean ones we -- in response to the

19    EPA document requests, the company formulated its own search

20    terms to search its electronic files.  Those search terms are

21    work product.  They show how the company responded to the EPA

22    document requests.

23            THE COURT:  Let me just stop you there.  I don't

24    understand that.

25            If, in fact, you're indicating, for example, insofar
```

```
 1   as the domestic documents are concerned, you utilized the

 2   plaintiffs' search terms; insofar as the Korean search terms,

 3   you indicate that you got a request from the EPA, but you

 4   modified it in some way shape or form and utilized something

 5   else.

 6           MR. MORGAN:  No, the EPA didn't suggest search terms,

 7   the EPA gave us document requests.  We formulated search

 8   terms --

 9           THE COURT:  Let me ask you this:  Do you have any

10   problem with turning over the EPA's document requests to --

11           MR. MORGAN:  Plaintiffs have those.

12           THE COURT:  Okay, they have those.

13           MR. MORGAN:  So because the way in which we responded

14   to the subpoena by formulating these document requests are work

15   product, we tried to strike a balance in the MDL by saying,

16   We'll show the search terms to liaison counsel and to the

17   settling counsel.  Both of them determined that those search

18   terms were fine and suitable for the purposes and, in fact, I

19   think both sets of counsel can confirm that in many respects,

20   they're far broader--

21           THE COURT:  Let me just ask:  I don't understand why

22   you don't want to release the search terms to the other

23   nonsettling plaintiffs.

24           MR. MORGAN:  These are nonparties to the EPA

25   investigation, and that is the defendants' work product, how
```

1    they go about complying --

2            THE COURT:  You've already given it to the settling

3    plaintiffs' counsel and to liaison counsel.

4            MR. MORGAN:  With a nonwork product waiver, which

5    they agreed to.

6            THE COURT:  Well, of course, if the nonsettling

7    plaintiffs want the information, they have to agree on

8    confidentiality, et cetera, et cetera, et cetera, and limited

9    use only to this lawsuit, of course.  I mean, I agree with you.

10   If the nonsettling plaintiffs are willing to do that, then they

11   should get copies, but if they're not, then I agree with you,

12   they didn't get copies.  Again, I don't think this is a major

13   thing.

14           You understand what I've said?

15           MR. GIBBS:  I actually -- I mean, I agreed to take it

16   in a limited scope because we needed to see it and try to work

17   through it, but I believe that in order for this process to

18   work, the other nonsettling plaintiffs, who are looking at this

19   and trying to assess whether the scope of this discovery makes

20   since, they need to see the search terms --

21           THE COURT:  And I agree with you, but like everything

22   else, they have to agree on the confidentiality aspects,

23   because, again, it seems to me that if I agree with the defense

24   counsel, how they formulate search terms based upon a request

25   for EPA is their work product.  You know, the -- these are

```
 1    things that the nonsettling plaintiffs or even the settling

 2    plaintiffs or the liaison counsel is not necessarily entitled

 3    to; however, to attempt to resolve the present matter and

 4    attempt to reach a settlement with everybody, you know, the

 5    counsel can waive their attorney work-product privilege to the

 6    extent that, We'll show it to you, but you have to promise not

 7    to show it to anyone else.  I think it's perfectly reasonable;

 8    I don't see a problem with that.

 9          MR. GIBBS:  And I don't think we have a dispute with

10    that, but all the nonsettling plaintiffs are on the phone, so

11    if someone does --

12          THE COURT:  Let me just put it this way:  They know

13    how I'm ruling.  In other words, I'm requiring -- not

14    requiring -- I'm allowing those items to be shown to people who

15    execute a sufficient confidentiality agreement because I agree

16    entirely this is work product.

17          MR. ROSENFIELD:  Your Honor, Harvey Rosenfield.  I

18    just want to emphasize that the defendants are refusing to use

19    the search terms that we presented to them in our discovery

20    request and --

21          THE COURT:  Let me stop.  That is not my

22    understanding.  Defense counsel has indicated insofar as

23    domestic documents are concerned, they utilized the search

24    terms that were proposed -- or are you saying it was only

25    proposed by the settling plaintiffs?
```

```
 1              MR. MORGAN:  No, no, no, no.  Those are the search

 2    terms proposed by all plaintiffs, Your Honor.

 3              THE COURT:  Okay.  I don't understand then.

 4              What are you saying?

 5              MR. ROSENFIELD:  Only for ESI, not for paper

 6    documents.

 7              THE COURT:  Well, again, you know --

 8              MR. ROSENFIELD:  File names --

 9              MR. CLOBES:  This is Bryan Clobes again.  Not for the

10    Korean documents.

11              THE COURT:  Well, I understand that insofar as the --

12    that's what we're talking about at this point in time, but

13    insofar as the Korean documents are concerned, we've resolved

14    that because I've indicated that they will be -- the defense

15    counsel will release the search terms that they utilized as

16    long as nonsettling plaintiffs' counsel, or anyone else, signs

17    off on an appropriate confidential agreement.  Now, if what

18    you're saying is that insofar as the search terms for the

19    Korean documents are concerned they did not utilize the

20    plaintiffs' -- nonsettling plaintiffs' search identification

21    requests, I don't know -- I don't know what ---

22              MR. MORGAN:  There was a logistical reason, Your

23    Honor.  First of all, the searches had already been completed

24    in connection with the EPA investigation, and, second, Korea

25    has local rules about restrictions on accessing somebody's
```

```
 1   files.  You have to get consent; it's a very cumbersome

 2   process, and to restart this and go search with plaintiffs'

 3   terms, you know, would have delayed this by months.

 4            Second, again, as I think liaison counsel and

 5   settling counsel plaintiffs will agree, for the most part that

 6   terms used in Korea were broader.  For instance, plaintiffs'

 7   search terms had no Korean words whatsoever; our search terms

 8   used in the EPA investigation used multiple Korean terms for

 9   the key words.  So there's no reason to believe that this

10   didn't capture the universe of documents.

11            THE COURT:  Let me put it this way:  I don't mind

12   addressing this as another issue insofar as the Korean

13   interviews are concerned, but for purposes of today, I want to

14   primarily focus on the disputes that evolve around the

15   interviews that are going to occur on the 29th and 30.  If

16   somebody wants to bring it to my attention insofar as the other

17   interviews in Korea, well, we'll have a similar process.  In

18   fact, probably what we want to do is set up some dates now so

19   that the parties can start gearing up on that issue as well.

20            So let me just ask:  The Korean interviews are going

21   to occur when?

22            MR. MORGAN:  The interviews themselves are on the

23   12th and 13th of September.  For purposes of preparation,

24   defendants are leaving on the 6th.

25            THE COURT:  Okay.  What I would want to do is as to
```

1                    C E R T I F I C A T E

2

3          I hereby certify that the foregoing is a true and

4     correct transcript from the stenographic record of

5     the proceedings in the foregoing matter.

6

7                                        August 29, 2013

8     /S/_____         _____

9          Deborah K. Gackle                       Date
           Official Court Reporter
10         CSR No. 7106

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT I**

1

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3            WESTERN DIVISION

4     THE HONORABLE GEORGE H. WU, JUDGE, PRESIDING

5

6  IN RE:  HYUNDAI AND KIA FUEL ECONOMY )
   LITIGATION,                          )
7                                       )
                                        )   No. MDL 13-2424-GW-FFM
8  _____ )

9

10

11        REPORTER'S TRANSCRIPT OF PROCEEDINGS

12

13            Los Angeles, California

14      Monday, December 9, 2013, 9:46 A.M.

15

16  Plaintiffs' Discovery Motion and Defendant Kia's Motion to

17      Strike Non-Settling Plaintiffs' Supplemental Brief

18

19

20

21                          PAT CUNEO CSR 1600, CRR-CM
22                          Official Reporter
                            Roybal Federal Building
23                          Room 181-E
                            255 East Temple Street
24                          Los Angeles, California 90012
                            213-894-1782
25                          patcuneo1600@gmail.com
                            www.patcuneo.com

1    to the privilege log, Your Honor.

2            THE COURT:  Yes.

3            MR. ANDERSON:  And the papers sort of set forth

4    our positions.  I have read what Your Honor wrote in the

5    tentative.

6            I would ask that with respect to the production of

7    a revised privilege log that Your Honor set a date certain

8    for that to occur.

9            THE COURT:  That's not a problem.

10           MR. ANDERSON:  I'm sorry?

11           THE COURT:  Not a problem.

12           MR. ANDERSON:  Okay.

13           And perhaps that Your Honor consider a slightly

14   larger cross-section than ten -- Perhaps fifteen or

15   twenty? -- just because there are documents that fall into

16   several categories, Your Honor.

17           THE COURT:  Fifteen.  Let me stop you.  Fifteen.

18   Because I originally had fifteen but then I thought:  No, if

19   I say fifteen, then you guys will want twenty.  So then I

20   thought:  Well, I should just do ten so that way we can get

21   to fifteen.

22           So fifteen is fine.  Fifteen is perfect in fact.

23           MR. ANDERSON:  I will sit then.  Thank you, Your

24   Honor.

25           THE COURT:  All right.  Let me ask defense

1    counsel.  You know what I'm talking about now?

2            MR. MORGAN:  Twelve, sixteen.

3            THE COURT:  What?

4            MR. MORGAN:  For the revised privilege log, the

5    privileged documents.

6            THE COURT:  The revised privilege log but there's

7    the check that I'm utilizing here.  It's not that I don't

8    trust you guys, but I want to see -- I will allow -- after

9    you've done the supplement, I will give the plaintiffs the

10   opportunity -- the question, however, is which plaintiffs

11   are going to choose the fifteen and we'll talk about that in

12   a second.

13           I'll allow plaintiffs to choose fifteen as kind of

14   like a verification device; and as to those fifteen, you'll

15   produce to me the documents themselves and your privilege

16   log entries as to those.

17           And if I find that there has not been what I

18   consider to be sufficient articulation or if I find that

19   there's been some, you know, inconsistencies or something

20   like that, I will have the parties come back and I will

21   address it as to what I will do at that point in time.

22           If I find substantial non-compliance with the

23   requirements of the privilege log, I may do either, one,

24   order everything to be resolved or written to -- and I'll

25   review everything or I will order production; one of the two

```
 1   depending upon how -- to what degree I find any sort of
 2   problems.
 3          A trivial problem to my mind is a trivial problem.
 4   In other words -- and if I find out that of fifteen there's
 5   only one that I think is a major problem, you know,
 6   everybody has differences of opinion as to how we approach
 7   these things.
 8          So I won't necessarily say that that will cause me
 9   to have a major, you know, conniption fit.  I don't know how
10   you spell that.
11          MR. MORGAN:  And the only thing I would add, Your
12   Honor, is to perhaps for the court to look at those not only
13   with an eye to the privilege descriptions but the relevance
14   to the settlement because I think what you're going to find
15   is these documents are of no moment to this settlement.
16          THE COURT:  I -- well, but again, the problem is
17   that it's not up to me to make a final determination fully
18   as to the relevance because sometimes plaintiffs counsel may
19   have a better idea as to how, you know, how they want to
20   evaluate the fairness.
21          But I do agree that, obviously, you know, this
22   whole exercise at this point in time is gearing for an
23   evaluation of the settlement.  This is not discovery if this
24   case were to go forward.
25          So I'm allowing a certain amount of discovery but
```

12

```
 1    I'm not doing a, you know, across the board allowing

 2    discovery at this stage.

 3            Yes.  So -- yes.

 4            MR. ANDERSON:  Did we select a date?

 5            THE COURT:  No, we haven't.  What date are you

 6    guys talking about or thinking about?

 7            MR. MORGAN:  For your identification of documents?

 8            THE COURT:  No, no.  What he's talking about is

 9    you have to respond first.  In other words, defense has to

10    respond with a revision of the privilege logs.

11            MR. MORGAN:  We're going to do that by

12    December 16th.

13            THE COURT:  Okay.  That's fine.

14            MR. ANDERSON:  Okay.  I guess we would ask for --

15    to a certain extent, we're not knowing --

16            THE COURT:  Well, now, what I think you want to

17    say -- let me stop you.  What you want to say is you want to

18    know who are the plaintiffs going to decide because that

19    will have an effect on the date that there will be a

20    selection.

21            So the question is:  Is the plaintiffs who are

22    going to be able to select the fifteen only the attorneys

23    for Krauth and Hasper plaintiffs?

24            Or is it a situation where all non-settling

25    plaintiffs, including the liaison counsel, will be able to
```

```
 1    participate in this selection?
 2              MR. ANDERSON:  I mean, I would anticipate, Your
 3    Honor, that we would loop in Mr. Gibbs and liaison counsel.
 4    Obviously, we've sort have been the prime movers in pursuing
 5    this so I suspect that we would be able to work with
 6    Mr. Gibbs.
 7              THE COURT:  Okay.
 8              Let me put it this way:  Why don't the
 9    non-settling plaintiffs as a group resolve that selection
10    process themselves; but if it turns out there is a problem,
11    then my inclination would be five, five, five, you know.
12              Hasper and Krauth plaintiffs getting five, the
13    liaison counsel getting five, and whatever other plaintiffs
14    counsel out there getting five total.  So it would be five,
15    five, five.
16              MR. GIBBS:  I mean, I may be able to cut through
17    it, Your Honor.
18              THE COURT:  Yes.
19              MR. GIBBS:  I would think that I could work with
20    Mr. Anderson to get this done; and if anyone who's here
21    today or is on the phone is resistant to that, they can
22    speak up and then we can work it out.
23              But we probably can reach an agreement on that
24    right now and then I would think --
25              THE COURT:  I don't think you can reach an
```

14

```
 1    agreement on who selects or reach agreement on which of the
 2    privilege log entries you want.
 3              MR. GIBBS:  Reach an agreement on who selects.
 4              THE COURT:  Oh, okay.
 5              MR. GIBBS:  In other words, it seems like we could
 6    just cut through that right now.  Someone has an issue with
 7    me working with Mr. Anderson to get that done, they can just
 8    speak up.
 9              THE COURT:  All right.  Somebody have an issue?
10                         (No response.)
11              THE COURT:  Hearing nothing, then you guys will
12    resolve it between yourselves.  Okay.
13              So that then -- when will the selection of the
14    fifteen documents and privilege log entries be done?
15                  (Plaintiffs counsel conferred.)
16              MR. ANDERSON:  A week from when they produce it,
17    Your Honor, should be sufficient.
18              THE COURT:  Okay.  So that will be on the 23$^{rd}$,
19    and I will have you guys back here on the -- well, on the
20    2$^{nd}$ of January?  You guys going to be available on the
21    2$^{nd}$ of January?  I certainly will be.
22              MR. GIBBS:  Could we table the date --
23              THE COURT:  Uh-huh.
24              MR. GIBBS:  -- until the end because I think one
25    of the things we're going to want to hear from the settling
```

1   after that.

2          THE COURT:  My holidays are going to be wonderful.

3   I love this.

4          MR. ROSENFIELD:  So we're going to talk about that

5   a little bit more at the end?

6          THE COURT:  Yes.

7          MR. ROSENFIELD:  Okay. Thank you.

8          THE COURT:  Okay.

9          MR. ROSENFIELD:  On Issue No. 4, Your Honor, we

10  would like to take advantage, if the court would give us the

11  permission to do so, of the court's suggestion in footnote 8

12  that we craft a more precise request with respect to the

13  documents concerning Consumer Watchdog in the defendants'

14  possession.  Would the court entertain that?

15         THE COURT:  Let me ask the defense:  What's your

16  response to that?

17         MR. MORGAN:  I mean, we're happy to look at any

18  request.  As it was presented to us, the area of concern

19  they had was:  Did the defendants take action in response to

20  Consumer Watchdog's initial press statements about this?

21         And we actually answered that definitively no.

22  There are no documents that would indicate that because

23  that's not what happened.

24         If now that's changed and they want the document

25  request --

```
 1              THE COURT:  Well, actually, I thought that the --
 2    you see, my view of what the problem was as to Issue No. 4,
 3    I thought that the, as I looked at the actual document
 4    request, it was -- something was much larger than what
 5    you've just described.
 6              MR. MORGAN:  During the meet and confer, they said
 7    that's what they were really after; and we actually
 8    responded in the meet and confer that those documents do not
 9    exist.
10              THE COURT:  Okay.  Well, if that's the response, I
11    mean, I'll allow you to amend if you think you can amend
12    that would somehow not be as broad as what is on page 5 of
13    the tentative but something that's more specific along the
14    lines of 8.
15              But if they've in fact for all intents and
16    purposes answered, you know, what would be crafted under
17    footnote 8, then you really have your answer.
18              There's no sense in wasting everybody's time.
19              MR. ROSENFIELD:  Well, absolutely, Your Honor; but
20    we don't feel that -- we're not satisfied with that answer.
21              THE COURT:  Okay.
22              MR. ROSENFIELD:  What I would like to do is turn
23    it around and present it to them in two days and see where
24    we are.
25              THE COURT:  Well, let's put it this way:  He's
```

```
 1    indicating he's willing to look at it.  Whether or not he's
 2    willing to answer it is a different thing.
 3              MR. ROSENFIELD:  I know.
 4              THE COURT:  So we'll see what happens.
 5              MR. MORGAN:  And what we're not willing to do,
 6    Your Honor, is we're not going to undertake company-wide
 7    search for --
 8              THE COURT:  I understand that and I don't think --
 9              MR. MORGAN:  We understand the universe of people
10    who would have been involved in this; and the answer is no.
11    Those documents don't exist.
12              THE COURT:  But I think you would certainly tell
13    him as to who you inquired of.
14              MR. MORGAN:  Sure.
15              THE COURT:  In other words, he'll tell you -- in
16    other words, if he says, you know, there is no document that
17    is responsive to this particular request and it's not a
18    company-wide response, then he will tell you which, you
19    know, divisions and even hopefully which persons that the
20    inquiry was directed to; and those are the persons who will
21    formulate the response.
22              MR. ROSENFIELD:  Okay.  Thank you, Your Honor.
23              I do want to say one thing since this issue of
24    company-wide has come up.  We have all -- you know, the
25    defendants have stated in their material presented to the
```

1    court that:  We have all -- we have never before suggested

2    that these searches should be company-wide; and I have stood

3    before Your Honor on numerous occasions objecting to the

4    efforts to restrict the discovery in this proceeding and the

5    court --

6                THE COURT:  It's two different things.  On the one

7    hand you said that you never insisted that it be

8    company-wide but then that you've just also said that you

9    resisted the -- well, the court's efforts, as you

10   characterize it -- I don't know if it's efforts -- that

11   would limit the scope of the discovery.

12               MR. ROSENFIELD:  No.  Well, I'm sorry.  Let me try

13   that again, Your Honor.

14               The defendants in their briefing suggested that we

15   concurred or conceded that all these -- that the discovery

16   so far would be limited to four interviewees.

17               THE COURT:  You don't have to make that argument.

18   I don't think that any plaintiffs counsel in their right

19   mind would have agreed to that necessarily.

20               But I think that the parties, partially at the

21   court's invitation, has indicated that since we're focusing

22   right now on potential fairness of the settlement and

23   focusing on those issues, we're not engaged in the normal

24   type of discovery which would be pretty much unrestricted

25   discovery.  It's discovery that is limited in terms of

```
 1   scope.  So I think that both sides would have to agree to
 2   that.
 3           MR. ROSENFIELD:  We've all -- no, we've all agreed
 4   to try to be in a cooperative way here for the last year on
 5   something between the normal course of discovery that would
 6   occur if this case were litigated and the discovery that
 7   would occur if there was a settlement agreement.
 8           But we're operating in between but without our
 9   ever having waived our opportunity to get that down the road
10   if we need it.
11           THE COURT:  Yes, I agree that if there is not a
12   settlement in this matter, then the -- you know, obviously,
13   the case would have to be litigated in which case there
14   would be discovery.
15           MR. ROSENFIELD:  And just to add one more point to
16   it.  If in fact there is a settlement presented which we all
17   hope there will be --
18           THE COURT:  Yes.
19           MR. ROSENFIELD:  -- then we have also reserved our
20   right to request more information based on what that
21   settlement document actually says.
22           THE COURT:  I understand that and I'm not
23   necessarily precluding that.  I'm not necessarily agreeing
24   to reopen discovery even on a limited basis.
25           It would really depend on what the settlement is
```

```
 1    and what the further discovery requests are, you know,

 2    because, again, it will be what it will be.

 3              MR. ROSENFIELD:  We're just trying to create a

 4    record that is most efficient for the court and the parties

 5    to assess the --

 6              THE COURT:  I understand that and I appreciate

 7    that.

 8              MR. ROSENFIELD:  Thank you.

 9              THE COURT:  Okay.

10              All right.  That takes care of 4.  Now, what about

11    No. 6?  Did we deal with 6, 7, and 8?

12              MS. WILLETT:  Good morning, Your Honor.

13              THE COURT:  Okay.

14              MS. WILLETT:  Allison Willett again for plaintiff

15    Figueroa.  This is respect to No. 6 and 7.

16              THE COURT:  Yes.

17              MS. WILLETT:  So for No. 6, defendant had stated

18    that they had checked the local hard drives and it's our

19    understanding that these messaging systems are not saved

20    generally on a local hard drive but rather on a network so

21    we would just ask that the network be searched.

22              THE COURT:  All right.

23              Let me hear a response from the defense.

24              MR. JEFFERS:  Your Honor, Ben Jeffers for Kia.

25    I'll speak to this.  We would submit on the tentative.  I
```

```
1   filed under seal; and I indicated that I wanted to know

2   whether or not there was any problem with my putting the

3   tentative out.

4           MALE VOICE FROM THE AUDIENCE:  I don't think

5   there's a problem, Your Honor.

6           THE COURT:  Okay.  That's fine.  Okay.  That's

7   fine.  No problem.

8           (At 10:33 a.m. proceedings were concluded.)

9

10                          -oOo-

11

12                        CERTIFICATE

13

14      I, PAT CUNEO, CSR 1600, hereby certify that

15   pursuant to Section 753, Title 28, United States Code, the

16   foregoing is a true and correct transcript of the

17   stenographically reported proceedings held in the

18   above-entitled matter and that the transcript page format is

19   in conformance with the regulations of the Judicial

20   Conference of the United States.

21

22   Date:  December 14, 2013

23

24                          /s/ PAT CUNEO
                            _____

25                          PAT CUNEO, OFFICIAL REPORTER
                            CSR NO. 1600
```

**EXHIBIT J**

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE GEORGE WU

4         UNITED STATES DISTRICT JUDGE PRESIDING

5                   - - -

6
In Re:                        )
7     Hyundai and Kia Fuel Economy    )
Litigation                    )
8                                 )  NO. MDL 13-2424 GW
                              )
9                                 )
_____)
10

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14            LOS ANGELES, CALIFORNIA

15          THURSDAY, JUNE 26, 2014

16

17

18     _____

19          KATIE E. THIBODEAUX, CSR 9858
           U.S. Official Court Reporter
20         312 North Spring Street, #436
           Los Angeles, California 90012
21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    prepared to present a specific number today.

2         THE COURT:  I didn't think you would be.  There is

3    a number of reasons why, I can't finalize.  I am

4    indicating my tendencies here, but I can't finalize

5    anything because, again, for things like the fact the

6    notice stuff that was just produced or final versions of

7    the notice stuff was produced a couple of days ago and I

8    have major problems with those.

9         MR. DESTEFANO:  Understood.  Well, if we could get

10   an opportunity to present more along those lines toward

11   the final approval process.

12        THE COURT:  Not a problem.

13        MR. DESTEFANO:  Okay.  Well, again, I think the

14   same point runs through all of the issues that have been

15   raised as to the fairness of the settlement which is that

16   it is a complimentary settlement.  It is a settlement

17   that enhances options that were already available to

18   consumers and adds to them and, you know, to the extent

19   that people --

20        THE COURT:  You are kind of like trying to sell it

21   to me.  I have already indicated that I have no major

22   problems with it.  I just need to get the verifications

23   to make sure that what I think I understand it is, in

24   fact, it is.  And once I get that, then, you know, I will

25   hear from the -- well, obviously, allow at this point in

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1   time but also later on any further objections to the

 2   program.  But from what I understand as to what it is, I

 3   do not see that there is any major problems assuming that

 4   I am correct insofar as my understanding.  And the

 5   footnote I was referring to was Footnote 7, for example.

 6          MR. DESTEFANO:  As to the notice issues which your

 7   Honor has advised are still open, essentially, we would

 8   agree.  And, obviously, there have been some late filings

 9   in that regard.  I would emphasize to the court that the

10   settling parties, particularly, the settling plaintiffs

11   are not trying to make life difficult for class members.

12            This is a complicated settlement set of terms

13   to express in this kind of process, and we have worked to

14   do that.  And at the time that settlement was initially

15   proposed, there was potential for continued development

16   which was recognized and it occurred.  We have had

17   continued prodding from the Consumer Watchdog parties.

18          THE COURT:  They are going to throw that in their

19   attorney's fees request.  You have given them the title.

20          MR. DESTEFANO:  Our diligence on honing the claims

21   process has, you know, been occurring independent of that

22   too.

23          THE COURT:  Let me stop you.  Does it seem like I

24   am not accepting the settlement, proposed settlement?

25   You argue like I must have written something different
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

     1    be made clear, very clear, to indicate in the e-mails

     2    that as it will be with the mailings that participation

     3    in the reimbursement program doesn't preclude further

     4    benefits under the settlement.

     5         MR. MORGAN:  I think that is fine, your Honor.

     6         THE COURT:  All right.  Yes.

     7         MR. MCCUNE:  Looks like Footnote 20 and 26, the

     8    court points out some deficits in the claims process.

     9         THE COURT:  And there is a lot more.  I just got

    10    tired of writing it all.

    11         MR. MCCUNE:  We will work to clean those up.

    12         THE COURT:  All right.  Also, that box that you

    13    have.  I didn't understand that box.  Who thought of that

    14    one?  It is not necessarily bad, but it is like really

    15    misleading.

    16         MR. MCCUNE:  Which box is that, your Honor?

    17         THE COURT:  The box on Exhibit 1, you know, well,

    18    Page 1, the long form notice, but I think it is Exhibit

    19    1, Page 3 of the thing that you gave me.

    20         MR. MCCUNE:  We will take a look at that, your

    21    Honor.

    22         THE COURT:  In other words, it says do nothing.

    23    If they did nothing, they would lose out.  So I don't

    24    understand that one.

    25         MR. MORGAN:  Just for the court's edification.  I

          UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

21

 1   think the point there was that there is an extremely long

 2   claims period here.  It is nine months, and that

 3   theoretically they could wait to see if there was final

 4   approval.

 5        THE COURT:  No.  But the thing about --

 6        MR. MORGAN:  It does say --

 7        THE COURT:  The problem is that, in other words,

 8   how are they supposed to know when there has been final

 9   approval, though?  I presume they are getting notice once

10   I initially approve.  So if I have initially approved,

11   they have to do something starting at that point in time.

12   So if you tell them to do nothing and there isn't any

13   further communication that they get because when the

14   court finally approves the settlement, they are not going

15   to get any additional notice.

16        MR. MORGAN:  That part is correct, your Honor.

17   They would not be getting an additional notice.  To the

18   extent the court took that as suggesting a second notice

19   then clarification needs to be made.  I think the

20   point made was that all the dates would be given in the

21   notice but that immediately in response to the notice,

22   they didn't have to elect before final approval of the

23   settlement.

24        THE COURT:  It is going to change, but just

25   one last point on my part.  Then don't say do nothing.  I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   would prefer doing something else, maybe delaying or
 2   action should be taken by the state or something like
 3   that, but don't say do nothing.
 4         MR. MORGAN:  Sure.
 5         THE COURT:  All right.  Okay.  So the notice and
 6   the forms have to be changed, and once they are changed,
 7   then I do want further responses from any of the other
 8   parties to the MDLs if they have any further objections
 9   on those.
10           Also, let me just ask, was there a class
11   action brought in Canada on this, and was it settled?  My
12   understanding -- I think I heard somewhere that there was
13   a Canadian class action.
14         MR. CAREY:  There was, your Honor.  There were --
15   Rob Carey, I believe there were three.  The one in
16   Ontario has been approved.  The one in Quebec has been
17   heard and the judge has a couple of changes, and the
18   other one is pending.
19         THE COURT:  I would also want to know what the
20   terms are to the extent that they are comparable.
21   Obviously, it is Canada.  It is a very peaceful
22   settlement.
23         MR. CAREY:  Those terms are what this was
24   initially, but they are being modified to really end up
25   where this court ends up.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1          MR. ROSENFIELD:  It was about 8:00 o'clock at

 2    night.

 3          THE COURT:  Well, in that case, the answer is no.

 4    I looked at it at like 6:00 o'clock at night.

 5          MR. ROSENFIELD:  Understand.  I'm sorry.  We were

 6    scrambling to get that in.

 7          THE COURT:  Let me ask you to give a copy to my

 8    clerk and let me take a look.

 9          MR. ROSENFIELD:  So, your Honor, that document is

10    an analysis of the shortcomings from our perspective in

11    both the short form and long form notice.

12          THE COURT:  Well, let me put it this way, if that

13    is what this is, I have already indicated there is going

14    to have to be a lot more reworking of the notice and the

15    forms.  I agree with you a hundred percent.  That is

16    one of the criticisms from your clients that I thought

17    was very well taken.  And I do want further workings on

18    that.  So the fact that I haven't read this thing at this

19    point in time is fine because of the fact I am requiring

20    the parties to get together on the notice provisions and

21    stuff like that to work out a better of set of notices.

22          MR. ROSENFIELD:  Thank you, your Honor.  So what I

23    would like to do is spend a few minutes talking about

24    three issues that we consider to be red flags in the

25    proposed settlement.  These are red flags that really can

```
1    for themselves, but I am saying the point of we don't

2    need a claims notice --

3        THE COURT:  Well, no.  He is conceding that there

4    has to be some initial claims notice.  Everybody agrees

5    it cannot be done without some initial claims notice

6    because part of the settlement is choosing what you want

7    of alternatives.  So there has to be that.

8            All I am saying is that what he is saying is

9    that it should be something where you don't really have

10   to fill out all that stuff other than perhaps indicating

11   your selection and being more transparent as to what you

12   are possibly going to get.

13       MR. CAREY:  And I would say we have been

14   negotiating with liaison counsel with all the non

15   settling plaintiffs.  He has worked with them all.  I

16   called him the first day we filed, and I said I

17   understand it is a federal judicial center model that is

18   in there, we don't think that works well, we are going to

19   do something like Toyota did.  My understanding is

20   Consumer Watchdog got input, and our goal is to have the

21   best notice possible and we will do that.

22       THE COURT:  All I am saying is that is the reason

23   why, again, I am indicating that insofar as the claims

24   and the notice, that has to be redone.  And I expect

25   everybody to be participating in that, and hopefully it
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    hearing would probably occur sometime before then.  So we

2    have an indication but not a final number.

3         THE COURT:  Let me put it this way, I don't mind

4    that, but it would have to be toward the end of the

5    nine month period.  And, also, if I find that there has

6    not been a significant participation that cannot be

7    explained by the fact that the other people who aren't

8    participating are already in the reimbursement program

9    so, therefore, that is why they are not participating, I

10   may find a problem of fairness or a problem of the

11   settlement because of the lack of participation.

12        MR. MORGAN:  And under the anticipated schedule,

13   we would be towards the end and I am sure that everybody

14   will make reports.

15        THE COURT:  That would be my understanding, and I

16   think that takes care of your concern.

17        MR. ADLER:  It does.  It goes to whether or not we

18   needed a claims process to go with, and I think we will

19   have empirical evidence by the fairness hearing to

20   determine whether or not we need that claim process or

21   not and it ended up being a stumbling block.  And that

22   was really the position we were taking.  I came all the

23   way from New Jersey to say that.  Thank you.

24        THE COURT:  It is always nice to have you here.

25   Is it humid there?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

                          CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28,

United States Code, the foregoing is a true and correct

transcript of the stenographically reported proceedings held

in the above-entitled matter and that the transcript page

format is in conformance with the regulations of the

Judicial Conference of the United States.

Date:  July 12, 2014


  /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR


UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT K**

1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE GEORGE WU

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                  - - -

6
   In Re:                         )
7  Hyundai and Kia Fuel Economy   )
   Litigation                     )
8                                 )  NO. MDL 13-2424 GW
                                  )
9                                 )
   _____)

10

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14             LOS ANGELES, CALIFORNIA

15            THURSDAY, JULY 24, 2014

16

17

18        _____

19            KATIE E. THIBODEAUX, CSR 9858
              U.S. Official Court Reporter
20            312 North Spring Street, #436
              Los Angeles, California 90012

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Also, on Exhibit A as well, I guess it is the
 2   first page of the form itself, I would suggest throwing
 3   in the possible range of monetary amounts because I think
 4   at some point I saw figures, for example, for the Hyundai
 5   class members, their range could be from about 240 to
 6   $715, in other words, to throw in what the possible range
 7   or a general range of an award might be simply for the
 8   fact that, obviously, if the reader knows that it
 9   involves hundreds of dollars versus 50 cents, they may be
10   more inclined to respond.
11              Liaison counsel is smiling.  I guess it has
12   been so long since you had to deal with such small
13   amounts.
14         MR. MORGAN:  We were just trying to think if there
15   was any problem at the low end if there were somebody
16   theoretically could have owned the car for a very short
17   period or short mileage and would be at an
18   unrealistically low scale.  We just -- we have to think
19   through that.
20         THE COURT:  You might refer to it as potential
21   average recovery or something of that sort.
22              And liaison counsel would say?
23         MR. GIBBS:  I would say these issues have been
24   discussed at length, and we appreciate the court's
25   guidance.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

          1          THE COURT:  Okay.  That is why he is liaison

          2   counsel.

          3          MR. JEFFERS:  We will work on something, your

          4   Honor.  Just as we said in the brief, we don't want

          5   simplicity to trump accuracy, and there is netting for

          6   the lifetime reimbursement program.  So we just want to

          7   make sure whatever we say about potential

          8   payment amounts --

          9          THE COURT:  I don't mind if it is general in

         10   nature as long as it is somewhat accurate, but, also, I

         11   want something where there is a dollar figure because,

         12   again, if you don't put a dollar figure, then, you know,

         13   some people who get this may say what is it worth to me

         14   in the end, I don't want to spend an hour of my time to

         15   get $5.  So I suggest something of that sort.

         16          Also, I would also provide language on this

         17   page to the effect that if they take no action, any

         18   monetary amounts, that they would otherwise be entitled

         19   to, they are forfeiting, and any claims that they would

         20   possibly have under this action, they are also going to

         21   be forfeiting, to make that clear.  No response results

         22   in that situation.

         23          And, well, all my other comments, I will wait

         24   to see what you guys do because I have some other things,

         25   but I mean you may be able catch them, maybe you won't.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  July 25, 2014

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT L**

1           UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3              HONORABLE GEORGE WU

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                    -  -  -

6
   In Re:                        )
7  Hyundai and Kia Fuel Economy  )
   Litigation                    )
8                                )  NO. MDL 13-2424 GW
                                 )
9                                )
   _____)
10

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              LOS ANGELES, CALIFORNIA

15            THURSDAY, AUGUST 21, 2014

16

17

18        _____

19            KATIE E. THIBODEAUX, CSR 9858
                U.S. Official Court Reporter
20           312 North Spring Street, #436
                Los Angeles, California 90012
21

22

23

24

25

```
 1              THE COURT:  Yes.

 2              MS. ANTONINI:  Well, preliminarily, I would like

 3    to just say that I don't know what is going on with the

 4    online claims website.  We have not received any

 5    information about it.  I went on it last night, and it

 6    looks the exact same as it did before.

 7              THE COURT:  That was one of my questions as well.

 8    There was supposed to be -- there was a glitch, and it

 9    was supposed to be repaired.  I didn't see as to whether

10    or not the glitch was repaired.

11              MR. MORGAN:  That has been addressed, your Honor.

12              THE COURT:  Why don't you give me something,

13    e-mail my clerk today the new access.  Give me a new

14    access.  So I can go on again and see what the status is

15    of the online stuff.

16              Also, let me ask, is there going to be -- are

17    there separate sets of notice, one for Kia and one for

18    Hyundai.

19              MR. MORGAN:  Correct, your Honor.  Which addresses

20    one of the issues in the tentative.

21              THE COURT:  So, therefore, I need a complete set

22    of both to look at.  And, also, another question I had

23    was why is there going to be -- you probably told me this

24    before -- but why again is it nine months?  In other

25    words, that there is -- the deadline is nine months away
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   and it directs them exactly where to go to register.

2          THE COURT:  I think one of my problems with that

3   particular box, I think it should be split.  In other

4   words, I think it should be separate between if you want

5   to register for the program versus if you want to

6   continue with the program because I think already they

7   are two different things.  So one of my suggestions was

8   to split that box.  But I will talk to you about that

9   with you guys later.

10          Okay.  What else?

11          MS. ANTONINI:  Finally, the last issue is the way

12   that the noticing claim documents characterize

13   compensation for former owners and lessees.  Throughout

14   the document, this compensation is characterized as a

15   lump sum payment, but the parties sort of conflate

16   whether it is a lump sum payment calculated pursuant to

17   the reimbursement program calculation or whether it is a

18   payment pursuant to the reimbursement program.

19          THE COURT:  Let's put it this way, I agree that it

20   should be clearer and that is what I was talking about

21   with Mr. Morgan earlier.  It just seems to me that it

22   should be clearer if you are in the reimbursement

23   program, this is what you get, if you are opting out for

24   the settlement, this is what you get because pretty much

25   if you are going to the settlement route, you are going

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    to, unless you are a 4 by 40, you are pretty much going

 2    to get a check, a lump sum check and that is going to be

 3    it.  But if you participate in the reimbursement program,

 4    you will get a continuation of debit cards as long as you

 5    are an owner, et cetera, et cetera.

 6              All right.  Okay.  So let's talk about a

 7    couple of things about scheduling.

 8              I am going to be certifying the class today.

 9    I am going to be initially approving the preliminary --

10    giving the preliminary approval of the class action

11    today.

12              We are going to talk further about notice, the

13    notice, just massaging the notice provisions, but there

14    is plenty of time for that because you have already

15    indicated it takes 90 days before the entity can be able

16    to send out this stuff.  So I have 90 days to finalize

17    this, but I want to get this stuff done as soon as

18    possible so that everybody, we have the dates all set.

19    But finally setting the dates will be dependent upon how

20    quickly we can massage the notice stuff.

21              So that being said, when do you guys want to

22    meet?  When do the settling parties and liaison counsel

23    want to meet with me?

24         MR. MORGAN:  You had mentioned, your Honor,

25    tomorrow or next week.  I leave Monday out of the country
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1        MR. MCCUNE:  Just the 2nd.

 2        THE COURT:  How about September 3?

 3        MR. GIBBS:  Perfect for me.

 4        THE COURT:  September 3rd.  We will start at 9:00.

 5             And you are going to get me the comparable Kia

 6   set of documents, and also get me access to the site.

 7   And give me that stuff by the tomorrow, the website

 8   stuff.

 9        MR. JEFFERS:  Your Honor, on the Kia documents, it

10   was easier to work off of one set which is why we have

11   the Hyundai set.  So we don't have a Kia set we have been

12   churning.  We have been waiting as all of these edits

13   flow back and forth.

14        THE COURT:  That is fine then.  Just give me the

15   web site information.

16             All right.  Anything else we need to discuss.

17        MS. ANTONINI:  Can we set a date for when the

18   settling parties are going to provide the next round of

19   noticing claims form?

20        THE COURT:  I can't say because we are going to

21   meet.  As soon as it is done, put it this way, as soon as

22   it is done, I am going to order that it be sent out to

23   the other plaintiffs' counsel for comments.

24        MS. ANTONINI:  Thank you, your Honor.

25        THE COURT:  And I will allow at least 10 days for
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1                           CERTIFICATE

2

3

4     I hereby certify that pursuant to Section 753, Title 28,

5     United States Code, the foregoing is a true and correct

6     transcript of the stenographically reported proceedings held

7     in the above-entitled matter and that the transcript page

8     format is in conformance with the regulations of the

9     Judicial Conference of the United States.

10    Date:  August 22, 2014

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**EXHIBIT M**



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

1
2
3
4
5   IN RE:  HYUNDAI AND KIA FUEL        )
    ECONOMY LITIGATION                 )
6                                      ) CASE NO.
                                       ) MDL 13-2424-GW
7                                      )
                                       )
8                                      )
                                       )
9                                      )
    _____)
10
11
12
13
14              REPORTER'S TRANSCRIPT OF
              STATUS CONFERENCE RE NOTICES
15           WEDNESDAY, SEPTEMBER 10, 2014
                     11:03 A.M.
16            LOS ANGELES, CALIFORNIA
17
18
19
20
21
22
23   _____
24         MAREA WOOLRICH, CSR 12698, CRR
          FEDERAL OFFICIAL COURT REPORTER
25        255 EAST TEMPLE STREET, ROOM 181-K
          LOS ANGELES, CALIFORNIA 90012
               mareawoolrich@aol.com

```
 1    the original purchaser, original retail purchaser of the

 2    vehicle from an authorized Hyundai dealer and not be a fleet

 3    vehicle or something to that effect.  So in other words, it's

 4    both the authorized dealership purchase and that it wasn't a

 5    fleet vehicle purchase.

 6              MR. KIDNEY:  That's correct.

 7              THE COURT:  Just throw in whatever language makes

 8    that point clear, and that would take care of the problem that

 9    I had there.

10              MR. KIDNEY:  We will do that, Your Honor.

11              THE COURT:  That would take care of page 5.

12         Then on page 6, let me just ask this question.  I didn't

13    note it previously, but there is a box for the people who under

14    the step 5 who apparently would be eligible for the additional

15    compensation under the 4 x 40 program.  There are four options,

16    one of which is the debit card, the service debit card, or the

17    rebate certificate.  But then the last one is, "No thanks.  I

18    opt to remain in the lifetime reimbursement program and do not

19    wish to receive this additional compensation."  Why would

20    anybody check that off unless they are an idiot?

21              MR. MORGAN:  I mean, there are a group of people who

22    may have already enrolled in a program but aren't supporters of

23    class actions who don't want that additional compensation.

24              THE COURT:  But that doesn't explain -- if you are

25    going to do something like that, then you can explain -- it is
```

```
 1   an option that is stupid.  So if you want to tell them, you

 2   know, if you don't support class actions -- but if they don't

 3   support class actions --

 4           MR. MORGAN:  There is another category, Your Honor.

 5   I mean, the point of that compensation was for people who would

 6   have relied on that advertising campaign.  If they felt that

 7   campaign played no role in their purchase decision, then they

 8   may not feel they are entitled to it.

 9           THE COURT:  I don't understand why you are making

10   this more complicated than it is.  You've offered it.  There's

11   no sense in not giving it to them if it's offered.  Some people

12   may mistakenly think, well, if I opt to remain in the

13   reimbursement program, I don't get this thing.  So why don't

14   you just leave it out.  If the person is eligible for it, they

15   get it.  Why don't we just leave that out.  I presume nobody

16   objects to that.

17           MR. MORGAN:  That's fine, Your Honor.

18           MR. MCCUNE:  No, Your Honor, we do not object.

19           THE COURT:  All right.  Then the next page, page 7,

20   these are the problems I have with page 7.  First of all, for

21   some reason there are two asterisks on the page.  The first one

22   of which is underneath the unique ID boxes.  And then the

23   second asterisk is underneath the VIN number.  I don't

24   understand why you are using asterisks there because the

25   asterisks don't refer to anything other than the two asterisks
```

 1   and you elect to get the lump sum, the lump sum amount would be

 2   X.

 3        However, if you did the lifetime reimbursement program and

 4   rather than driving an average of 15,000 miles, you drove an

 5   average of 30,000 miles per year, this is what your benefits --

 6   and you keep your car for a period of seven years, this is what

 7   your benefits would be.  And do it in that fashion.  That way

 8   people can say, oh, okay.  You give me an example like that, I

 9   understand it.

10        So I suggest you do something of that sort because that

11   will make it very clear to the people of what their choices

12   are.  Also the other thing is that, frankly -- and I threw it

13   in at one point in time.  Under the section as to when would

14   the people get paid, one of the advantages of the lifetime

15   program is that even if something were to scuttle the

16   settlement, the lifetime program goes on.  It goes on while the

17   thing is being disputed.  If for some reason the Court approves

18   and that approval gets reversed, the lifetime reimbursement

19   program goes on even doing that.  Something for them to

20   consider.

21        But you know my problem as to the language on page 7.  So

22   you guys are going to change that.  Also my suggestion would

23   be, as I've indicated, given a positive example and somewhere

24   in the class notice because I think an example is worth a lot

25   more than just further explanations because they can actually

1                CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5             I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT

6  REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

7  CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

8  TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

9  IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

10  REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

11  THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

12  REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14

15                DATED THIS  15TH  DAY OF SEPTEMBER, 2014.

16

17

18                /S/ MAREA WOOLRICH

19                MAREA WOOLRICH, CSR NO. 12698, CRR
                     FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**<u>EXHIBIT N</u>**

1     UNITED STATES DISTRICT COURT

2  CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE GEORGE WU

4   UNITED STATES DISTRICT JUDGE PRESIDING

5       - - -

6
In Re:           )
7 Hyundai and Kia Fuel Economy )
Litigation        )
8            ) NO. MDL 13-2424 GW
             )
9            )
_____)

10

11

12

13   REPORTER'S TRANSCRIPT OF PROCEEDINGS

14     LOS ANGELES, CALIFORNIA

15    MONDAY, SEPTEMBER 29, 2014

16

17

18   _____

19    KATIE E. THIBODEAUX, CSR 9858
     U.S. Official Court Reporter
20    312 North Spring Street, #436
     Los Angeles, California 90012
21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    would not do the first three items that are listed in

2    Consumer Watchdog's submission, basically, because a lot

3    of it -- I don't know if it would possibly fit.

4            Then, the next one would be on Page 2, the

5    first bullet point.  I would agree that the reference

6    probably should be bolded there, at least, the first time

7    because it does bring it out more.  And I don't see a

8    problem with that.  I don't think it makes it any -- I

9    don't see an argument really for not doing it.  I think

10   it would be helpful.  So I would agree with Watchdog on

11   that.

12           Let me ask, is there any problem that either

13   plaintiff's counsel or defense counsel see with that?

14           MR. DISTEFANO:  No, your Honor.

15           MR. MORGAN:  No, your Honor.

16           THE COURT:  Okay.  So why don't you do that.

17           And similarly, obviously, with the Kia,

18   because whatever we discuss with Hyundai would be done if

19   it is applicable to Kia as well.  So we don't have to do

20   it twice.

21           All right.  As to the fifth paragraph, getting

22   more information.  I think if we have done it previously,

23   I don't know if we need to do it here.  It may be

24   overkill but I don't feel strongly one way or the other.

25   If the parties think it might be a good idea to bold this

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

24

```
 1   number at that point.  So we will do it in that fashion.

 2   So I will leave this one out but with that understanding.

 3   All right.

 4           And how will I know that has been done?

 5       MR. MORGAN:  Well, you will have our

 6   representation, but we can make a further report.

 7       THE COURT:  I tell you what, why don't you just

 8   indicate to me that you have informed the administrator

 9   of that requirement.

10           All right.  And, then, the sixth, sorry, the

11   fifth bullet point, are there any objections to bolding

12   the dates, the deadlines?  There is two on the bottom of

13   the page.

14       MR. DISTEFANO:  No objection, your Honor.

15       MR. MORGAN:  No, your Honor.

16       THE COURT:  Okay.  Bold them.

17           And then, the Kia short form matter, same

18   types of things.  In other words, I make the same

19   rulings.  Those ones I have rejected, I rejected.  Those

20   ones you guys agreed to or I insisted on are the ones

21   that will be included.

22           Then, on the long form notices, Page 7,

23   Question 8.  Let me ask the parties what is your response

24   to Consumer Watchdog's point?

25       MR. MORGAN:  From our perspective, your Honor,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Then, the next objection is that on the
 2    Consumer Watchdog's paragraph, it says, former owners or
 3    lessees do not drive their vehicle anymore so it would be
 4    impossible for them to bring a vehicle into the
 5    dealership to have its mileage verified.  How to get
 6    mileage as to a former vehicle for purposes of a claim,
 7    that is covered in the claims form on Page 7 and the
 8    sixth bullet point.
 9              MS. ANTONINI:  Your Honor, if I may.
10              THE COURT:  Yes.
11              MS. ANTONINI:  I think there just seems to be a
12    fundamental confusion here.  So class members are offered
13    two options.  They can either get a lump sum payment or
14    they can pick the reimbursement program.  For former
15    owners, they can pick a lump sum payment, and it involves
16    cash debit card, dealer service credit, new car rebate or
17    the life time reimbursement program.  Their cash debit
18    card under the lump sum payment is the amount they would
19    get under the lifetime reimbursement program.
20              I don't understand the difference between a
21    former owner who picks a lump sum payment cash debit card
22    and a former owner who picks the lifetime reimbursement
23    program.  It seems like you would be getting the exact
24    same amount of money notwithstanding the additional 4 by
25    40.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Sure.  I think that is true; isn't it?
 2          MR. MORGAN:  Yes.
 3          THE COURT:  What you are saying is maybe that
 4     should be stated more clearly somewhere.
 5          MS. ANTONINI:  It is confusing because the former
 6     owner has to pick between lump sum and lifetime
 7     reimbursement program, but there is nothing that explains
 8     that what the advantage is if you are a former owner
 9     picking the lump sum payment, cash debit card or
10     participation in the lifetime reimbursement program.
11          THE COURT:  Well, I think that the benefit is that
12     the lifetime reimbursement program would only be the
13     debit card whereas with the settlement, you could get the
14     payment in the form of either a debit card or the repair
15     card.  Although, you wouldn't use a repair card.
16     Although, you could, technically, use the -- if you plan
17     to get another Hyundai vehicle or Kia vehicle,
18     200 percent.  So I think that would be the difference.
19          MR. MORGAN:  Just to clarify, your Honor, the
20     service credit would apply if you owned another Hyundai
21     vehicle.
22          THE COURT:  But, obviously, you have to have
23     another Hyundai vehicle.
24          MR. KIDNEY:  Your Honor, this is Michael Kidney.
25               To clarify, this issue has been discussed
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   between the settling plaintiffs and defense counsel, and

2   I think the issue is moot for the following reason.

3            It would not make sense for any class member

4   who wants a cash debit card to say they want the lump sum

5   program and then select the cash debit card as opposed

6   to, say, a dealer service card or a new car rebate

7   certificate.

8            But we have confirmed with plaintiff in the

9   amended settlement agreement which your Honor will see

10  this week, we expect, that if there is a class member who

11  selects lump sum program and selects the cash debit card,

12  they will be treated, for purposes of the 4 by 4 program,

13  identically to someone who has chosen the reimbursement

14  program.

15           So restated, there is no -- and that is the

16  way the parties have always viewed this settlement.  So

17  restated, your Honor, there is no point to making this

18  more complicated and suggesting to class members that if

19  they want the cash debit card, they should choose

20  one program or the other because if they are a former

21  owner and it doesn't matter what program they choose if

22  they are choosing a cash debit card.

23           THE COURT:  Okay.  Let me ask Consumer Watchdog,

24  do you understand his response?

25           MS. ANTONINI:  I understand his response.  I still

```
 1   find it confusing.  Why give them the option if there is

 2   really no difference in what they are getting?

 3        THE COURT:  Because there can be a potential

 4   difference.  In other words, if you -- under the

 5   settlement you can get a multiplier whereas if you choose

 6   a lifetime, you can't.  I agree with you, if your

 7   intention is to just get a debit card, it doesn't make

 8   any difference.  But if you want the others, it will make

 9   a difference.

10             And, so, therefore, I think it -- I think it

11   is already explained to some extent.  Somebody -- we will

12   say, oh, it doesn't make much difference to a debit card.

13   Well, somebody may want to, for example, get a debit card

14   that is good for repairs or debit card that is good for

15   purchase in which case there would be a multiple of the

16   amount.

17             So I would say that it is fine the way it is

18   at this point in time with that observation.  All right.

19        MS. ANTONINI:  The next bullet point is sort of

20   just a continuation of this same issue which is why are 4

21   by 40 former owners entitled to the additional

22   compensation if they, only if they pick the reimbursement

23   program.

24        THE COURT:  No.  Wait a second.

25        MS. ANTONINI:  Unless I am incorrect, then that is
```

```
 1    not clear in the notice.

 2          THE COURT:  Let me ask, are the former owners

 3    entitled to any 4 by 40 amounts?  Because if they are, I

 4    thought it would already have been included in the

 5    figures.

 6               Where is Mr. Kidney now?

 7          MR. KIDNEY:  Your Honor, if they are a former

 8    owner, there are no lump sum -- there is no single lump

 9    sum amount in the exhibit to the -- as reflected in the

10    exhibit to the class notice, but, rather, the lump sum

11    amount is based on their mileage.

12          THE COURT:  No.  But let me ask you, the question

13    is can a former owner, in other words, former owners who

14    go into the reimbursement program get something

15    vis-a-vis -- if they fall -- if the vehicle falls within

16    the 4 by 40.

17          MR. KIDNEY:  Yes, your Honor.

18          THE COURT:  The question is would a former owner

19    who selects the settlement lump sum get something

20    additional because they had owned at one point in time a

21    4 by 40?

22          MR. KIDNEY:  If, if and only if they select the

23    lump sum cash debit card.  In other words, a former owner

24    gets to choose between either getting a cash debit card

25    and potentially participating in the 4 by 40 program if
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    they are a qualifying former member.

 2              Or their second choice is instead of getting a

 3    cash debit card, they can get a dealer service debit card

 4    or a new car rebate certificate.  But if they go that

 5    route, they don't qualify for the 4 by 40.  So it is --

 6    in other words, it is a choice that each former owner can

 7    make.

 8         THE COURT:  Where is that in the class notice?

 9         MR. KIDNEY:  I am just paging through, your Honor.

10    So on Page 11 of the class notice, it says -- I am

11    looking under Step 4, the second full paragraph, and I

12    will wait until the court gets there.

13         THE COURT:  Oh.  I am there.

14         MR. KIDNEY:  I'm sorry, your Honor?

15         THE COURT:  I am there.

16         MR. KIDNEY:  Okay.  It says, if you were a former

17    owner of an Elantra, et cetera, and you elect to remain

18    in or register for the lifetime reimbursement program,

19    you can receive the additional compensation set forth

20    below.

21         THE COURT:  But we are talking about a person who

22    was a former owner and selects the lump sum under the

23    settlement?

24         MR. KIDNEY:  Yes.

25         THE COURT:  Do they they get anything from the 4
```

1   by 40?

2       MR. KIDNEY:  They do, your Honor.  And even though

3   that is not spelled out here in Step 4, the parties have

4   agreed that that person will nonetheless get that money.

5       THE COURT:  But it is already put into the

6   calculation?

7       MR. KIDNEY:  Well, I am not sure what your Honor

8   means by calculation, but if somebody gets --

9       THE COURT:  I mean that, in other words, the

10  former owners, I thought, have to go to some site.

11      MR. KIDNEY:  Yes.

12      THE COURT:  And it will tell them how much they

13  are getting.  So all we need to say to add some

14  additional language to this Step 4 would be for former

15  owners who elect -- well, maybe it should be -- I don't

16  know if it should be here or not, but somewhere in the

17  class notice should be something to the effect that for

18  former owners who elect a lump sum under the settlement,

19  you know, well --

20      MR. KIDNEY:  Your Honor, perhaps, let me make a

21  suggestion to the court.  Right here in this sentence, we

22  say we refer to people who remain in or register for the

23  lifetime reimbursement program.  We wanted to avoid

24  complicating things too much, but I think if we put in a

25  parenthetical statement right after that and said, or

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    select the cash debit card option under the lump sum

 2    settlement program.

 3         (Pause in proceedings.)

 4         THE COURT:  Let me ask, current owners of the

 5    vehicles that fall within the 4 by 40 who elect to get

 6    lump sum, the 4 by 40 was already incorporated into the

 7    lump sum figure?

 8         MR. KIDNEY:  That's correct.

 9         THE COURT:  So they aren't notified, for example,

10    that they are getting a lump sum figure.  It would be the

11    same in regards to former owners.  They also are getting

12    something that is part of the lump sum anyway.  So they

13    are already getting the benefit.

14         So I don't see why we would notify them at all

15    since we are not notifying the former owners that they

16    are getting this thing as well.  It is part and parcel of

17    the settlement figure amount.  So persons are going to be

18    looking to see what that figure is.

19         And they can decide based on that figure

20    whether or not they want that figure or whether or not

21    they want to have something else.  But it will already be

22    included therein.  So I don't see the necessity of

23    informing them.

24         MS. ANTONINI:  The former owners' lump sum cash

25    payment is not like one set number that is in Schedule A.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    It is the lifetime reimbursement program calculation
2    number.  So it is not actually built in.
3          THE COURT:  No.  I thought it would be different.
4    Let me ask Mr. Kidney, do you understand what we are
5    talking about now?
6          MR. KIDNEY:  Yes, your Honor.
7          THE COURT:  Would the number be different or not?
8          MR. KIDNEY:  Well, I would say it is slightly
9    different from the current owner in that if you are
10   envisioning someone on the settlement website, they are
11   going to type in their mileage, and then they will be
12   given various options and, then, if they select that they
13   want a cash debit card, then, there will be a second pop
14   up that will come up which will give them the choice for
15   this additional compensation.
16               And on the web site, they can play around
17   and see what they are entitled to.  So it won't be in a
18   single number.  There will be two prompts, but it will be
19   clear on the settlement website that anyone who clicks on
20   a cash debit card will be entitled to additional
21   compensation under the 4 by 40 program assuming they
22   qualify.
23         THE COURT:  But that is sent automatically.  They
24   don't have to say they are applying for it.  It would
25   just be that which pops up.
```

```
 1          MR. KIDNEY:  Absolutely correct, your Honor.

 2          And, then, your Honor, also, they will be

 3    given three choices for that additional compensation.

 4    They could choose cash, dealer service or new car rebate

 5    certificate for the additional compensation under the 4

 6    by 40.

 7          THE COURT:  All right.  In that case, then, I

 8    don't think -- they are in a sense treated the same as

 9    current owners who elect the cash payment.

10          All right.  Anything else on that one?

11          MS. ANTONINI:  No, your Honor.  I think the notice

12    materials should be really clear as to what we just

13    discussed because I just learned some new information

14    about how the settlement works.

15          THE COURT:  It would probably take two pages to

16    tell them something that they are going to automatically

17    get if they select the program.  Although, frankly,

18    maybe --

19          (Pause in proceedings.)

20          THE COURT:  Well, you know, on Page 8, under

21    Question 9 under the first paragraph for lump sum

22    payment, it does say that former owners and lessees are

23    eligible to receive a lump sum payment with the same cash

24    value that they would receive under lifetime

25    reimbursement program.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1            MR. MORGAN:  Your Honor, from our perspective, and
 2    this is in the comments that follow, the next few all
 3    relate to providing additional information that appears
 4    in the long form notice which will have a link on the
 5    settlement website, and what they are requesting is
 6    essentially to start repeating this data verbatim
 7    throughout the settlement website.
 8            THE COURT:  I would agree.  It is overkill.
 9                 However, I did have some problems with the
10    website.  Let me ask, is everything supposedly working at
11    this point in time?
12            MR. MORGAN:  I will let Mr. Kidney address that.
13                 Obviously, I think we informed the court by
14    e-mail to your clerk that certain data, for instance, the
15    FAQ's, we just had a placeholder there until the notice
16    documents and other information was finalized.  So, no,
17    there is not a live FAQ right now, for instance.
18            THE COURT:  All right.
19            MR. KIDNEY:  Your Honor, this is Michael Kidney.
20                 Yes.  Aside from what Mr. Morgan said, we --
21    it is our understanding the website is working.
22    Obviously, there are some things that we have told the
23    court in recent filings that will change such as taking
24    out that button that says, no thanks, and we obviously
25    need to make those changes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Okay.  This is what I want.  When you
 2    get the thing, I am going to be approving the form pretty
 3    much as we discussed it.  You don't need to submit it to
 4    me again.  But when you do have the website up and
 5    running, I want the -- give me notice and access, and,
 6    actually, do that before you open it to the public
 7    because I want to give it one more ride through because I
 8    was having problems with it.
 9          Also, let me just ask, the website is also
10    supposed to have language or areas, for example, on the
11    status of the class action.  For example, if there is a
12    change in the hearing date or something of that sort,
13    where is that stuff going to be located?
14          MR. MORGAN:  I assume there will just be a link
15    such as -- some of the screen shots if your Honor has
16    them on the left, you will see home page, long form,
17    class notice, claim form.  I assume we would add a link
18    there for status updates.
19          THE COURT:  Well, when you get the thing up and
20    running, you will point those out to me.
21          MR. MORGAN:  We can put a blank in for now.
22          THE COURT:  Let me ask Consumer Watchdog, that is
23    all I have from you; is that correct?
24          MR. KIDNEY:  Your Honor, Michael Kidney again.
25          Can the court give us an idea of the problem
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  October 8, 2014

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

**<u>EXHIBIT O</u>**

1           UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3               HONORABLE GEORGE WU

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                    - - -

6
  In Re:                          )
7 Hyundai and Kia Fuel Economy    )
  Litigation                      )
8                                 )  NO. MDL 13-2424 GW
                                  )
9                                 )
  _____)
10

11

12

13     REPORTER'S TRANSCRIPT OF PROCEEDINGS

14          LOS ANGELES, CALIFORNIA

15       WEDNESDAY, SEPTEMBER 3, 2014

16

17

18     _____

19         KATIE E. THIBODEAUX, CSR 9858
           U.S. Official Court Reporter
20         312 North Spring Street, #436
           Los Angeles, California 90012
21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    it was most prudent to hear from the court about the

2    court's views.

3              Second, many of these comments, again, were

4    largely stylistic, and there were some to which we had

5    substantive objections.  We just didn't want Consumer

6    Watchdog to come in later and say, well, you had this

7    conference and you didn't even consider our suggested

8    revisions.  They were considered, but for the reasons I

9    just articulated.

10         THE COURT:  Well, they are absolutely free, once

11   we get a closer final version, to give any additional

12   comments.

13         MR. MORGAN:  And that is precisely why we

14   deferred.

15         THE COURT:  So that is not going to be a problem.

16         MR. GIBBS:  And for the record, my office has had

17   discussions with Consumer Watchdog with respect to that

18   letter, and in the context of the discussions I have had

19   with the court today, I folded in some of their concerns.

20         THE COURT:  Okay.  Great.

21              Anything else?  No?  All right.

22         MR. CAREY:  Thank you, your Honor.

23         THE COURT:  Have a very nice day.

24         (Proceedings concluded.)

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                        CERTIFICATE

 2

 3

 4    I hereby certify that pursuant to Section 753, Title 28,

 5    United States Code, the foregoing is a true and correct

 6    transcript of the stenographically reported proceedings held

 7    in the above-entitled matter and that the transcript page

 8    format is in conformance with the regulations of the

 9    Judicial Conference of the United States.

10    Date:  September 15, 2014

11

12     /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA